1

2

3

4

5

BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (Ariz. Bar No. 012548)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone:  (702) 382-7300
Facsimile:  (702) 382-2755
rpocker@bsfllp.com

6

7

8

9

10

11

WILLIAM A. ISAACSON *(pro hac vice to be filed)*
KAREN L. DUNN *(pro hac vice to be filed)*
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

12

13

14

15

16

17

STEVEN C. HOLTZMAN *(pro hac vice to be filed)*
JOHN F. COVE, JR. *(pro hac vice to be filed)*
KIERAN P. RINGGENBERG *(pro hac vice to be filed)*
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
jcove@bsfllp.com
kringgenberg@bsfllp.com

18

19

20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

21

22

23

24

25

26

27

28

| | |
|---|---|
| SolarCity Corporation,<br><br>                                        Plaintiff,<br><br>                    vs.<br><br>Salt River Project Agricultural<br>Improvement and Power District,<br><br>                                        Defendant. | Civil No.<br><br>**COMPLAINT FOR ANTITRUST VIOLATIONS AND BUSINESS TORTS**<br><br>DEMAND FOR JURY TRIAL |

SolarCity Corporation ("SolarCity"), through its undersigned attorneys at Boies, Schiller & Flexner LLP, alleges as follows, based on knowledge as to its own actions and status, and upon information and belief as to all other facts.

**INTRODUCTION**

1.    This case arises from Defendant Salt River Project Agricultural Improvement and Power District ("SRP")'s unlawful efforts to preserve its existing monopoly over the retail provision of electric power for consumers and businesses. Through this complaint, SolarCity seeks relief under the federal and state antitrust laws, as well as the common law, from SRP's anticompetitive and tortious conduct designed to eliminate solar competition, including competition from SolarCity.

2.    SRP is a monopolist.  In the territory it serves, it has monopoly power over the electrical grid, and it has monopoly power over the delivery and sale of electricity to retail customers.

3.    SolarCity sells and leases rooftop solar energy systems to residential and business customers.[1]  By buying or leasing solar energy systems, SolarCity customers are able to generate their own electricity on their own property.  That reduces the amount of electricity that customers need to buy from SRP, allows customers to save money, and conserves natural resources.

4.    SRP has a simple strategy to destroy the competitive threat from SolarCity and other competitors:  under SRP's newly introduced pricing plans (called "Standard Electric Price Plans" ["SEPPs"]), customers who choose to obtain some of their own power from solar energy systems must pay a substantial penalty to SRP.  Because solar customers are unable to completely disconnect from SRP's grid—they still need power in the evening hours and at other times when their energy demands exceed what their solar energy systems produce—they cannot escape SRP's penalty.

---

[1] These rooftop solar energy systems are sometimes referred to as "distributed solar," as distinguished from centralized, utility-scale solar power plants.

5.      The penalty is so significant that it eliminates the economic value to customers of generating their own power.  The new plan penalizes what SRP describes as the "typical solar customer" by about ***$600 per year*** for installing solar as compared to SRP's longstanding prior plans, thereby increasing a new distributed solar customer's SRP bill by approximately ***65%*** compared to the previous plan.  At the same time, SRP has adopted an average 3.9% increase for residential customers who keep purchasing all their power from SRP.  Flexing its monopoly power, SRP has not adopted a price *decrease* for any customer.

6.      SRP's own internal analyses establish that, with the new plan, a residential customer who wants to install distributed solar would simultaneously have to cut his or her peak electricity usage and demand by ***60%*** just to keep payments to SRP comparable to what those payments would have been under the previous SRP rate plan that applied to distributed solar customers.

7.      Customers recognize that SRP's new pricing plan leaves them with no choice:  after the effective date of SRP's new plan, applications for distributed solar energy systems in SRP territory fell by ***96%***.  Numerous potential solar customers have submitted complaints to SRP that corroborate that the new plan completely eliminates their ability and incentive to install solar systems.

8.      SRP's penalty on solar customers is not justified by the costs SRP incurs to serve customers who use distributed solar.  To the contrary, solar energy systems confer substantial benefits to the grid and to SRP itself that offset or reduce the cost of service for customers with solar energy systems.  For years, SRP has explicitly recognized these benefits by spending tens of millions of dollars in incentives to encourage its customers to buy and lease solar energy systems for their homes and businesses.

9.      In the space of just over two years, however, SRP has gone from providing monetary *incentives* averaging approximately $4,000 per customer to promote the installation of distributed solar systems to imposing monetary *penalties* on such

installations, to the tune of $12,000 over the usual 20-year amortization period of installed systems.  There is no reasonable basis for such an unprecedented and dramatic reversal.

10.     The SEPPs place no similar penalties on any of the numerous other categories of SRP customers who have similar characteristics with respect to their use of the SRP grid, including customers who make relatively low or reduced electricity purchases from SRP for other reasons, such as those with high energy efficiency or seasonal residents, as well as customers who purchase solar power from the solar power plants with which SRP has contracts.  The penalties correspond to only one thing: whether customers provide any of their own power instead of buying all of their power—including solar-generated power—from SRP.

11.     Nor do the penalties imposed by the SEPPs correspond to any unique characteristics of distributed solar systems.  Indeed, the penalties apply to all methods of self-generation—in other words, obtaining any electricity from sources other than SRP—regardless of whether they share the same cost and demand characteristics.  The SEPPs are explicit that their penalties will likewise apply to "other technologies such as battery storage or fuel cells [which] may be viable in the future"—completely without regard to any actual impact of such technologies on SRP's cost recovery.

12.     SRP's new self-generation price plans manifestly exclude competition and unlawfully maintain SRP's monopoly over the retail sale of electricity in SRP territory. SRP unlawfully uses its position as the only available supplier of certain power (for example, the portion of electricity usage at times when the sun does not shine) to eliminate the ability of distributed-solar providers to compete for the substantial portion of SRP customers' retail power requirements that can be cost-effectively served by distributed solar.  Through the SEPPs, SRP effectively requires customers who must buy *any* of their electricity from SRP (which is all or virtually all customers) to do so on terms that effectively require those customers to buy *all* of their power from SRP.  This prevents customers from taking advantage of distributed solar when it is more efficient, lower cost, and far better for the environment.

