WILMER CUTLER PICKERING
  HALE AND DORR LLP
Eric Mahr (*admitted pro hac vice*)
Christopher E. Babbitt (*admitted pro hac vice*)
Christopher T. Casamassima (*admitted pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
eric.mahr@wilmerhale.com
christopher.babbitt@wilmerhale.com
chris.casamassima@wilmerhale.com

STEPTOE & JOHNSON LLP
Paul K. Charlton (012449)
Karl M. Tilleman (013435)
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| SolarCity Corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>Salt River Project Agricultural Improvement and Power District; Salt River Valley Water Users' Association,<br><br>            Defendant. | Case No. 2:15-CV-00374-DLR<br><br>**DEFENDANT SALT RIVER VALLEY WATER USERS' ASSOCIATION'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM**<br><br>**Oral Argument Requested** |

Pursuant to this Court's March 3, 2015 Order, Defendant Salt River Project Agricultural Improvement and Power District (the "District") met and conferred with Plaintiff SolarCity to discuss the defenses the District intended to raise in its motion to

1

1 dismiss. Among those defenses are the District's immunities to antitrust claims, some of
2 which are based on the District's status as a political subdivision of the State of Arizona.
3 In response, SolarCity filed its First Amended Complaint ("FAC"), adding the Salt River
4 Valley Water Users' Association (the "Association") as a defendant. Absent from the
5 FAC, however, is a single allegation that the Association played any role in setting the
6 retail electricity rates that are the exclusive focus of the FAC's claims, or that it did
7 anything at all to harm SolarCity. The FAC therefore should be dismissed for failure to
8 satisfy the pleading standards established by the Supreme Court in *Twombly* and *Iqbal*.

9 Because SolarCity cannot allege facts sufficient to state a claim directly against
10 the Association, it attempts to meld the Association into the District through two artifices:
11 First, early in the FAC, it simply defines the Association to be part of "SRP," thus
12 attributing to the Association all of the conduct it previously alleged as to the District
13 alone. Second, it asserts, without any basis, the legal conclusion that "[a]s the *alter ego* of
14 the District, the Association is also liable for the District's wrongful actions." FAC ¶ 30.
15 As explained below, however, the alter ego liability doctrine has no application to this
16 case and provides no basis for SolarCity to circumvent the District's immunity from suit.

17 Moreover, if the Association were somehow the "alter ego" of the District, the
18 Association would enjoy the same immunities as the District on the basis of that status.
19 Indeed, quite apart from any alleged "alter ego" status, the same immunities that apply to
20 the District also apply to the Association, both because the relevant conduct here is that
21 of the District and because, as the contractual agent of the District, the Association is
22 entitled to its protections.

23 For all the reasons herein, and those set forth in the District's motion to dismiss—
24 which the Association hereby incorporates by reference—the Association hereby moves
25 to dismiss SolarCity's FAC in its entirety with prejudice.

26
27
28

2

# BACKGROUND

The Salt River Project (as distinct from either the District or the Association) is a creation of federal and state law and policy. Its origins lie in efforts on the part of the federal government and Arizona farmers to irrigate the semiarid lands of the Salt River Valley in the late 19th Century. *See City of Mesa v. Salt River Project Agric. Improvement & Power Dist.*, 416 P.2d 187, 188 (Ariz. 1966). To develop the West and provide farmers with a more permanent solution for their water needs, Congress passed the Reclamation Act of 1902, ch. 1093, 32 Stat. 388. *City of Mesa*, 416 P.2d at 188, 195. The Reclamation Act established a fund to be used "for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in" Arizona and other western states. *Uhlmann v. Wren*, 401 P.2d 113, 117-118 (Ariz. 1965).

In 1903, the Salt River Valley Water Users' Association was incorporated and it reached an agreement with the United States to form the Salt River Project, one of the first federal reclamation projects approved under the 1902 Act. *City of Mesa*, 416 P.2d at 188 & n.2. The United States Reclamation Service[1] operated the Salt River Project until 1917, when the United States turned over operation of the Project to the Association. *Id*. The United States retained title to Project property. *Id*. at 191, 197.

