WILMER CUTLER PICKERING
  HALE AND DORR LLP
Eric Mahr (*admitted pro hac vice*)
Christopher E. Babbitt (*admitted pro hac vice*)
Christopher T. Casamassima (*admitted pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
eric.mahr@wilmerhale.com
christopher.babbitt@wilmerhale.com
chris.casamassima@wilmerhale.com

STEPTOE & JOHNSON LLP
Paul K. Charlton (012449)
Karl M. Tilleman (013435)
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| SolarCity Corporation,<br><br>           Plaintiff,<br><br>vs.<br><br>Salt River Project Agricultural Improvement and Power District; Salt River Valley Water Users' Association,<br><br>           Defendants. | Case No. 2:15-CV-00374-DLR<br><br>**DEFENDANT SALT RIVER AGRICULTURAL IMPROVEMENT AND POWER DISTRICT'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM**<br><br>**Oral Argument Requested** |

      This case comes before the Court in the midst of a national policy debate over how to integrate rooftop solar systems into the electrical grid, who should bear the cost of subsidizing the rooftop solar industry, and how the costs of maintaining the grid should

be recovered from those who benefit from it—including from rooftop solar customers who indisputably rely on the grid for much of their power. First Amended Complaint ("FAC") ¶ 4. Utilities around the country, including the Salt River Project Agricultural Improvement and Power District (the "District"), have recognized that traditional pricing models are ill-suited to recovering costs required to serve customers who self-generate a portion of their electricity needs. The District's current Standard Electric Price Plans ("SEPPs")—challenged here under the antitrust laws—include a pricing mechanism to address these flaws and to effectuate the basic bargain the District has with all of its customer classes: that customers in each class pay their fair share of the costs of service.

Not surprisingly, SolarCity does not ask this Court to mandate the reinstitution of the direct subsidies and incentives the District has voluntarily provided to rooftop solar customers in the past. *Id*. ¶ 72 (referencing $150 million of past solar incentives from the District to support the adoption of self-generation technologies). It does, however, ask this Court to set aside the decision of the District's publicly elected Board of Directors (the "Board")—issued after a robust public process—to discontinue the indirect subsidies embedded in past rate plans. But the antitrust laws provide no basis to mandate a continuation of those indirect subsidies any more than they would require their imposition in the first place. Those are fundamentally questions of public policy that Arizona law has left to the Legislature and the District's Board, and that therefore are beyond the purview of the federal judiciary to resolve.

The District is an agricultural improvement district and—as a matter of law—is designated as a public, political subdivision of the state, with all rights, privileges, benefits, immunities and exemptions granted municipalities and other political subdivisions under the Arizona Constitution or state law. Ariz. Const. Art. 13, § 7 and A.R.S. § 48-2302. Governed by an elected Board, the District is obligated to meet both the power and water needs of its service territory and is expressly authorized under state law to generate and sell electricity "[t]o reduce the cost of irrigation, drainage, and power to the owners of land in the district." A.R.S. § 48-2303(A)(7). Thus, while SolarCity

purports to challenge only the specific rate plan adopted by the District's Board, it actually attacks the policy judgment of the Arizona Legislature to preserve the Salt River Project as a federal reclamation project under the supervision of an elected Board of Directors, as well as the policy judgment of that Board with respect to the best interests of the District's customers.

Having failed to advance its policy and commercial objectives before the District's Board, SolarCity now asks this Court to insert itself as the District's rate regulator and replace the results of the regulatory process the Arizona Legislature has prescribed for setting the District's electricity rates with its own judgment.  But the federal courts are not intended to be rate regulators and the antitrust laws are not designed to replace Arizona's state regulatory and political processes.[1]  Federal and State statutes protect the District from actions for damages alleged to arise from its rate-setting (§ I, *infra*), and the state action immunity doctrine (§ II), the filed-rate doctrine (§ III), and the *Noerr-Pennington* doctrine (§ IV) preclude the antitrust laws from being used to thwart Arizona's state regulatory and political processes.

Separate from these doctrines, SolarCity's federal antitrust claims should be dismissed for lack of standing because SolarCity does not, and cannot, allege that it suffered an injury as a customer of the District and has admitted in other proceedings that it does not compete with the District or other utilities. (§ V).  SolarCity's FAC also fails to properly state a claim upon which relief can be granted under any of its various causes of action. (§ VI).  Its state law claims fail for the additional reasons that SolarCity did not follow the mandatory process under A.R.S. § 30-810 for challenging the Board's decision (§ VII), and the FAC fails to state a cause of action under those claims (§ VIII).

To the extent SolarCity disagrees with the Board's decision concerning the District's rates, it had and has numerous opportunities to pursue its agenda through the

---

[1] *Verizon Commn's Inc. v. Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 879 (2004) ( antitrust courts are "ill-suited" to "act as central planners, identifying the proper price ... and other terms of dealing.").

Board's legislatively mandated, public rate-setting process; by application for rehearing pursuant to A.R.S. § 30-810; or through the political process. What SolarCity may not do, however, is misuse the antitrust laws to serve its own narrow business interests and, in the process, displace the State of Arizona's considered policy judgments concerning the most effective way of ensuring the continued reliable supply of electricity and water to its citizens. Accordingly, the District hereby moves to dismiss SolarCity's FAC in its entirety and with prejudice.

## BACKGROUND[2]

### A.    The Regulatory Process Governing The District's Rate-Making

Before making changes to its price plan, the District must "provide public notice of proposed changes" to its rates. *Id*. at §§ 30-802(B)(1), 48-2334(B). Then, the District must make specific information available to the public, *id*. at §§ 30-802(B)(2), 48-2334(C), and provide an opportunity to comment. *Id*. at §§ 30-802(B)(3), 48-2334(D). The Board is also required to hold a public meeting where District management, consultants, and any interested persons must be afforded an opportunity to submit written comments or make oral presentations. *Id*. After completing this process, and making modifications as it deems fit, the Board votes on the proposed rate changes. *Id*. at §§ 30-803(B)(4), 48-2334(E). If dissatisfied with the Board's decision, the Arizona Attorney General or "any party to the action or proceeding" may file a notice of rehearing with the Board within twenty days of the order and, within thirty days after rehearing is denied or granted, seek judicial review. *Id*. at §§ 30-810 to -812.

### B.    The District's 2014-2015 Rate Changes

The District adhered to this regulatory process during the 2014-2015 pricing process. On December 12, 2014, the District opened the process to consider proposed rate changes. Notice was provided to the public and instructions were given regarding

---

[2] The District hereby incorporates the background section of the Motion to Dismiss of the Salt River Valley Water Users Association (the "Association") setting forth the history of the Salt River Project and the evolution of the District and the Association.

how to participate.[3]   The proposal included a general 3.9% overall average annual increase for all residential price plans and a new rate plan for self-generation customers, SEPP E-27.[4]   The proposal explained that the District incurs substantial costs to build and maintain the infrastructure necessary to meet the combined peak demand of its customers.[5]   Although a customer with rooftop solar panels typically requires less total electricity from the District, those solar panels do not reduce significantly (if at all) that customer's peak demand for power from the District. *Supra* note 5. Therefore, in a given month, a self-generating customer could have close to zero net power usage, but still have very high peak demand (demand the District is required by law to meet). *See supra* note 5. SEPP E-27 accounts for this imbalance through a targeted demand charge. *See supra* note 5, at 4-5.

