1   COPPERSMITH BROCKELMAN PLC
    KEITH BEAUCHAMP (#012434)
2   ROOPALI H. DESAI (#024295)
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    Telephone:  (602) 381-5490
4   kbeauchamp@cblawyers.com
    rdesai@cblawyers.com
5
    BOIES, SCHILLER & FLEXNER LLP
6   WILLIAM A. ISAACSON *(admitted pro hac vice)*
    KAREN L. DUNN *(admitted pro hac vice)*
7   5301 Wisconsin Ave, NW
    Washington, DC 20015
8   Telephone:  (202) 237-2727
    wisaacson@bsfllp.com
9   kdunn@bsfllp.com

10  STEVEN C. HOLTZMAN *(admitted pro hac vice)*
    JOHN F. COVE, JR. *(admitted pro hac vice)*
11  KIERAN P. RINGGENBERG *(admitted pro hac vice)*
    SEAN P. RODRIGUEZ *(admitted pro hac vice)*
12  1999 Harrison Street, Suite 900
    Oakland, CA 94612
13  Telephone: (510) 874-1000
    sholtzman@bsfllp.com
14  jcove@bsfllp.com
    kringgenberg@bsfllp.com
15  srodriguez@bsfllp.com

16  *Attorneys for Plaintiff SolarCity Corporation*

17          UNITED STATES DISTRICT COURT

18          FOR THE DISTRICT OF ARIZONA

19  SolarCity Corporation,                     No.  2:15-CV-00374-DLR

20              Plaintiff,               **PLAINTIFF SOLARCITY**
                                         **CORPORATION'S OPPOSITION TO**
21          vs.                          **DEFENDANT SALT RIVER**
                                         **AGRICULTURAL IMPROVEMENT**
22  Salt River Project Agricultural Improvement   **AND POWER DISTRICT'S MOTION**
23  and Power District; Salt River Valley Water   **TO DISMISS**
    Users' Association,
24                                       **Oral Argument Requested**
                Defendants.
25

26

27

28

1

# TABLE OF CONTENTS

2

INTRODUCTION ...................................................................................................... 1

THE COMPLAINT ................................................................................................... 2

ARGUMENT ............................................................................................................. 4

I.    No Doctrine Of Regulatory Or Political Deference Protects SRP From Answering The Complaint ............................................................................... 4

    A.    The District's State-Action Doctrine Defense Fails On Multiple Grounds .................................................................................................. 6

        1.    No clearly articulated policy to allow the anticompetitive conduct ......................................................................................... 7

        2.    No active supervision ............................................................... 10

    B.    The Filed-Rate Doctrine Cannot Apply In This Competitor Case .............. 12

    C.    The *Noerr-Pennington* Doctrine Does Not Apply ................................... 13

II.    SRP's Claim- or Issue-Specific Statutory Arguments Are Incorrect.................... 15

    A.    The LGAA Does Not Apply To The District.............................................. 15

    B.    Other Arizona Statutes Pose No Obstacle To The Case ............................ 17

        1.    A.R.S. § 12-820.01 provides no protection from damages ................. 17

        2.    SolarCity satisfied Arizona's notice of claim statute ......................... 18

        3.    The rehearing procedures in A.R.S. § 30-810 do not apply................. 19

III.    SolarCity Properly States Claims On The Antitrust Merits .................................. 20

    A.    SolarCity Properly Alleges That It And The District Compete In The Same Relevant Market, In Which SolarCity Suffered Antitrust Injury ......................................................................................................... 20

        1.    SolarCity alleges harm to competition ............................................ 20

        2.    SolarCity properly alleges competition in relevant markets ............... 21

        3.    Regulatory issues do not control antitrust analysis ............................ 22

        4.    SolarCity has properly pled both a separate market for grid access and an unlawful tying arrangement........................................ 24

    B.    SolarCity's Restraint Of Trade Claims Are Properly Pled ....................... 25

    C.    SolarCity's Monopolization Claims Are Properly Pled ............................. 26

    D.    SolarCity's Interference Claims Are Properly Pled .................................. 29

CONCLUSION ....................................................................................................... 30

**INTRODUCTION**

The Complaint[1] establishes that the District uses its dominant position to impose harsh penalties on customers who want to do business with distributed-solar companies so they can buy less electricity from the District and save money.  The District's penalties have eliminated consumer choice, squelched competition from innovative upstarts, and raised customer prices—the precise evils that the antitrust laws were designed to prevent.  In so doing, the District excluded SolarCity from the market and is causing it substantial losses.  The Complaint lays out in detail a traditional case of anticompetitive conduct.

The District's motion to dismiss seeks to avoid liability for its conduct, as a matter of law, by making three categories of meritless arguments. *First*, the District argues that its anticompetitive conduct is "beyond the purview of the federal judiciary."  D-MTD 2.  It claims that doctrines of regulatory deference or political noninterference allow it to exclude competition, extract monopoly profits, and injure consumers with impunity.  The District cannot seek refuge in these doctrines, which the Supreme Court and Ninth Circuit have explained are disfavored, because it is not even close to the type of governmental entity to which the doctrines narrowly apply.  Decades of law make clear that the District's electric operations are not sovereign functions and serve no governmental purpose, but rather a business enterprise conducted for private profit.  They are supervised by no one other the District itself, through a Board systematically designed to serve the private interests that profit from electricity monopoly maintenance.

*Second*, the District tries to narrow the available relief based on the federal Local Government Antitrust Act ("LGAA").  The LGAA precludes damages under federal antitrust law in cases involving specific types of local government.  Even if it applied, the

---

[1] "Complaint" means the Amended Complaint. Dkt. 39.  Citations preceded by "¶"without other qualification refer to the Complaint.  "The District" means defendant Salt River Project Agricultural Improvement and Power District.  "The Association" means defendant Salt River Valley Water Users' Association.  "SRP" means both the District and the Association.  ¶¶ 19-20.  "SolarCity" means plaintiff SolarCity Corporation.  "D-MTD" and "A-MTD" mean the District and Association's motions to dismiss, respectively.  Dkts. 52, 53. "D-RJN" refers to the District's request for judicial notice. Dkt. 54.  S-RJN means SolarCity's response to that request for judicial notice.

1    LGAA affects only certain federal damages; it does not prevent federal or state injunctive
2    relief, nor does it preclude state damages.  But it does not apply, largely for the same
3    reasons that the District's regulatory-and-political-deference arguments fail.  For this
4    reason, although the District oddly leads with its limited LGAA argument, this brief
5    addresses it following the District's doctrinal arguments.

6         *Third*, the District tries to whittle away portions of SolarCity's state law claims
7    under the state's notice of damages claims statute (A.R.S. § 12-821.01), and a rehearing
8    provision (A.R.S. § 30-810) of the Arizona Electric Power Competition Act ("EPCA").
9    The first was plainly fulfilled by SolarCity's notice to the District before filing suit.  The
10   second does not apply because EPCA does not authorize the District to take any action
11   against distributed generation companies or their consumers.

12        *Finally*, the District argues that SolarCity has no claim on the antitrust merits, and
13   no tort claims as a result.  To do so, the District misconstrues the law and disregards
14   Complaint's fact allegations, replacing them instead with incorrect, irrelevant, or improper
15   factual assertions.  None of the District's arguments is well-founded; most are
16   quintessentially factual, and therefore not appropriate on the pleadings.

17                                    **THE COMPLAINT**

18        The District is a monopolist.  It dominates the retail provision of electricity to
19   customers and controls access to the electric grid in its service area.  ¶¶ 48, 53-64.
20   SolarCity competes with SRP by selling and leasing rooftop solar energy systems to
21   residential and business customers.  ¶¶ 50-51.  SolarCity customers thus are able to
22   generate their own electricity, which reduces the amount of electricity that customers need
23   to buy from SRP, allows customers to save money, and conserves natural resources.  ¶¶ 3,
24   50.  SRP and third parties have repeatedly recognized the competitive threat posed by
25   SolarCity and other providers of solar energy systems.  *E.g.*, ¶¶ 39, 51, 52, 82-84, 86.

26        On February 26, 2015, the District adopted Standard Electric Price Plans ("SEPPs")
27   that single out prospective solar customers for such a severe economic penalty that it is
28   now infeasible to install solar.  ¶¶ 7, 97-116.  The District was able to do so because it has

unquestionable power over the portion of consumer demand that can be satisfied only through a traditional utility (the captive or incontestable demand), including because the District is gatekeeper for grid access.  ¶¶ 63, 119(d).  As intended, the SEPPs essentially halted distributed solar installations (by any company, not just SolarCity) in SRP's territory, eliminating competition in a single stroke.  ¶ 7 (SEPPs caused applications for new solar installations to fall by 96%).

The District adopted the SEPPs with the anticompetitive intent of preventing further growth of distributed generation and keeping retail electric prices high, disregarding many of the near-term benefits that distributed solar provides to the District.  ¶¶ 76-87, 127.  To the extent the District offered justifications for its conduct, those reasons are irrelevant or pretextual; its solar penalties are neither tailored to nor necessary to accomplish its stated business purpose.[2]  *See* ¶¶ 112-116, 126-140.  Meanwhile, the District makes hundreds of millions of dollars in electricity profits and spends profligately, while the private debt markets that finance it are concerned about the District's poor investment decisions with respect to coal power.  ¶¶ 35, 38, 140.

