# EXHIBIT A

ORIGINAL



0000106865

BEFORE THE ARIZONA CORPORATION COMMISSION

| | |
|---|---|
| KRISTIN K. MAYES<br>**Chairman**<br>GARY PIERCE<br>**Commissioner**<br>PAUL NEWMAN<br>**Commissioner**<br>SANDRA D. KENNEDY<br>**Commissioner**<br>BOB STUMP<br>**Commissioner** | 2010 JAN 15 P 2: 51<br>AZ CORP COMMISSION<br>DOCKET CONTROL<br><br>Arizona Corporation Commission<br>**DOCKETED**<br>JAN 15 2010<br>DOCKETED BY |

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE APPLICATION OF SOLARCITY FOR A DETERMINATION THAT WHEN IT PROVIDES SOLAR SERVICE TO ARIZONA SCHOOLS, GOVERNMENTS, AND NON-PROFIT ENTITIES IT IS NOT ACTING AS PUBLIC SERVICE COPRORATION PURSUANT TO ART. 15, SECTION 2 OF THE ARIZONA CONSTITUTION | DOCKET NO. E-20690A-09-0346<br><br>**SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT'S CLOSING BRIEF** |

In its opening brief, Salt River Project cautioned against making a significant change in Arizona utility law because of a current desire to promote a particular solar business model. The "SSA" structure is simply an ephemeral reaction to a current tax structure and incentive model. It would be a mistake for the Commission to ignore the Constitution for this circumstance, given the potential known and unknown long-term implications. The better approach is for the Commission to exercise its jurisdiction, in an appropriate manner, to support the development of solar businesses and protect consumers.

After several days of hearings and written briefs from the parties, Article 15, Section 2 of the Constitution remains clear – "All corporations other than municipal engaged in furnishing ... electricity for light ... shall be deemed public service corporations." Artful contract drafting or strained interpretations of words cannot change that conclusion.

In their opening briefs, the parties were split on these issues. Several parties agreed with the Commission Staff's position. Others, although agreeing that SolarCity is a public service corporation, decided not to take a position on

3346225v1(60003.1)

whether or to what extent the Commission should exercise its jurisdiction in this case.

SolarCity and other parties made various arguments, mostly relying on the factors set forth in the *Serv-Yu* case (even though this case was never intended to set forth a general test). This brief will respond to those arguments.

### RESPONSE TO OPENING BRIEFS

While some of the parties structured their responses in accordance with the factors listed in the *Serv-Yu case*, it is more instructive to break the arguments out in a more structured way—first, determine whether SolarCity meets the Constitutional definition of public service corporation, second, address arguments that suggest that the Commission should not exercise jurisdiction, and finally, discuss how *Serv-Yu* relates to this case.

#### A. SolarCity is a Public Service Corporation

In its opening brief, SRP discussed the historic backdrop of Article 15 of the Arizona Constitution. The thrust of the Constitution, and related statutory provisions, was to protect the public with respect to the provision of services that were deemed to be of particular public benefit, such as the provision of water, electricity, natural gas, oil, telephone and transportation services. It is quite clear, placing the constitutional provision in context, that the definitions of public services were meant to be read broadly with the intent of protecting the citizens of the State.

The arguments of the no-regulation advocates follow a similar theme. Their first argument is that SolarCity is not "furnishing" electricity, and is therefore not within the scope of the Constitutional definition. They cite only one case, *Williams v. Pipe Trades Industry Program of Arizona*, 100 Ariz. 14, 409 P.2d 720 (1966) for the proposition that the term "furnishing" means a transfer of possession. As SolarCity claims to never take title to the electricity,

1   they argue that it is not "furnishing" electricity.

2   Putting aside the obvious point that the structure of the SolarCity
3   agreements should not solely dictate the classification of the company, their
4   argument is not even supported by the one case cited in support. In *Williams*,
5   the court was faced with an argument that a company providing hot water for
6   heating was "furnishing" water under the constitution. The court noted that the
7   customer never receives the water, as it simply circulates in the pipes. The
8   point of the decision was that the customer did not receive water; there was no
9   "transfer of possession", in the parlance dictated by the facts of this case.