13.     SRP's penalty on solar customers is harmful to consumers, and harmful to competition.  The SEPPs constitute an unlawful exclusive dealing arrangement that forecloses effectively *all* competition in the retail sale of electricity in SRP's service area. SRP's exclusion of distributed solar as a competitive alternative leaves nearly a million consumers with no choice but to buy all their electricity from SRP.  Competition is eliminated, consumers are hurt, and the environment is harmed.

14.     SolarCity brings this action to stop SRP's anticompetitive conduct and return competition and customer choice to the retail market.

**PARTIES**

15.     SolarCity is a publicly traded company, incorporated in Delaware with its principal place of business in San Mateo, California.

16.     SolarCity is America's largest installer of distributed solar energy systems. It engages in the design, manufacturing, installation, and sale or lease of solar energy systems to residential and commercial customers, who then use the systems to generate electricity and thereby displace a portion of their electricity purchases from an electric utility.

17.     SolarCity has over 7,000 active customers in SRP's service area.  In the six months prior to SRP's December 2014 announcement, SolarCity averaged almost 400 installations per month in SRP's service area.

18.     SRP is a power-and-water utility.  It is one of the nation's largest power utilities, and has over 900,000 customers.

19.     Arizona's utility regulator, the Arizona Corporation Commission, has no authority over SRP.  Instead, SRP management and its Board of Directors are free to act—including as to the misconduct alleged herein—without state regulatory oversight. Similarly, federal regulatory authority as to SRP's local facilities and retail operations is strictly limited, and does not govern the setting of retail rates.

20.     SRP's latest Annual Report describes "the Company" as "an agricultural improvement district organized in 1937 under the laws of the State of Arizona."

SRP has its origins in the Salt River Valley Water Users' Association (the "Association"), a private corporation formed by Salt River Valley landowners to enter into contracts with the federal government for the irrigation of their land.

21.     SRP was created for the purpose of refinancing the Association's debts by issuing interest-free bonds, thereby saving the private landowners very large sums of money each year.  The Association's responsibilities were divided between SRP and the Association, with SRP taking over the power and water storage work, and the Association managing water delivery as an agent of SRP.

22.     SRP and the Association continue to operate as alter egos, with SRP using its profits from its electric operations to subsidize the Association's water.  SRP admits that its own accounting reveals over $100 million in profit from electricity operations over the last year.  SRP shifts much of that surplus to subsidize the Association's water customers.

23.     Today, SRP continues to participate in private markets and serves private economic interests.  It engages in the proprietary business of supplying electric power at retail to the ultimate consumer.

24.     Only real property owners in SRP's District can serve on SRP's Board, and only real property owners in SRP's District are allowed to vote in SRP elections.  Their votes are counted in proportion to their land holdings.

25.     In addition, the right to vote, even for real property owners, is further limited to specific geographic areas within the District.  For the most part, these additional restrictions limit voting rights to the lands whose water needs were originally served by the Association in 1903.  Consequently, about one-third of SRP's electricity customers have no right to vote in SRP elections.

26.     This structure encourages SRP to serve the private interests of landowners, particularly large landowners who value cheap water, at the expense of a broad base of electric customers.

27.     SRP behaves consistently with these economic incentives.  SRP admits that its electric operations run profitably (even before the SEPPs) and subsidize its money-losing water operations by millions of dollars per year.  SRP has suggested the subsidy was $52 million in 2014, but SRP's publicly disclosed financials show that the figure was much more likely over $100 million.  The Arizona Supreme Court has characterized SRP's behavior as taking profits from electric service and using them to irrigate "private lands for personal profit."

28.     As another illustration of SRP's private-market participation and incentives, SRP has entered into at least three agreements to purchase all output from three large, privately owned solar farms.  One agreement obligates SRP to purchase all output for 20 years; another obligates SRP to purchase all output for 21 years; and another obligates SRP to purchase all output for 25 years.

29.     Although SRP has been described as a subdivision of the state, it lacks traditional governmental powers.  It cannot impose ad valorem property taxes or sales taxes, enact any laws governing the conduct of citizens, or administer such normal functions of government as the maintenance of streets, the operation of schools, or the provision of sanitation, health, or welfare services.  Its employees are allowed to strike under their labor contract, it is not immune from Arizona banking laws, it is not exempt from a city's power of eminent domain, and it is not immune from tort liability.

**JURISDICTION AND VENUE**

30.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. § 22, because this action seeks damages and injunctive relief to remedy, prevent, and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, within the meaning of 15 U.S.C. §§ 15, 26.

31.     This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.  Furthermore, this Court has diversity jurisdiction over the state claims

under 28 U.S.C. § 1332 because there is complete diversity between the parties and the matter in controversy exceeds $75,000 before interest and costs.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. §§ 22 and 26, because SRP is a resident of this District and SRP's conduct alleged herein took place, and continues to take place, in this District.

33.     In addition to the detrimental effects felt in Arizona, SRP's conduct substantially affects interstate commerce in that it harms competition from SolarCity and other out-of-state companies, as well as new entry from out-of-state competitors.  For example, many of the distributed-solar companies that do or have recently done business in SRP's service area (SolarCity, Sunrun, SunPower, Sungevity, and Verengo) are based in California.

34.     SRP's conduct also substantially affects interstate commerce in that SRP relies on interstate commerce by purchasing, delivering and selling electricity on an interstate basis.

**RELEVANT MARKETS AND MARKET POWER**

35.     The relevant geographic market is SRP's service area.

36.     At a minimum, the relevant product market is the retail provision of electric power for consumers and businesses (hereafter the "retail market").  In this market, power may be provided either by outright sale of power, or by the lease or sale of distributed systems through which a customer generates power on his or her own property.

37.     SolarCity directly competes with SRP in the retail market because SolarCity offers equipment and services that provide power—specifically solar power—to customers.