The Association "is an Arizona corporation whose shareholders are the subscribing landowners." *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 588 (9th Cir. 1997). "The Association's Articles, drafted in cooperation with the Federal Reclamation Service, [give] subscribing landowners the right to reclamation water and the power to vote in Association decisions in proportion to the number of acres the subscribers owned." *Ball v. James*, 451 U.S. 355, 358 (1980). The Association is a quasi-public corporation, *Citrus Growers' Development Ass'n, Inc. v. Salt River Valley Water Users' Ass'n*, 268 P. 773, 774-775 (Ariz. 1928), and

---

[1] The U.S. Reclamation Service has been renamed the U.S. Bureau of Reclamation and is part of the U.S. Department of the Interior. *See* http://www.usbr.gov/projects/Project.jsp?proj_Name=Salt River Project.

"shareholders of the [A]ssociation do not have the rights usually associated with those of a stockholder in a private corporation." *Miller v. Salt River Valley Water Users' Ass'n*, 463 P.2d 840, 845 (Ariz. Ct. App. 1970). Rather, the primary benefit of being a shareholder in the Association is the right to receive water. *Id.*

In 1922, the Arizona Legislature enacted the Agricultural Improvement District Act (the "1922 Act"), which authorized the creation of self-financing agricultural improvement districts as political subdivisions of the State empowered to levy taxes. *See Reichenberger v. Salt River Project Agric. Improvement & Power Dist.*, 70 P.2d 452, 454 (Ariz. 1937). In 1937, the Association took advantage of the 1922 Act by organizing a district to issue tax-exempt bonds. *See Smith*, 109 F.3d at 588. The Association continued to operate all the Salt River Project's works and facilities until September 1949, when it transferred responsibility for them to the District. *See Wren*, 401 P.2d at 121.

The 1949 Agreement governs the relationship between the Association and the District and provides that "the District itself manages the power and water storage work of the project, and the Association, as agent for the District, manages water delivery." *Ball*, 451 U.S. at 359; *see Smith*, 109 F.3d at 589; *City of Mesa v. Salt River Project Agric. Improvement & Power Dist.*, 373 P.2d 722, 725 (Ariz. 1962). Thus, since 1949, the District has maintained and operated the entire Salt River Project on behalf of the lands of the District, and has used the Association as its agent to maintain and operate the Project's irrigation and drainage system. Pursuant to Arizona law, a portion of the District's electricity revenues is used to support the Association's water and irrigation operations. *See* A.R.S. §§ 48-2303(A)(7); 48-2337(A)(4).

The District is governed by an elected 14-person Board of Directors ("the Board"), A.R.S. § 48-2361, while the Association's Board comprises ten members.[2] For voting

---

[2] *See* http://www.srpnet.com/about/elected.aspx. Candidates often seek election to both Boards, although there are occasions where District electors elect different

1  purposes, the District is divided into ten equal voting divisions, each of which elects one
2  director. *Id.* The additional four directors are elected at-large. *Id.* This governance
3  structure has been upheld by the U.S. Supreme Court. *Ball v. James*, 451 U.S. 355
4  (1980). The District is a political subdivision of the State of Arizona pursuant to A.R.S. §
5  48-2302. As a political subdivision, the District is "vested with all the rights, privileges
6  and benefits, and entitled to the immunities and exemptions granted municipalities and
7  political subdivisions" under the Arizona Constitution and the laws of Arizona or the
8  United States. Ariz. Const. art. 13, § 7; *Smith*, 109 F.3d at 592 (the District "enjoys the
9  powers and privileges of a political subdivision . . . [and] the duties and obligations of a
10 political subdivision") .