The District's Legal Notice notified members of the public they could submit (i) comments and proposals, (ii) questions to management, (iii) requests for documents from management, and (iv) requests for interviews with District management and the District Board's consultants. *See supra* note 4. Public sessions were held on January 5, January 8, February 9, February 12, February 19, and February 26, 2015, at some of which the Board heard presentations (including from SolarCity) and received public comments on the proposal.[6]   Moreover, from December 12, 2014 to April 30, 2015, the District made the information required by A.R.S. §§ 30-802(B)(2) and 48-2334(C) available for inspection.   In addition, the District's management and consultants were available for interviews, including interviews by SolarCity on January 15, 2015.[7]   On February 26,

---

[3] *See* SRP Legal Notice (Dec. 12, 2014) (Request for Judicial Notice ("RJN") Ex. 8).
[4] *See* Executive Summary at 1 (Feb. 9, 2015) (RJN Ex. 9).
[5] "Demand" is the "total amount of electricity being used by customers at a given time." http://www.srpnet.com/electric/business/glossary.aspx. Thus, "peak demand" is the largest amount of electricity demanded over a given time period.
[6] *See generally*, Public Pricing Process, http://www.srpnet.com/prices/priceprocess/default.aspx.
[7] *See* Interviews by TASC and SolarCity with John Chamberlin and Tim Lyons and the District's Management, 2014/2015 Salt River Project Price Process, in Tempe, Ariz. (Jan. 15, 2015) (transcript on file with the District).

1    2015, the Board modified the original proposal and then approved the SEPPs.[8]

2    **ARGUMENT**

3    **I.     THE DISTRICT HAS ABSOLUTE IMMUNITY FROM DAMAGES**

4         **A.     The LGAA Provides The District Absolute Immunity From Federal
5              Antitrust Damages Claims**

6         The Local Government Antitrust Act of 1984 ("LGAA") provides the District

7    absolute immunity from damage claims arising under the antitrust laws. The LGAA

8    states that "[n]o damages, interest on damages, costs, or attorney's fees may be

9    recovered" in an antitrust action "from any local government, or official or employee

10   thereof acting in an official capacity." 15 U.S.C. § 35(a). Congress enacted the LGAA

11   to "allow local governments to go about their daily functions without the paralyzing fear

12   of antitrust lawsuits." S. Rep. No. 98-593, at 3 (1984). Consequently, "a court should

13   strive to resolve the [LGAA] immunity issue as early as possible, with a minimum of

14   expense and time to the parties." *Sandcrest Outpatient Servs. P.A. v. Cumberland Cty.*

15   *Hosp. Sys., Inc.*, 853 F.2d 1139, 1148 n.9 (4th Cir. 1988).

16        The LGAA broadly defines "local government" to include "a school district,

17   sanitary district, or any other special function governmental unit established by State law

18   in one or more States." 15 U.S.C. § 34(1); *Palm Springs Med. Clinic, Inc. v. Desert*

19   *Hosp.*, 628 F. Supp. 454, 457 (C.D. Cal. 1986). The "'special function governmental unit'

20   provision" is construed broadly, and is "designed to protect those political subdivisions of

21   the state, which though they do not have broad governmental powers, nonetheless serve a

22   public function in the provision of a particular service." *Capital Freight Servs., Inc. v.*

23   *Trailer Marine Transp. Corp.*, 704 F. Supp. 1190, 1198 (S.D.N.Y. 1988). Congress

24   intended to immunize entities like the District: political subdivisions with limited

25   governmental powers: "[e]xamples of special purpose political subdivisions include[] ...

26   planning districts, water districts, sewer districts, irrigation districts, drainage districts,

27

28   [8] *See* Press Release, SRP Board Approves Reduced Price Increase (Feb. 26, 2015).
     http://www.srpnet.com/newsroom/releases/022615.aspx.

6

road districts, and mosquito control districts." H.R. Rep. No. 98-965, at 19-20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4602, 4620-21.

The District is an agricultural improvement district under A.R.S. § 48-2301 *et seq*. As such, it is a "public, political, taxing subdivision of the state," A.R.S. § 48-2302, expressly authorized to exercise certain powers common to local governments.[9] Under the Arizona Constitution, it is "vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under ... any law of the state or of the United States." Ariz. Const. Art. 13, § 7. Because municipalities have "blanket and absolute" immunity under the LGAA, the District receives the same protection, *Palm Springs*, 628 F. Supp. at 458.[10]

**B.      The District Is Immune From SolarCity's State Law Damages Claims**

The District is a "[p]ublic entity" under Arizona law. *See* A.R.S. § 12-820(7) ("[p]ublic entity includes ... any political subdivision of this state"). Public entities possess "absolute immunity" in the "exercise of a ... legislative function" or "an administrative function involving the determination of fundamental governmental policy." *Id.* § 12-820.01. Setting and regulating electricity rates is a legislative function. *See Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 291 (Ariz. 1992) (ratemaking is an exercise of "legislative power").[11] SolarCity's FAC challenges only the

---

[9] *See, e.g.*, A.R.S. § 48-2340 (power of eminent domain); *id.* § 48-2339 (power to construct works across public and private property); *id.* § 48-2341 (power to survey land); and *id.* § 48-2442 (power to call elections for bond issuances). Moreover, like other local governments, the District is governed by an *elected* board of representatives, *id.* § 48-2381, and its property and bonds are immune from taxation, *id.* § 48-2302.

[10] In *Driscoll v. City of New York*, the court held that local governments are entitled to immunity from damages under state antitrust law claims because to hold otherwise "would be an obstacle to the accomplishment of the goals of Congress." No. 82 Civ. 8497, 1987 WL 26799, at *2 (S.D.N.Y. Nov. 25, 1987). The Ninth Circuit and Arizona's courts have not addressed the issue, but no political subdivision or municipality has ever been subject to antitrust damages under Arizona's antitrust law.

[11] *See also Ariz. Corp. Comm'n v. Super. Ct. In & For Maricopa Cnty.*, 107 Ariz. 24, 27 (1971) ("we hold that ratemaking is a legislative function"); *Am. Microsys., Inc. v. City of Santa Clara*, 137 Cal. App. 1037, 1042 (Ct. App. 1982) ("rate fixing" by public utility "is

1   rates set by the District's Board—a legislative function by a public utility.  The District is
2   therefore absolutely immune from damages under § 12-820.01.

3           In the alternative, the District's rate-setting is immune as an "exercise of an
4   administrative function involving the determination of fundamental governmental
5   policy." A.R.S. § 12-820.01(2).  Under § 12-820.01(2), a public entity's "determination
6   ... to seek ... the resources necessary for ... (b) [t]he construction or maintenance of
7   facilities" is recognized expressly as a "fundamental governmental policy." *Id.* § 12-
8   820.01(B).  The District's E-27 plan was implemented to cover the fixed costs of
9   maintaining the electrical grid so that the District can provide electricity and water to
10  hundreds of thousands of customers.  The E-27 plan thus qualifies as a "fundamental
11  governmental policy." *See Myers v. City of Tempe*, 212 Ariz. 128, 130 (Ariz. 2006)
12  (administrative decision that "involved ... the distribution of resources and assets, and
13  required consulting the city's subject matter experts" was immune).  Consequently,
14  SolarCity's state law damage claims should be dismissed under § 12-820.01.

15      **C.      SolarCity's Failure To Comply With The Notice Of Claim Statute
                    Compels Dismissal Of Its State Law Claims**
16

17          Because the District is a "public entity" under Arizona law, SolarCity was
18  required to comply with Arizona's notice of claim statute, A.R.S. § 12-821.01, before
19  initiating any state law claim for damages against the District.  To comply with the
20  statute, a notice of claim must provide the "*specific amount* for which the claim[s] can be
21  settled and the facts supporting that amount." A.R.S. § 12-821.01(A) (emphasis added);
22  *see also Yollin v. City of Glendale*, 219 Ariz. 24, 28 (App. 2008) ("[T]he first statutory
23  requirement is that the notice of claim contain an amount for which the claim can be
24  settled").  The notice of claim statute "unmistakably instructs claimants to include a
25  particular and certain amount of money that ... will settle the claim." *Deer Valley*

26

27

28  a legislative function"); *Earle M. Jorgensen Co. v. City of Seattle*, 665 P.2d 1328, 1331
    (Wash. 1983) ("municipality's setting of rates is a legislative act").

*Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 296 (Ariz. 2007).  A demand subject to "qualifying language" does not satisfy the statute.  *Id.* at 295-96.