The District's conduct constitutes monopolization of or an attempt to monopolize the retail market, violating both federal and state antitrust statutes.  ¶ 119(b), (d); Counts I-II, V-VI.  It also unreasonably restrains trade under other federal and state antitrust statutes because the SEPPs are agreements between the District and the customers who must accept service under them, which impose such extreme penalties on customers who install distributed solar that they *de facto* require customers to deal exclusively with the District.  ¶ 119(a), (b); Counts III-IV, VII-VII.

---

[2] The District purported to justify its conduct by claiming that the loss of revenues from solar customers causes a "cost shift" or a "cross subsidy" because the District prefers to keep its profits high through anticompetitive conduct rather than competing, *e.g.*, by lowering rates or operating more efficiently.  *See* ¶¶ 126, 139.  The Supreme Court has rejected that notion.  *Otter Tail Pwr. Co. v. U.S.*, 410 U.S. 366, 368, 380 (1973).  In *Otter Tail*, Court rebuked an electric utility that used its lost revenues as a procompetitive justification because the law "assumes that an enterprise will protect itself against a loss by operating with superior service, lower costs, and improved efficiency" rather than by excluding competition.  *Id.*  The antitrust laws that embody these principles are so "fundamental" to our economic system that even purported government actors must abide by them.  *N.C. State Board Of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101, 1110 (2015).

1

**ARGUMENT**

2   Antitrust claims are subject to ordinary pleading standards. *Newcal Indus. v. Ikon*

3 *Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). To survive a motion to dismiss, a

4 complaint must contain sufficient factual matter to state a claim to relief that is plausible

5 on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007). All factual

6 allegations should be accepted as true and construed in the light most favorable to the

7 nonmoving party. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008).

8 **I. No Doctrine Of Regulatory Or Political Deference Protects SRP From**

9   **Answering The Complaint**

10   The District leads with arguments based on doctrines concerning deference to

11 political bodies or state regulators. All these arguments turn on the proposition that the

12 District is the type of governmental actor that can avoid the antitrust laws. D-MTD 6-18.

13 The following facts about the District's purpose, structure, and powers refute that premise.

14   *First*, the District lacks most governmental powers. ¶¶ 24, 29, 40-42; *Ball v.*

15 *James*, 451 U.S. 355, 366 (1981) (the District "cannot impose ad valorem property taxes

16 or sales taxes," it "cannot enact any laws governing the conduct of citizens, nor does it

17 administer such normal functions of government as the maintenance of streets, the

18 operation of schools, or sanitation, health, or welfare services"); *Gorenc v. Salt River*

19 *Project Agr. Imp. & Pwr. Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (Arizona "never

20 intended to grant irrigation districts governmental powers on a par with cities, counties, or

21 the state itself" (internal quotations omitted)). Its electric operations do not implicate

22 sovereign power. *Ball*, 451 U.S. at 368-69 (electricity "not a traditional element of

23 governmental sovereignty" and merely incidental to water operations); *Niedner v. Salt*

24 *River Project Agr. Imp. & Pwr. Dist.*, 121 Ariz. 331, 331 (1979) ("The District's powers

25 as a political subdivision are limited to the purposes justifying its political existence and

26 the provisions of Art. 13, s 7 do not alter the inherent characteristics of the District as a

27 business corporation with attributes of sovereignty which are only incidental [. . . .]"

28 (internal quotations omitted)).

*Second*, the District's retail electricity operations are an ordinary business enterprise. ¶¶ 19, 22-27, 31-39; *Ball*, 451 U.S. at 370 (the District's relationship with its retail electricity customers "is <u>essentially that between consumers and a business enterprise from which they buy</u>" (emphasis added)); ¶ 35(c) (quoting *Local 266, Int'l Bd. of Elec. Workers v. Salt River Project Agr. Imp. & Pwr. Dist.*, 78 Ariz. 30, 44 (1954) (the District's "<u>profits from the sale of electricity are used to defray the expense in irrigating these private lands for personal profit</u>") (emphasis added)); *Gorenc*, 869 F.2d at 506 (9th Cir. 1989) (the District "is owned and operated by private individual landowners.  It is not operated for the benefit of the general public but for the benefit of the private landowners in the district." (internal citations omitted)); *see also Ball*, 451 U.S. at 368-369 ("[T]he sole legislative reason for making water projects [such as the District] public entities was to enable them to raise revenue through interest-free bonds. . . .").

*Third*, neither the District's management nor its Board is regulated or overseen by the Arizona Corporation Commission ("ACC") or any entity exercising State sovereignty. *See* ¶ 42; *Salt River Valley Water Users' Ass'n v. Giglio*, 113 Ariz. 190, 193 (1976) (the District is "not a public service corporation . . . and is not subject to regulation by the [ACC] as to its services and rates" (internal quotations omitted)).  As alleged by the Complaint, the Board does not in fact exercise independent oversight over District management. *E.g.*, ¶ 103 (quoting Board member in connection with SEPPs:  "I don't want management . . . to think I'm second guessing them in anything they do.").

*Fourth*, the District is not a democratic institution.  It is not even governed by the basic equal protection principle of one-person/one-vote.  ¶ 32; *Ball*, 451 U.S. at 359. Instead, only a small group of landholder-owners vote, and do so in proportion to the size of their landholdings. *Id.*  Approximately 1/3 of the District's electric customers (landholders or not) have no voting rights because they do not own land within the District's original geographic area.  ¶ 32.  This structure has ensured that high-intensity water users—particularly large agricultural interests— have durably captured a majority of the District's Board, ¶ 34, which runs the business at the expense of un- and

underrepresented customers.  *See Ball*, 451 U.S. at 359-60.

The result, over a period of decades, has been the District's use of supracompetitive electricity prices to generate profits that subsidize water—and the private economic interests of the majority of the Board—to the tune of billions of dollars.  Last year, the District transferred as much as $100 million in electric profits to its private landholders.  ¶¶ 21-35.  That annual subsidy is far higher than any supposed "subsidy" to solar users.  It is due not to government design, but to the District's market power, and the maintenance and use of that power for private gain.

### A.    The District's State-Action Doctrine Defense Fails On Multiple Grounds

The state-action doctrine "does not apply where a State has chosen to compete in the private retail market." *Jefferson Cnty. Pharm. Ass'n., Inc. v. Abbott Labs*, 460 U.S. 150, 154 (1983).  The state-action doctrine is "disfavored" and "interpreted narrowly." *N.C. State Board of Dental Exam'rs v. F.T.C.*, 135 S. Ct. 1101, 1110 (2015) ("disfavored"); *Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079, 1084 (9th Cir. 2010) ("interpreted narrowly").  It is a tool of statutory interpretation that serves federalism principles by limiting antitrust's scope when the state exercises sovereign prerogatives that interfere with competition.  *S.C. State Board of Dentistry v. F.T.C.*, 455 F.3d 436, 444-45 (4th Cir. 2006)*, cert. denied*, 549 U.S. 1165 (2007).

To establish that the doctrine applies, the District must first show that that the state has "articulated a clear policy to allow the anticompetitive conduct." *N.C. State Board*, 135 S. Ct. at 1112.  Second, because the District lacks structural checks against anticompetitive conduct and is "controlled by active market participants" with strong incentives to serve their private interests, the District must be "actively supervised" by the state. *Id.* at 1110-14.  The District fulfills neither requirement.  Moreover, because the relevant inquiries are intensely factual, they are "inappropriately resolved in the context of a motion to dismiss." *Cost Mgmt. Svcs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 943 (9th Cir. 1996) (active supervision requirement).

### 1.      No clearly articulated policy to allow the anticompetitive conduct

The "clearly articulated" requirement has two distinct prongs:  (1) a clearly articulated state policy to both displace competition and authorize anticompetitive conduct that (2) is "the inherent, logical, or ordinary" result of that authority.  *F.T.C v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1013 (2013) (explaining that "the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals"); *Shames*, 626 F.3d at 1084 ("a foreseeable result cannot create state authorization"; after a clearly articulated policy to displace competition is found, then foreseeability determines the permissible scope of conduct).  Thus, for example, in *Phoebe* the defendant hospital had authority to engage in *acquisitions*, but such authority did not include approval to "*displace competition by consolidating* hospital ownership," so the policy requirement was not met.  133 S.Ct. at 1007-08, 1011 (emphasis added).[3]

So too here:  The District may be allowed to perform irrigation functions and certain electric functions as incidental to irrigation, but it points to no provision of Arizona law that authorizes it to displace competition.  Arizona's policy goal in establishing the District was simply to provide it access to cheap financing.  *Ball*, 451 U.S. at 368.  The 1936 Arizona legislature cannot have foreseen that enabling the District's financing would squelch electric competition almost eighty years later.  *See Ball*, 451 U.S. at 359.  Even more important, there is no indication that the state meant to let the District exclude competition at all—let alone specifically with regard to distributed solar.  As discussed below, the contrary is true.

The District offers two candidates for a state policy.  Both fail.  Its first suggestion is Arizona's Electric Power Competition Act ("EPCA").  Ariz. Sess. Laws. Ch. 209

---

[3] SRP's attempt to use the 1985 *Hallie* case to suggest the standard is merely loose foreseeability of some unspecified anticompetitive conduct, D-MTD 15 ("logical foreseeable result . . . might have anticompetitive effects"), is outdated and incorrect.  The *Phoebe* case makes clear that more is needed.  133 S. Ct. at 1012.  The cases at D-MTD page 14 and footnotes 22-23 also pre-date *Phoebe* and apply an incorrect standard that it eliminated.  As the leading antitrust treatise confirms, *Phoebe* "clarifies the 'foreseeable consequence' formulation that has often led courts to approve practices where state authorization seemed dubious."  Areeda & Hovenkamp,  Antitrust Law ¶ 225b5 (Lexis 2015).