10   Here, of course, the customer receives and uses electricity generated
11   from solar generators owned by SolarCity. It is the receipt and use of the
12   product that was the basis of the *Williams* decision. *Williams* in no sense stands
13   for the proposition that the owner of an electric generator providing electricity
14   to a customer can escape regulation simply through the device of claiming not
15   to take title to the output that is provided to the customer.

16   The corollaries to this strained interpretation are obvious. A water utility
17   might claim that it is just providing pumps, wells and pipes, and never takes
18   title to the water. An electric generator could sell undivided shares in the
19   output of a generating facility, thus not taking title to the electricity. A
20   telecommunications company might provide the use of the infrastructure,
21   leaving the customer to provide the signals.

22   In its brief, RUCO claims that SolarCity is simply a financier, it is not
23   furnishing electricity to anyone (RUCO's Closing Brief dated December 15,
24   2009, p.4, ll.4-11) ("RUCO Brief"). It is difficult to follow this argument, as the
25   practical effect of SolarCity's ownership and operation of distributed generating
26   facilities is that the customer receives and uses electricity. There are few
27   utilities of any type that do not engage in financing the facilities that provide
28   services to customers. In this respect SolarCity is no different from any utility.

1       There is little question that SolarCity is furnishing electricity within the
2 meaning of the Constitution.

### B. The Second "Prong" of the Test Does Not Exempt SolarCity

Under the case law, it is certain that there is a second level of analysis, or a second prong of the test, to determine whether a business is subject to Commission oversight. The question in this docket is the breath of this second level of analysis. In its opening brief, SRP pointed out that the application of this second level has been limited to businesses where the constitutionally-listed service was incidental to a different business, for example, trailer park services, alarm services and security services.

The case law contains a number of broad statements in *dicta*, which are cited by all of the parties (not excepting SRP) to support various positions. Several of the parties argue for a broad exemption, based on these *dicta* statements. But a careful reading of each of these cases support the common sense proposition that where the primary purpose of a business is to deliver a constitutionally-listed service, no exemption applies.

The no-regulation advocates most often cite *Natural Gas Service Co. v. Serv-Yu Cooperative, Inc.*, 84 P.U.R.(NS) 148, 70 Ariz. 235, 219 P.2d 324 (1950) for the proposition that ACC regulation is not required. As discussed in detail in SRP's opening brief, this case is specific to its facts and, to some extent, is a function of the time in which the decision was written. As discussed below in subpart D(4), when considered in context, the *Serv-Yu* case firmly supports a finding that SolarCity is subject to Commission oversight.

The next most cited case probably is *Southwest Transmission Cooperative, Inc. v. Arizona Corporation Commission*, 213 Ariz. 427, 142 P.3d 1240 (Ariz.App.Div.1 2007). The parties particularly focused on the language of the Court of Appeals decision which describes the second "step" as:

> Second, we evaluate whether the entity's business and activity are such "as to make its rates, charges, and methods of operations a matter of public concern", by considering the eight factors articulated in [*Serv-Yu*].

213 Ariz. 427, 430, 142 P.3d 1240, 1243

But, the facts in *Southwest Transmission* bear no resemblance to the SolarCity circumstances. In Southwest Transmission Cooperative (SWTC) (a spinoff company from an integrated and regulated retail electric provider) owned and operated high voltage electric transmission. It had no retail customers. SWTC argued that although the transmission operations were once part of a regulated entity, they were no longer subject to regulation because they were now owned by a separate company that does not "furnish" electricity. The court found that SWTC was furnishing electricity within the meaning of the Constitution, even though SWTC did not own the electricity, did not sell the electricity and did not interact with retail customers. The court reasoned that "[b]y transmitting electricity from a generating entity to the distributors, SWTC is 'furnishing power' to the distributors, which sell the electricity as 'power' to various customers." See Id. at 213 Ariz. 427, 431, 142 P.3d 1240, 1244.