38.     SRP has monopoly power in the retail market within the geographic market, currently providing more than 95% of the electricity used by retail customers in SRP territory.

39.     Another indicator of SRP's monopoly power is SRP's long-standing ability to extract supra-competitive profits from its electric operations and use them to fund its money-losing water operations.

40.     In addition, there are high barriers to entry in the retail market, including as a virtue of the need for new providers to interconnect with the SRP grid.

41.     SRP provides retail electric power through a variety of different plans and sources.  For example, for residential customers, SRP provides a standard plan (E-23) under which customers purchase power on a generalized basis for specified per-kilowatt-hour ("kWh") rates and a monthly service charge; a "time-of-use" plan (E-26) under which the per-kWh rates vary by time of day, in addition to the same monthly service charge; a Community Solar plan under which customers purchase power generated by solar power plants at different per-kWh rates and the same monthly service charge; and a variety of other plans, including separate plans for commercial and governmental customers.  SRP's Community Solar plan is a particularly close substitute for distributed solar power.

42.     Other relevant markets exist, either as submarkets within the retail market or as complementary or adjacent markets of their own, such as the market for access to distribution and transmission of power through the electric grid ("grid access market").

43.     There are high barriers to entry in the grid access market because duplicating the distribution and transmission systems that SRP controls would require massive investment, permitting, construction, and many other hurdles.

44.     Traditionally, SRP has sold grid access together with the electricity generated by power plants, which were both included in a largely single per-unit (kWh) price based on electricity usage.

45.     More recently, and particularly with the SEPPs as applied to self-generating customers, SRP has moved to unbundle grid access from power sales.  The SRP-created graphic below shows how grid access relates to retail customers:



46.     SRP has monopoly power over grid access within the geographic market.

47.     SRP's monopoly power is not the result of any state policy to displace competition in favor of an SRP monopoly or government regulation or supervision of SRP's conduct.  Indeed, Arizona state law specifically supports competition in electric service through an "Electric Power Competition Act" under which it is, in theory, possible for other large-scale utilities in Arizona to sell power to SRP customers through SRP's grid access facilities.  However, SRP's 2014 Audited Financials explains this theoretical competition has not materialized:  "there is no active retail competition within the District's service territory" for that type of service.

48.     Whether SRP customers self-generate power (including through distributed solar provided by SolarCity) or not, all or virtually all of them still need to purchase both retail electric power and grid access from SRP to have access power at times that alternative sources of power (such as distributed solar) cannot meet the customers' needs. SRP has monopoly power over these incontestable portions of consumer demand, even while SolarCity and other distributed solar companies try to provide competition for the contestable portion of demand.

**GENERAL ALLEGATIONS**

*Industry Background*

49.     Distributed solar systems generate electricity when the sun shines on them. Depending on the solar panels' orientation, generation continues for hours and often peaks near mid-day.  Distributed solar in Arizona offers peak generation during many of the highest-usage hours and provides clean power for much of the peak-demand period, which reduces demand on the electric grid and mitigates the need for incremental generating and transmission capacity.

50.     Distributed solar benefits utilities, including SRP, in many ways, including by, among other things, reducing electric demand, particularly during the electric system's peak hours, when electricity from other sources is available to the utility only at high prices; adding electric capacity, particularly during the electric system's peak hours, when electricity from other sources is available to the utility only at high prices; reducing transmission costs by reducing congestion or allowing utilities to reduce or defer investment in enhancing or adding transmission facilities; reducing the utility's long-term capital needs for investment in power generation capacity; and helping the utility meet environmental or "green" goals or requirements.

*SRP's Prior Course of Conduct*

51.     The benefit of solar generation to SRP is demonstrated by SRP's own decision to make substantial investments in solar power and offer incentives to customers to adopt it.  For years, SRP has provided customers incentives—totaling approximately $150 million—to encourage the installation of distributed solar systems.  Moreover, SRP has committed to buy the output from at least three substantial solar facilities and owns at least three facilities outright.  Those investments were rational and justified because electricity generated by solar power in or near SRP's service area benefits SRP by meeting demand during peak periods (such as during sunny summer days), reducing costs of generation, providing renewable energy credits ("RECs"), and otherwise.

52.     SRP has also recognized the benefits of solar in other ways. For example, SRP has for years offered residential and small-to-medium-sized commercial and government customers "net metering," a system that helps encourage distributed solar in which the utility company offers the customer a bill credit for excess solar production when a customer's distributed solar system produces more than the customer uses.

53.     Under net metering, the excess electricity from a distributed generation customer's solar system is transferred into the grid and purchased at retail rates by the distributed solar customer's neighbors or others. The distributed solar customer is then billed for its "net" electricity use (*i.e.*, what the customer took from the SRP network minus what the customer added to the network).

54.     SRP voluntarily adopted net metering, and has engaged in that program for years on terms that benefitted SRP and its customers. Among other things, net metering has reduced SRP's need to purchase costly power from other sources and to make investments in power generation.

55.     SRP publicly touted the benefits of distributed solar and encouraged its customers to use it. As SRP customers recently commented to SRP:

> "You guys convinced me to go solar back when you were subsidizing the installation. You also touted solar because it would reduce demand and add to your generating capacity. I made a 20 year commitment and a major roof top change based on your recommendations!"

> "When we decided to go with solar, I talked with different SRP people, and was told that you were all for us 'helping SRP to produce electricity', as it would help you to keep from having to pay for all the new equipment to provide more electricity. Now we hear that you want to penalize us for the decision that you helped us to make."

> "As a customer of yours for some 18 years now, we bought into your advertising that by going solar you not only help yourselves, but you help your neighbors, the environment, and SRP at the same time. We were told that by going solar, we'd help reduce the drain on the system during peak power usage. We'd help reduce carbon emissions. We'd help SRP delay the spending of resources to expand the grid to deliver more power. You even put together incentives to drive us as customers to solar."