## ARGUMENT

**I. THE FAC FAILS TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM AGAINST THE ASSOCIATION DIRECTLY OR UNDER ANY "ALTER EGO" THEORY OF LIABILITY**

**A.   The FAC Alleges No Facts Suggesting That The Association Participated In Any Misconduct**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When more than one defendant is named, the complaint must allege facts that create a reasonable inference that each defendant "is liable for the misconduct alleged." *See id.*; *Egbert v. Sw. Collection Servs., Inc.*, No. SA CV 13-00421-DOC (RNBx), 2013 WL 3188850, *4 (C.D. Cal. June 21, 2013) ("Plaintiff must allege facts identifying which specific defendant acted unlawfully."); *In re TFT-*

---

Association and District Board members for a particular District, as is the case currently for District 1. *Id.*

5

*LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116-17 (N.D. Cal. 2008) (must plead allegations "specific to each defendant alleging that defendant's role in the alleged [misconduct]"); *see also Slack v. Int'l Union of Operating Eng's*, No. C–13–5001 EMC, 2014 WL 4090383, at *16 (N.D. Cal. Aug. 19, 2014) (while collective allegations are not a per se violation of Rule 8, "a complaint that repeatedly refers to defendants collectively, without differentiation, is more likely to run afoul of the plausibility standard of *Iqbal* and *Twombly*").

      SolarCity has pled no facts that create a reasonable inference that the Association played any role in the alleged misconduct. That SolarCity could not allege any facts against the Association in a case premised on the District's electricity rates is not surprising. The Association's operations relate solely to water and irrigation, *see Wren*, 401 P.2d at 121; *Smith*, 109 F.3d at 489, and have nothing to do with electricity, let alone the retail electricity rates that are the focus of SolarCity's claims. By statute, the District's Board sets retail electricity rates for customers in the District's service area. *See* A.R.S. §§ 30-802, 48-2334. Indeed, SolarCity concedes that the Association's original responsibilities (which encompassed both water and power functions) have been divided "with the District taking over the power and water storage work, and the Association managing water delivery as agent of the District." FAC ¶ 28.

      In an attempt to avoid this reality, the FAC artificially conflates the District and the Association as "SRP," FAC ¶ 1, and then makes a number of allegations against the defendants collectively, *i.e.*, "SRP." However, courts have repeatedly held that making allegations against defendants collectively is insufficient to put each defendant on notice of the claims against it, as required by Rule 8(a)(2) of the Federal Rules of Civil Procedure. *See In re Capacitors Antitrust Litig.*, --- F. Supp. 3d ---, No. 14-cv-03264-JD, 2015 WL 3398199, at *7 (N.D. Cal. May 26, 2015) ("[A]n antitrust complaint 'must allege'" that each defendant participated in the alleged wrongdoing); *In re TFT-LCD*, 586 F. Supp. 2d at 1116-17 (labeling parent and subsidiaries of NEC or Hitachi as "NEC" or "Hitachi" is "insufficient to put specific defendants on notice of claims against them");

*Precision Assocs., Inc. v. Panalpina World Trans. (Holding) Ltd.*, No. 08-CV-42 (JG)(VVP), 2011 WL 7053807, at *17 (E.D.N.Y. Jan. 4, 2011) (complaint inadequate where plaintiffs grouped each parent with its subsidiary "in the definition of the parties at the outset of the Complaint, and then proceed[ed] to name only the parents in the individual counts"); *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025, at *8 (N.D. Cal. May 21, 2009) ("[W]ithout any specific allegations as to what Parent Corporations did, [the complaint is] insufficient to put the Parent Corporations on notice of the claims asserted against them.").

Notably, the FAC does not contain a single allegation of misconduct against the Association and, in fact, does not contain a single allegation that the Association did anything at all, unlawful or otherwise. Instead, all of the allegations of wrongdoing in the FAC are the same as those in SolarCity's original complaint brought solely against the District. *See* Complaint (Dkt. No. 1). And, even in the FAC, SolarCity concedes (as it must) that it was the District's Board of Directors that approved the standard electric pricing plans ("SEPPs"), FAC ¶ 97, which is the only alleged basis of SolarCity's claims, *see* FAC ¶¶ 145, 154, 161, 170, 178, 187, 194, 204, 212 (describing the SEPPs as anticompetitive and tortious conduct). In short, the FAC fails to plead facts sufficient to state a claim against the Association, *see Iqbal*, 556 U.S. at 678, and therefore SolarCity's claims against the Association must be dismissed.