SolarCity's notice, (RJN Ex. 10), served on March 24, 2015, does not comply with the notice of claim statute.  As stated in the District's response, (RJN Ex. 11, at 4), SolarCity's notice did not identify a "particular and certain amount of money" it would accept to settle its claims.  *See Deer Valley*, 214 Ariz. at 296. Rather, SolarCity's notice states that it "is not willing to settle damages independent of [the District's] consent to cease and desist from the business practices at issue … in a manner enforceable by court injunction or contempt proceedings." (RJN Ex. 10, at 2.) By conditioning its settlement offer on the District accepting its ambiguous demand for injunctive relief, SolarCity failed to state a "specific amount" for which its damages claims could be settled.  The failure to comply with the notice of claim statute cannot be cured because the 180-day deadline has passed.[12]  SolarCity's state law damages claims must therefore be dismissed. *Deer Valley*, 214 Ariz. at 295-96.

## II.  THE DISTRICT IS IMMUNE FROM ANTITRUST LIABILITY UNDER THE STATE ACTION IMMUNITY DOCTRINE

The state action doctrine provides states with immunity from antitrust liability.[13] *FTC v. Phoebe Putney Health Sys., Inc.*, --- U.S. ---, 133 S. Ct. 1003, 1010 (2013).  This immunity extends to a state's political subdivisions, like the District, where the challenged conduct is undertaken pursuant to a "clearly articulated and affirmatively expressed state policy" to displace competition. *Phoebe Putney*, 133 at 1010-1011; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985).  A state legislature "need not expressly state in a statute or its legislative history that the legislature intends for the

---

[12] *See* FAC ¶¶ 17, 89, 107, 116, 120(b), 123, 124, 203, 204, 211 and 212 (establishing SolarCity's state law damages claims accrued no later than December 12, 2014).

[13] Importantly, the state action doctrine provides "immunity from suit and not just from judgment ... to spare state officials the burdens and uncertainties of the litigation itself as well as the cost of an adverse judgment." *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 296 (5th Cir. 2000). Consequently, state action immunity presents a question of law appropriately resolved at the outset of a case.

delegated action to have anticompetitive effects." *Id.* at 34. Nor must the legislature expressly permit the challenged conduct. *S. Motor Carriers Rate Conf., Inc. v. United States,* 471 U.S. 48, 63 (1985). Instead, the clear articulation requirement is satisfied so long as anticompetitive effects are the "foreseeable result" of conduct that the state authorizes. *Phoebe Putney*, 133 S. Ct. at 1011 (quoting *Town of Hallie*, 471 U.S. at 42 (1985)); *Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079, 1084 (9th Cir. 2010) ("real question" is whether "alleged anticompetitive conduct was a foreseeable result" of state authorization).[14]

Since statehood, Arizona's clearly articulated policy, which is expressed in the Arizona Constitution and statutes, has been to displace unfettered competition with an elaborate regulatory structure. Pursuant to the Arizona Constitution, the regulation of electric utilities is a shared function between the Arizona Corporation Commission ("ACC") and the Arizona Legislature. The ACC has exclusive jurisdiction over Arizona's private utilities operated by public service corporations and cooperatives, Ariz. Const. Art. 15, §1, and the Arizona Legislature has jurisdiction over public power entities, including the District. *See State v. Tucson Gas, Electric Light & Power Company*, 15 Ariz. 294 (Ariz. 1914); *Rubenstein Const. Co. v. Salt River Project Agr. Imp. & Power Dist.*, 76 Ariz. 402, 404 (Ariz. 1953).

Retail electric rates in Arizona are not determined by competition. The regulatory framework governing the retail sale of electricity in Arizona is extensive. *See* Ariz. Const. Art. 15, § 3 (constitutionally mandating regulation and stating that the ACC "**shall**, prescribe just and reasonable rates and charges to be made and collected, by

---

[14] Private entities must satisfy a second element before their conduct is immunized as state action: active supervision. *United Nat. Maint. Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014). However, the District, as a public, local government entity, is not required to show that the challenged conduct is actively supervised. *North Carolina State Bd. of Dental Examiners v. FTC*, 135 at 1101, 1112 (2015) (no active supervision requirement where political subdivision has "electorally accountable" leadership because "there is little or no danger that it is involved in a private price-fixing arrangement").

public service corporations …") (emphasis added); Ariz. Admin. Code, § 14-2 (comprehensive rules governing public service corporations); A.R.S. § 30-801 *et seq.* (Electric Power Competition Act ("EPCA")); and § 48-2301 *et seq.* To effectuate the regulation of public power entities, the Legislature enacted statutes that establish local governing bodies, including the District's Board, and prescribe the process by which rates shall be set. *See* A.R.S. § 48-2301 *et seq.* and A.R.S. § 30-801 *et seq.* (setting forth the Legislature's delegation of authority to the District). Where, as here, the challenged conduct is both authorized by the state and the foreseeable, logical result of the state's clearly articulated policy, state action immunity warrants dismissal.[15]

### A.   Regulation Of The Electric Industry Continued During Arizona's Brief Exploration Of Competitive Generation

In the mid-1990s, the ACC promulgated a new regulatory framework that would move Arizona's electric industry from a vertically integrated industry (*i.e.*, one utility provides generation, transmission and distribution service) to a structure where properly certified "electric service providers" ("ESP") could compete in the limited areas of generation and related services, such as metering and billing. *Phelps Dodge Corp. v. Ariz. Elec. Power Co-op., Inc.*, 207 Ariz. 95, 100-101, ¶ 1 (App. 2004), *as amended on denial of reconsideration* (Mar. 15, 2004); Ariz. Admin. Code, §14-2-16 ("Electric Competition Rules" ("Rules")).[16] However, the other aspects of Arizona's electric industry, distribution and transmission, would remain closed to competition and continue as a regulated monopoly. *Id.*

In 1998, the Legislature enacted the EPCA as a companion to the ACC's Rules. The EPCA was intended to establish "a framework" for regulated competition in retail electric generation. 1998 Ariz. Sess. Laws, Ch. 209, § 35 (directing public power entities

---

[15] State action immunity also bars SolarCity's state-law antitrust claims. *See Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 609 (9th Cir. 2005).

[16] For example, an ESP was required to file a proposed tariff stating the "maximum" and "minimum" rates to be charged for a particular service. *Phelps Dodge Corp.*, 207 Ariz. at 101, ¶ 5, 102, ¶ 9. In addition, the competitive services the ESP could provide were limited to a "prescribed geographical area." *Id.* at 101, ¶ 5.

to coordinate with the ACC to "ensure an orderly transition to a competitive market in the retail sale of electricity."). Consistent with these objectives, the EPCA added numerous regulations governing public power entities' generation, transmission, and distribution services. *See e.g.* A.R.S. §§ 30-803(B), -804 and -805(A), (E) and (F) (mandating that public power entities continue to exclusively control distribution within their existing service territories); A.R.S. § 30-806(I) (requiring public power entities to be "supplier of last resort" for electric generation service if other electricity suppliers are unwilling or unable to supply electric generation service); and A.R.S. § 30-802(B) (setting forth a step-by-step, public procedure for adopting "terms and conditions" for electric generation services). Further, the Legislature required the governing bodies of public power entities to establish terms and conditions for generation service pursuant to a public process, subject to rehearing and judicial review. A.R.S. §§ 30-802(B), 30-810 to -812.[17]

### B.   Competition In Retail Electric Generation Does Not Exist In Arizona

Competition in the area of retail electric generation does not exist in Arizona. In *Phelps Dodge*, the Arizona Court of Appeals held that aspects of the ACC's Rules violated the Arizona Constitution. 207 Ariz. at 108, ¶ 39. The court held that the Arizona Constitution's "fair value" provision required the ACC to set retail electric rates so as to "provide for the needs of all whose interests are involved," and that competitively set rates, as proposed in the ACC Rules, could not fulfill that mandate. *Id.*

Since *Phelps Dodge*, the ACC has declined to allow any retail electric competition, including in the District's service area. *See 2010 Staff Report* Dkt. Nos. E-00000A-02-0051 & E-00000A-01-0630 ("the Phelps Dodge decision largely halted the