1    (1998).  Both parties agree that nothing in EPCA governs SolarCity's business.  D-MTD

2    nn.17 & 18; 19:3-13; ¶ 93.  Instead, the District attempts to use EPCA's history to argue

3    that Arizona has a policy to displace competition.  D-MTD 9-11.

4         But EPCA expressly *promotes* competition.  Section 40-202(B) could not make the

5    State's policy clearer: "It is the public policy of this state that a competitive market shall

6    exist in the sale of electric generation service."  A.R.S. § 40-202(B) (Ariz. Sess. Laws. Ch.

7    209 § 23).  As the District recognizes, EPCA envisioned competition among electric

8    utilities.  D-MTD 11-12.  Unsurprisingly, those entities—each a monopolist in its

9    geographic market—chose to keep to their historical territories rather than pursue

10   competition against one another.  ¶ 67.  Instead, real competition came from distributed

11   generation upstarts, such as SolarCity.

12        EPCA nowhere purports to authorize entities such as the District to take action to

13   disable, harm, or impede competition from distributed generation companies such as

14   SolarCity—or to prevent such companies from competing at all.  To the contrary, EPCA

15   expressly (1) recognizes that "self-generation" by consumers may reduce demand from

16   entities such as SRP (*i.e.*, that there is cross-elasticity of demand and therefore

17   competition between self-generation and District provision of electricity), and (2)

18   confirms that demand reduction from self-generation does not justify financial penalties:

19        "Any reduction in electricity purchases from a public power entity resulting from
         self-generation, demand side management or other demand reduction attributable
20       to any cause other than the retail access provisions of this chapter[4] shall not be
         used to calculate or recover any stranded cost[5] from a customer."

21   A.R.S. § 30-805(D) (emphases and footnotes added).

22        As the Tenth Circuit explained when it addressed a similar state act—likewise in

23   _____
     [4] When statutes list terms, then follow them a reference to "other" items in a category, the
24   terms that precede "or other" are examples of items in the category.  *Ariz. Pub. Svc. Co. v.
     Town of Paradise Valley*, 125 Ariz. 447, 452 (1980).  Thus, "self-generation" is not and
25   cannot be covered by EPCA "retail access provisions."
     [5] The term "stranded costs" is undefined, so it receives its "commonly accepted meaning,"
26   consistent with the statutory context.  *Stulce v. Salt River Project Agr. Imp. & Pwr. Dist.*,
     197 Ariz. 87, 90 (App. 1999).  In utility jargon, "stranded costs" include those that utilities
27   claim they may not to recover in a competitive market.  *S. Cal. Edison Co. v. Lynch*, 307
     F.3d 794, 801 (9th Cir. 2002).  Thus, the provision means that the District cannot act
28   under EPCA to discriminate against distributed solar customers using the type of "fixed
     cost" arguments it has made and continues to make in this case.

1  disuse—such a statutory scheme favors applying antitrust law.  *Kay Elec. Coop. v. City of*

2  *Newkirk*, 647 F.3d 1039, 1045 (10th Cir. 2011), *cited with approval regarding state-*

3  *action doctrine*, *Phoebe*, 133 S. Ct. at 1013.

4        Further, even as to the limited activities as to which EPCA does provide some

5  authority to public power entities (*i.e.*, with regard to entry by other utilities), the

6  Legislature made clear that the state's antitrust laws "apply to the provisions of

7  competitive electric generation service or other services by public power entities."  A.R.S.

8  § 30-813.[6]  In light of this express antitrust savings clause and Section 30-805(D), it is

9  nonsensical to argue, as the District does, that EPCA's competition-promoting provisions

10  somehow authorize the District to exclude SolarCity.

11        The District's second suggestion for a clearly articulated policy to displace

12  competition is A.R.S. § 48-247 (D-MTD 14-15), which provides:

13      "The provisions of [the state's antitrust laws] shall not apply to any conduct or
   activity of a district organized pursuant to this title, which conduct or activity is
14  approved by a statute of this state or of the United States or by the corporation
   commission or an administrative agency of this state or of the United States
15  having jurisdiction of the subject matter."

16        But SRP is not acting in a manner "approved" by any statute, the ACC, or any

17  other state or federal administrative agency.  Irrigation and agricultural-improvement

18  districts organized under the relevant title (title 48) have "no political or governmental

19  purposes or functions" and are granted limited authority to benefit landholders through

20  water-related services.  *Maricopa Cnty. Mun. Water Conservation Dist. No. 1 v. La Prade*,

21  45 Ariz. 61, 76 (1935), *addressing title subsequently renumbered to title 48*, Ariz. Sess.

22  Laws Ch. 190 § 18 (1985); *Gorenc*, 869 at F.3d 506-07 (addressing the District

23  specifically).  The District cites Section 48-2303(a)(7), but this section merely permits

24  power operations incidental to the District's water functions; it does not create or approve

25  _____

26  [6] The District argues that § 30-813 applies only if <u>SolarCity</u>*'s* business implicates the
   statutory scheme or if the District enacted its solar penalties under that scheme.  D-MTD
   n.17.  But § 30-813's plain text applies to retail operations "by public power entities" (*i.e.*,
27  the District), not by the District's competitors, and regardless of whether the District's
   competitors are subject to any particular statutes.  A.R.S. § 30-801(10), (15)-(16)
28  (defining "public power entity," "electric generation service," and "other services").

1    a government-sanctioned monopoly or authorize anticompetitive conduct to exclude

2    competition concerning power.  Indeed, both the United States and Arizona Supreme

3    Courts have made clear that SRP's retail electric operations are private business

4    enterprises, as discussed above.

5            In sum, the only statute relating to the District's antitrust liability reaffirms that the

6    District may be liable, not that it is exempt.  The state articulated a policy of competition,

7    not the displacement of competition—and especially not the displacement of competition

8    between the District and distributed solar companies such as SolarCity.  *Cf. Kay Elec.*, 647

9    F.3d at 1042.  Nor is the anticompetitive conduct challenged by SolarCity in this case "the

10   inherent, logical or ordinary result" of anything the State has authorized.  *Phoebe*, 133 S.

11   Ct. at 1012.  The District has not met the authorization requirement.[7]

12                          **2.      No active supervision**

13           Earlier this year, the Supreme Court made clear that when a non-sovereign actor

14   such as the District is "controlled by active market participants," the actor must also prove

15   that it is "actively supervised" by the state before it can use the state action doctrine.  *N.C.*

16   *State Board*, 135 S. Ct. at 1110-12.  Thus, a state board of dentistry, the majority of which

17   was made up of dentists, could not claim the protection of the state action doctrine without

18   active supervision even though state law authorized it to regulate dentistry licenses and

19   conduct other business with the state's imprimatur.  *Id.*  The District—lacking general

20   governmental powers, controlled by private interests that directly receive the benefits of

21   monopoly electric profits, and repeatedly held by the federal and state courts to be a

22   "business enterprise" conducted for the personal profit of private landowners—is no

23   different.  ¶¶ 19-42.  These facts make it a non-sovereign that must show active

24

25   ─────────────
     [7] The so-called "market participant exception" also confirms the result.  *See A.D. Bedell*
     *Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 265 n.55 (3d Cir. 2001)
26   (collecting authority).  The market participant inquiry assesses whether the entity behaves
     like a private economic actor "in a proprietary activity."  *See* Areeda, ¶ 224e1
27   (synthesizing cases).  If so, it is unlikely the state authorized such conduct to supersede the
     antitrust laws.  *See id.*  As alleged, the District behaves like any other private economic
28   actor engaged in a proprietary business.  ¶¶ 19-42.

supervision by the state to qualify for the state action doctrine.[8]

The District argues that it is not subject to any active supervision requirement by virtue of its purported "electoral[] accountab[ility]."  D-MTD n.14, citing *N.C. State Board* at 135 S. Ct. at 1112.  This argument profoundly misstates the Supreme Court's holding in *N.C. State Board*.  The Court's reference to electoral accountability was to its earlier *Hallie* decision, which it *distinguished* from the unsupervised dentistry Board:

> "Critically, the municipality in *Hallie* exercised a wide range of governmental powers, across different economic spheres, substantially reducing the risk that it would pursue private interests while regulating any single field." *N.C. State Board*, 135 S. Ct. at 1112-13.

The District is nothing like the municipality in *Hallie* or other cases the District cites.  The District "cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." *Ball*, 451 U.S. at 366.  Arizona "never intended to grant irrigation districts governmental powers on a par with cities, counties, or the state itself." *Gorenc*, 869 F.2d at 507 (addressing the District).  And even if mere "electoral accountability" were sufficient, the District's elections do not conform to our nation's core democratic principle. *Ball*, 451 U.S. 355, 370-71.  As courts have repeatedly explained, the District is fundamentally controlled by and organized for the benefit of private interests "for personal profit." *E.g.*, *Local 266*, 78 Ariz. at 44.

The District makes no attempt to show active supervision and does not dispute that it is unregulated by anyone other than its own structurally self-interested Board.  Such "self-regulation" fails for at least two reasons.  *First*, the Supreme Court has rejected that argument:  "If a State wants to rely on active market participants as regulators, it must provide active supervision if state action immunity under [the doctrine] is to be invoked."

---

[8] A non-sovereign for state-action purposes is "one whose conduct does not automatically qualify as that of the sovereign State itself." 135 S.Ct. at 1111.  The District lacks such identity with the state.  As discussed above, it lacks the general grants of state powers that would subject it to the Equal Protection Clause, and the District's electric operations are not a sovereign function. *See also* Areeda ¶ 224(b) ("state itself" requirement protects against the "parochial interests" that "are inclined to discriminate against interests not able to participate in the electoral process").