The court went on to consider the *Serv-Yu* factors, again concluding that SWTC was subject to regulation. Though SWTC was not asserting any monopoly rights, the court in substance found that "[i]ts role is integral in providing electricity to the public." See Id. at 213 Ariz. 427, 433, 142 P.3d 1240, 1246.

To even a more significant and direct extent than with SWTC, SolarCity owns the facilities which generate the power which is integral to providing electricity to the public. The *Southwest Transmission* case supports a finding that SolarCity is a public service corporation subject to regulation.

The no-regulation advocates also cite *Arizona Corporation Commission v. Nicholson*, 108 Ariz. 317, 497 P.2d 815 (1972) to support the proposition that there is a presumption against regulation: "free enterprise and competition is the general rule". *Id.* at 321, 497 P.2d 815 819, citing *General Alarm v. Underdown* 76 Ariz. 235, 262 P.2d 671 (1953). In Nicholson, the owner of a trailer park that provided water service as part of a trailer space rental package was found not to be a public service corporation. The court first noted that it is the "commodity" that establishes the interest of the public: "plaintiffs concede, and there can be no question that the commodity, water in this case, is one of special public interest". *See, Id.* at 108 Ariz. 317, 320, 497 P.2d 815, 818. The court stated generally: "When one devotes his property to a use in which the public has an interest he, in effect, grants to the public an interest in that use, and must submit to control by the public for the common good." But the court found that "the furnishing of water is in support and incidental to plaintiffs' business of renting trailer spaces." *See, Id.* at 108 Ariz. 317, 320, 497 P.2d 815, 818.

Despite language in *dicta*, the crux of the holding in this case was that the provision of water was incidental to the main business of renting trailer spaces. The court was clear that its general language related to this premise: "It was never contemplated that the definition of public service corporations as defined by our constitution be so elastic as to fan out and include businesses in which the public might be incidentally interested." *See, Id.* at 108 Ariz. 317, 321, 497 P.2d 815, 819. While a presumption against regulation may exist, this presumption does not extend to businesses clearly providing electricity as the primary (or in this case only) product of the business.

It is surprising to see *Petrolane-Arizona Gas Service v. Arizona Corp. Comm'n*, 119 Ariz. 257, 580 P.2d 718, (1978) cited in support of the no regulation advocates' position, because the holding of the case clearly supports

Commission oversight here. In *Petrolane,* a distributor of liquid propane gas through a central distribution system argued that it was not subject to regulation as the Constitution did not specify liquid gas as a listed public service, and that this was not the company's primary service. In rejecting that contention, the court found that the fact that the gas delivery was by liquid means did not exempt the company from regulation and that the gas distribution business was not "incidental, but was a distinct part of the company's business. The reasoning of the court is instructive in this case:

> [T]he purposes of regulation are to preserve and promote those services which are indispensable to large segments of our population, and to prevent excessive and discriminatory rates and inferior service where the nature of the facilities used in providing the service and the disparity in the relative bargaining power of the utility ratepayer are such as to prevent the ratepayer from demanding a high level of service at a fair price without the assistance of governmental intervention on his behalf.

119 Ariz. 257, 259, 580 P.2d 718, 720.

*Southwest Gas Corporation v. Arizona Corp. Comm'n*, 169 Ariz. 279, 818 P.2d 714 (Ariz.App.Div.1 1991) contains general language regarding the public interest, and is cited by the no-regulation advocates as supporting the proposition that there is no public interest in reviewing the business of SolarCity. But, the facts and findings of this case have no similarity to SolarCity. The court found that El Paso Natural Gas Company, which predominantly operated a wholesale natural gas transport business, was not a public service corporation even though it had ten retail customers. The court based its decision primarily on the fact that one hundred percent of the business was regulated by FERC and that FERC had issued certificates of convenience and necessity for the ten retail customers. The court also noted that El Paso's retail relationships were long standing, and that it was not accepting any new requests for service.