*SRP Begins to Change Course to Eliminate Competition*

56.     In or around 2011, as distributed solar increased in popularity and efficiency, SRP began to recognize that distributed solar could become a competitive threat in the longer term.

57.     In part as a response, SRP developed its "Community Solar" program, where customers purchase solar-generated electricity.  SRP pitches Community Solar as a direct competitor to distributed solar.

58.     SRP has strong financial incentives to sign customers to Community Solar. Because SRP has obligated itself to buy all output from at least three large-scale and privately owned solar farms, SRP has a strong financial interest in ensuring demand for that electricity.

59.     Unaccustomed to competition and perhaps believing that solar-generated power had different consumer demand characteristics than traditionally-generated power, SRP initially overpriced Community Solar for consumers, making it uncompetitive with distributed solar, particularly as distributed solar prices rapidly declined.  By December 2013, SRP reported that one of its solar farms was selling only 60% of its output.

60.     In December 2013, SRP had to lower Community Solar's pricing to meet competition from SolarCity and other distributed solar providers.

61.     This kind of pricing to demand is foreign to a monopolist.  SRP manager John Tucker regretfully explained the reason for the Community Solar rate drop:  "It's come to the point where solar customers expect to realize some sort of savings."  In other words, customers who invested in distributed solar that reduced their usage and provided surplus power to the grid expected to save money on their electric bill, even while SRP had reduced its incentives for installing distributed solar to zero.

62.     Despite distributed solar's benefits to SRP in the short- and medium-term, SRP has come to recognize that, as distributed solar continues to grow, distributed solar will force SRP to adapt to vigorous competition in the future—including on metrics like price, service, innovation, and the ability to efficiently generate electricity.

63.     As SRP's own consultant, hired to justify its SEPPs, summed it up:  SRP faces "the present reality of industry transformation" due to distributed generation and energy efficiency.

**SRP's Anticompetitive And Wrongful Conduct**

64.     In response to this growing threat, SRP committed to using its monopoly power to eliminate rooftop solar competition.

65.     In December 2014, SRP announced its intent to adopt the SEPPs to apply new service terms and rates to its customers.  SRP's Board of Directors approved the SEPPs, with minor changes, on February 26, 2015.

66.     For customers who purchase all their electric requirements from SRP, the SEPPs follow SRP's traditional rate structure, with charges largely for per-kWh electricity usage and secondarily in the form of a fixed monthly service charge, which SRP raised from $17 to $20.  The overall effect of the new terms and rates, according to SRP, will be an average 3.9% increase.

67.     For the first time, however, the SEPPs also include rate plans that uniquely apply to self-generating residential customers who purchase both electricity from SRP when their systems are not generating power and grid access for transmission of that electricity and for the electricity generated by their systems and made available to other users.  These self-generating residential customers are overwhelmingly or exclusively distributed solar customers.

68.     The SEPPs, and particularly the new rate plans that apply to self-generating customers only, have the purpose and effect of eliminating future distributed solar installations.  Overall, in comparison to the 3.9% increase across the full range of SRP's over 900,000 customers, the new rate plans dramatically increase (retroactively to December 8, 2014) the costs of switching to distributed solar.  For example, using SRP data for what SRP describes as a "typical solar customer," the new residential plan will result in an increase of approximately **65%**—approximately **$600 per year**, or **$12,000 over twenty years**—for a new distributed solar customer compared to what that customer

would have paid under the previous rate structure that applied to self-generating customers.  Existing distributed solar users—already essentially lost to SRP for significant portions of their electricity purchases—are "grandfathered" into the old plans.

69.     The SEPPs' huge fees for residential distributed solar customers, which have no corresponding changes for either non-solar or Community Solar customers, include:

a.      A "distribution charge" of either $12.44 or $37.88 per month, depending on whether the customer has service below or above 200 amps.  By contrast, SRP charges non-solar and Community Solar customers a flat $4.20 per month "distribution charge."  This distribution charge is part of a discriminatory monthly service charge, totaling a flat $20 per month for all customers except self-generating customers, but $32.44 to $57.88 per month for self-generating customers.

b.      "Demand charges" for each kilowatt of usage in the customer's most intensive 30-minute peak period each month, regardless of who generates the power used during that period, such that for the "typical solar customer" profile provided by SRP, the discriminatory demand charge will range from about $30 per month in the winter to around $125 in the summer peak months.  Customers without distributed solar face no demand charge at all.

c.      Substantially reduced bill credits for the power that distributed solar customers send *back* into SRP's grid for SRP to re-sell to other customers.

70.     The only practicable way to escape the charges is to forgo installing distributed solar systems or to radically reduce peak usage, both overall and for every single 30-minute period of peak period usage every month.  A consultant hired by SRP admitted that a residential customer who wants to install distributed solar would simultaneously have to cut peak electricity usage and demand by *60%* just to keep paying SRP "about the same" as those payments would have been under the previous plan.

71.     Under the SEPPs, for a residential self-generating solar customer to break even after installing a distributed solar system, SolarCity would have to charge far less per

kWh on a retail basis than the 5.3 cents per kWh wholesale price SRP announced it will pay its largest Community Solar generator.

72.     Commercial customers will pay about 2% more annually (on top of other pricing increases) as a penalty, as well as lose net metering altogether, if they use distributed solar under typical circumstances.  In view of the average commercial customer's high energy consumption, that increase, including the 2% penalty, translates into more than *$24,000* each year.  As with residential customers, the SEPPs' new penalties render it impossible for commercial, municipal, and educational customers to obtain any viable return on a new distributed solar investment.

73.     SRP's anticompetitive intent is clearly revealed by the fact there are no differences in usage patterns between new distributed solar customers subject to the discriminatory charges and the grandfathered existing distributed solar customers or the Community Solar customers.  The only distinction is that the new distributed solar customers represent incremental losses of business to competitors, while the Community Solar customers and customers with existing solar installations do not.

74.     Given the sheer magnitude of the increases for new distributed solar customers, it is clear that the purpose of the SEPPs is not to recoup reasonable grid-related costs from distributed solar customers, but to prevent competition from SolarCity (and other providers of distributed solar) by punishing customers who deal with such competitors with higher prices on the remainder of any power that those customers continue to purchase from SRP.