**B.     SolarCity's FAC Fails To Plead Facts Sufficient To Bring A Claim Under Alter Ego Liability**

Because it cannot allege any misconduct on the part of the Association directly, SolarCity baldly asserts the purely legal conclusion that "[a]s the *alter ego* of the District, the Association is also liable for the District's wrongful actions." FAC ¶ 30. But that allegation fails as a matter of law, and it rests entirely on a misreading of dicta in a Ninth Circuit decision that the FAC invokes but does not cite, *Smith v. Salt River Project Agricultural Improvement and Power District*, 109 F.3d 586, 589 (9th Cir. 1997).

7

1    The alter ego theory of liability is a common-law creation under which the
2 corporate veil may—in limited circumstances—be pierced to make shareholders liable
3 for the acts of the corporation. *See, e.g.*, *Seymour v. Hull & Moreland Eng'g*, 605 F.2d
4 1105, 1111 (9th Cir. 1979). Even in that traditional context, alter ego liability is "a rare
5 exception" to the general rule that the corporate form should be respected and is only
6 "applied in the case of fraud or certain other exceptional circumstances." *Dole Food Co.*
7 *v. Patrickson*, 538 U.S. 468, 475 (2003); *see United States v. Bestfoods*, 524 U.S. 51, 61
8 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and
9 legal systems' that a parent corporation (so-called because of control through ownership
10 of another corporation's stock) is not liable for the acts of its subsidiaries.").

11    Here, however, the District is not a private corporation with shareholders; rather, it
12 is a political subdivision. A.R.S. § 48-2302. Courts have uniformly rejected attempts to
13 apply the alter ego liability doctrine in cases involving public authorities such as the
14 District. *Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.*, 970 F.2d
15 199, 202-203 (6th Cir. 1992); *McDaniel v. Bd. of Educ.*, 956 F. Supp. 2d 887, 896 (N.D.
16 Ill. 2013) ("Plaintiffs have provided no legal authority to support their veil-piercing
17 theory in the context of municipal entities like those at issue here, and the Court finds
18 none."); *Katz v. Holzberg*, Civil Case No. 13-1726 (FSH), 2013 WL 5523488, at *4
19 (D.N.J. Oct. 2, 2013) ("Katz does not provide a single case, from New Jersey or
20 otherwise, supporting the application of corporate veil-piercing theory or parent-
21 subsidiary law to the public authority context."); *Newcrete Prods. v. City of Wilkes-Barre*,
22 37 A.3d 7, 13-14 (Pa. Commw. Ct. 2012). The reasoning behind these decisions is that,
23 unlike a private corporation, public authorities have no equity owners to hold liable in the
24 event the corporate veil is pierced. *See Foster Wheeler*, 970 F.2d at 203; *McDaniel*, 956
25 F. Supp. 2d at 897-98; *Newcrete*, 37 A.3d at 14 ("Regardless of how controlling City may
26 have been in its cooperative relationship with Authority, City does not have an ownership
27 interest in Authority that can be reached by piercing the corporate veil"). Here, because
28 the District is a political subdivision of the State of Arizona, *Smith*, 109 F.3d at 592 (the

District "enjoys the powers and privileges of a political subdivision [and] the duties and obligations of a political subdivision"), it is impossible for the Association to have an "ownership" interest in the District. As such, all of SolarCity's claims against the Association premised on alter ego liability must be dismissed.

Even assuming, *arguendo*, that it is possible for a private corporation to be the alter ego of a political subdivision, SolarCity has failed to plead sufficient facts to create a reasonable inference that the Association is an alter ego of the District. *See Iqbal*, 556 U.S. at 678.

To state a plausible claim for alter ego liability,[3] a plaintiff must allege at minimum "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (alterations omitted); *see Eclectic Props. E., LLC v. Marcus & Millichap Co.*, No. C-09-00511 RMW, 2011 WL 1375164, at *5 (N.D. Cal. Apr. 12, 2011). As discussed above, this test does not even apply here, as a private entity can have no "unity of ownership" with a government entity that is in no sense "owned," and where the District Board and Council members are elected public officials. *See* A.R.S. § 48-2361. In addition, SolarCity has failed to make *any* allegation suggesting that the failure to treat the District and the Association as separate entities "would result in fraud or injustice." *See Unocal*, 248 F.3d at 926. This failure alone is sufficient to dismiss all claims against the Association premised on an alter ego theory of liability. *Foster*