---

[17] Notably, SolarCity does not, and cannot, allege anticompetitive effect on the retail electric generation market established by the EPCA. SolarCity does not contend that it is an "electricity supplier" or that it engages in "electricity generation" or "other services" as defined in A.R.S. § 30-801. FAC ¶ 93 (conceding the EPCA does not apply to self-generation). Therefore, A.R.S. § 30-813 is not implicated by SolarCity's claims.

movement to ... provide for retail electric competition") (RJN Ex. 5, at 1).[18]  In 2013, the ACC opened a docket to reexamine whether Arizona should pursue restructuring of the electric industry.[19]  After receiving comments from many interested parties, the ACC voted 4 to 1 to close the docket and ended the inquiry into electric industry restructuring.[20]  As a result, no firms—including SolarCity—are certified to compete with the District.  This alone satisfies the state action immunity doctrine's clear articulation requirement.  *See Cal. CNG v. S. Cal. Gas Co.,* 96 F.3d 1193, 1198 (9th Cir. 1996) (where legislature has left to the regulatory body the decision of whether to allow competition, unless and until the regulator allows for competition "any activity" by the utility was immune).[21]

### C.   The Anticompetitive Effects Alleged By SolarCity Are A Foreseeable Result Of Arizona's Existing Regulatory Scheme

SolarCity contends that the District's rate setting pursuant to A.R.S. §§ 30-802 and 48-2334 has had anticompetitive effects on the rooftop solar industry.  However, even if presumed true, the alleged anticompetitive effects are the logical, foreseeable result of Arizona's regulatory scheme governing the electric industry.  *S. Motor Carriers Rate Conf.*, 471 U.S. at 65.[22]

---

[18] Only those companies "certificated by the commission" may compete in the District's service area.  A.R.S. § 30-803(A).  The *Phelps Dodge* decision revoked all of the certificates that the ACC had issued to that point.  207 Ariz. at 129.

[19] Jodi Jerich, Memorandum Directing Opening of Docket, ACC Dkt. No. E-00000W-13-0135, May 14, 2013 (RJN Ex. 6).

[20] Jodi Jerich, Memorandum Directing Administrative Closure of this Docket, ACC Dkt. No. E-00000W-13-0135, Sept. 24, 2013 (RJN Ex. 7).

[21] *See also Trigen-Okla. City Energy Corp. v. Okla. Gas & Electric Co.*, 244 F.3d 1220, 1226 (10th Cir. 2001) (grant of authority to state corporation commission to "regulate public utilities" illustrated state's "intent to displace competition"); *cf. Chugach Elec. Ass'n v. Regulatory Comm'n of Alaska*, 49 P.3d 246, 252 n.18 (Alaska 2003) (state law requiring certificate of convenience and necessity from state commission before competing in electric utility market immunizes utilities that have received certificate).

[22] *See also Nugget Hydroelectric L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 434 (9th Cir.1992) (alleged anticompetitive conduct was foreseeable result of regulatory authority granted to California public utility commission to specify "prices, terms and conditions" for sale of power); *Metro Mobile CTS, Inc. v. Newvector Comm'ns, Inc.*, 661 F. Supp.

Within the regulatory structures of Titles 30 and 48, A.R.S., the Board is required to set rates and to promulgate rules and regulations. A.R.S. §§ 30-802 and 48-2334.[23] No "electricity supplier" in Arizona is free to set its own rates without regulatory oversight and in no case are rates set by competition. Anticompetitive effects foreseeably result from this regulatory regime. *Metro Mobile CTS, Inc.,* 661 F. Supp. at 1509-1510 (holding that "[t]he directive to the ACC to determine just and reasonable rates and charges falls squarely within the analysis of *Southern Motor Carriers*" because "by definition, just and reasonable rates are set by regulatory agency, not by the market."). That the Legislature anticipated its regulatory scheme for public power entities would have anticompetitive effects is clearly articulated in A.R.S. § 48-247, which exempts the District from Arizona's antitrust laws. *McCallum v. City of Athens,* 976 F.2d 649, 655 (11th Cir. 1992) (stating that similar Georgia statute "unequivocally revealed that it contemplated that its municipalities might engage in anticompetitive conduct").

The provisions of the EPCA that were designed to facilitate a transition to competition in retail electric generation do not change the analysis under the state action immunity doctrine. A state policy need not compel anticompetitive activity to establish a state policy favoring regulation, nor is it required that the state policy prohibit competition. The "federal antitrust laws do not forbid the States to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties." *S. Motor Carriers,* 471 U.S. at 60 (emphasis in original). Statutes designed to "achieve the desired balance" between regulation and competition are sufficient to support state action immunity "as long as the State as sovereign clearly intends to displace competition in a

---

1504, 1515-16 (D. Ariz. 1987) *aff'd,* 892 F.2d 62 (9th Cir. 1989) ("As long as an agency is under the mandate of a sovereign state to establish just and reasonable rates, and retains discretion as to how those rates will be determined, the method by which it establishes those rates is, and remains, regulation, even if one of the factors used in determining the just and reasonable rates is the effect of competition.").

[23] Granting the District the right to set its own prices while the State was aware that the District was a monopoly suffices for clear articulation purposes. *Grason Elec. Co. v. Sacramento Util. Dist.,* 770 F.2d 833, 838 (9th Cir. 1985); *Hayes v. Shelby Cty. Trustee,* 971 F. Supp. 2d 717, 736 (W.D. Tenn. 2013).

1    particular field with a regulatory *structure*…." *Id.* at 59, 64 (emphasis added.); *Metro*

2    *Mobile CTS, Inc.*, 661 F. Supp. at 1514 ("a state regulatory scheme need not be

3    antithetical to competition to be exempt from federal antitrust scrutiny").

4        The EPCA created a regulatory "framework" within which public power entities

5    were to cooperate with the ACC in regulating limited competition in retail electric

6    generation. *See* 1998 Ariz. Sess. Laws, Ch. 209, § 38 (recognizing possibility the ACC

7    would delay or suspend efforts in connection with competition in retail generation and

8    authorizing public power entities to suspend A.R.S. § 30-803(A)). However, the EPCA

9    did not depart from Arizona's long-existing practice of the ACC and the local governing

10    bodies regulating the electric industry. *See* A.R.S. § 30-802(A)

11        Moreover, the EPCA clearly articulates a policy of continued regulation of

12    monopolies in all other aspects of the electric industry, including distribution,

13    transmission, and the supplier of last resort obligation. The Legislature expressly

14    selected regulation over competition in these areas to ensure "system safety, reliability,

15    environmental protection and fair access for all" and "sufficient supplies of electricity

16    and an adequate transmission and distribution system will be available to serve the

17    citizens and business of this state," as these policies were deemed matters of "utmost

18    importance." 1998 Ariz. Sess. Laws, Ch. 209, § 35; *see also* A.R.S. §§ 30-803(B), -

19    805(A)(1) and -806(I). The District is expressly authorized to adopt terms and conditions

20    to accomplish these goals. The logical foreseeable result of the Legislature's choice is

21    that the District's acts in these areas might have anticompetitive effects. *See* A.R.S. § 48-

22    247; *Town of Hallie*, 471 U.S. at 42 (clear articulation requirement satisfied where the

23    municipality was given broad authority to regulate); *City of Columbia v. Omni Outdoor*

24    *Advert., Inc.*, 499 U.S. 365, 370 (1991) (statute that authorized city to adopt regulations

25    for the "purpose of promoting health, safety, morals or the general welfare of the

26    community" satisfied clear articulation requirement); *New Motor Vehicle Bd. of Cal. v.*

27    *Orrin W. Fox Co.*, 439 U.S. 96, 109 (1978) (finding clear articulation where regulatory

28

1  scheme was "designed to displace unfettered business freedom"). State action immunity

2  therefore bars SolarCity's antitrust claims.