135 S.Ct. at 1117.[9]  Non-sovereign actors such as the Board do not qualify.  *Id.* at 1110-11.  *Second*, the District's argument contests as a factual matter the well-pleaded factual allegations of the Complaint that the Board in fact does not supervise District management at all.  ¶¶ 19-27, 29, 103.  Its arguments cannot be resolved on a motion to dismiss.  *Cost Mgmt*, 99 F.3d at 943 ("whether a state has 'actively supervised' a state regulatory policy is a factual one which is inappropriately resolved in the context of a motion to dismiss").

Accordingly, even if the District could point to a clearly articulated state policy to displace competition, which it cannot, it could not—especially at the pleading stage—seek refuge in the state action doctrine.[10]

**B.     The Filed-Rate Doctrine Cannot Apply In This Competitor Case**

The filed-rate doctrine limits certain challenges to rates or tariffs when a "regulatory agency" has the authority to approve proposed rates or tariffs and has done so.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir. 2000); *see also MCI Telecom. Corp. v. AT&T,* 512 U.S. 218, 234 (1994) (doctrine protects "regulated firms" under some circumstances).  The doctrine is "strongly disfavored" and "strictly construed" so as not to enlarge its traditional confines.  *Cost Mgmt.*, 99 F.3d at 941, 948.

The doctrine has no application in this case for three reasons.  *First*, the District is neither a regulator nor an administrative agency of the type that may implicate the doctrine.  *See, e.g.*, *ClipperExxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1267 n.38 (9th Cir. 1982) (collecting cases, all of which involved independent

---

[9] SRP cites pre-*N.C. State Board* case law for the proposition that only entities that are formally "private" must have active supervision (D-MTD n. 14), but *N.C. State Board* makes clear that the inquiry turns on structural and practical reality—not formal designations.  Moreover, the District's *alter ego*, the Association, is a formally private entity that is equally liable.

[10] Nor should the state action doctrine, even if it applied to the District as a matter of federal antitrust law (which it does not), constitute a defense to SolarCity's state antitrust claims, because the doctrine is about federalism, and there are no federalism concerns when applying state law to purported state actors.  *See F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 632 (1992); *Fine Airport Pkg., Inc. v. City of Tulsa*, 71 P.3d 5, 11-12 (Okla. 2003).  Although the Ninth Circuit has held that Arizona's Supreme Court would likely apply the federal state-action doctrine to state antitrust law as a general matter, *Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 609 (9th Cir. 2005), SolarCity reserves its right to argue in subsequent proceedings that *Mothershed* is incorrectly decided or that the issue should be certified to the Arizona Supreme Court.

regulatory agencies); *Perryman v. Litton Loan Svc'g, LP*, 2014 WL 4954674, at *7-8 (N.D. Cal. Oct. 1, 2014) (doctrine presumes "strong and pervasive" regulatory authority).

*Second*, even if the District were a regulator or agency, the doctrine cannot apply when, as here, a *competitor* challenges a rate that the competitor does not pay. *Cost Mgmt. Services*, 99 F.3d at 945-48 (9th Cir. 1996). The doctrine applies only when persons directly subject to a rate challenge that rate. *Id.* at 948.[11]

*Third*, state law controls the application of state antitrust law to a purported state entity. *Knevelbaard*, 232 F.3d at 992. Arizona state law "has never adopted the filed-rate doctrine." *Johnson v. First Am. Title Ins. Co.*, 2008 WL 4850198, at *4 (D. Ariz. 2008). And its courts would not, because they recognize the "persuasive authority" against adopting the doctrine—even in non-competitor suits. *Qwest Corp. v. Kelly*, 204 Ariz. 25, 36 (App. 2002); *see also* Areeda, ¶ 247b ("the filed rate doctrine in antitrust is in large measure irrational and justifiable only on grounds of *stare decisis*").[12]

Any one, let alone all three, of these principles forecloses the District's reliance on the filed rate doctrine.

## C.   The *Noerr-Pennington* Doctrine Does Not Apply

The *Noerr-Pennington* doctrine serves First Amendment interests by protecting those who petition the government from antitrust liability based on protected petitioning. *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.,* 552 F.3d 1033, 1044-45 (9th Cir. 2009). The doctrine's namesake cases establish its two distinct applications. *Noerr*

---

[11] In the case cited by the District, the plaintiffs were milk producers that were subject to USDA-approved rates paid to the defendant milk wholesalers. *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 864 (9th Cir. 2012). Had the plaintiffs been milk wholesalers, they could have challenged the rate under *Cost Management*.

[12] The District also says that the filed-rate doctrine bars any "relief that would necessarily require an adjustment" to rates. D-MTD n.25. However, an injunction against future antitrust violations (*e.g.*, prohibiting discrimination based on the use of competitive technologies or providers) may nevertheless be appropriate even if it touched upon rate setting issues. *Square D. Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 418 n.22 (1986) (filed rate doctrine prevents recovery of damages based on tariff but "does not dispose of . . . relief by way of injunction" against repeating the antitrust violation underlying the tariff's competitive harm); *In re NOS Communications*, 495 F.3d 1052, 1060-61 (9th Cir. 2007). Here, an injunction may include prohibiting rate structures that discriminate on the basis of distributed generation.

1    protects the petitioner where a suit alleges anticompetitive harm due to the petitioning

2    itself—*e.g.*, non-sham lobbying activity does not violate the antitrust laws.  *E.R.R. Pres.*

3    *Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 143 (1961).  *Pennington* protects the

4    petitioner in a suit based on government action due to petitioning.  *United Mine Workers*

5    *of Am. v. Pennington*, 381 U.S. 657, 369-71 (1965).

6         The District makes two *Noerr-Pennington* arguments.  The first asserts that the

7    doctrine "extends absolute immunity where alleged 'monopolization is the result of valid

8    governmental action,'" quoting the Supreme Court's *Allied Tube* decision.  D-MTD 17.

9    This argument omits critical language (underlined below) from *Allied Tube*:

10        Where a restraint upon trade or monopolization is the result of valid governmental
          action, as opposed to private action, <u>those urging the governmental action enjoy</u>
11        <u>absolute immunity from antitrust liability for the anticompetitive restraint</u>.  *Allied*
          *Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 499 (1988) (internal
12        quotation marks omitted; emphasis added).

13        By omitting the underlined language, the District conceals that *Noerr-Pennington*

14   protects those who petition, not those who impose the restraint.  The distinction is

15   fundamental:  the state-action doctrine "protects the States' acts of governing, and *Noerr*

16   the citizens' participation in government."  *City of Columbia v. Omni Outdoor Adver. Inc.*,

17   499 U.S. 365, 383 (1991); *see also In re Airport Car Rental Antitrust Litigation*, 693 F.2d

18   84, 87 (9th Cir. 1982) (challenges to governmental entities' decisions trigger state-action

19   inquiry; suits against those urging the decisions trigger *Noerr-Pennington*; the two

20   doctrines must not be conflated).  SolarCity challenges the District Board's decision, not

21   District's "petitioning" of the Board.  The District and the Board are the same, both in fact

22   and when sued.  *E.g.*, A.R.S. § 48-2338 ("In all courts, actions and proceedings the board

23   may sue, appear and defend in person or by attorney in the name of the district").

24        "Petitioning" is not at issue here.  The District contends that its employees, acting

25   within the scope of their employment, urged the District's Board to undertake conduct to

26   benefit the private financial interests the District serves.  D-MTD 17.  But the Board *is* the

27   District's management, A.R.S. § 48-2335 (Board "[m]anage[s] and conduct[s] the

28   business and affairs of the district"); *see also Valley Nat'l Bank of Phx. v. Electrical Dist.*

1   *No. Four*, 90 Ariz. 306, 312-16 (1961) (applying same analysis to defendant electric

2   power district's boardmembers as any other "officers or agents").  The District cites no

3   case applying *Noerr-Pennington* to such "self-petitioning"; its cited case addresses

4   government officials lobbying "*another* government entity," not their own employer.

5   *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093-94 (9th Cir. 2000)

6   (emphasis added); *see also Walker v. City of Lakewood*, 272 F.3d 1114, 1129 n.5 (9th Cir.

7   2001) (questioning whether certain actions constituted petitioning under *Manistee*;

8   reversing dismissal because possible fact issue existed for summary judgment).

9       The District's unprecedented bootstrapping theory would eviscerate the state-action

10  doctrine.  A government entity's decisions could avoid challenge any time its agents speak

11  publicly in favor of the unlawful conduct the entity intends to pursue.  The District has no

12  *Noerr-Pennington* defense.

13  **II.     SRP's Claim- or Issue-Specific Statutory Arguments Are Incorrect**

14      In addition to the above court-made doctrines, the District cites a variety of statutes

15  that similarly turn on purported governmental status.  Specifically, it cites the federal

16  Local Government Antitrust Act ("LGAA"), and state notice of claims and rehearing

17  statutes to shield its conduct from particular claims or remedies sought by SolarCity's

18  complaint.  These arguments are meritless, but even if they could prevail, none could

19  eliminate all of SolarCity's claims.