### C.    *The Public Interest is Served by Commission Oversight*

As has been discussed, a business providing electricity provides a public service. The Constitution elevates certain services, including electric service, to a different status because they are services imbued with the public interest. Nonetheless, it has been argued that SolarCity's business is such that regulation is not needed, or that the only level of regulation needed is the general oversight provided by the Registrar of Contractors or the Attorney General.

While this argument misses the point, as it is the commodity that dictates the public interest, the argument is simply wrong. There are many aspects of SolarCity's business that in appropriate circumstances would benefit by Commission oversight and consumer protection.

For example:

1.    *Ensure Accurate Cost Comparisons with Current Rates.*  As demonstrated by the testimony of David Peterson, Assistant Superintendant for Operations, of Scottsdale Unified School District (more by omission in the testimony) a comparison of costs is very complicated and requires expertise. A comparison would look, for example, at the use on peak and off peak (contrary to popular belief, the majority of the output of a solar photovoltaic system is off peak, when the winter months are included). As indicated by Staff witness Steve Irvine, an actual comparison of cost requires access to and the ability to use complicated formulae. Solar generators will not likely be able to perform this customer-by-customer comparison, leaving to the Commission the oversight responsibility of determining whether sales representations are appropriately informative and accurate.

2.    *Ensure the Clarity of Pricing Terms.*  While the contracts of SolarCity presented to the Commission contemplate a fixed price, this approach is by no means universal. Contracts can contain escalators and adjustment

1   mechanisms. These types of pricing structures have the potential of deception
2   or confusion, an area suited to Commission oversight. Also, full disclosure of
3   the terms of net metering and wholesale buy-back programs by the distribution
4   utility and potential future changes will be very important to the economics to
5   the customer.

6       3.    *Ensure the Accuracy of Advertising Statements.* While perhaps not
7   the case with SolarCity, the advertisement and marketing representations
8   regarding distributed solar services have significant potential to create customer
9   confusion, or in the worst case constitute outright misrepresentations. Probably
10  the biggest area of possible issues is in the representations of long term savings
11  (which assumes various levels of electricity price increases).

12      4.    *Provide a Forum for Resolution of Disputes.* During the hearing,
13  we learned that the business model of most providers is to form a limited
14  liability company for each installation and then sell that company as a revenue
15  stream to investors. Some providers like SolarCity maintain a managing
16  partner interest in the limited liability company but others sell their ownership
17  interest. In these circumstances, the only recourse for a consumer with a
18  problem is to appeal to these potentially unknown and out of state investors.

19      Clearly, these are similar issues that exist with any electricity provider.
20  The Commission is particularly suited (putting aside that it is constitutionally
21  required) to provide appropriate oversight to customers.

22      **D.    A Reprise on Serv-Yu**

23      SRP has demonstrated that the "*Serv-Yu* factors" should be used
24  sparingly and carefully, if at all, in determining whether a business is a public
25  service corporation. While there are general *dicta* in a number of Court of
26  Appeals decisions, the actual decisions have focused on a single concept.

27      The concept is that the protection of the Constitution focuses on the
28  service provided, not the structure of the business. Where a business provides

3346225v1(60003.1)                                  - 9 -

1  one of the listed services, its business is infused with the public interest, and it
2  is said to be providing a public service. Only where the listed service is truly
3  incidental to an unregulated business, have the courts found that the public
4  interest does not require oversight by the Commission.

5  At issue here is SolarCity's business of owning solar generating facilities
6  on customer premises. The business provides a single product, electricity. The
7  analysis can stop there. But, added to this is the fact is the Commission is
8  uniquely suited to oversee the terms and conditions of service, review the
9  pricing and pricing formulas, and ensure consumer protection. This is not a
10 close case.

11 Nonetheless, as every other party has gone through the "factors" in
12 *Serv-Yu*, SRP will do so against the backdrop of the Constitution and the
13 substantive holdings of the case law.