75.     SRP knows that very few, if any, customers will make the economically irrational decision to install distributed solar systems if the result will be to pay a *higher* total amount for power.  SRP has designed its price plan to make it irrational for any customer to obtain solar power from a competitor because SRP knows that every customer depends on it for some part of its power demand.

76.     SRP does not try to hide its anticompetitive intent.  In its efforts to justify the SEPPs, SRP asserted that those who do not like the new, high rates on distributed solar users should "take part in [SRP's] Community Solar program."

77.     By making the new rate structure retroactive to December 8, 2014, SRP has already seen the anticompetitive result of its new policies:  SRP received about 500 distributed-solar applications per month from May through October 2014.  Between the time SRP published the SEPPs on December 12, 2014 and January 15, 2015, SRP received just 20 distributed-solar applications.

78.     The SEPPs are exclusionary because they punish customers for dealing with SRP's competitors by raising prices those customers must pay for a product (portions of electricity not addressable through self-generation) and a service (access to the electrical grid) over which SRP holds an unassailable monopoly position.  Among other things, the SEPPs are exclusive dealing contracts because they require customers who wish to obtain essential power and grid access from SRP to agree to terms that preclude rational customers from dealing with distributed solar competitors like SolarCity.  Alternatively, the SEPPs monopolize, attempt to monopolize, and unreasonably restrain trade in the retail market by tying, bundling, and leveraging SRP's monopoly power in the market for grid access to foreclose competition in the retail market.

79.     In sum, SRP has reversed a long-time course of conduct that had generated customer goodwill, benefitted SRP in the short- and medium-term, and created a unique combination of services that consumers enjoy (rooftop solar and electric grid interconnection), for the sake of excluding longer-term competition by preventing customers in its service area from installing distributed solar from competitors like SolarCity.

80.     SRP's conduct with respect to the SEPPs was also designed to interfere with and impair the obligations of SolarCity's contracts and prospective contracts.

81.     For example, SolarCity spent two years working with Maricopa Community Colleges to implement multiple solar installations totaling over 12 megawatts in

capacity.  According to an SRP employee, it sent "chills down the spine" of SRP management when it became clear that Maricopa and SolarCity were nearing a successful deal.  In releasing the SEPPs on December 12, 2014, SRP established that the deadline for grandfathered applications would be retroactive to December 8 (even though the pricing plan would not be voted on until February 2015), knowing that doing so would eliminate Maricopa's and other commercial, municipal and educational customers' ability to qualify for the then-existing rate plan.  Accordingly, even though Maricopa unanimously voted to authorize an agreement with SolarCity on December 9, 2014, even before the release of the proposed SEPPs, it was already too late.

***Harm And Damage***

82.     SolarCity has lost substantial past, present, and future revenues and profit as a result of SRP's anticompetitive conduct.  These damages are the result of harm to competition, not just to a competitor.

83.     SRP's rates have made rooftop solar profoundly uneconomical.  Indeed, as noted above, there have been nearly no new distributed solar applications in SRP territory since December 12, 2014.  SolarCity has identified at least 500 customers who have not moved forward with SolarCity as a result of SRP's SEPPs in just the last two months, and SolarCity cannot justify continuing to offer leases or sales in SRP territory.  No rooftop solar company will be able to compete effectively with SRP under SRP's punitive SEPPs.  This is illustrated by the near-total elimination of new distributed solar applications since December 12, 2014.  It is also illustrated by the comments of numerous SRP customers, including for example:

> "By adding the proposed fees, it is no longer feasible for someone like me to lease a system from SolarCity and there is no way I can buy one outright so you are proposing to cut an entire class of people out of being able to have solar on their property."

> "I was considering installing a very small solar system to help the environment a little bit by increasing the portion of my energy consumption that is clean, and lower my costs a bit.  By my calculations, this ridiculous anti-environmental penalty would make me lose money each month rather than saving money to re-coup the costs."

"Seeing the new projected additional cost for homeowners with roof top solar systems just made my decision to NOT go this route, which I had been considering."

"I've been so excited to get a solar system on my home I just moved into, but with your new rate plan I have no incentive to go solar now."

"You are taking the opportunity to eliminate the solar industry in AZ. With this move you have penalized anyone thinking about solar and using it for future use. Monopolies are not the norm as people look for alternative energy….What would SRP do if there was another competitor on this grid? Competition breeds better pricing for all."

### SRP's Conduct Has No Legitimate Justification

84.    SRP has asserted false or pretextual reasons for its conduct, most of which are versions of the argument that customers with distributed solar are "subsidized" by customers without distributed solar because the payments distributed solar customers make to SRP do not allow SRP to recover a sufficient portion of SRP's fixed costs of offering service to those customers.

85.    The fundamental premises of SRP's assertion are unsupportable. Rather than saddling other customers with additional costs, distributed solar benefits SRP and all its customers in numerous ways, including by reducing SRP's costs of generating power, distribution, and transmission. SRP's own history of supporting, purchasing, and subsidizing the purchase of solar energy shows that it recognizes the benefits to SRP and its customers of solar energy in general and distributed solar in particular.

86.    SRP's justification also runs directly counter to the basic premise of the antitrust laws. As the United States Supreme Court reminded another utility that protested its antitrust liability, the law "assumes that an enterprise will protect itself against a loss by operating with superior service, lower costs, and improved efficiency"—not by using its market power to exclude competition by punishing customers who deal with competitors.

87.    SRP erroneously asserts a supposed right to recover costs it chose to incur. Pro-competitive responses to reduced demand include reducing unnecessary "fixed costs" by innovating or operating more efficiently.