---

[3] It is not entirely clear whether federal common law, *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979) (applying Ninth Circuit law), or Arizona law, *see In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010) ("[I]n determining whether alter ego liability applies, [federal courts] apply the law of the forum state."), governs the determination of alter ego liability. However, the outcome is the same in either case. *See EEOC v. Recession Proof USA LLC*, No. CV-11-01355-PHX-BSB, 2013 WL 6328000, at *7 n.10 (D. Ariz. Aug. 20, 2013) report and recommendation adopted in part, rejected in part on other grounds, No. CV-11-1355-PHX-SMM, 2013 WL 6327994 (D. Ariz. Dec. 5, 2013).

1  *Wheeler*, 970 F.2d at 203; *Eclectic Props.*, 2011 WL 1375164, at *6; *Nordberg v.
2  Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1102 (N.D. Cal 2006).

3        Moreover, SolarCity's allegations regarding the first element of alter ego
4  liability—the elimination of separate personalities—are inadequate as a matter of law. To
5  satisfy this element, "the plaintiff must show the parent controls its subsidiary to such a
6  degree as to render the subsidiary a 'mere instrumentality' of its parent." *Arandell Corp.
7  v. Xcel Energy, Inc. (In re W. States Wholesale Nat. Gas Litig.)*, 605 F. Supp. 2d 1118,
8  1132 (D. Nev. 2009) (quoting *Unocal*, 248 F.3d at 926). Although the FAC does not
9  explicitly state which allegations are relevant to this aspect of alter ego liability, it
10 appears that SolarCity relies on two basic allegations: (1) that Salt River Project's annual
11 report and other documents refer to the Association as part of the Salt River Project, FAC
12 ¶¶ 19-20, 27, and (2) the District and the Association have common board members and
13 management, FAC ¶¶ 21-22.

14       Regarding the first allegation, courts have consistently held that identifying a
15 subsidiary as a division of a parent in annual reports or other documents does not satisfy
16 the first element of alter ego liability. *Unocal*, 248 F.3d at 928; *In re Western States*, 605
17 F. Supp. 2d at 1133.[4] Similarly, that two entities share some directors and officers is
18 insufficient to allege that one is the "mere instrumentality" of the other. *Doughtery v.
19 Lincare, Inc.*, No. CV10–0978 PHX DGC, 2010 WL 3218613, at *2-3 (D. Ariz. Aug. 13,
20 2010); *Unocal*, 248 F.3d at 926. Nor is it somehow wrong or improper for individuals to
21 sit on the boards of two related entities. Indeed, it is a "well established principle of
22 corporate law that directors and officers holding positions with a parent and its subsidiary
23 can and do 'change hats' to represent the two corporations separately, despite their
24 common ownership." *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998).[5]

---

26    [4] Here, of course, the Association is not a subsidiary of the District, it is its
27 contractual agent. *See Ball*, 451 U.S. at 359. In any event, the same analysis applies.

   [5] Therefore, that some of the District's board members also serve on the
28 Association's board does not suggest that such Board members were acting on behalf of

The FAC rests entirely on a Ninth Circuit case that SolarCity claims to have "expressly recognized" that the District and the Association "operate as alter egos." FAC ¶ 30. In fact, the court in *Smith v. Salt River Project Agricultural Improvement and Power District* stated in the background section of the opinion: "Today, the Association and District operate as alter egos. The District operates the Salt River Project's power function; the Association acts as the District's agent to operate the water delivery system." 109 F.3d 586, 589 (9th Cir. 1997). *Smith*, however, did not analyze whether the Association and the District were alter egos of each other in the sense that one would be liable for the actions of the other. *Smith* does not support the position that the Association is the alter ego of the District for liability purposes. Rather, the case holds that section 2 of the Voting Rights Act applied to the District. *Id.* at 593-94. In reaching that conclusion, the court affirmed that "the District is a public, political, taxing subdivision of the state, and a municipal corporation," with an elected board of directors vested by Arizona law with "broad decision-making authority over the District's water and power functions." *Id.* at 593. Moreover, the case makes clear that the Association's role is limited to water and irrigation and that the District is responsible for electricity. *Id.* at 589.