3  **III.    THE FILED-RATE DOCTRINE BARS ALL OF SOLAR CITY'S CLAIMS**

4          The filed-rate doctrine forbids a court from revising a utility's rate where that rate

5  has been approved by the utility's governing body.[24]  *See Ark. La. Gas Co. v. Hall*, 453

6  U.S. 571, 577 (1981) (doctrine applies to rates that are reviewed by "the appropriate ...

7  regulatory authority.");  *see E. & J. Gallo Winery.*, 503 F.3d at 1040. At the doctrine's

8  core is an awareness that courts "are not institutionally well suited to engage in

9  retroactive rate setting."  *Wegoland Ltd. v. NYNEX, Inc.*, 27 F.3d 17, 19 (2d Cir. 1994);

10  *Pub. Util. Dist. No. 1 of Grays Harbor Cnty. Wash. v. IDACORP Inc.*, 379 F.3d 641, 650-

11  51 (9th Cir. 2004) (courts may not substitute their own views of reasonableness regarding

12  regulated rates).

13          In the Ninth Circuit, "[t]he filed rate doctrine has been given an expansive reading

14  and application."  *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 868 (9th Cir. 2013). The

15  filed rate doctrine provides "fortification against direct attack [of regulated rates and] is

16  impenetrable. It turns away both federal and state antitrust actions ... [and] ... state tort

17  actions."  *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th

18  Cir. 2007).

19          All of SolarCity's claims challenge rates set pursuant to the District Board's

20  regulatory authority under Titles 30 and 48 of the A.R.S. The filed-rate doctrine

21  therefore bars them completely. The rates at issue were considered and approved by the

22  Board. Pursuant to state law, there was a notice and comment period, public hearings (in

23  which SolarCity participated vigorously), a vote, and an opportunity to challenge the

24  Board's decision in state court—the *only* mechanism allowed for reconsideration of the

25  District's rates as a matter of state law (which SolarCity elected not to pursue). A.R.S. §§

26

27  _____

    [24] The name "filed rate" is a misnomer, as there is no requirement that a rate literally be

28  "filed" for immunity to attach. *See E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1040 (9th Cir. 2007).

30-810 to 30-812. Collateral judicial review of the Board's decision clearly "infringe[s] upon [the Board's] power to set rates" and thus is prohibited. *Smith v. Sprint Commc'ns Co.*, No. C 96-2067, 1996 WL 1058204, at *3 (N.D. Cal. Sept. 13, 1996).[25]

All counts of SolarCity's FAC ask the Court to reverse the rate set by the District's Board for its self-generation customers, and thereby increase the rates of all of the District's other customers—precisely the kind of relief the filed-rate doctrine was created to prohibit. The FAC therefore must be dismissed.

## IV. SOLARCITY'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE *NOERR-PENNINGTON* DOCTRINE

SolarCity's FAC must also be dismissed in its entirety under the *Noerr-Pennington* doctrine ("*Noerr*"). *Noerr* extends absolute immunity where alleged "monopolization is the result of valid governmental action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 499 (1988). SolarCity challenges the Board's decision regarding the appropriate rates to charge retail electric customers. That decision was made in direct response to petitioning from District management for a rate change, and made only after the elected Board modified management's proposal during the course of the public proceeding. *See* FAC ¶¶ 89, 97. Because SolarCity's alleged injuries result solely from government action in response to valid petitioning, its suit must be dismissed. *See Joor Mfg.*, 17 F.3d at 300-02.

Immunity is not lost because the petitioning at issue was initiated by the management of a public entity. The Ninth Circuit has held that *Noerr* extends to petitioning by government officials and other employees of public entities. *See Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092-94 (9th Cir. 2000). If anything, *Noerr* immunity for government officials carries with it the additional safeguard that

---

[25] The filed rate doctrine bars injunctive relief in addition to damages where—as is true here—such relief would necessarily require an adjustment to the set rate. *See Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg., Inc.,* 384 F.3d 756, 761 (9th Cir. 2004) ("injunctive relief ... [is] barred by the filed rate doctrine"); *McLeod USA Telecomms. Servs. v. Ariz. Corp. Comm'n*, 655 F. Supp. 2d 1003,1009-11 (D. Ariz. 2009) (doctrine barred suit seeking injunctive relief).

"elected officials have political checks on their actions that private petitioners do not face." *Id.* at 1094. So it is here, where the Board members are politically accountable to the District electorate.[26] *Noerr* bars not only SolarCity's state and federal law antitrust claims, but also its state law tort claims. *See*, *e.g.*, *Joor Mfg.*, 17 F.3d at 301-02.

## V.   SOLARCITY HAS NOT AND CANNOT ALLEGE ANTITRUST INJURY AND THEREFORE LACKS STANDING

Not every party alleging injury arising from a violation of the antitrust laws has standing to bring suit: "Only those who meet the requirements for 'antitrust *standing*' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove '**antitrust injury**.'" *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003) (second emphasis added). A plaintiff's failure to adequately allege antitrust injury compels dismissal under Fed. R. Civ. P. 12(b)(6). *Somers v. Apple, Inc.*, 729 F.3d 953, 962 (9th Cir. 2013).

To establish antitrust injury, the Ninth Circuit requires, *inter alia*, "that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers*, 729 F.3d at 963 (citing *Glen Holly*, 343 F.3d at 1008); *see also Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996) ("plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury.") (internal quotation marks omitted).

SolarCity does not claim injury as a customer of the District. And, while SolarCity asserts in its FAC that it "directly competes with SRP in the retail market because SolarCity offers equipment and services that provide electricity—specifically solar-generated electricity—to customers," FAC ¶ 50, this conclusory assertion is false as

---

[26] Moreover, because SolarCity's FAC clearly involves the right to petition governmental bodies under *Noerr*, it was required to satisfy a "heightened pleading standard" that "include[s] allegations of the specific activities" which bring "the defendant's conduct into one of the exceptions to *Noerr-Pennington* protection." *Or. Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991). SolarCity's FAC contains no such allegations.

a matter of law and is contradicted by SolarCity's own statements to the ACC and, more recently, to the Maricopa County Superior Court.[27]

First, to supply retail electricity in Arizona, a company must "obtain a certificate" from the ACC. A.R.S. §§ 30-803(A), 40-207(A). SolarCity has not applied for, much less obtained such a certificate. As SolarCity itself admits: "specific rules adopted by the Arizona Corporation Commission—which regulates companies that produce and sell electricity directly to consumers—expressly prohibit [SolarCity] from doing so."[28] SolarCity is therefore prohibited as a matter of law from competing with the District to supply retail electricity. *See Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 180 (3d Cir. 1997) (Alito, J.) (plaintiff not a competitor in relevant market because it "lacked the required [regulatory] license); *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 235-36 (3d Cir. 2013) (plaintiff "does not and indeed cannot compete with [defendant]" because "[i]t did not ... receive the required FDA approval").

Second, in a 2009 regulatory proceeding before the ACC—initiated by SolarCity—SolarCity argued that it does not supply retail electricity in Arizona. As part of that proceeding, SolarCity submitted the written testimony of its CEO, Lyndon Rive, who responded to the very question raised by the Ninth Circuit's test:

> **6. Does SolarCity compete against public service corporations?** No. ... The systems that SolarCity finances and installs do not replace the customer's need for service from their traditional utility. SolarCity offers a *completely different set of products and services* than a traditional public service corporation.[29]

While the District and others argued that SolarCity should be regulated, SolarCity prevailed and the ACC found that SolarCity does not furnish electricity in Arizona. *See* Decision No. 71795, Docket E-20690A-09-0346 (July 12, 2010) (RJN Ex. 4). SolarCity

---

[27] The Court need not assume the truth of legal conclusions like SolarCity's claim that it competes in the relevant market. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

[28] *SolarCity v. Ariz. Dep't of Revenue*, Verified Complaint ¶ 5 ("*SolarCity* Compl."), No. TX 2014-00129 (Ariz. Super. Ct. June 30, 2014) (RJN Ex. 1).

[29] Notice of Filing of Applicant, SolarCity's Pre-Filed Witness Testimony and Exhibits, Docket E-20690A-09-0346 (Aug. 24, 2009), Testimony of Lyndon Rive (Aug. 20, 2009) (RJN Ex. 3, at 8) (emphasis added).