20      **A.     The LGAA Does Not Apply To The District**

21      The LGAA limits only specific types of monetary recovery from specific types of

22  defendants under the federal antitrust laws.  *Lancaster Cmty. Hosp. v. Antelope Valley*

23  *Hosp. Dist.*, 940 F.2d 397, 404 n.14 (9th Cir. 1991).  Injunctive and other relief remains

24  available, *id.*, as do damages under state antitrust law.[13]

25  _____

26  [13] The District asserts that the federal LGAA somehow controls state law damages, despite the fact that the statute explicitly applies to specific federal provisions and has been strictly construed as limited to the specific provisions it cites.  *Lancaster*, 940 F.2d at

27  404 n.14; 15 U.S.C. § 35(a).  The District's sole support is a district court case applying an outmoded method of finding implied preemption.  D-MTD n.10.  That case is a classic

28  example of "freewheeling judicial inquiry into whether a state statute is in tension" with a (footnote continued on next page)

1    The District does not meet the definition of any entity the LGAA covers.  15 U.S.C.

2    § 34.  The District argues that it is a "special function governmental unit" entitled to

3    LGAA protection.  15 U.S.C. § 34(1)(B).  The District resorts to off-point state provisions

4    or LGAA legislative history,[14] but elides the case law.  In order to

5    "qualify as a 'special function governmental unit,' Defendant must show that: (1)
     [state] law treats it as a government entity; (2) Defendant has limited geographic
6    jurisdiction; and (3) taxpayers would bear the burden of any antitrust damage
     award." *United Nat'l. Maint., Inc. v. San Diego Conv'tn Ctr. Corp.*, 2010 WL
7    3034024, at *4 (S.D. Cal. Aug. 3, 2010) (defendant failed to meet LGAA burden).

8    The District cannot satisfy (1) or (3).  As discussed above, Arizona law treats the

9    District as a private actor when engaged in retail electric operations.  The District's

10   incidental and nominal government status in other respects is irrelevant.  *See Tarabishi v.*

11   *McAlester Regional Hosp.*, 951 F.2d 1558, 1566-67 (10th Cir. 1991) (state view of

12   governmental status may vary; LGAA considers state view in relevant context); *see also*

13   *id.* at 1565 n.9 (statutory statement that defendant is "deemed to exercise public and

14   essential governmental functions" did not trigger LGAA).  And taxpayers would not bear

15   the burden because (1) as the District itself recently asserted, and as the Supreme Court

16   found in 1981, it is not a general taxing district, ¶ 41 (District asserts that it is "not a tax-

17   supported district"), *Ball*, 451 U.S. at 366; and (2) any damages award would be satisfied

18   by revenues from the District's proprietary electric power business.[15]  Alternatively, the

19   District's private *alter ego*, the Association, can satisfy a judgment because it is equally

20   liable.  *See Tarabishi*, 951 F.2d at 1566.

21   The LGAA provides no basis to dismiss any claim.

22

23   vaguely defined Congressional purpose.  *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d
24   1041, 1049 (7th Cir. 2013).  Modern courts require "major damage" to clear and
     substantial <u>federal</u> interests before the presumption against preemption is overcome.  *Id.* at
25   1050.  There is no such federal interest in the application of state law to a unique creature
     of state law.
26   [14] In fact, the LGAA's legislative history indicates that "largely private" bodies operating
     with government imprimatur were not intended coverage.  H.R. Rep. No. 98-965, at *20
27   (1984).
     [15] *See also* Ariz. Rev. Stat. § 48-2414(B) (District taxes are levied against landowners in
28   proportion to acres owned).

### B.      Other Arizona Statutes Pose No Obstacle To The Case

#### 1.      A.R.S. § 12-820.01 provides no protection from damages

The District argues that A.R.S. § 12-820.01 immunizes it from damages under state (though not federal) law.  Government "liability is the rule in Arizona and immunity is the exception" under A.R.S. § 12-820.01.  *Doe v. State*, 200 Ariz. 174, 176 (2001).  Arizona courts "construe immunity provisions narrowly."  *Id.*

Immunity is designed to prevent questioning "policy determinations of a <u>coordinate</u> branch of government."  *Doe*, 200 Ariz. at 176 (emphasis added).  Thus, "legislative" acts may warrant immunity under § 12-820.01, but "administrative" functions must meet a higher threshold, requiring "the determination of fundamental governmental policy."  *Id.* Only a "narrow category" of conduct does so, and the District bears the burden of proving its conduct fails within it.  *AlliedSignal, Inc. v. City of Phx.*, 182 F.3d 692, 695 (9th Cir. 1999).  The narrow category includes "the direction and general focus of an entire regulatory scheme," but not "operational actions and decisions within that regulatory scheme."  *Doe*, 200 Ariz. at 176.

The District analogizes to cases involving the ACC—a popularly elected coordinate branch of Arizona government[16]—or cities with broad grants of general authority.  D-MTD 7-8.  In the alternative, the District says it is like an administrative agency exercising a "fundamental government function."  D-MTD 8.  As discussed above, the Supreme Court disagrees.  *Ball*, 451 U.S. at 368-70.  The District's decision to penalize solar customers is a specific operational and commercial decision, not one of an independent regulator or legislative body, and implicates no fundamental government policy or sovereign power.  A.R.S. § 12-820.01 therefore provides it no protection from state law damages, let alone any other relief sought by SolarCity.

---

[16] *State v. Tucson Gas & Electric*, 15 Ariz. 294, 300 (1914) (ACC is "another branch of government, with powers and duties, as well defined as any branch of the government, and where it is given exclusive power it is supreme."); *Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 290 (1992) (ACC is a "popularly elected branch of state government").

1

### 2.    SolarCity satisfied Arizona's notice of claim statute

2    The District also procedurally argues that under A.R.S. § 12-821.01, SolarCity

3    provided insufficient notice of a potential settlement amount.  The District acknowledges

4    that SolarCity provided notice pursuant to the statute, D-RJN Ex. 10, but argues that

5    SolarCity's refusal to settle solely for damages in this case—where injunctive relief is

6    necessary—eliminates SolarCity's ability to pursue damages.[17]  The District is wrong.

7    SolarCity's letter provided a specific amount for which it would settle its state law

8    damages claims.  It stated the precise dollar amount for which SolarCity would settle as of

9    the letter's date, as well as the precise dollar amount by which SolarCity's demand

10    increased each month that the District delayed settlement.  *Id.* at 1.  This approach was

11    necessary because SolarCity's business has been effectively shuttered in the District's

12    service area, causing continuing injury each day the District's penalties remain in place.

13    Thus, the letter establishes the specific amount required to settle the relevant claims at any

14    time. *Backus v. State*, 220 Ariz. 101, 106-07 (2009) (interpreting A.R.S. § 12-821.01's

15    supporting-facts requirement; statute is interpreted flexibly, recognizing that different

16    contexts require different levels of specificity).  To require more would be to elevate form

17    over substance and undermine the Arizona legislature's intent that "liability of public

18    entities be the rule and immunity the exception." *Id*. at 106.

19    The District argues that SolarCity's offer should not have conditioned settlement on

20    some form of injunctive relief.  But SolarCity is entitled to pursue injunctive relief,

21    regardless of resolution of its damages claims, to address the continuing harm to

22    competition and to its business.  The District's position, if accepted, would bar plaintiffs

23    from pursuing such a claim.  This would be a radical and unprecedented result.  *Cf.*

24

25    _____

[17]  Like the District's other arguments discussed in this section, A.R.S. § 12-821.01 cannot eliminate the entire case.  It could at most bar damages on SolarCity's state claims. *See Home Builders Ass'n of Cent. Arizona v. Kard*, 219 Ariz. 374, 381 (App. 2008) ("The notice of claim statute applies to a request for damages, rather than to a request for declaratory or injunctive relief.").  The statute has no application to SolarCity's federal claims. *See, e.g., Felder v. Casey*, 487 U.S. 131, 152 (1988) (state-law notice requirements cannot burden federal claims); *Fox v. Goddard*, 2011 WL 2669298, *4 (D. Ariz. July 7, 2011) ("the notice of claims provision does not apply to bar Plaintiff's federal claim").

26

27

28

*Auble v. Maricopa Cnty.*, 2009 WL 3188378, at \*3-4 (D. Ariz. Sept. 30, 2009) (Murguia, D.J.) (reservation of unspecified other relief, in the form of fees and costs separate from demanded damages, does not violate A.R.S. § 12-821.01).[18]

### 3.    The rehearing procedures in A.R.S. § 30-810 do not apply

Section 30-810 provides for a rehearing procedure as to public power entities' actions under EPCA.  But as discussed above (*supra*, Section I.A.1), the District admits that EPCA has no application to its decision or SolarCity.  *E.g.*, D-MTD n.17; 19:3-13 (citing EPCA; acknowledging that both the District and SolarCity agree that SolarCity is not subject to EPCA).  Accordingly, the conduct at issue is not authorized by EPCA and did not take place under EPCA.  Therefore, EPCA's rehearing procedure has no application here.[19]

This would also be true in this case even if EPCA authorized the solar penalties.  Section 30-810 can apply only to a "party to the action or proceeding."  Section 30-810 uses the term "party," while § 30-811 uses the term "party in interest."  Neither term is defined.  When interpreting statutes, Arizona courts "give undefined terms their commonly accepted meaning" and examine "related provisions with the goal to achieve consistency among them."  *Stulce v. Salt River Project Agr. Imp. & Pwr. Dist.*, 197 Ariz. 87, 90 (App. 1999).  Arizona courts have defined "real party in interest" as "[a]ny person interested in the subject-matter of the suit who has a personal interest in the judgment," *Mosher v. Hiner*, 62 Ariz. 110, 112 (1944); but a "party" to a proceeding is defined as "one who has a right to control proceedings, to make a defense, to present evidence and to

---

[18] The District says that the *Deer Valley* case holds that any "qualifying language" nullifies an offer.  D-MTD 8.  But the Arizona Supreme Court has emphasized that *Deer Valley* turned on how the plaintiff's "repeated use of qualifying language made it impossible to ascertain the precise amount for which the public entity could have settled." *Backus*, 220 Ariz. at 105 (internal quotations and modifications omitted).  By contrast, SolarCity's letter did not qualify the amount of its damages demand in any way; it merely reiterated that SolarCity would continue to seek necessary injunctive relief.