14 The *Serv-Yu* factors:

15 1. *What the corporation actually does.*

16 This factor is consistent with the Constitution. If a corporation provided
17 one of the listed services (e.g. water or electricity) it is providing a public
18 service and is a public service corporation. Unquestionably the sole business of
19 SolarCity is to provide electricity to customers. RUCO claims that this factor is
20 met only where the service is indispensible (RUCO's Brief, p.7, ll.3-22). Not
21 only is the statement without support, but it would exempt any utility service
22 being provided in a competitive market.

23 2. *A dedication to public use.*

24 This factor is similar to subparagraph 1 above. The facilities are
25 dedicated to providing a public service to members of the public, electricity.
26 The no-regulation advocates, particularly SunPower (SunPower Initial Post
27 Hearing Brief dated December 15, 2009, p.15, ll.20-25, p. 16, ll.1-26) claim
28 that this factor contemplates that the electricity is generally available to the

public. This argument is inconsistent with the Constitutional approach in Arizona. It is the provision of electricity that is the public use or public service. There is no authority that would suggest that the public service changes if the electricity is provided by distributed generation rather than central station generation.

      3.    *Articles of incorporation, authorization, and purposes.*

As discussed in SRP's opening brief, this factor became antiquated upon the adoption of a new corporations code in 1975, as the law no longer required a limited purpose for corporations. Nonetheless, the organizational documents of SolarCity permit the business of a public service corporation.

      4.    *Dealing with the service of a commodity in which the public has been generally held to have an interest.*

It is difficult to separate this factor from subparagraphs 1 and 2 above, as they all interrelate. Clearly SolarCity's business is to provide electricity to customers, no matter how characterized. RUCO claims that this factor is only triggered where the service uses common facilities. Putting aside the fact that SolarCity's model relies on common facilities both for net metering and to provide firm capacity, there is no authority that would limit regulation to services provided through common facilities.

      5.    *Monopolizing or intending to monopolize the territory with a public service commodity.*

This factor is inconsistent with the Constitution and has been rejected by subsequent court decisions. As SRP points out in its opening brief, the concept of whether a business is a monopoly played no part in the development of Article 15. The point was whether the business provided an essential "public service". Thus the Constitution included many classes of businesses that did not enjoy monopoly status, then or now:

> Corporations . . . engaged in carrying persons or property for hire; or in furnishing gas, oil, or

> electricity for light, fuel, or power; or in furnishing water for irrigation, fire protection, or other public purposes; or in furnishing, for profit, hot or cold air or steam for heating or cooling purposes; or in transmitting messages or furnishing public telegraph or telephone service, and all corporations . . . operating as common carriers, shall be deemed public service corporations.

The only support for this proposition is the general language in the *Serv-Yu* case. As pointed out in SRP's opening brief, *Serv-Yu*'s eight factors are particular to its facts and the company at issue. There were additional facts from the particular record listed by the court on rehearing to support its original determination that Serv-Yu was a public service corporation. It was not intended to nor should it be extrapolated into a general test.

The argument that non-monopolies should be exempted from regulation would not have made sense in 1912, and it would make even less sense now. Today, most businesses providing a commodity listed in the Constitution are competitive to one degree or another. Certainly, most if not all of the telecommunications industry is competitive; its participants are not monopoly providers. And it might be argued that natural gas service is subject to a myriad of competitors providing alternative energy services (e.g. electricity and propane). A broad extrapolation of the argument made here would exempt almost all of the utilities regulated by the Commission, save perhaps water and sewer utilities.

6. *Acceptance of substantially all requests for service.*

To the extent that this is a consideration, the record shows that SolarCity accepts all requests for service by customers meeting its standards. (Exhibit A-5, p.8, ll.12-28, p.9, ll.1-7).

7. *Service under contracts and reserving the right to discriminate is not always controlling.*

This factor does not apply here, except to say that SolarCity does provide service under contract and assumedly intends to discriminate from customer to customer.