88.     Nor is SRP undoing any "subsidy" to distributed solar customers.  Instead, it charges distributed solar customers more for less service, or more for the same service, than other customers with the exact same usage characteristics.  And it is charging distributed solar customers far more than the amount of fixed costs that are attributable to such customers, while continuing to charge (subject to a significantly smaller $3 increase) all other customers a small fraction of the fixed costs attributable to their use of the SRP grid.  As one SRP customer explained to SRP:

> "Non-generating customers SHOULD pay more of the costs of SRP's maintenance than solar-generating customers do since they use more energy than solar customers do, since they are not helping to reduce demand during peak summer season, when SRP can use the help and benefits from less reliance on the grid, and since they are contributing to greater environmental and health costs for our population through a heavier reliance on fossil fuels.  This proposal makes it clear that SRP's goal is to discourage customers from creating their own electricity and to become the sole provider of solar electricity by making home solar economically unfeasible through this plan, but it is unfair to penalize those of us who have already taken on 20-year leases to do the right thing. . . .
>
> SRP says on its website that it supports solar power.  What it obviously means is that it supports it *only* if it supplies it.  Solar generation customers have taken on a financial burden for the life of their leases—many as much as 20 years—to do the right thing, take pressure off the grid during peak times, and create clean power to reduce pollution and other environmental costs.  SRP could raise rates on all customers equally, but it is proposing instead to doubly burden those who have attempted to help safeguard our future by increasing their rates far greater than they have for traditional energy customers and ignoring the fact that many of those solar-generating customers have already taken on additional financial burdens to reduce stress on the electric grid."

89.     The SEPPs' proposed Community Solar pricing also undermines SRP's arguments.  The SEPPs' Community Solar price structure offers some customers Community Solar through a bill credit scheme that SRP says results in selling Community Solar power to those customers "at cost" to SRP.  However, this "at cost" system keeps customers on the standard time-of-use pricing plan with no discriminatory service and demand charges.  Thus, SRP has no problem with its existing, non-discriminatory rate

structure so long as customers pay SRP for solar power.  This fact was not lost on SRP's customers, one of whom noted to SRP:

> "[SRP's SEPP] loudly sings the praises of 'new' community-scale solar which would seem to offer the same panacea as was Roof Top Solar just a few short years ago.  To read this section, one would be led to believe that Community Solar is completely different from Roof Top Solar.  The truth is that, from the point of view of the Grid, they are exactly alike.  All Solar generation suffers from intermittency; however that intermittency is strongly mitigated by spatial distribution."

90.    In fact, there is zero or very little "subsidy" after all distributed solar's benefits to SRP are appropriately considered.  As another SRP customer put it:

> "A few years ago, I sat in the PERA Club in a most upbeat presentation from your staff on the great benefits of residential installations and how much SRP was behind their customers who were thinking of 'going solar'.  What happened between then and now?  How did incentives turn into disincentives in such a short period of time?
>
> Please don't quote the standard grid investment collapse arguments to explain this.  These are at best inaccurate and at worst completely disingenuous.  I pay for the generation, transmission, and distribution of the power that I get from SRP and any excess that I generate at any particular moment goes straight to my neighbors who pay YOU for it.  Since their meters don't know where the power is coming from, they get charged for generation, transmission, and distribution for energy that didn't come from the grid.  Is that fair?  I should also note that in addition to taking the solar bait, I have replaced all my incandescent bulbs with low energy alternatives (also encouraged by SRP).  Should I be paying more to you to cover the reduced transmission/distribution fee collection that this incurs?  If I turn off the lights in my daughter's room after she has left, should I mail you a check?  Ridiculous?  Not if you think your residential solar penalties are appropriate."

91.    That SRP's cross subsidy claim is pretextual is demonstrated by SRP's comfort with the large "cross subsidies" it will continue to provide when those subsidies do not arise from solar competition.  For example, SRP customers who use natural gas appliances have less electricity demand from SRP, and any "fixed" costs attributable to them are therefore "subsidized" by others; SRP customers with winter homes in Arizona use far less electricity from SRP, and therefore are "subsidized" by others; SRP's existing customers "subsidize" customers in new homes, for whom SRP has to build out new lines;

1    SRP's more rural customers, who cause SRP higher distribution and transmission costs

2    than metropolitan customers, are "subsidized" by metropolitan customers; and SRP's

3    customers who have taken steps other than installing competitive distributed solar to

4    reduce the amount of electricity they demand from the grid are "subsidized" by those who

5    consume more electricity.

6          92.    In short, hundreds of thousands of SRP customers have electricity purchase

7    or demand characteristics such that they are, under SRP's logic, being "subsidized" by

8    other customers.  Yet SRP's punitive new SEPPs do not apply to those customers.  They

9    apply only to those customers who obtain electricity from a competitive source such as

10   distributed solar from SolarCity.

11         93.    Moreover, the structure of the demand charges the SEPPs impose on

12   distributed solar customers fatally undermine SRP's stated justifications for the plan.  By

13   imposing a demand charge based on the 30-minute period of highest usage at peak times

14   in any given month, SRP's demand charge merely creates the incentive to mitigate 30-

15   minute spikes in individual customer demand that do not necessarily correspond to

16   system-wide peak demand, and therefore are poorly correlated to any significant or

17   demonstrable incremental fixed costs to begin with.  Such a demand charge does little to

18   affect customer behavior if the *next* largest 30-minute spike is not much smaller, as is

19   likely the case for virtually all customers.  Meanwhile, by reducing the per-kWh energy

20   charge that applies to both peak usage and peak generation, the SEPPs *reduce* solar users'

21   incentives to reduce peak demand overall.

22         94.    SRP has deliberately designed its demand charge to be difficult—perhaps

23   virtually impossible—to calculate, manage, know in advance, or even be likely to reduce

24   peak demand.  Asked why the SEPPs do not have any analogous "demand charge" for

25   customers who do not use distributed solar, SRP's General Manager & Chief Executive

26   Officer, Mark Bonsall, summed up the anti-consumer effect of the demand charge as

27   follows:

28

"I guess the bottom line on that is I think it would be very difficult, were she still with us, to put my grandma on a demand charge.  I mean, we're gonna have people that just don't want to do that or it's too complicated for them to understand and/or they don't care about it.  I think we need to be sensitive to some of those issues as well."