The only Court that has spoken about an alter ego relationship between the District and the Association for the purposes of liability is *Wright v. Salt River Valley Water Users' Ass'n*, 384 P.2d 104, 323-24 (Ariz. 1963). There, plaintiff Wright was employed by the Association as a gate operator at Granite Reef Dam in Maricopa County. *Id.* at 104. In an attempt to satisfy a Fair Labor Standards Act exemption, Wright argued that the District was the alter ego of the Association. *Id.* at 107. The court found that the District

---

the Association rather than the District. Moreover, even if such Board members were said to be acting on behalf of the Association's water interests, there would be no conflict of interest between the Association and the District because Arizona law explicitly authorizes the District to use electricity sales to support irrigation and water operations. *See* A.R.S. §§ 48-2303(A)(7), 48-2337(A)(4).

11

was "a separate legal entity working in conjunction with" the Association, and explicitly rejected the Plaintiff's attempt to treat the District and Association as alter egos. *Id.*; *Carman v. Yolo Cty. Flood Control and Water Conservation Dist.*, 535 F. Supp. 2d 1039, 1051 n.8 (E.D. Cal. 2008) ("In *Wright*, the court declined to find that the defendant employer and owner of the waterway was the alter ego of the power plant that was using the waterway to generate electricity.").[6] SolarCity does not plead sufficient facts to plausibly conclude the opposite.

## II. THE IMMUNITIES APPLICABLE TO THE DISTRICT EXTEND TO THE ASSOCIATION

To the extent the Court determines that the FAC states a claim against the Association, either directly or through an alter ego theory, the immunity defenses set forth in the District's memorandum in support of its motion to dismiss apply equally to the Association. *See* District's Motion to Dismiss, at pp. 6-18. Therefore, all claims against the Association should also be dismissed on that basis.

### A. If The Association Is The Alter Ego Of The District, The District's Immunities Apply Automatically To The Association

The FAC must be dismissed because, if the Association were held to be the legal "alter ego" of the District for purposes of liability, it would then automatically be entitled to the same immunities as the District itself. While courts have not addressed this issue in the context of immunities to antitrust claims, they have repeatedly held that the immunities of one alter ego apply equally to the other. For example, alter egos of the State share the State's sovereign immunity under the Eleventh Amendment, *e.g.*, *Alaska*

---

[6] Moreover, the Arizona Supreme Court has twice referred to the District and the Association as "alter egos in substance, though not in law." *Wren*, 401 P.2d at 121; *Reichenberger*, 70 P.2d at 455. Of course, here, SolarCity is trying to convince the Court that the Association is the alter ego of the District as a legal matter. Another case, *Miller v. Salt River Valley Water Users' Ass'n*, relies on the alter ego language in *Wren* and *Reichenberger* to support an interpretation of the 1949 agreement between the Association and the District. 463 P.2d at 845-846. None of these cases support the argument that the Association is liable for the acts of the District.

*Cargo Transport, Inc. v. Alaska Railroad Corp.*, 5 F.3d 378, 382 (9th Cir. 1993). Likewise, alter egos of legislators (*i.e.*, legislative aids) share the Speech or Debate immunities of Congressmen and other legislators, *see Jeff D. v. Otter*, 643 F.3d 278, 289-90 (9th Cir. 2011) (citing *Gravel v. United States*, 408 U.S. 606, 616-17 (1972).[7] Similarly, courts have extended immunities to alter egos of corporations in the workmen's compensation context, *see Santiago-Hodge v. Parke Davis & Co.*, 859 F.2d 1026, 1032-33 (1st Cir. 1988) (citing *Muniz v. National Can Corp.*, 737 F. 2d 145, 147 n.2 (1st Cir. 1984)), and the maritime claims context, *see Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (holding that private defendant shared immunity with its alter ego).

Here, as set forth in pages 6-18 of the District's Motion to Dismiss, the District is entitled to several immunities, including those under the Local Government Antitrust Act, the state action antitrust immunity doctrine, the filed rate doctrine, and *Noerr-Pennington*, all of which would apply equally to the Association, if it were determined to be the District's alter ego. Therefore, even if SolarCity could establish that the Association is the alter ego of the District, the FAC against the Association should still be dismissed.