1   cannot have it both ways.  It therefore should be judicially estopped from claiming to

2   compete with the District.[30]

3          Furthermore, as recently as April 2015, *after* the initiation of this lawsuit,

4   SolarCity reaffirmed that it does not compete in the sale of retail electricity, when it

5   asserted to the Maricopa County Superior Court: "Simply put, there is no issue as to

6   whether either of the Plaintiffs [SolarCity and SunRun] 'compete' with local utilities *in*

7   *any sense of that word.*"[31]

8          Third, SolarCity's assertion that it "directly competes with [the District] in the

9   retail market because SolarCity offers equipment and services that provide electricity—

10  specifically solar power—to customers" is internally inconsistent.  FAC ¶ 50.  SolarCity

11  no more competes with the District to supply power through its sale of solar panels than

12  do companies that manufacture and supply wind turbines, hydroelectric dams, or gasoline

13  generators.  By its own account, SolarCity sells equipment, not retail electricity.[32]

14         Further, SolarCity's purported "injury" fails to give it standing.  The claimed

15  injury is that SolarCity now sells and leases fewer rooftop solar panels because of the

16  District's SEPPs. But this purported injury to SolarCity's bottom line is not an allegation

17  of harm to competition.  *See, e.g.*, *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1035-

18  36 (9th Cir. 2001) ("reduced profits ... and decreased market share" from allegedly

19  anticompetitive acts "is not the type of harm ... antitrust laws were meant to protect

20  against").  There is no requirement in the antitrust laws or otherwise that the District

21  establish its rates in a manner that aids SolarCity's sales.

22

---

23  [30] To apply judicial estoppel, courts consider (1) whether "a party's later position [is]
    'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in

24  persuading a court to accept that party's earlier position"; and (3) "whether the party
    seeking to assert an inconsistent position would derive an unfair advantage or impose an

25  unfair detriment on the opposing party if not estopped." *Hamilton v. State Farm Fire &*

26  *Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001). Here, all three favor judicial estoppel.
    [31] *SolarCity v. Ariz. Dep't of Revenue*, No. TX2014-000129, Plaintiffs' Controverting

27  Statement of Facts (Ariz. Super. Ct., T.C. Apr. 9, 2015) (emphasis added) (RJN Ex. 2, at

28  15-16, ¶ 70).
    [32] *See* FAC ¶ 3.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   SOLARCITY FAILS TO STATE A CLAIM UNDER STATE OR FEDERAL ANTITRUST LAW

### A.   SolarCity's Failure To Adequately Plead Relevant Markets Requires Dismissal Of All Of Its State And Federal Antitrust Claims

Each antitrust claim requires SolarCity to plead a plausible relevant product market in which the conduct at issue took place.[33] Failure to do so requires dismissal. *Tanaka*, 252 F.3d at 1063. A properly alleged antitrust product market must be defined in more than conclusory terms: "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, ... the relevant market is legally insufficient and a motion to dismiss may be granted." *POURfect Prods. v. KitchenAid*, No. 09-cv-2660, 2010 WL 1769413, at *4 n.1 (D. Ariz. May 3, 2010); *Tanaka*, 252 F.3d at 1063.

SolarCity alleges the relevant product market to be the retail market for "the provision of electric power to end-use residential, governmental, and business consumers." FAC ¶ 49. It posits that, in this alleged market, "power may be provided by various sources, such as through the outright sale of power, or by the lease or sale of distributed systems through which a customer generates power on his or her own property." *Id.* A retail electricity market that includes self-generated power *and* equipment suppliers to self-generating customers is facially implausible.

As explained above, SolarCity does not supply retail electricity. It supplies *equipment* (and financing for that equipment) that can generate electricity during certain times of the day under certain conditions, *i.e.*, when the sun shines. FAC ¶ 70. Thus, accepting SolarCity's unsustainable view of the market, *any* supplier of *any* equipment used to generate electricity would be included.

Moreover, the FAC does not, because it cannot, allege that the equipment SolarCity sells is reasonably interchangeable with retail electricity. *See Grason Elec. Co.*

---

[33] *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (Sherman Act § 1); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458-459 (1993) (Sherman Act § 2); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (Clayton Act § 3).

*v. Sacramento Mun. Util. Dist.*, 571 F. Supp. 1504, 1522 (E.D. Cal. 1983) (alternative forms of energy not interchangeable with electricity). And several allegations contend just the opposite. For example, FAC ¶ 63 states,

> Whether SRP customers self-generate power (including through distributed solar provided by SolarCity) or not, all or virtually all of them still need to purchase both retail electric power and grid access from SRP to have access to power at times that alternative sources of power (such as distributed solar) cannot meet the customers' needs.

Consequently, as a matter of law, the two products are not part of the same market. *See Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1146 (E.D. Ark. 2008) ("as a matter of law, complementary products sold separately are not in the same product market"), *aff'd*, 591 F. 3d 591 (8th Cir. 2009); *Transphase Sys., Inc. v. S. Cal. Edison Co.*, 839 F. Supp. 711, 717-18 (C.D. Cal. 1993) (dismissing monopolization allegations because plaintiff did not participate in relevant market); Areeda & Hovenkamp, *Antitrust Law*, ¶ 565a (2014) (complements do not belong in the same market). And SolarCity does not even attempt to allege cross-elasticity of demand between electricity supplied by the District and SolarCity's panels. Cross-elasticity of demand simply refers to "the extent to which consumers will respond to an increase in the price of one good by substituting or switching to another," that is, by increasing their purchases of the second good. *Mobil Pipe Line Co. v. F.E.R.C.*, 676 F.3d 1098, 1102 (D.C. Cir. 2012). Here, SolarCity alleges the very opposite of cross-elasticity: it claims that increases in the District's rates will result in *decreased*, rather than increased, demand for SolarCity's panels. FAC ¶ 123.

Where, as here, a complaint itself contains allegations that make the alleged product market implausible—both in terms of reasonable substitutability and cross-elasticity of demand—it must be dismissed. *See Tanaka*, 252 F.3d at 1063.[34]

---

[34] SolarCity also does not define its purported "grid access market," with reference to the rule of interchangeability and cross-elasticity of demand. *See* FAC ¶ 58.

**B.    SolarCity's Claims Under Sherman Act § 1, Clayton Act § 3, And A.R.S. § 44-1402 Must Be Dismissed Because SolarCity Has Failed To Adequately Plead An Agreement**

SolarCity's claims are also deficient in other respects. "Section 1 of the Sherman Act does not preclude a party from *unilaterally* determining the parties with whom it will deal and the terms on which it will transact business." *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1468 (9th Cir. 1986) (emphasis added). Instead a plaintiff must show "an agreement, conspiracy or combination among two or more persons or distinct business entities." *Cent. Valley Chrysler-Jeep v. Witherspoon*, 456 F. Supp. 2d 1160, 1186 (E.D. Cal. 2006) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988)). Similarly, "[e]vidence of an agreement is expressly required under ... Section 3 of the Clayton Act." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 n.10 (3d Cir. 2012). Failure to plead that a defendant entered into such an illegal agreement compels dismissal of those claims. *See Supermarket of Homes, Inc. v. San Fernando Valley Bd.*, 786 F.2d 1400, 1405 (9th Cir. 1988).

SolarCity attempts to characterize the District's retail rates as "agreements." FAC ¶ 161. This does not suffice. SolarCity does not allege that the District's rates are the result of anything other than the District's unilateral pricing decision. A customer's agreement to pay that price is of no moment under the antitrust laws. If it were, each District customer would be party to the allegedly unlawful agreement and, therefore, at least theoretically liable for the challenged conduct. The antitrust laws do not compel such an absurd result. *See, e.g.*, *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008) ("ordinary sales contract [is] not an illegal antitrust agreement"). Rather, there "can be no liability under § 1" for a single firm's unilateral decision as to how to set its prices. *Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 266 (1986).