[19] The District concedes that A.R.S. § 30-810 could, at most, affect SolarCity's state claims.  D-MTD 28:17-18.  That is because federal courts have exclusive jurisdiction over antitrust claims, and state statutes cannot impede the federal courts from hearing antitrust claims.  *Marrese v. Am. Acad. Of Orthopedic Surgeons*, 470 U.S. 373, 379-80 (1985) (exclusive jurisdiction); *Felder*, 487 U.S. at152 (state statutes).

1  appeal." *State v. Nineteen Thousand Two Hundred & Thirty-Eight Dollars ($19,238.00)*

2  *in U.S. Currency*, 157 Ariz. 178, 181 (App. 1987). Without all such rights, SolarCity was

3  not a "party." At most, SolarCity could have been a "party in interest."[20]

4  **III.  SolarCity Properly States Claims On The Antitrust Merits**

5  The District's merits arguments fare no better than its policy- and statute-based

6  arguments.  The District argues that SolarCity has alleged neither competitive harm nor

7  properly pleaded relevant markets that are cognizable under the antitrust laws. Next, the

8  District says that SolarCity has not pled claims for reasonable restraint of trade and

9  Clayton Act claim (Counts III-IV, VII-VIII) because SolarCity has not adequately alleged

10  a required element (an agreement). Finally, the District attacks the monopolization claims

11  (Counts I-II, V-VI). Each argument either improperly disputes fact allegations or

12  mischaracterizes them so as to force them in an irrelevant legal box.

13
14  **A.  SolarCity Properly Alleges That It And The District Compete In The Same Relevant Market, In Which SolarCity Suffered Antitrust Injury**

15  **1.  SolarCity alleges harm to competition**

16  SolarCity's antitrust claims require "antitrust injury," which is harm to competition

17  or the competitive process that caused harm to the plaintiff in its capacity as a competitor

18  or consumer. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 488-89 &

19  n.14 (1977); *Doe*, 2009 WL 1423378, at *4-5. The District says that SolarCity merely

20  complains about harm "to its bottom line," as though that ends the inquiry. D-MTD 20.

21  Every antitrust plaintiff seeking damages alleges harm to its bottom line. The

22  fundamental issue is whether that harm was competitive harm caused by the antitrust

23  violation. *Brunswick*, 429 U.S. at 488-89 & n.14; *see also Doe*, WL 1423378, at *4-5.

24  SolarCity alleges that the District's conduct resulted in the exclusion of all or nearly all

25  ─────────────
[20] To support its argument, the District asks the Court to take judicial notice of the
26  District's own mailer, styled as an "official legal notice," that says the District will
    consider those who participate in the public-hearing process a "party" under EPCA. D-
27  RJN Ex. 8. SolarCity objects to noticing the document. S-RJN § III. Regardless, the
    District cannot redefine the plain meaning of "party," and wishing does not make it so. At
    most, the District's mailer acknowledged that the District would provide requestors
28  documentation consistent with EPCA. *See* D-RJN Ex. 8 at p.4.

1   competition from the relevant market, harming SolarCity as a competitor.  ¶¶ 5, 7, 13,

2   122-124.  It also alleges that the conduct harms all consumers by depriving them of the

3   benefits of choice, lower prices, innovation, and superior efficiency.  ¶¶ 13, 71-84, 128,

4   162, 171, 195.  That is well-pleaded antitrust injury.

5               **2.    SolarCity properly alleges competition in relevant markets**

6               SolarCity must allege at least one relevant product market.  *Newcal*, 513 F.3d at

7   1044 n.4.  A relevant product market is defined by "the reasonable interchangeability of

8   use or the cross-elasticity of demand between the product itself and substitutes for it."

9   *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).  The "reasonable interchangeability"

10  test is a "factual inquiry into the commercial realities faced by consumers."  *Eastman*

11  *Kodak Co. v. Image Tech. Svcs., Inc.*, 504 U.S. 451, 482 (1992) (internal quotes omitted).

12  Cross-elasticity of demand refers to "whether consumers view the products as substitutes

13  for each other."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-37 (9th Cir.

14  1995).  At bottom, the question is whether the District and SolarCity have the "actual or

15  potential ability to deprive each other of significant levels of business."  *Id.* at 1434.

16              SolarCity pleads facts showing interchangeability of use in the retail market.  ¶¶ 50,

17  52, 57.  It pleads facts showing demand cross-elasticity.  ¶¶ 51, 81-83, 86.  SolarCity

18  deprives the District of business by allowing customers to reduce the amount of electricity

19  they purchase from the District.  ¶¶ 3, 50; *see also* ¶¶ 52, 83, 129.  And the discriminatory

20  SEPPs had the actual effect of depriving SolarCity (and others in the market) of virtually

21  all their business in the geographic market.  *E.g.*, ¶ 7.  Thus, the Complaint clearly pleads

22  what it needs to:  the actual "ability to deprive each other of significant levels of

23  business."  *Rebel Oil*, 51 F.3d at 1434; *Newcal*, 513 F.3d at 1045 (no special pleading

24  standard for antitrust elements; "the 'relevant market' is typically a factual element rather

25  than a legal element").[21]

26  _____

27  [21] The District says that its ability to impose a highly targeted price increase shows lack of
    cross-elasticity of demand.  D-MTD 22.  In addition to being an improper factual
    argument, this is nonsense.  *First*, the SEPPs were designed not as a "price" to be paid by

28  anyone, but a set of terms so punitive that virtually no one will subject themselves to it.
    (footnote continued on next page)

1       SolarCity sells equipment and services that provide electricity by enabling

2  consumers to generate it themselves.  ¶¶ 49-50.  Without citation, the District says it is

3  "facially implausible" that such a self-service or do-it-yourself system could be

4  interchangeable with the District's landline service.  Numerous cases hold otherwise:

5       "As a matter of law, courts have generally recognized that when a customer can replace the services of an external product with an internally-created system, this 'captive output' (i.e. the self-production of all or part of the relevant product) should be included in the same market."  *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001) (internal quotations and modifications omitted).

8       *See also Cal. v. Sutter Health*, 84 F. Supp. 2d 1057, 1068 (N.D. Cal. 2000)

9  ("Internal or captive transfers of a product should be included in the market.  It is a part of

10  supply, and control over supply determines the existence of market power . . . ." (internal

11  quotations and modifications omitted)), *aff'd*, 217 F.3d 846 (9th Cir. 2000); Areeda ¶

12  562b ("products that differ in physical composition are sometimes in the same market

13  when buyers use them for the same purpose and when their price movements are highly

14  correlated, thus indicating a high cross-elasticity of demand").[22]  There is no "facial" legal

15  issue; the issue of what products belong in the same market is a question of fact.

16  SolarCity has properly pled the relevant retail market.

### 3.    Regulatory issues do not control antitrust analysis

18       To avoid these facts, the District first argues that regulatory issues control the

19  antitrust market as a matter of law.  D-MTD 18-20.[23] The Ninth Circuit has rejected this

---

¶¶ 5-7, 64, 107-14, 116, 126-142.  *Second*, a defendant's ability to price without regard to competition reflects monopoly power, not a lack of cross elasticity.  *Rebel Oil*, 51 F.3d at 1439 ("power to control prices" is market power).  *Third*, to the extent that some consumers pay the solar penalty, this is merely price discrimination—capturing higher prices from some customers based on their particular demand elasticities.  *MetroNet Svcs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 n.14 (9th Cir. 2004).

[22] A solar panel alone may or may not be determined to be in the market after a factual analysis, but SolarCity's products are more than mere panels; they combine equipment and service that makes it easy for consumers to switch a significant portion of their electric demand from the District to SolarCity's products (*i.e.*, they compete).  *See* ¶¶ 16, 49-50.

[23] The District styles this argument as "antitrust injury" and treats it separately from its market definition arguments.  Whatever the label, the District's argument is about antitrust market definition.  *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991) (competing in the same market for antitrust injury purposes requires "sellers who have actual or potential ability to deprive each other of (footnote continued on next page)

1    argument. *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467 (9th Cir. 1985). The *Bhan* plaintiff,

2    a nurse anesthetist, alleged that he competed with medical doctors to provide certain

3    services. *Id.* at 1470-71. After the district court held that the plaintiff lacked antitrust

4    injury because "the legal restrictions upon nurse anesthetists precluded any reasonable

5    interchangeability of use," the Ninth Circuit reversed, explaining that such legal or

6    regulatory restrictions do not control the antitrust issue "of a reasonable interchangeability

7    of use or cross-elasticity of demand [for nurse anesthetists] sufficient to constrain the

8    market power of M.D. anesthesiologists and thereby to affect competition." *Id.* Just as in

9    *Bhan*, the District uses regulations and statutory definitions to avoid the fact-based

10    antitrust analysis. Worse than *Bhan*, the District relies on regulations relating to the

11    jurisdiction of the ACC that have no application to either party. Inapplicable regulations

12    cannot preclude reasonable interchangeability.