8. *Actual or potential competition with other corporations whose business is clothed with public interest.*

This factor seems inconsistent with the breadth of the Constitution. Nonetheless, the electricity service provided by SolarCity is directly competitive with energy sales by the incumbent distribution utility. SolarCity argues that it is not, as the utilities must meet renewable standards. (SolarCity's Initial Post-Hearing Brief dated December 15, 2009, p. 15, ll.11-16) ("SolarCity Brief") But once again this is a function of this particular point in time, and cannot be said to be universally true for any type of distributed generation at any time.

We have pointed out that the eight factors of Serv-Yu are merely guides for analysis, they need not be found to exist for a company to be a public service corporation. *Petrolane-Arizona Gas Serv. v. Arizona Corp. Comm'n*, 119 Ariz. at 259, 580 P.2d at 720. But, even if we follow the *Serv-Yu* eight factors, the conclusion is clear: put in the context of history and case law *Serv-Yu* supports the proposition that the business of SolarCity falls squarely within the scope of Commission oversight. In the ultimate analysis it is the language of the Constitution that controls:

> However we do not rely entirely upon the reasons set forth in . . . [*Serv-Yu*] for our conclusion in this case. The language of the Constitution is too clear to admit of any other interpretation than that reached under the facts of this case.

*Trico Electric Cooperative v. Corporation Commission*, 86 Ariz. 27, 33-34, 339 P.2d 1046, 1050-51 (1959)

## CONCLUSION

The approach of SolarCity is to tell the Commission that to regulate means to kill the development of solar power. For example, on page 1 of its opening brief SolarCity states: "Regulating the providers of Solar Service Agreements . . .will drive tax equity investors away from Arizona and into the numerous other unregulated markets around the Country. . . . Decide not to regulate – like every other State that has faced this question – and watch the tax equity investment pour into Arizona. . . .[1]"

But, current circumstances make these statements hard to believe. In September of 2009 the Commission established a relatively easy and streamlined process for approving solar services contracts. At that time it was projected (in the Solar Alliance docket, Docket No. E-20633A-08-0513) that the Commission would be flooded with applications. (Transcript of Proceedings, June 22, 2009, p. 91, ll. 15-17) It was said that solar contracts must be executed before year-end. Yet other than the applications for the two high school installations that are part of this docket, there has not been a single request for approval of a solar services agreement.

This factor alone demonstrates that it is not the Commission that is standing in the way of a "flood" of SSA transactions. The Commission has and can establish effective and inexpensive methods of oversight. So long as there were no problems requiring Commission intervention, solar providers would be inconvenienced little. SolarCity claims that any regulation at all will destroy the solar industry (SolarCity Brief, p. 24, ll.1-23). But, just like the business licenses, procurement policies and building permits that the industry seems to

---

[1] In its opening brief, page 1, RUCO appears to support this all or nothing approach: "There is a lot at stake in this case - perhaps the future development of the solar industry in Arizona. (RUCO Brief, p.1, ll.20-21) . . . The evidence in this record is clear – a determination to regulate, even in its lightest form, will hinder the growth of the solar industry in Arizona." (RUCO Brief, p. 2, ll.18-20)

3346225v1(60003.1) - 14 -

1 | accept, SolarCity and the rest of the industry will adapt to reasonable oversight
2 | by the Commission.

3 |     SRP suggests that the Commission should not succumb to scare tactics. The precedents that would be set by granting SolarCity's application will have long reaching effects on the regulations of utilities in Arizona. The Commission should exercise its constitutional jurisdiction to support the solar industry while protecting customers against possible abuses.

    DATED this 15th day of January, 2010.

JENNINGS, STROUSS & SALMON, P.L.C.

By _____
Kenneth C. Sundlof, Jr.
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, Arizona 85004-2385
Attorneys for Salt River Project
Agricultural Improvement & Power
District

ORIGINAL and 13 copies filed this 15th day of January, 2010, with:

Docket Control
ARIZONA CORPORATION COMMISSION
1200 West Washington Street
Phoenix, Arizona 85007

COPY emailed this 15th day of January, 2010, to:

All parties of record

By: _Michele Maser_