95.     In short, SRP's demand charge is explicitly and unapologetically discriminatory.  For the 98% of SRP customers who do not generate any rooftop solar electricity, SRP considers it infeasible for those customers to reduce their peak demand to reduce peak loads and mitigate draconian monthly bill impacts.  SRP refuses to apply the same reasoning to distributed solar customers.  The conclusion is inescapable: SRP is more interested in punishing solar than actually reducing peak demand and managing SRP's grid-related costs.

96.     Other utilities have been unable to prove similarly pretextual subsidy claims.  For example, Arizona Public Service ("APS") has a service area adjacent to SRP's, but unlike SRP, is subject to regulation.  APS asserted to its regulator that a $50 per month increase on distributed solar customers would remedy a supposed cross subsidy.  The Commission eventually approved, on an interim basis, an approximately $5 increase as a compromise solution.

97.     Finally, even were it the case (which it is not) that SRP's "cost-shifting" rationale had a rational basis, neither the discriminatory charges its SEPPs impose nor the exclusion of competition that has already resulted are necessary or reasonable ways to address it.  Other price structures are readily available that non-discriminatorily charge for usage and demand at the peak times SRP says are critical to controlling its supposed "fixed costs" (many of which in fact have nothing to do with the relationship between distributed solar customers' usage and demand patterns).

98.     SRP's true message to consumers could not be clearer:  Consumers who want to choose an alternative technology cannot escape SRP's grip.

## COUNT I:
## MONOPOLY MAINTENANCE
## IN VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 2)

99.   SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

100.   SRP has engaged in anticompetitive conduct to maintain its monopoly power in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

101.   SRP's SEPPs constitute anticompetitive conduct and unlawful monopoly maintenance in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

102.   SRP possesses monopoly power in the relevant market or markets, and willfully maintains it, including through the imposition of SRP's SEPPs.

103.   SRP's SEPPs have the purpose and effect of excluding competition from distributed solar, including by actually foreclosing competition in the market and preventing entry.

104.   SRP's continued anticompetitive conduct and maintenance of its monopoly power through its SEPPs is not the result of superior skill, business acumen, or historic accident.

105.   As a direct and foreseeable result of SRP's monopoly maintenance, SolarCity has suffered damages in an amount to be proved at trial.

106.   As a direct and foreseeable result of SRP's monopoly maintenance, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

107.   SRP's monopoly maintenance is likely to continue if not enjoined.

## COUNT II:
## ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 2)

108.   SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

109.    SRP has engaged in anticompetitive conduct to attempt to monopolize in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

110.    As an alternative to Count I, SRP's SEPPs constitute an unlawful attempt to monopolize in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

111.    Specifically, SRP's SEPPs constitute a willful and intentional attempt to monopolize the retail market, by excluding competition from distributed solar.

112.    SRP's attempt to monopolize has a dangerous probability of success.

113.    As a direct and foreseeable result of SRP's attempt to monopolize, SolarCity has suffered damages in an amount to be proved at trial.

114.    As a direct and foreseeable result of SRP's attempt to monopolize, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

115.    SRP's attempt to monopolize is likely to continue if not enjoined.

## COUNT III:
## UNREASONABLE RESTRAINT OF TRADE
## IN VIOLATION OF THE SHERMAN ANTITRUST ACT
## (15 U.S.C. § 1)

116.    SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

117.    SRP's SEPPs constitute agreements that unreasonably restrain trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

118.    These agreements have and will continue to have anticompetitive effects. They unlawfully insulate SRP from competition and exclude distributed solar companies from the retail market, including by actually foreclosing competition in the market and preventing entry, thereby allowing SRP to raise prices, harm the competitive process, raise barriers to entry and expansion, and retard innovation.

119.    These agreements are not reasonably necessary to accomplish any of SRP's purported procompetitive goals.  Any procompetitive benefit is outweighed by anticompetitive harm, and there are less restrictive alternatives by which SRP could reasonably achieve any procompetitive goal.

120.   As a direct and foreseeable result of SRP's willful imposition of these agreements, SolarCity has suffered damages in an amount to be proved at trial.

121.   As a direct and foreseeable result of SRP's willful imposition of these agreements, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

122.   SRP's imposition and enforcement of these agreements is likely to continue if not enjoined.

## COUNT IV:
## EXCLUSIVE DEALING
## IN VIOLATION OF THE CLAYTON ANTITRUST ACT
## (15 U.S.C. § 14)

123.   SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

124.   Electricity is a commodity subject to Section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14.

125.   SRP's SEPPs constitute an exclusivity arrangement that unreasonably restrains trade in violation of Section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14.

126.   SRP's arrangement has and will continue to have anticompetitive effects.  It unlawfully insulates SRP from competition and excludes distributed solar companies from the retail market, including by actually foreclosing competition in the market and preventing entry, thereby allowing SRP to raise prices, harm the competitive process, raise barriers to entry and expansion, and retard innovation.

127.   SRP's exclusivity arrangement is not reasonably necessary to accomplish any of SRP's purported procompetitive goals.  Any procompetitive benefit is outweighed by anticompetitive harm, and there are less restrictive alternatives by which SRP could reasonably achieve any procompetitive goal.

128.   As a direct and foreseeable result of SRP's willful exclusivity arrangement, SolarCity has suffered damages in an amount to be proved at trial.

129.   As a direct and foreseeable result of SRP's willful exclusivity arrangement, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

130.   SRP's imposition and enforcement of its exclusivity arrangement is likely to continue if not enjoined.

## COUNT V:
## MONOPOLY MAINTENANCE
## IN VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT
## (A.R.S. § 44-1403)

131.   SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

132.   SRP has engaged in anticompetitive conduct to maintain its monopoly over trade or commerce within Arizona in violation of A.R.S. § 44-1403.

133.   SRP's SEPPs constitute anticompetitive conduct and unlawful monopoly maintenance in violation of A.R.S. § 44-1403.

134.   SRP possesses monopoly power in the relevant market or markets, and willfully maintains it, including through the imposition of SRP's SEPPs.