---

[7] The analysis to determine the existence of an "alter ego" in the Eleventh Amendment and Speech or Debate immunities context is different than in the alter ego liability context. For Eleventh Amendment purposes, the primary question "is whether a judgment would impact the state treasury." *Alaska Cargo*, 5 F.3d at 380. In the Speech or Immunities context, a legislative aid is assumed to be an alter ego and is thus entitled to immunity if the "aide's conduct would be a protected legislative act if performed by the Member." *United States v. Renzi*, 686 F. Supp. 2d 956, 973 (D. Ariz. 2010). Regardless of how the court determines the existence of an alter ego in a particular context, once that determination has been made, the immunities of one alter ego apply equally to the other.

### B. The State Action Immunity Doctrine And The Local Government Antitrust Act Apply To The Association

#### 1. *State Action Immunity Applies to the Association*

Even if this Court were to conclude that the FAC states a claim against the Association directly (*i.e.*, not based on alter ego liability), the state action immunity doctrine would require dismissal of all claims against the Association. The Supreme Court has explained that state action immunity applies where the challenged conduct (1) is undertaken pursuant to a "clearly articulated and affirmatively expressed state policy" to displace competition with regulation or monopoly and (2), in the case of private entities, is "actively supervised." *FTC v. Phoebe Putney Health Sys. Inc.*, 133 S. Ct. 1003, 1010 (citing *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)). The FAC alleges that the Association is a private corporation. FAC ¶ 29. As such, unlike the District, both the "clear articulation" and the "active supervision" prongs of the state action immunity doctrine must be met for the Association to be immune. As explained in pages 9-16 of the District's Motion to Dismiss, Arizona has clearly displaced competition with regulation.

In addition, to the extent the FAC adequately alleges that the Association participated in the challenged conduct (which it does not), it was actively supervised. The "active supervision" requirement ensures that the regulatory body charged with oversight in fact exercises its regulatory authority. *Nugget Hydroelectric, L.P. v. P. Gas & Elec. Co.*, 981 F.2d 429, 434-35 (9th Cir. 1992). The requirement is met if the regulatory authority in question "has the power to exercise control over the … anticompetitive conduct" and that the power has "in fact [been] exercise[d]." *Snake River Valley Elec. Ass'n v. PacifiCorp.*, 357 F.3d 1042, 1049 (9th Cir. 2004). Because the Arizona Legislature authorized the District to set its own rates and the terms and conditions of retail competition, the Board's consideration and approval of those rates satisfies the active supervision prong. No further state involvement is required. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their

14

1  Application ¶ 226d (2015) ("where a body such as a municipality regulates pursuant to
2  state authorization, active supervision by that body is all that is required"). Here, there is
3  no allegation that the process compelled by the Legislature was not followed. The
4  District's Board met, considered a full record of evidence, required management to
5  modify the rate proposal before it, and ultimately set the rates in question. *See* FAC ¶¶
6  89, 91, 94. In short, management's proposed rates were not "passively accept[ed]," *Tom
7  Hudson & Associates, Inc. v. City of Chula Vista SCA Services Inc.*, 746 F.2d 1370, 1374
8  (9th Cir. 1984). Active supervision requires nothing more.[8] Because both prongs of the
9  state action immunity doctrine are met, the FAC must be dismissed in its entirety.

### 2. *The Local Government Antitrust Act Applies to the Association*

Similarly, the Local Government Antitrust Act of 1984's ("LGAA") limitations on damages also apply to the claims against the Association. The LGAA precludes monetary damages for antitrust claims "against a person based on any official action directed by a local government." 15 U.S.C. § 36(a); *GF Gaming Corp. v. City of Black Hawk, Colo.*, 405 F.3d 876, 886 (10th Cir. 2005). To determine whether actions of private entities constitute "official action directed by a local government" for purposes of the LGAA, Congress has explicitly instructed district courts to apply a two-part test based on the test applied in the state action immunity context. *City of Black Hawk*, 405 F.3d at 886; H.R. Rep. No. 98-1158, 1984 WL 37493, at *3 (1984) (Conf. Rep.) ("the conferees intend that [state-action immunity] and subsequent cases interpreting it shall apply by analogy to the conduct of a local government in directing the actions of non-governmental parties, as if the local government were a state"). The relevant questions are thus: "(1) whether the challenged [conduct] was the clearly articulated and affirmatively expressed policy of [the District], and (2) whether the policy was actively