**C.    SolarCity Has Failed To Plead Adequately A Tying Arrangement**

SolarCity also cannot allege a Section 1 violation by labeling the price that the District charges its retail customers for electricity an illegal "tying" arrangement. *See* FAC ¶ 164. A tying arrangement is an "agreement by [the seller] to sell one product but

only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992). To state a valid tying claim, a plaintiff must plausibly plead "that there exist two *distinct* products … in different markets whose sales are tied together." *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 993 (N.D. Cal. 2010) (*citing Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)).

SolarCity fails to allege adequately two distinct product markets. It provides no factual allegations to support its naked assertion that there is "separate demand" for grid access. *See, e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (antitrust plaintiff must provide "factual basis" in complaint for alleged product market). As SolarCity acknowledges, its customers purchase the same electricity at retail from the District as any other District customer. FAC ¶ 63. Indeed, by the FAC's own terms, none of the District's retail customers purchase "grid access" apart from their demand for retail electric power from the District. *Id.*; *see also City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1306, 1312 (N.D. Ohio 1980) (that access to wholesale power was important element in competition in retail power market did not mean that there was a "wholesale power market" separate from retail market); *Grason Elec. Co.*, 571 F. Supp. at 1527 (electricity distribution facilities not a separate market from retail electricity because "the consumer has no interest in those facilities independent of the desire to obtain raw electric power"). SolarCity's failure to plead two distinct markets requires its tying claim to be dismissed. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984) (Tying "cannot exist unless two separate product markets have been linked.").

### D.   SolarCity's State And Federal Monopolization Claims Must Be Dismissed For Failure To Adequately Plead Anticompetitive Conduct

The antitrust laws recognize that a "single entity . . . must have the discretion to determine the prices of the products that it sells." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7

(2006).  Thus,"[s]imply possessing monopoly power and charging monopoly prices does not violate" Sherman Act § 2 (or its state corollary, A.R.S. § 44-1403).  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) (citation omitted).  "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko,* 540 U.S. at 407; *see also POURfect Prods.*, 2010 WL 1769413, at *5 (granting a rule 12(b)(6) motion because "a monopolist's act ... must harm the competitive process and thereby harm consumers, but mere harm to one or more competitors will not suffice").  SolarCity's failure to adequately plead anticompetitive conduct requires dismissal of its monopolization claims.  *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) ("anticompetitive conduct" an essential element of attempted monopolization claim).

### 1.    SolarCity Fails To Allege Below-Cost Pricing Or An Antitrust Duty To Deal

While in certain contexts what constitutes "anticompetitive conduct" can be challenging to discern, the Supreme Court has established clear standards where—as here—the conduct at issue arises from a defendant's pricing.  Typically, a company "is free to charge whatever [] price it would like." *linkLine*, 555 U.S. at 454.  However, in "rare circumstances, a dominant firm may incur antitrust liability for purely unilateral conduct." *Id.* at 439.  As the Supreme Court explained in *linkLine*, if a plaintiff contends that a defendant's prices are ***too low***, it must allege that those prices are below a reasonable measure of the defendant's costs. *Id.* at 451.  If a plaintiff alleges that a defendant's prices are ***too high***, the plaintiff must allege that the defendant has an "antitrust duty to deal" with the plaintiff. *Id.* at 450-51.

The FAC does neither.  SolarCity does not allege that the District has an "antitrust duty to deal" with SolarCity.  "[A] defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals." *Id.* at 457.  Nor does SolarCity allege that the District's price are below a reasonable measure of its costs.  If anything, SolarCity alleges that the District charges all of its customers well

above its costs.  In *PeaceHealth*, the Ninth Circuit held that the below-cost pricing test applies to the evaluation of whether the defendant's "bundled discounts" amounted to anticompetitive conduct.  *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008).  And the only two circuits to have addressed the issue have extended the price-cost test to the kind of claims alleged by SolarCity: exclusive dealing claims in which price is the primary method of exclusion.  In *ZF Meritor*, the Court held that, "in the context of exclusive dealing, the price-cost test may be utilized as a specific application of the 'rule of reason' when the plaintiff alleges that price is the vehicle of exclusion."  696 F.3d at 273-74; *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451-52 (6th Cir. 2007) (dismissing Sherman Act § 2 claim where plaintiff conceded defendant did not engage in below-cost "predatory pricing"); *PNY Techs., Inc. v. SanDisk Corp.*, Case No. 11-cv-04689-WHO, 2014 WL 2987322, at *6 & nn.9, 10 (N.D. Cal. July 2, 2014) (noting absence of below-cost pricing allegation and dismissing exclusive dealing claim); *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, Civil Action No. 08-4168 (MLC), 2014 WL 1343254, at *25-30 (D.N.J. March 28, 2014).

Accordingly, SolarCity's claim based on exclusive dealing (or any other antitrust label) must be dismissed based on its failure to allege that the District's rates are priced below its costs.[35]

## 2. At Best, SolarCity Asserts A Price Squeeze Claim, Which The Supreme Court Has Plainly Rejected As Invalid

The gravamen of the FAC appears to be that the District's price increase for electricity has made it less attractive for customers to purchase SolarCity's distributed solar product.  *See* FAC ¶¶ 5, 78, 83.  SolarCity implies that, on the one hand, the District's prices for non-solar customers are too low and, on the other, alleges its prices for self-generation customers are too high.  While SolarCity's casual approach to

---

[35] This same analysis applies to SolarCity's exclusive dealing claims under Sherman Act § 1 and § 2, and Clayton Act § 3. *ZF Meritor*, 696 F.3d at 281.  Consequently, the shortcomings of the FAC identified in this section provide additional reasons that its exclusive dealing claims under Sherman Act § 1 and Clayton Act § 3 must be dismissed.

1    pleading its monopolization claims avoids the term, these allegations are the functional

2    equivalent of a "price squeeze." Price squeezes typically occur "when a vertically

3    integrated firm sells inputs at wholesale and also sells finished goods or services at

4    retail." *linkLine*, 555 U.S. at 442. SolarCity's allegations that the District is using some

5    combination of allegedly too high and too low prices to exclude SolarCity places its

6    claim squarely within the Supreme Court's "price squeeze" framework in *linkLine*, and

7    requires its dismissal.

8         In *linkLine*, the Supreme Court held that plaintiffs asserting a price squeeze claim

9    must show either that the defendant had a duty to deal at the wholesale level or that its

10   prices at the retail level were below cost. *Id.* at 457. "In short, there is no independently

11   cognizable harm to competition when the wholesale price and the retail price are

12   independently lawful." *Doe v. Abbott Labs.*, 571 F.3d 930, 934-35 (9th Cir. 2009). In

13   *Doe v. Abbott Labs.*, the Ninth Circuit dismissed plaintiffs' "monopoly leveraging"

14   claims, reasoning that they were the economic equivalent of a price squeeze under

15   *linkLine*. *Id.* at 935. There, the defendant, Abbott, manufactured a drug called Norvir,

16   which served as a "booster" to enhance the effectiveness of Abbott's protease inhibitors

17   (a type of HIV/AIDS drug). *Id.* at 932. "[T]he alleged vice [was] that Abbott [was]

18   using its monopoly position in the booster market to raise the price of Norvir while

19   selling its own boosted inhibitor at too low a price." *Id.* at 935. The plaintiffs tried to

20   distinguish *linkLine* on the grounds that they labeled their claim "monopoly leveraging"

21   instead of a price squeeze. *Id.* at 935. The court rejected this distinction as

22   "insubstantial," and held instead that "Abbott's conduct [was] the functional equivalent

23   of a price squeeze the [Supreme] Court found unobjectionable in *linkLine*." *Id.*

24        The allegations here are virtually identical to those the Ninth Circuit found

25   wanting in *Abbott Labs*. Just as Norvir was alleged to be necessary for Abbott's

26   competitors to offer an effective and thus competitive protease inhibitor, *see id.* at 932,

27   SolarCity's customers still need electricity from the District. *See* FAC ¶¶ 4, 63. As in

28   *Abbott Labs.*, the alleged effect of the District's conduct is "to raise the total cost to the