13        None of the District's cases are contrary.[24]  Its *Grason* case proves the rule. At

14    summary judgment, the *Grason* court discounted market definition argument based on

15    other cases because "[w]hat other courts have done in other cases gives little aid to the

16    plaintiffs in this case [ . . . ] for market definition is a factual inquiry." *Grason Elect. Co.*

17    *v. Sac. Mun. Util. Dist.*, 571 F. Supp. 1504, 1520 (E.D. Cal. 1983). The court reviewed

18    <u>facts</u> concerning alternative forms of energy, and found a relevant market for electric

19    energy because "[a]t present, no other form of generated energy is available for use in this

20    casual and convenient manner." *Id.* at 1522. Thirty-two years of technological advances

21    later, distributed generation <u>is</u> "available for use in [a] casual and convenient manner,"

22    and produces electricity in the same relevant market as a landline utility. ¶¶ 51, 86-87.

23    _____

24    significant levels of business"); *Rebel Oil*, 51 F.3d at 1434 (9th Cir. 1995) (identical
     language regarding market definition).

     [24] In *Barton and Ethypharm*, the products at issue could be sold only with FDA

25    permission. *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 180 (3d
     Cir. 1997); *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 235-36 (3d Cir. 2013).

26    By contrast, SolarCity sells its products without the regulatory permission the District
     discusses. Moreover, *Barton* did not rely on the regulation but on a full interchangeability

27    analysis, 118 F.3d at 183-84, and the reasoning in *Ethypharm* was based on the plaintiff's
     decision not to enter the relevant geographic market, not on the fact that the product was

28    regulated. 707 F.3d at 236.

1    The District attempts to invoke judicial estoppel by relying on extrinsic evidence

2   from other proceedings.  D-MTD 19-20 & n.30.  SolarCity objects to that evidence.  S-

3   RJN §§ I, II.  Regardless, those proceedings involved regulatory and tax issues, not the

4   interchangeability analysis required for antitrust market definition.  *See Malaney v. UAL*

5   *Corp.*, 2011 WL 6845773, *3 (N.D. Cal. Dec. 29, 2011) (rejecting estoppel on antitrust

6   market definition), *aff'd on this ground at* 552 F. Appx. 698, 701-02 (9th Cir. 2014).  Just

7   as importantly, SolarCity's statements in the regulatory proceedings were made six years

8   ago, under very different market conditions than exist today.  *See  Malaney*, 552 F. Appx.

9   at 701-02 (recognizing that antitrust market definition positions change as industry

10  matures); S-RJN § II.A.  Indeed, SolarCity's complaint specifically alleges that the

11  competitive landscape has changed dramatically in recent years.  ¶¶ 8-9, 72-104.[25]

12    In fact, by the District's own reasoning, the District itself must be judicially

13  estopped.  In the very ACC proceeding on which the District relies, the District said that

14  "*the electricity service provided by SolarCity is directly competitive with energy sales by*

15  *the incumbent distribution utility.*"  S-RJN, Ex. A.  Such prior statements and other fact

16  issues will, and must, be handled at trial.

### 4.    SolarCity has properly pled both a separate market for grid access and an unlawful tying arrangement

19    Tying—one of SolarCity's alternative antitrust theories—requires two separate

20  product markets.  *Eastman Kodak*, 504 U.S. 461-62.  The District argues that SolarCity

21  cannot pursue such a theory because a second market, the "grid access" market, is

22  inadequately pled.  As with the District's other market definition arguments, this is a fact

23  issue subject to ordinary pleading.  *Newcal*, 513 F.3d at 1051-52.

24    The Complaint explains that consumers have "inelastic" (or "incontestable")

---

[25] The statements in the more recent tax matter cited by the District are even less apposite
.  SolarCity merely stated that "competition" was irrelevant to issue of tax assessment
under A.R.S. § 42-14151(B)—not that SolarCity does not compete with the District or
other utilities.  D-RJN, exh. 2 at ¶ 70 ("The statements in this paragraph <u>are not relevant to
any issue before this</u> court [ . . . ] there is no issue as to whether [plaintiff distributed solar
companies] 'compete' with local utilities" in that tax context) (emphasis added)).

1    demand for grid access, ¶¶ 63, 119(d); that the grid access market is marked by high

2    barriers to entry, ¶ 59; that SRP has unbundled grid access from power sales (*i.e.*, priced

3    them separately), ¶¶ 61, 67; and that the growth of distributed generation confirms that

4    consumers have separate demand for power and for the facilities that enable always-on

5    power. ¶ 63, 85-87.  Indeed, the District's pretextual "cost shift" arguments and the

6    opening sentence of its brief (regarding the "costs of maintaining the grid," D-MTD 1),

7    recognize that grid access and retail electricity have separate demand characteristics and

8    cost structures.  *See F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 165 (D.D.C. 2000)

9    ("Distinct pricing is also a consideration" in determining the relevant product market.).

10   The electricity-related cases the District cites were decided at a fact stage, years before

11   distributed generation and unbundling allowed consumers to express demand for grid

12   access.  D-MTD 24.  That is the appropriate stage for determination here as well.

13          **B.      SolarCity's Restraint Of Trade Claims Are Properly Pled**

14          The District argues that SolarCity has not pled an agreement, as required by the

15   claims for unreasonable restraint of trade and Clayton Act claims (Counts III-IV, VII-

16   VIII).  *Bhan*, 929 F.2d at 1410; 15 U.S.C. § 14; A.R.S. § 44-1402.  But the District

17   nowhere denies (1) that it has a contractual relationship with its electric customers and (2)

18   that the SEPPs are critical terms of those contracts.  ¶ 118.  Those contracts, through the

19   SEPPs, punish customers for dealing with the District's rivals to such an extent that the

20   District has foreclosed all or nearly all competition.  ¶¶ 7, 122-25.  That is, customers who

21   use the District's retail electricity must promise to abide by the SEPPs, and that promise

22   prevents them from dealing with the District's competitors.  Nothing more is required.

23          Unreasonable restraints of trade are often contained in agreements between firms

24   and their customers, regardless of whether the customer shares the anticompetitive

25   motivation of the supplier.  For example, "[e]xclusive dealing involves an agreement

26   between a vendor and a buyer that prevents the buyer from purchasing a given good from

27   any other vendor."  *Allied Ortho. Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d

28   991, 996 (9th Cir. 2010).  To argue for a contrary result, the District misquotes and

1   mischaracterizes a Ninth Circuit case as holding that an "ordinary sales contract [is] not an

2   agreement."  D-MTD 22. The full quote is:

3       "If the complaint is that [the defendant franchisor] agreed with banks on a price to
        provide credit card processing services for franchisees, it would be an '[o]rdinary

4       sales contract[,]' not an illegal antitrust agreement."  *Rick-Mik Enters. Inc. v.
        Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008).

5   *Rick-Mik* was rejecting the notion that a *vertical* agreement between a franchisor and

6   "banks" was sufficient to allege a *horizontal* price fixing-conspiracy among the banks. *Id.*

7   That is all the "ordinary sales contract" language in *Rick-Mik* and the precedent it cites

8   means.[26]  Sales agreements, just like any other, most certainly can form the basis for

9   claims of unreasonable restraint of trade, including exclusive dealing, in the vertical

10  supplier-customer context, as here.  The District further attempts to confuse the issues by

11  reciting the truism that unilateral decisions do not implicate Section 1, D-MTD 23:16-18,

12  but "unilateral" means "without an agreement."  *See* Areeda ¶ 1437b (cautioning against

13  misuse of "unilateral" when discussing vertical agreements).  As the District's cited case

14  recognizes, "where a single firm's restraints directly affect prices," that single firm may be

15  liable under Section 1 when there is an agreement.  *Fisher v. Berkeley*, 475 U.S. 260, 266

16  (1986).

17          **C.    SolarCity's Monopolization Claims Are Properly Pled**

18          The District challenges one theory of SolarCity's monopolization claims (Counts I-

19  II, V-VI) only by mischaracterizing both the law and the Complaint.  The exclusive-

20  dealing theory—one of several expressly pled monopolization theories in the Complaint,

21  ¶ 119(b)-(c); *infra* fn.29—does not turn on the District "charging monopoly prices," and

22  does not allege that the District is competing with discounts or below-cost prices or

23  engaging in a "price squeeze."  D-MTD 25-28.  Instead, the District imposed

24  exclusionary, discriminatory terms that lock its customers into satisfying all their electric

25  requirements from the District.  This excludes efficient competitors, without sufficient

26  _____

27  [26] That precedent, *49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1467
    (9th Cir. 1986), quoted the Areeda treatise for the phrase.  Areeda, in turn, distinguishes
    the "ordinary sales contact" from what is at issue in this case:  "agreements . . . concerning

28  purchases of other products from [a firm] or from its rivals."  Areeda ¶ 1437a.

justification or purpose, and does not involve "discounting" or lowering prices to consumers. ¶¶ 12, 84, 112-15, 126-142. This constitutes a well pleaded and traditional monopolization violation. *See Cost Mgmt.*, 99 F.3d at 949-50 (elements); Areeda ¶ 1821a1 & n.12 (exclusive-dealing and similar arrangements as monopolization).

Not a single one of the cases the District cites holds differently because, to the extent they discuss "pricing" conduct, they relate to allegations of discounting, rebates, or unbounded duties to deal with competitors, none of which is at issue here.[27] The Third Circuit's *ZF Meritor* decision, on which the District relies, makes clear:

> "Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a *per se* rule of non-liability under the antitrust laws for all contractual practices that involve above-cost pricing. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) (stating that the Supreme Court's predatory pricing decisions have not "go[ne] so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct[,] the plaintiff must prove that those prices were below cost"). Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful. We decline to impose such an unduly simplistic and mechanical rule because to do so would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification." *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 278 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013).