135.   SRP's SEPPs have the purpose and effect of excluding competition from distributed solar, including by actually foreclosing competition in the market and preventing entry.

136.   SRP's continued anticompetitive conduct and maintenance of its monopoly power through its SEPPs is not the result of superior skill, business acumen, or historic accident.

137.   As a direct and foreseeable result of SRP's monopoly maintenance, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

138.   SRP's monopoly maintenance is likely to continue if not enjoined.

**COUNT VI:**
**ATTEMPTED MONOPOLIZATION**
**IN VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT**
**(A.R.S. § 44-1403)**

139.    SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

140.    As an alternative to Count V, SRP's SEPPs constitute an unlawful attempt to monopolize trade or commerce within Arizona in violation of A.R.S. § 44-1403.

141.    Specifically, SRP's SEPPs constitute a willful and intentional attempt to monopolize the retail market, by excluding competition from distributed solar.

142.    SRP's attempt to monopolize has a dangerous probability of success.

143.    As a direct and foreseeable result of SRP's attempt to monopolize, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

144.    SRP's attempt to monopolize is likely to continue if not enjoined.

**COUNT VII:**
**UNREASONABLE RESTRAINT OF TRADE**
**IN VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT**
**(A.R.S. § 44-1402)**

145.    SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

146.    SRP's SEPPs constitute agreements that unreasonably restrain trade within Arizona in violation of A.R.S. § 44-1402.

147.    These agreements have and will continue to have anticompetitive effects. They unlawfully insulate SRP from competition and exclude distributed solar companies from the retail market, including by actually foreclosing competition in the market and preventing entry, thereby allowing SRP to raise prices, harm the competitive process, raise barriers to entry and expansion, and retard innovation.

148.    These agreements are not reasonably necessary to accomplish any of SRP's purported procompetitive goals.  Any procompetitive benefit is outweighed by

anticompetitive harm, and there are less restrictive alternatives by which SRP could reasonably achieve any procompetitive goal.

149. As a direct and foreseeable result of SRP's willful imposition of these agreements, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

150. SRP's imposition and enforcement of these agreements is likely to continue if not enjoined.

## COUNT VIII:
## INTENTIONAL INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

151. SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

152. SolarCity has and had an expectancy in continuing advantageous economic relationships with current and prospective customers in SRP's service area, including Maricopa Community Colleges and at least 500 additional specific customers who did not move forward with SolarCity as a result of SRP's conduct with respect to the SEPPs' design, announcement, and imposition.

153. SRP had knowledge of these economic relationships and intended to interfere with and disrupt them by wrongfully designing, announcing, and imposing the SEPPs in a way that destroyed these relationships' economic value, thereby causing breaches in the relationships.

154. SRP's intentional interference was improper in both motive and means.

155. Any interests that SRP purports to advance through its intentional interference are pretextual.

156. As a direct and foreseeable result of SRP's intentional interference, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

157. SRP's intentional interference is likely to continue if not enjoined.

## COUNT IX:
## INTENTIONAL INTERFERENCE WITH CONTRACT

158.    SolarCity repeats and re-alleges the allegations contained in each and every preceding paragraph of this Complaint.

159.    In the months and weeks prior to SRP's release of its SEPPs, SolarCity entered into contractual relationships with customers in SRP's service area, including numerous 20-year leases.

160.    SRP had knowledge of these contractual relationships and intended to interfere with and disrupt them by wrongfully designing, announcing, and imposing the SEPPs in a way that destroyed these relationships' economic value, thereby causing breaches in the relationships.

161.    SRP's intentional interference was improper in both motive and means.

162.    Any interests that SRP purports to advance through its intentional interference are pretextual.

163.    SolarCity has suffered damages in an amount to be proved at trial.

164.    As a direct and foreseeable result of SRP's intentional interference, SolarCity continues to suffer irreparable injury for which there is no adequate remedy at law.

165.    SRP's intentional interference is likely to continue if not enjoined.

### STATEMENT REGARDING SRP'S STATE LAW VIOLATIONS

166.    An Arizona statute requires that entities such as SRP be served with notice of claims arising under state law before seeking damages in court.

167.    Federal courts consider this statute substantive law that applies in federal court.

168.    SolarCity is complying with this statute and, as soon as possible, will seek leave to amend this complaint to seek damages for SRP's state law violations.

1
## REQUEST FOR RELIEF

2       169.    SolarCity repeats and re-alleges the allegations contained in each and every

3   preceding paragraph of this Complaint.

4       170.    With respect to its federal law claims (Counts I-IV), SolarCity requests that

5   this Court render the following relief:

6               a.    Grant judgment in favor of SolarCity and against SRP;

7               b.    Grant all appropriate injunctive relief;

8               c.    Award SolarCity an appropriate amount in monetary damages as

9   determined at trial, including pre- and post-judgment interest;

10              d.    Award SolarCity treble damages in an amount to be proved at trial;

11              e.    Award SolarCity attorneys' fees and the costs of bringing this action;

12  and

13              f.    Grant SolarCity such other relief as is just and appropriate.

14      171.    With respect to its state law claims (Counts V-IX), SolarCity requests that

15  this Court render the following relief:

16              a.    Grant judgment in favor of SolarCity and against SRP;

17              b.    Grant all appropriate injunctive relief;

18              c.    Award SolarCity attorneys' fees and the costs of bringing this action;

19  and

20              d.    Grant SolarCity such other relief as is just and appropriate.

21

22                      *               *               *

23

24

25

26

27

28

1

**JURY TRIAL DEMANDED**

2          Pursuant to Fed. R. Civ. P. 38(b), SolarCity demands a trial by jury of all of the

3    claims asserted in this Complaint so triable.

4                                    Respectfully submitted,

5

6                                    BOIES, SCHILLER & FLEXNER LLP

7

8

9                               _____s/Richard J. Pocker_____

10                                   BOIES, SCHILLER & FLEXNER LLP
                                     *Attorneys for Plaintiff SolarCity Corporation*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28