---

[8] *Id.*; *see also Green v. Peoples Energy Corp.*, No. 02 C 4117, 2003 WL 1712566, at *6 (N.D. Ill. Mar. 28, 2003) (finding active supervision where state law set up regulatory authority with power to evaluate electricity rates after holding public hearing, and challenged rates were, in fact set according to that process).

supervised by [the District]." *See City of Black Hawk*, 405 F.3d at 886 (citing *Crosby v. Hospital Author.*, 93 F.3d 1515, 1536 (11th Cir. 1996)).

In this case, the only challenged conduct—the adoption of the SEPPs—is that of the District. *See supra*, pp. 5-7, FAC ¶ 97. And the SEPPs were "the clearly articulated and affirmatively express policy of [the District]," *see City of Black Hawk*, 405 F.3d at 886, because as SolarCity alleges, it was the District's Board that approved the SEPPs, FAC ¶ 97. Similarly, to the extent any activity with respect to the adoption of the SEPPs may be attributed to the Association, any such activity was "actively supervised by [the District]," *see City of Black Hawk*, 405 F.3d at 886, because it was in fact the District's Board that approved the SEPPs, FAC ¶ 97. Therefore, any actions by the Association were "official action directed by a local government," 15 U.S.C. § 36(a), and thus all antitrust damages against the Association must be dismissed.

### C. The Filed-Rate Doctrine And *Noerr-Pennington* Immunity Require Dismissal Of The FAC

The filed-rate and *Noerr-Pennington* doctrines also require dismissal of all claims against the Association. The filed-rate doctrine forbids a court from revising a utility's rate where that rate is approved by the utility's governing body, *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (doctrine applies to rates that are reviewed by "the appropriate . . . regulatory authority."), and the *Noerr-Pennington* immunity doctrine extends absolute immunity where a defendant's alleged injuries result solely from government action in response to valid petitioning. *See Sessions Tank Liners, Inc. v. Joor Mfg.*, 17 F.3d 295, 300-02 (9th Cir. 1994). Because the FAC does not allege that the Association engaged in conduct other than what is already alleged against the District, for the reasons set forth in pages 16-18 of the District's Motion to Dismiss, the filed-rate and *Noerr-Pennington* doctrines require dismissal of the claims against the Association.

# CONCLUSION

For all these reasons, and those set forth in the District's motion to dismiss, the Association respectfully requests that SolarCity's claims against it be dismissed with prejudice in their entirety.

RESPECTFULLY SUBMITTED this 23rd day of June, 2015.

|  |  |
|---|---|
| Steptoe & Johnson LLP<br>Paul K. Charlton<br>Karl M. Tilleman<br>201 East Washington Street, Suite 1600<br>Phoenix, AZ 85004<br>Telephone: (602) 257-5200<br>Facsimile: (602) 257-5299<br>pcharlton@steptoe.com<br>ktilleman@steptoe.com | s/Christopher E. Babbitt<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>Eric Mahr<br>Christopher E. Babbitt<br>Christopher T. Casamassima<br>1875 Pennsylvania Avenue NW<br>Washington, DC 20006<br>Telephone: (202) 663 6000<br>Facsimile: (202) 663 6363<br>eric.mahr@wilmerhale.com<br>christopher.babbitt@wilmerhale.com<br>chris.casamassima@wilmerhale.com<br><br>Attorneys for Defendants |

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Richard J. Pocker (012548)

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
William A. Isaacson (*admitted pro hac vice*)
Karen L. Dunn (*admitted pro hac vice*)

BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Steven C. Holtzman
John F. Cove, Jr.
Kieran P. Ringgenberg
Sean P. Rodriguez

COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Keith Beauchamp
Roopali H. Desai

s/ Christopher E. Babbitt