[customer]" of using distributed solar. 571 F.3d at 932. For example, the FAC alleges that the District's "rates have made rooftop solar profoundly uneconomical," ¶ 123; that the District's price increase is "so significant that it eliminates the economic value to customers of generating their own power," *id.* ¶ 5; and "that very few, if any, customers will make the economically irrational decision to install distributed solar systems if the result will be to pay a *higher* total amount for power." *Id.* ¶ 114. At the same time, SolarCity suggests that the District keeps its prices to non-solar customers low, so that all customers are incentivized to purchase all of their power from the District. *See id.* ¶ 12. In short, "the alleged vice is that [the District] is using its monopoly position ... to raise the price of [electricity for self-generators] while selling its own [electricity] at too low a price" for SolarCity to compete. *See Abbott Labs.*, 571 F.3d at 935. The FAC's allegations are thus the "functional equivalent of [a] price squeeze." *Id.*

Because the FAC does not allege either that the District has an antitrust duty to deal with SolarCity, or that it has priced retail electricity below its costs, SolarCity's monopolization and attempted monopolization claims must be dismissed.[36]

## VII. SOLARCITY'S STATE LAW CLAIMS ARE BARRED PURSUANT TO A.R.S. § 30-810

SolarCity failed to file a request for a rehearing before bringing its state law claims pursuant to A.R.S. § 301-810(B). This statute provides that "no claim arising from any ... decision of the [Board] ... shall accrue in any court... unless the party ... makes ... application to the [District] for a rehearing." The rehearing requirement in A.R.S. § 30-810 mirrors A.R.S. § 40-253, which requires an application for a rehearing before bringing a claim arising from a decision by the ACC.[37] Arizona law is clear that a party that fails to

---

[36] *See also NicSand*, 507 F.3d at 451-52 (dismissing § 2 claim where plaintiff conceded defendant "did not engage in any form of predatory pricing"); *PNY Techs.*, 2014 WL 2987322, at *6 & nn.9, 10 (noting absence of below-cost pricing allegation and dismissing exclusive dealing claim).

[37] A.R.S. § 40-253 states: "no claim arising from any order or decision of the commission shall accrue in any court to any party or the state unless the party or the state makes ... an application to the commission for a rehearing."

file a timely application for rehearing under A.R.S. § 40-253 is barred from bringing a collateral attack on the decision in the courts. *Phoenix Ry. Co. of Ariz. v. Lount*, 21 Ariz. 289, 301(Ariz. 1920) ("It being evident that the [ACC] had jurisdiction to make the order, the decision was conclusive as against collateral attack as here attempted."); *Ariz. Pub. Serv. Co. v. S. Union Gas Co.*, 76 Ariz. 373, 379 (Ariz. 1954).

SolarCity attempts to plead around the rehearing requirement by claiming it was not a "party" to the proceeding. (FAC ¶ 91.) However, the official notice of the price process made clear that:

> Persons wishing to participate in these proceedings may provide their names, addresses, telephone numbers, facsimile numbers (optional), and email addresses (optional) to the SRP Corporate Secretary. ***Persons providing their names and addresses to the SRP Corporate Secretary will be considered "parties" within the meaning of A.R.S. Sections 30-810 through 812 for the purpose of these proceedings***.[38]

SolarCity did so and, therefore, is a party to the proceeding. In addition, SolarCity exercised the rights afforded under A.R.S. § 30-802(B), including examining financial documents, consultant reports, and other materials relevant to the proposal; submitting written materials; making oral presentations; and questioning the District's employees and consultants during interviews conducted by counsel. *See* FAC ¶ 91, 92, and 96. Thus, SolarCity's failure to comply with A.R.S. § 30-810 bars its state law claims.

## VIII. SOLARCITY'S TORTIOUS INTERFERENCE CLAIMS FAIL WITH ITS ANTITRUST CLAIMS

SolarCity's tortious interference claims should also be dismissed. "To be actionable, [tortious] interference must 'be both intentional and improper .... Thus, there is ordinarily no liability absent a showing that defendant's actions were improper.'" *Neonatology Assocs. v. Phoenix Perinatal Assocs.*, 216 Ariz. 185, 187-88 (App. 2007). Here, SolarCity's interference claims rest solely on the same alleged misconduct as its failed antitrust claims. Conduct permitted under antitrust laws may not be punished as a

---

[38] *See* SRP Legal Notice (Dec. 12, 2014) (RJN Ex. 8) (emphasis added).

1  tort. "[S]uch common law 'back dooring' would subvert the function of antitrust law in

2  defining, and regulating, the boundary between permissible and impermissible

3  competitive conduct." *Willamette Dental Grp., P.C. v. Oregon Dental Serv. Corp.*, 882

4  P.2d 637, 644 (Or. Ct. App. 1994); *see also United Nat'l Maint.*,766 F.3d at 1012 (state

5  action antitrust immunity "dooms" any intentional interference with prospective

6  economic advantage claim premised on challenged conduct).[39]

7  **CONCLUSION**

8      For all the foregoing reasons, the District respectfully requests that the Court

9  dismiss with prejudice Plaintiff SolarCity's First Amended Complaint in its entirety.

10  RESPECTFULLY SUBMITTED this 23rd day of June, 2015.

11

12

13                                            s/Christopher E. Babbitt
                                              _____
14  Steptoe & Johnson LLP                     Wilmer Cutler Pickering Hale and Dorr LLP
    Paul K. Charlton                          Eric Mahr
15  Karl M. Tilleman                          Christopher E. Babbitt
    201 East Washington Street, Suite 1600    Christopher T. Casamassima
16  Phoenix, AZ 85004                         1875 Pennsylvania Avenue NW
    Telephone: (602) 257-5200                 Washington, DC 20006
17  Facsimile: (602) 257-5299                 Telephone: (202) 663 6000
    pcharlton@steptoe.com                     Facsimile: (202) 663 6363
18  ktilleman@steptoe.com                     eric.mahr@wilmerhale.com
19                                            christopher.babbitt@wilmerhale.com
                                              chris.casamassima@wilmerhale.com
20

21                                            Attorneys for Defendants

22

23  _____

24  [39] With dismissal of the federal law claims, diversity would be the sole basis for this court
    to exercise jurisdiction. The state law claims would therefore be barred by the Johnson
25  Act, which states that "[t]he district courts shall not enjoin, suspend or restrain the
    operation of, or compliance with, any order affecting rates chargeable by a public utility
26  and made by a State administrative agency or a rate-making body of a State political
    subdivision, where: "(1) Jurisdiction is based solely on diversity of citizenship ... (2) The
27  order does not interfere with interstate commerce; and, (3) The order has been made after
    reasonable notice and hearing; and, (4) A plain, speedy and efficient remedy may be had
28  in the courts of such State." 28 U.S.C. § 1342. Each element is met here.

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on June 23, 2015, I electronically transmitted the attached

4 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

5 Notice of Electronic Filing to the following CM/ECF registrants:

6        BOIES, SCHILLER & FLEXNER LLP
         300 South Fourth Street, Suite 800
7        Las Vegas, NV 89101
         Richard J. Pocker (012548)
8

9        BOIES, SCHILLER & FLEXNER LLP
         5301 Wisconsin Avenue, NW
10       Washington, DC 20015
         William A. Isaacson (*admitted pro hac vice*)
11       Karen L. Dunn (*admitted pro hac vice*)
12

13       BOIES, SCHILLER & FLEXNER LLP
         1999 Harrison Street, Suite 900
14       Oakland, CA 94612
         Steven C. Holtzman
15       John F. Cove, Jr.
         Kieran P. Ringgenberg
16       Sean P. Rodriguez
17

18       COPPERSMITH BROCKELMAN PLC
         2800 North Central Avenue, Suite 1200
19       Phoenix, AZ 85004
         Keith Beauchamp
20       Roopali H. Desai
21

22                                            s/Christopher E. Babbitt

23

24

25

26

27

28