The District cannot twist the facts and law to fit SolarCity's exclusive dealing theory into a below-cost pricing box. *First*, a "price" not intended to be paid is no price at all. The "price" terms are penalties so extreme[28] that virtually no customer has agreed to pay them or will trigger them. ¶¶ 5-7, 64, 107-11, 116. Instead, they are terms that require exclusive dealing with the District by imposing penalties so severe that no customer will stray. When price is not "clearly" the "predominant mechanism of exclusion," the "price"-specific authorities that the District cites do not apply. *ZF Meritor*, 696 F.3d at 269 (using ordinary exclusive-dealing test). The District's "price" formalism cannot save

---

[27] *See* Areeda ¶¶ 768b4 (distinguishing discounting from other mechanisms that constitute exclusive dealing); *see also Otter Tail*, 342 U.S. at 377-78; *McWane v. FTC*, 783 F.3d 814, 832-34 (11th Cir. 2015) (collecting cases); *Church & Dwight Co., Inc. v. Mayer Labs.*, Inc., 2011 WL 1225912, at *10 (N.D. Cal. Apr. 1, 2011) (same).

[28] According to the District's self-serving math, it was a 65% increase for a "typical solar [residential] customer," compared to a 3.9% increase for non-solar customers, but the effect was likely much higher. ¶¶ 5-6; 105-108. The average penalty on a commercial customer is about $24,000 per year. ¶ 111.

1   it from antitrust scrutiny of substance.  *See United States v. Dentsply Int'l, Inc.*, 399 F.3d

2   181, 189 (3d Cir. 2005) (exclusive-dealing case collecting Supreme Court cases that

3   confirm substance, not form, governs the analysis).

4          *Second*, accepting *arguendo* the "price" characterization, this not a case about low

5   prices or discounts.  When plaintiffs complain that the defendant sells products too

6   cheaply with the intent to drive out its competitors, courts are appropriately skeptical of

7   such claims because they challenge the very result antitrust seeks:  lower consumer prices.

8   *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223-26 (1993);

9   *Peacehealth*, 515 F.3d at 895-96, 901; Areeda at ¶¶ 725a-a2, 736a.  SolarCity alleges no

10  such theory.  Instead, as the Complaint makes clear, the District "has not adopted a price

11  *decrease* for any customer."  ¶ 5.  Rather, the District imposes discriminatory penalties,

12  charges *supracompetitive* prices to all customers, collects monopoly rents, and disburses

13  them for "private profit."  ¶¶ 35, 54.  At trial, the District will be free to tell the jury that it

14  keeps "prices to non-solar customers low, so that all customers are incentivized to

15  purchase all of their power from the District," D-MTD 25:6-8, but this fact contention is

16  not a ground for dismissal.

17         At the other end of the spectrum, competitors that want to purchase an input from a

18  monopolist sometimes argue that the monopolist should sell to them for a lower price than

19  it has offered.  But firms generally have no antitrust "duty to deal" with a competitor.

20  *Pac. Bell v. linkLine Comm'cns.*, 555 U.S. 438, 450 (2009); *Verizon Commc'ns, Inc. v.*

21  *Law Ofcs. of Curtis V. Trinko, LLP*, 540 U.S. 39, 407-08 (2004) (explaining that antitrust

22  discourages cooperating with competitors).  The District mischaracterizes SolarCity's

23  Complaint as a request for assistance from its competitor, but it is SolarCity's *customers*,

24  not SolarCity, that do business with the District, and the District's conduct is directed at

25  those customers.  By the District's reasoning, no competitor could sue for monopolization

26  because any challenge can be re-framed as a request to "assist" a competitor by refraining

27  from anticompetitive conduct.  That is wrong.  *Trinko* and *linkLine* are simply

28

1   inapplicable to SolarCity's claims.[29]

2          *Finally*, the District erroneously asserts that this is a "price squeeze" case.  D-MTD

3   26-27.  A "price squeeze" combines the two theories discussed above—non-predatory

4   price reductions by the defendant at the retail level, and refusing to sell an input to a

5   competitor at a low price.  *linkLine*, 555 U.S. at 442, 451-52; *ZF Meritor*, 696 F.3d at 280.

6   As discussed above, this case is neither.  The conduct SolarCity alleges is a well-

7   recognized form of anticompetitive conduct.  *ZF Meritor*, 696 F.3d at 269-81; *see also*

8   *McWane*, 783 F.3d at 832-33; *Church & Dwight*, 2011 WL 1225912, at *10.

9          **D.      SolarCity's Interference Claims Are Properly Pled**

10         The District incorrectly argues that SolarCity's interference claims challenge the

11  same conduct as the antitrust claims.  D-MTD 29.  But the interference claims also

12  challenge the District's manipulation of the SEPPs' effective dates.  ¶¶ 107, 116, 120.

13  When the District announced the SEPPs' actual terms on December 12, it also announced

14  they would apply retroactively to December 9.  The District chose the date knowing that

15  Maricopa Community Colleges unanimously approved major SolarCity installations on

16  December 9.  The District's manipulation of the effective date tortiously interfered with

17  that relationship, ¶ 120(b), entirely independent of the District's antitrust violations.

18         The interference claims are also proper so far as they overlap with antitrust.

19  Contrary to the District's out-of-state case, Arizona uses the Restatement approach, which

20  expressly permits the result.  Restatement (Second) of Torts, § 767 cmt. to cl. (a).

21  _____

22  [29] The District does not question SolarCity's independent monopolization theory,
    expressly asserted at ¶ 119(c), under the Supreme Court's *Aspen Skiing* decision, 472 U.S.
    at 589, 602, 609-11 (1985).  *Aspen Skiing* provides an important exception to the no-duty-

23  to-deal principle, and this exception is expressly unchanged by *linkLine*, 555 U.S. at 439
    and *Verizon*, 540 U.S. at 410.  It applies when a firm abandons a longstanding, beneficial

24  practice after recognizing that doing so may exclude a rival in the long term.  *MetroNet
    Svcs. Corp. v. Qwest*, 383 F.3d 1124, 1133-34 (9th Cir. 2004); *Safeway, Inc. v. Abbott

25  Labs.*, 761 F. Supp. 2d 874, 894-96 (N.D. Cal. 2011).  Recognizing the high likelihood of
    anticompetitive effect and intent in such circumstances, courts recognize an antitrust

26  violation and may remedy the conduct by requiring the violator to deal with a would-be
    competitor.  *Id.*; *Otter Tail*, 342 U.S. at 377-78 (same in the utility context).  SolarCity has

27  expressly alleged this monopolization violation.   ¶ 119(c).  None of the District's
    monopolization arguments question it.  Thus, even accepting all the District's

28  monopolization arguments, Counts I-II, V-VI would survive.

1    ("Conduct specifically in violation of statutory provisions [ . . . ] may for that reason make

2    an interference improper [ . . . ] for example, . . . conduct that is in violation of antitrust

3    provisions . . . .") (emphasis added); *Wagenseller v. Scottsdale Mem'l Hosp.,* 147 Ariz.

4    370, 387-88 (1985) (adopting the Restatement (Second)'s approach to interference

5    conduct), *superseded by statute on employment-law grounds as recognized by Chaboya v.*

6    *Am. Nat'l Red Cross,* 72 F. Supp. 2d 1081, 1092 (D. Ariz. 1999).[30]

7                                    **CONCLUSION**

8           The District's motion to dismiss should be denied in its entirety.

9    Dated:  July 24, 2015                    Respectfully submitted,
                                              BOIES, SCHILLER & FLEXNER LLP
10

11                                            By:   s/Steven C. Holtzman
                                                   Steven C. Holtzman
12

13                                            *Attorneys for Plaintiff SolarCity Corporation*

14

15

16

17

18

19

20

21

22

23

24   [30] The District concludes with a footnote about the inapplicable Johnson Act.  28 U.S.C. §
     1342.  The Johnson Act does not apply if the defendant's acts interfere with interstate
25   commerce or if there is "a plain, speedy and efficient remedy" in state courts.  *U.S. West,*
     *Inc. v. Nelson*, 146 F.3d 718, 722 (9th Cir. 1998).  The District's acts interfere with
26   interstate commerce.  ¶ 46 (major distributed solar companies are from out of state); Nucor
     Corp. v. Neb. Pub. Pwr. Dist., 891 F.2d 1343, 1348 (8th Cir. 1989).  The District believes
27   that the only remedy lies with its board, but the District is not the type of state actor for
     which the Act is intended to provide deference, and any request for relief would be futile.
28   See *Nucor*, 891 F.2d at 1346 & n.4.

1

**CERTIFICATE OF SERVICE**

2
        I hereby certify that on July 24, 2015, I electronically transmitted the attached

3
document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4
Notice of Electronic Filing to the following CM/ECF registrants:

5
        WILMER CUTLER PICKERING HALE & DORR LLP
        1875 Pennsylvania Ave. NW
6
        Washington, DC 20006

7
        Eric J. Mahr *(admitted pro hac vice)*
        Christopher E Babbitt *(admitted pro hac vice)*
8
        350 South Grand Ave.
        Los Angeles, CA 90071
9
        Christopher T. Casamassina *(admitted pro hac vice)*

10

        STEPTOE & JOHNSON LLP
11
        201 East Washington Street, Suite 1600
        Phoenix, Arizona 85004-2382
12
        Paul K. Charlton (012449)

13
        Karl M. Tilleman (013435)
        Quintin Cushner (027303)
14
        Jason M. Porter (027475)

15

16

17
                                        s/Steven C. Holtzman
                                        _____
18
                                        Steven C. Holtzman

19

20

21

22

23

24

25

26

27

28