1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  SolarCity Corporation,                        No. CV-15-00374-PHX-DLR

10              Plaintiff,                        **ORDER**

11  v.

12  Salt River Project Agricultural
    Improvement and Power District, et al.,

13

14              Defendants.

15

16          In December 2014, the Salt River Project ("SRP") announced a new rate structure

17  for sale of retail electricity, which included additional fees for consumers who obtain part

18  of their electricity from rooftop solar energy systems.  Solar energy companies,

19  environmentalists, and other interest groups opposed the rate change, arguing the new fee

20  would dissuade consumers from installing solar energy systems.  SRP approved the new

21  rates in February 2015.  Plaintiff SolarCity Corporation brings this action challenging the

22  new rate structure under federal and state antitrust laws.

23          Before the Court are Defendant Salt River Project Agricultural Improvement and

24  Power District's (the "District") motion to dismiss, (Doc. 53), and Defendant Salt River

25  Valley Water Users' Association's (the "Association") motion to dismiss, (Doc. 52).  The

26  District has also filed a request for judicial notice.  (Doc. 54.)  The Court held oral

27  argument on October 14, 2015.  For the reasons stated below, the District's motion to

28  dismiss is granted in part, the Association's motion to dismiss is granted, and the

District's motion for judicial notice is granted in part.

**BACKGROUND**

## I.    The Parties

SolarCity is the country's "largest installer of distributed solar energy systems." (Doc. 39, ¶ 15.)  It sells and leases solar energy systems to residential and commercial customers "who then use the systems to generate electricity and thereby displace a portion of their electricity purchases from an electric utility."  (*Id.*, ¶ 16.)  Prior to the rate change, SolarCity "averaged almost 400 installations per month in SRP's service area." (*Id.*, ¶ 17.)[1]

SRP is a power-and-water utility comprised of two separate entities: the District and the Association (collectively referred to as "SRP").   (*Id.*, ¶¶ 18-19.)   "The Association is a private, for-profit corporation that files reports with the state listing its Board members as 'directors' of the corporation."  (*Id.*, ¶ 26.)  It was formed in 1903 by private Salt River Valley landowners in order to "enter into contracts with the federal government for the irrigation of their land."  (*Id.*, ¶ 27.)  It continues to operate as a private corporation for the benefit of private landowners.  (*Id.*, ¶ 29.)

The District was created in 1937 "for the purpose of refinancing the Association's debts by issuing interest-free bonds, thereby saving the private landowners very large sums of money each year."  (*Id.*, ¶ 28.)  The District is responsible for power and water storage work, and the Association manages "water delivery as an agent of the District." (*Id.*)   The revenues generated from the District's sale of electricity subsidize the Association's "money-losing water operations, by [$100 million] per year."  (*Id.*, ¶ 35(b).)  The District "cannot impose ad valorem property taxes or sales taxes, enact any laws governing the conduct of citizens, or administer [other] such normal functions of government[.]"  (*Id.*, ¶ 40.)  The Arizona Corporation Commission ("ACC"), Arizona's public utility regulatory authority, "has no rate-setting or review authority over the

---

[1] "Distributed solar systems generate electricity when the sun shines on them" and reduce "electric demand during the electric system's peak hours."  (Doc. 39, ¶¶ 70-71.)

1  District or its retail operations."  (*Id.*, ¶ 42.)

2  **II.    Industry Allegations**

3  SRP operates in the Phoenix-metro area.  It provides electricity to residential and

4  commercial customers through a variety of plans: (1) a Standard Plan based on per-

5  kilowatt usage, (2) a Time-of-Use Plan where rates vary according to the time of day, (3)

6  a Community Solar Plan where customers purchase power generated by solar power

7  plants at different rates, and (4) other governmental and commercial plans.  (*Id.*, ¶ 56.)

8  SolarCity participates in this market, which it defines as "the provision of electric

9  power to end-use residential, governmental, and businesses consumers[.]"  (*Id.*, ¶¶ 48-

10  49.)  It alleges it "directly competes with SRP because it offers equipment and services

11  that provide electricity – specifically solar-generated electricity – to customers."  (*Id.*, ¶

12  50.)   When customers purchase SolarCity's equipment and services, it reduces the

13  amount of electricity they must purchase from SRP.  (*Id.*)

14  SolarCity alleges "SRP has monopoly power in the retail market within the

15  geographic market, currently providing more than 95% of the electricity used by retail

16  customers in SRP territory."  (*Id.*, ¶ 53.)  This is evidenced by SRP's ability to "extract

17  supra-competitive profits from its electrical operations and use them to fund its money-

18  losing water operations," as well as the high-barriers to entry in the market.  (*Id.*, ¶¶ 54-

19  55.)  Moreover, "[w]hether SRP customers self-generate power . . . or not, all or virtually

20  all of them still need to purchase both retail electric power and grid access from SRP to

21  have access to power at times that alternative sources of power . . . cannot meet the

22  customers' needs."  (*Id.*, ¶ 63.)

23  **III.    The Dispute**

24  For several years, SRP provided incentives for customers to install distributed

25  solar systems.  (*Id.*, ¶ 72.)  In 2011, however, "distributed solar increased in popularity

26  and efficiency [and] SRP began to recognize that distributed solar could become a

27  competitive threat in the longer term."  (*Id.*, ¶ 78.)  In response, "SRP developed its

28  'Community Solar' program, where customers purchase solar-generated electricity."

(*Id.*, ¶ 79.)  SolarCity alleges SRP implemented this program in part to ensure its ability to perform under several output requirement contracts with privately-owned solar farms. (*Id.*, ¶ 80.)  However, it could not compete with distributed solar.

In December 2013, SRP lowered pricing for the Community Solar program, and shortly thereafter, "eliminated incentives to install distributed solar."  (*Id.*, ¶¶ 82, 85.) One year later, in December 2014, "SRP announced its intent to adopt new [Standard Electric Price Plans ("SEPPs")] to apply new service terms and rates to its customers." (*Id.*, ¶ 89.)  Around the same time, SRP held several hearings and disclosed information relating to the SEPPs.  (*Id.*, ¶ 91.)  SolarCity participated in this process and voiced its opposition to the SEPPs.  (*Id.*)

On February 26, 2015, the District's Board of Directors approved the SEPPs.  (*Id.*, ¶¶ 97, 100.)  The SEPPs retain the normal rate structure for customers that purchase all of their electricity from SRP.  (*Id.*, ¶ 105.)  These customers are charged a specific rate per kilowatt usage along with a fixed monthly service charge.  (*Id.*)  But for customers that purchase electricity from SRP and also generate their own electricity, the SEPPs impose a nearly 65% rate increase from the previous rate structure.  (*Id.*, ¶ 107.)  This increase appears as several additional charges applicable only to self-generating customers, as well as "reduced bill credits for the power that distributed solar customers send *back* into SRP's grid for SRP to re-sell to other customers."  (*Id.*, ¶ 108(c) (emphasis in original).)

On March 2, 2015, SolarCity filed this action seeking damages and injunctive relief under federal and state antitrust laws.  (Doc. 1.)  On May 20, 2015, SolarCity filed an amended complaint alleging nine counts: (1) Monopoly Maintenance in violation of § 2 of the Sherman Act; (2) Attempted Monopolization in violation of § 2 of the Sherman Act; (3) Unreasonable Restraint of Trade in violation of § 1 of the Sherman Act, (4) Exclusive Dealing in violation of § 3 of the Clayton Act; (5) Monopoly Maintenance in violation of the Arizona Uniform State Antitrust Act ("AUSAA"); (6) Attempted Monopolization in violation of AUSAA; (7) Unreasonable Restraint of Trade in violation of AUSAA; (8) Intentional Interference with Prospective Economic Advantage; and (9)

Intentional Interference with Contract.  (Doc. 39.)  The District and the Association both move to dismiss all counts.

## **REQUEST FOR JUDICIAL NOTICE**

The District requests the Court to take judicial notice of eleven exhibits, (Docs. 54-1 through 54-11).  It asserts each exhibit contains information that is publicly available and directly related to allegations in the amended complaint.  SolarCity objects to each of these documents except Exhibit 10, which is a copy of SolarCity's Notice of Claims sent to SRP in March 2015, (Doc. 54-10).

Rule 201 permits courts to take judicial notice of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201(b)(2).  The advisory committee notes accompanying Rule 201 "explain that '[a] high degree of indisputability is the essential prerequisite' to taking judicial notice of adjudicative facts and that 'the tradition [of taking judicial notice] has been one of caution in requiring that the matter be beyond reasonable controversy.'"  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005) (quoting Fed. R. Ev. 201(a) & (b) advisory committee's notes).  In addition, "[b]ecause the effect of judicial notice is to deprive a party of an opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Id.* (internal quotation marks and citation omitted).

SolarCity does not dispute the accuracy of Exhibit 10, nor does it object to the Court taking judicial notice of this document.  Because the document is publicly available and not subject to reasonable dispute, the Court will take judicial notice of Exhibit 10.

The District argues Exhibits 1-4 are necessary for the Court to apply judicial estoppel and preclude SolarCity from taking a position inconsistent from one taken before a different tribunal.  It asserts Exhibits 1 and 2, which contain 153 pages from the record of a tax case SolarCity filed against the Arizona Department of Revenue and purportedly contain statements relating to SolarCity's lack of "competition" with public

utilities, should be noticed by the Court.  It also asserts Exhibits 3 and 4 contain additional evidence that SolarCity does not "compete" with SRP in the antitrust context. But SolarCity disputes the relevancy of the statements given the context in which they were made.  It claims the District mischaracterizes the statements, and thus they should be narrowly interpreted to apply only to the issues considered during each proceeding. The Court agrees.  Taking judicial notice of the documents would require analysis of the context in which the statements were made and may give rise to factual issues.  Such an inquiry is not appropriate at the 12(b)(6) stage.

The District also requests judicial notice of Exhibits 5-7, which are documents from an administrative proceeding that purportedly indicate "the ACC has declined to certify any retail electricity competitor in Arizona and that, as a result, the State of Arizona has a policy in favor of regulation, not competition."  (Doc. 63 at 7.)[2]  But again, SolarCity disputes the context in which the documents were produced.  The documents contain hearsay and opinions of non-experts that are subject to reasonable dispute. Taking judicial notice is not appropriate where the Court would be required to weigh evidence without providing SolarCity an opportunity to rebut.  *See Rivera*, 395 F.3d at 1151.

Last, the District seeks judicial notice of three self-created documents, two of which are posted on the District's website and contain information related to the SEPPs, and one prepared in response to SolarCity's Notice of Claims submitted in March 2015. (Docs. 54-8, 54-9, 54-11.)  SolarCity argues the documents are irrelevant to this case and disputes the accuracy of the statements contained therein.  It also challenges the authenticity of the documents posted on the District's website as they contain no information as to when they were prepared and when they were posted online.  Because these documents were prepared by the District, and because SolarCity challenges their content, the Court cannot conclude they are beyond reasonable dispute.

---

[2] Citations to pages in the Court's docket are to the page numbers stamped at the top of the page by the Court's CM/ECF system, not the page numbers at the bottom of each page.

Accordingly, the Court will only take judicial notice of Exhibit 10.  The remaining exhibits lack the "high degree of indisputability" necessary under Rule 201, and taking notice of the documents for the purposes suggested by the District would require the Court to engage in evidentiary and factual analysis inappropriate at this stage.  The District's motion is therefore granted only with respect to Exhibit 10 and denied as to the remaining exhibits.

## MOTIONS TO DISMISS

### I.   Legal Standard

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party.  *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).  Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2008).  To avoid a Rule 12(b)(6) dismissal, the complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Dismissal is appropriate when the complaint lacks a cognizable legal theory, lacks sufficient facts alleged under a cognizable legal theory, or contains allegations disclosing some absolute defense or bar to recovery.  *See Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

### II.   Analysis

Both the District and the Association move to dismiss SolarCity's amended complaint.  The District argues: (1) it is absolutely immune from antitrust damages claims under federal and state law, (2) it is immune from antitrust liability under the state action immunity doctrine, (3) the filed-rate doctrine bars SolarCity's claims, (4) the *Noerr-Pennington* doctrine bars SolarCity's claims, (5) SolarCity lacks standing because

it fails to adequately plead an antitrust injury, (6) SolarCity fails to state a claim under federal or state antitrust law, (7) SolarCity's state law claims are barred because it failed to comply with administrative procedures, and (8) SolarCity fails to adequately plead its tortious interference claims.  The Association's motion raises similar arguments and differs only in that it argues (1) the amended complaint fails to implicate it in any wrongdoing, and (2) it and the District are not alter egos.  The Court will address the Association's motion first.

**A. Allegations Against the Association**

The Association argues SolarCity fails to directly implicate it in any wrongful conduct.  It claims it has nothing to do with setting electricity rates and that the District enacted the SEPPs on its own.  The Court agrees.

An antitrust plaintiff must "include allegations specific to each defendant alleging defendant's role in the alleged [misconduct]."  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  Here, the District is alleged to be responsible for the anticompetitive conduct – not the Association.  SolarCity does not allege that the Association had any role in promulgating the SEPPs, nor does it otherwise implicate the Association in any wrongdoing.  SolarCity acknowledges that the Association's functions are limited to "managing water delivery as agent of the District." (Doc. 39, ¶ 28.)  Moreover, SolarCity has admitted that it did not directly allege any wrongful conduct attributable to the Association.  (*See* Doc. 76 at 18 ("It's true, Your Honor, that we don't specifically allege conduct that the Association engages in as opposed to the District[.]").)

SolarCity alleges the District and the Association are alter egos and hold themselves out as one entity: SRP.  It alleges the District is a mere instrumentality of the Association, and therefore both are liable for the alleged anticompetitive conduct.  The Association argues the doctrine does not apply between a political subdivision of the state and a private entity, and even if it does, the Association should be able to raise the same governmental defenses as the District.

The District is a "municipal corporation" formed under Arizona law and entitled to "the powers and privileges conferred . . . or granted generally to municipal corporations by the constitution and statutes of the state, including immunity of its property and bonds from taxation."  A.R.S. § 48-2302; *see also* Ariz. Const. art. 13, § 7 ("Irrigation, power, electrical, [and] agricultural improvement . . . districts . . . shall be political subdivisions of the state, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this constitution and laws of the state[.]").  The Association is a private corporation operating for the benefit of its shareholders.  (Doc. 39, ¶ 29.)

The alter ego doctrine is generally applied between private parent and subsidiary corporations or between a private corporation and one of its shareholders.  *See, e.g.*, *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991); *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972).  The rationale is that a corporation should not be used to shield assets or avoid liability for fraud or other tortious conduct.  *See Dietel*, 492 P.2d at 728 ("If a corporation was formed or is employed for fraudulent purposes then clearly the corporate fiction should be disregarded.").  Arizona courts have not addressed whether the doctrine applies between a political subdivision of the state and a private entity, and other jurisdictions have refused to apply it between two governmental entities.  *See Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.*, 970 F.2d 199, 202 (6th Cir. 1992) (rejecting the plaintiffs' attempt to hold the city and county liable for the contractual obligations of the city waste authority, a nonprofit corporation created by the city and the county); *McDaniel v. Bd. of Educ. of City of Chi.*, 956 F. Supp. 2d 887, 896 (N.D. Ill. 2013) ("It bears repeating that Plaintiffs have offered no Illinois or Seventh Circuit authority that applies a corporate veil-piercing theory to hold a municipality liable for the actions of a statutorily-created independent corporation."); *Katz v. Holzberg*, No. 13-1726 (FSH), 2013 WL 5523488, at *4 (D.N.J. Oct. 2, 2013) ("Katz does not provide a single case, from New Jersey or otherwise, supporting the application of corporate veil-piercing theory or parent-subsidiary law to the public

authority context."); *Newcrete Prods. v. City of Wilkes-Barre*, 37 A.3d 7, 14 (Pa. Commw. Ct. 2012) (finding alter ego theory inapplicable between a city and city redevelopment authority); *DBT Yuma, L.L.C. v. Yuma Cty. Airport Auth.*, 340 P.3d 1080, 1082 (Ariz. Ct. App. 2014) (finding that a county and a statutorily-created "nonprofit civic corporation" were not alter egos).

SolarCity cites no Arizona case or statute that permits holding a private corporation liable for the acts of a municipal corporation, or vice versa.  Because the Court agrees with *McDaniel*, which noted: "the traditional veil-piercing analysis employed by [state] courts is ill-suited to these circumstances," 956 F. Supp. 2d at 897, it finds the doctrine is not applicable to this case.

Arizona law requires "such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist."  *Dietel*, 492 P.2d at 457.  But SolarCity does not allege the Association has any ownership interest in the District, nor could it, as the District is a political subdivision of the state.  It does not allege the District has purchased shares of the Association or that funds were commingled between the entities.  Perhaps most importantly, it fails to allege any resulting fraud or injustice. *See Loiselle v. Casa Mgmt. Grp., LLC*, 228 P.3d 943, 950 (Ariz. Ct. App. 2010) ("[D]isregarding the corporation's separate legal status [must be] necessary to prevent injustice." (internal quotation marks omitted)).  SolarCity's sole argument is that it would be unjust for the District to take advantage of its status as a political subdivision and raise its governmental defenses.  But during argument, SolarCity admitted that holding the District and the Association as alter egos would not strip the District of these defenses, and under Arizona law, the District is entitled to raise them.  SolarCity does not claim that the District is used as a vehicle to shield the Association's assets, or that it lacks the funds to satisfy an award of damages.  No fraud or injustice is present here.

Last, SolarCity asserts the alter ego doctrine applies because the District and the Association were found to be alter egos in *Miller v. Salt River Valley Water Users Ass'n*, 463 P.2d 840 (Ariz. Ct. App. 1970).  In *Miller*, the court held that the District and the

Association were alter egos for purposes of performing a contractual obligation owed by the Association and later assumed by the District.  *Id.* at 845-46.  But *Miller*'s holding was based primarily on an assumption agreement executed between the District and the Association.  It did not analyze whether the two entities were alter egos based on the similarities between the two entities.

Accordingly, because SolarCity has failed to provide any Arizona authority applying the alter ego doctrine to a municipal corporation and a private entity, the Court declines to apply the doctrine in this case.  The Association is dismissed.

**B. Antitrust Claims Alleged Against the District**

The District raises two threshold arguments: (1) SolarCity fails to properly allege a relevant market, and (2) SolarCity fails to allege antitrust injury.  The District also argues SolarCity fails to adequately allege several elements of its antitrust claims.  The Court will address the threshold issues first.

**1. Threshold Issues**

**a. Relevant Market**

SolarCity alleges violations of § 1 and § 2 of the Sherman Act, which govern monopolization and attempted monopolization, and § 3 of the Clayton Act, which governs exclusive dealing.  These claims are brought under section 4 of the Clayton Act, which provides that "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore[.]"  15 U.S.C. § 15(a).  Each claim requires SolarCity to allege "that the defendant has market power within a 'relevant market.'"  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  "Without a definition of [the relevant] market there is no way to measure [the company's] ability to lessen or destroy competition."  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

"[T]he [relevant] market must encompass the product at issue as well as all economic substitutes for the product."  *Newcal Indus.*, 513 F.3d at 1045.  "The outer boundaries of a product market are determined by the reasonable interchangeability of

use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Interchangeability and cross-elasticity of demand refer to "the availability of products that are similar in character or use to the product in question and the degree to which buyers are willing to substitute those similar products for the product." *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 157 (D.D.C. 2000).  Ultimately, "the relevant market must include 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Newcal Indus.*, 513 F.3d at 1045 (quoting *Thurman Indus., Inc. v. Pay N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).  The relevant market need not "be pled with specificity," and "[a]n antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect" or is "facially unsustainable." *Id.*

SolarCity alleges "the relevant product market is the provision of electric power to end-use residential, governmental, and businesses consumers . . . .  In this market, power may be provided by various sources, such as through outright sale of power, or by the lease or sale of distributed systems . . . ." (Doc. 39, ¶ 49.)  It alleges that its rooftop solar energy systems provide customers the ability to "generate their own electricity on their own property," which "reduces the amount of electricity that customers need to buy from SRP [and] allows customers to save money, and conserve natural resources." (*Id.*, ¶ 3.)  In addition, distributed solar systems and SRP's Community Solar plan are close substitutes. (*Id.*, ¶ 57.)

SolarCity's relevant market, though narrowly defined, is not facially unsustainable.  The product market is the provision of electricity to residential and commercial customers, which includes public utilities and distributed solar systems.  The geographic market extends to the outer boundaries of SRP's service area, at which point consumers must purchase electricity from another regional source.  Because distributed solar systems produce electricity at a cheaper rate than from public utilities, customers increasingly made the switch to self-generate, reducing the amount of electricity they had

to purchase from the District.  Outside of distributed solar and public utility electricity, there are no other economically feasible electricity sources for consumers.

The District argues that a "retail electricity market that includes self-generated power *and* equipment suppliers to self-generating customers is facially implausible." (Doc. 53 at 21 (emphasis in original).)   It asserts SolarCity's product is not interchangeable with retail electricity because customers who self-generate still must purchase retail electric power from SRP.  Accepting SolarCity's market definition, "*any* supplier of *any* equipment used to generate electricity would be included," such as "companies that manufacture and supply wind turbines, hydroelectric dams, or gasoline generators."  (*Id.* at 20, 21.)

The fact that customers who purchase SolarCity's product still have to purchase electricity from the District does not undermine the interchangeability of the two products.  Customers can either purchase electricity from the District, or they can purchase SolarCity's product (or other distributed solar products) and generate some of their own electricity, which reduces their need to purchase the District's product.  The extent to which the product is entirely interchangeable is lessened, but either way, the customer is receiving electricity.  Moreover, "when a customer can replace the services of an external product with an internally-created system, this 'captive output' (i.e. the self-production of all or part of the relevant product) should be included in the same market."  *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001) (internal quotations omitted).  In addition, unlike distributed solar, gasoline generators, wind turbines, and hydroelectric dams are not reasonable substitutes for public utility electricity because they are not economically feasible options for the average consumer.

SolarCity's alleged relevant market is defined narrowly because electricity customers allegedly have only two economically feasible choices for obtaining electricity in the area, either from the District or from solar power.  Prior to the District's implementation of the SEPPs, SolarCity was installing a large number of distributed solar

systems in the District's territory.  (Doc. 39, ¶ 17.)  Distributed solar systems were reducing the amount of electricity the District sold, thereby depriving it of business.  *See Newcal Indus.*, 513 F.3d at 1045.  When SRP imposed an extra fee for customers with self-generating systems, customers switched back to purchasing all of their electricity from SRP.  This dynamic illustrates that SolarCity and the District have the actual ability to deprive each other of significant business in the relevant market.  *See Newcal Indus.*, 513 F.3d at 1045 (quoting *Thurman*, 875 F.2d at 1374).

### b. Antitrust Injury

In order to have standing to bring its claims, SolarCity must demonstrate antitrust injury.  "Only those who meet the requirements for 'antitrust standing' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'"  *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003) (quoting *Am. Ad Mgmt, Inc. v. Gen. Telephone Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999)).

"Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Glen Holly*, 343 F.3d at 1007-08 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  In addition, "'the injured party [must] be a participant in the same market as the alleged malefactors.'"  *Id.* at 1008 (quoting *Am. Ad*, 190 F.3d at 1057).  "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987).  "In analyzing whether [the plaintiff] participate[s] in the same market, the focus is upon the reasonable interchangeability of use or the cross-elasticity of demand between the services provided by [the plaintiff] and by [the defendants]."  *Bhan v. NME Hosp., Inc.*, 772 F.2d 1467, 1470-71 (9th Cir. 1985).  The antitrust laws are meant to "protect competition as a whole, not individual competitors."  *Brunswick*, 429 U.S. at 488.

SolarCity plausibly alleges that it is a competitor of the District.  It claims that it "offers equipment and services that provide electricity – specifically solar-generated electricity – to customers.  By using SolarCity's equipment and services, customers reduce the amount of power that consumers purchase from SRP."  (Doc. 39, ¶ 50.)  It alleges it has the ability to deprive SRP of business.  SolarCity further claims that "SRP fully recognizes that SolarCity and other distributed solar providers are competitors," given that at least one SRP employee has referred to SolarCity as "the enemy."  (*Id.*, ¶ 51.)   In addition, "a trade group with which SRP corresponded during the SEPPs' approval process – has published a report noting that distributed solar is one of many 'disruptive technologies . . . *that may compete with utility-provided services*' and that '[a]s the cost curve for these technologies improves, they could directly threaten the centralized utility model.'"  (*Id.* (emphasis in original).)  SolarCity alleges the Arizona legislature has "expressly recognized that 'self-generation' by customers reduces demand from entities such as SRP."  (*Id.*, ¶ 52.)

The District asserts that SolarCity does not compete with the District as a matter of law because it has not applied for or obtained the certificate necessary to supply retail electricity in Arizona.  But the statutes cited by the District apply to "electricity suppliers," which are defined as "public service corporation[s] that offer[] to sell electricity to a retail electric customer in this state."  A.R.S. §§ 40-201, 40-207.  They do not apply to private companies that provide alternate access to retail electricity.

The District also argues that SolarCity fails to allege harm to competition.  But SolarCity alleges the SEPPs "have the purpose and effect of eliminating future distributed solar installations" and that the "only practicable way to escape the charges is to forgo installing distributed solar systems or to radically reduce peak usage," which is impracticable.  (Doc. 39, ¶¶ 107, 109.)  SolarCity further alleges the SEPPs make it "impossible for commercial, municipal, and educational customers to obtain any viable return on a new distributed solar investment," and that the "clear purpose of the SEPPs is not to recoup reasonable grid-related costs from distributed solar customers, but to

prevent competition from SolarCity (and other providers of distributed solar) by punishing customers who deal with such competitors[.]"  (*Id.*, ¶¶ 111, 113.)  It asserts it has lost substantial business because the SEPPs have "made rooftop solar profoundly uneconomical."  (*Id.*, ¶ 123.)  These allegations sufficiently allege harm to competition in the retail electricity market.  SolarCity has adequately alleged antitrust injury.

### 2.  Antitrust Claims

#### a.  Claims Based on an Illegal Agreement

Count three alleges unreasonable restraint of trade in violation of § 1 of the Sherman Act.  Count four alleges exclusive dealing in violation of § 3 of the Clayton Act.  Count seven alleges unreasonable restraint of trade in violation of Arizona's antitrust act.[3]  An essential element of these counts is an illegal agreement between two or more persons to retrain trade or exclusively deal with one another.  *See* 15 U.S.C. §§ 1, 14; A.R.S. § 44-1402.  The District argues SolarCity has failed to plead an agreement.

SolarCity alleges the "SEPPs are agreements (indeed, agreements in restraint of trade) within the meaning of the antitrust laws because they form [] a critical part of the express contract that customers have with SRP."  (Doc. 39, ¶ 118.)  "The SEPPs are exclusionary because they punish customers for dealing with SRP's competitors by raising prices those customers must pay for a product[.]"  (*Id.*, ¶ 119.)  SolarCity alleges these agreements restrain trade and "constitute unreasonable exclusive-dealing agreements[.]"  (*Id.*, ¶ 119(a).)

SolarCity fails to plausibly allege an agreement or conspiracy to restrain trade.  Section 1 of the Sherman Act "prohibits agreements that unreasonably restrain trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).  Such agreements are either horizontal (between competitors), or vertical (between manufacturer and retailer).  *Id.*  SolarCity claims the SEPPs are unlawful

---

[3] The language of the AUSAA is derived from the Sherman Act, and thus the two claims will be analyzed together.  *See Lake Havasu City v. Rancho Disposal Serv., Inc.*, 860 F.2d 1089 (9th Cir. 1988) (unpublished table decision).

vertical restraint agreements between the District and its customers.  But an agreement requires at least two participants, and SolarCity does not allege that the customers agreed to restrain trade by raising rates.  Rather, the District unilaterally set price terms that have an allegedly anticompetitive effect.  Although "a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement."  *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986).

SolarCity argues "[u]nreasonable restraints of trade are often contained in agreements between firms and their customers, regardless of whether the customer shares the anticompetitive motivation of the supplier."  (Doc. 58 at 27.)  But it points to no authority in support, and finding that such an agreement exists between an antitrust malefactor and an unwitting customer would potentially subject the customer to criminal and civil liability simply for entering into a sales contract.  An antitrust plaintiff must allege the antitrust defendant and another party "had a conscious commitment to a common scheme designed to achieve and unlawful objective."  *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986).  SolarCity's complaint contains no such allegations.

SolarCity also fails to allege an agreement necessary for its exclusive dealing claim.  Section 3 of the Clayton Act prohibits exclusive dealing arrangements.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010).  "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).  Generally, the buyer is precluded by contract, either expressly or implicitly, from dealing with other vendors.  *See id.*  The plaintiff must show an agreement with the defendant, "though not necessarily [] explicit," that the buyer not purchase a competing product.  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392 (7th Cir. 1984).

SolarCity fails to plausibly allege an agreement to exclusively deal.  Two

1   scenarios exist in this case: either customers who want to use distributed solar will pay

2   the extra fee, or they will not self-generate to avoid the fee.  Although the District

3   allegedly intends the latter, charging a higher rate to customers who use distributed solar

4   systems is not the same as an agreement to exclusively deal.  The amended complaint

5   does not allege an agreement, express or implied, in which customers will only purchase

6   their electricity from the District.

7        In sum, the complaint does not allege facts that "raise a reasonable expectation

8   that discovery will reveal evidence of an illegal agreement."  *Twombly*, 550 U.S. at 556.

9   Accordingly, count four will be dismissed.

10               **b.  Tying Arrangement Claim**

11       Count three also alleges a tying arrangement under § 1 of the Sherman Act.  "A

12  tying arrangement exists when a seller conditions the sale of one product or service (the

13  tying product or service) on the buyer's purchase of another product or service (the tied

14  product or service)."  *Cty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th

15  Cir. 2001).  Tying arrangements "cannot exist unless two separate product markets have

16  been linked."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984),

17  *abrogated on other grounds by* 547 U.S. 28 (2006).  Whether separate markets exist

18  depends "on the character of the demand for the two items," i.e., whether the items are

19  "distinguishable in the eyes of buyers."  *Id.* at 20.  The District argues SolarCity has

20  failed to plausibly allege that two distinct markets exist for grid access and retail

21  electricity.

22       SolarCity claims the District is only selling grid access if customers also purchase

23  electricity.  It alleges "SRP uses its appreciable market power in the grid access market to

24  coerce purchases from SRP in the retail market (or, alternatively, to use its appreciable

25  economic power in one retail sub-market to coerce the purchase of power from SRP in

26  another sub-market)[.]"  (Doc. 39, ¶ 164.)  It further alleges that "[t]hese markets are

27  separate markets, as is illustrated by the separate demand for the products and services in

28  each."  (*Id.*)  SolarCity alleges the grid access market has inelastic demand, has high

barriers to entry, and that SRP has unbundled grid access from power sales.  (*Id.*, ¶¶ 59, 61, 63, 67.)  It claims that "the growth of distributed generation confirms that consumers have separate demand for power and for the facilities that enable always-on power." (Doc. 58 at 27.)

SolarCity fails to plausibly allege that a separate market exists for grid access.  It alleges the "power delivery system," which includes "transmission" and "distribution" of electricity, is the "the grid."  (Doc. 39, ¶ 61 (chart).)  In other words, the grid is the delivery system for electricity.  But without electricity running through it, the grid is simply the District's infrastructure necessary to deliver its product to customers.  Access to this infrastructure does not provide customers the ability to produce their own electricity, and SolarCity does not allege otherwise.  It is thus implausible that a separate demand exists for grid access, especially given customers "still need to purchase *both* retail electric power and grid access from SRP to have access to power at all times[.]" (*Id.*, ¶ 63 (emphasis added).)  Customers cannot simply "plug in" to the grid and generate power.   The two products are not "distinguishable in the eyes of" customers, *see Jefferson Parish*, 466 U.S. at 20, as customers would have little use or demand for grid access alone.

SolarCity asserts this is a factual question.  But its own allegations give rise to the inference that the two products are one and the same, not separate with distinct markets. As such, this claim fails.[4]

### c.  Monopoly Claims

Counts one and two allege monopoly maintenance and attempted monopolization in violation of § 2 of the Sherman Act, respectively.  Counts five and six allege monopoly maintenance and attempted monopolization in violation of the AUSAA, respectively. The District does not dispute allegations that it has monopoly power in the relevant market.  Instead, it argues SolarCity fails to adequately plead any anticompetitive conduct

---

[4] Count three also alleges unreasonable restraint of trade in violation of § 1 of the Sherman Act.  Because both theories are implausible, count three is dismissed.

because there are no allegations of below-cost pricing or an antitrust duty to deal.  These arguments mischaracterize SolarCity's theory and are unpersuasive.

"Section 2 of the Sherman Act makes it unlawful for a person to monopolize or attempt to monopolize 'any part of the trade or commerce among the several States.'" *Aerotec Intern., Inc. v. Honeywell Intern., Inc.*, 4 F. Supp. 3d 1123, 1136 (D. Ariz. 2014) (quoting 15 U.S.C. § 2).  "The possession of monopoly power alone is not an antitrust violation.  It must be accompanied by an element of anticompetitive conduct."  *Id.* at 1136-37.  An antitrust plaintiff must demonstrate both the monopoly power of the defendant in the relevant market, and "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S 585, 595 (1985), the owner of a ski resort brought suit under § 2 of the Sherman Act against a competing owner of three ski resorts.  The plaintiff alleged the defendant monopolized the market for downhill skiing services by opting out of participating in an interchangeable lift-ticket, which provided customers access to all four resorts.  *Id.*  The parties had jointly offered this ticket for several years, but after the defendant opted out, the plaintiff's market share dropped significantly because customers found it inconvenient to only have access to the plaintiff's resort.  *Id.* at 594.  The defendant did not dispute that it had acquired a monopoly, but argued that it had no duty to deal or cooperate with the plaintiff and that its conduct was not anticompetitive.  *Id.* at 600.

The Court disagreed.  It found that although high value has been placed on the "right to refuse to deal with other firms," such a right is not unqualified.  *Id.* at 601.  The defendant "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."  *Id.* at 603.  Such a decision is not necessarily anticompetitive, however, unless "the conduct in which it

engaged to implement that decision, can fairly be characterized as exclusionary[.]"  *Id.* at 604.  The Court noted the important distinction between practices that exclude or restrict competition and those that reflect superior business acumen, success of a business, or luck.  *Id.*  Whether conduct is exclusionary depends on "its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way."  *Id.* at 605.  The Court found the "evidence supports an inference that [the defendant] was not motivated by efficiency concerns" and that it "made a deliberate effort to discourage its customers from doing business with its smaller rival."  *Id.* at 610.

SolarCity's allegations are similar to those in *Aspen Skiing*.  It alleges the District is a monopolist and imposed the SEPPs to exclude SolarCity from a market that was previously supporting such competition: "SRP has reversed a long-time course of conduct that had generated customer goodwill, benefitted SRP in the short-[term] and medium-term . . . for the sake of excluding longer-term competition by preventing customers in its service area from installing distributed solar from competitors like SolarCity."  (Doc. 39, ¶ 119(c).)  SolarCity claims the SEPPs limit the choices of consumers because they will decide against purchasing SolarCity's products.  These allegations plausibly allege anticompetitive conduct by an alleged monopolist.

The District argues that SolarCity fails to allege that the District "is willing to forsake short-term profits to achieve an anticompetitive end."  (Doc. 65 at 16.)  But SolarCity expressly alleges this in its complaint.  (*See* Doc. 39, ¶ 119(c).)  The District also claims *Aspen Skiing* only applies in rare circumstances, (Doc. 65 at 16 n.9), but fails to explain why it does not apply to this case.

Accordingly, SolarCity has plausibly alleged that (1) the District has monopoly power, (2) it made a decision to change the market, (3) this decision was motivated by a desire to restrict competition, and (4) the decision has the effect of limiting competition.  Counts one, two, five, and six survive.[5]

---

[5] The District argues SolarCity's state law antitrust claims are barred by A.R.S. § 30-810(B), which requires a "party" to a decision of the Board of the District to file an application for rehearing before it may bring an action in court.  But SolarCity claims it

## C.  State Law Claims Alleged Against the District

Count eight alleges intentional interference with prospective economic advantage. Count nine alleges intentional interference with contract.  The District argues these claims should be dismissed because SolarCity fails to demonstrate that its actions were "improper."  (Doc. 53 at 29.)

SolarCity alleges SRP retroactively applied the SEPPs by only grandfathering in customers who installed distributed solar systems prior to December 8, 2014.  (Doc. 39, ¶ 116.)  SolarCity claims SRP chose this date to interfere with its contract with Maricopa Community Colleges "to implement multiple solar installations," which Maricopa County voted to authorize on December 9, 2014.  (*Id.*, ¶ 120(b).)   Coupled with SolarCity's allegations of illegal anticompetitive conduct by the District, these allegations are sufficient, and these claims will not be dismissed.

## D.  The District's Defenses

The District raises several defenses to SolarCity's claims, many of which rest on its status as a political subdivision of the state.  Each will be addressed in turn.

### 1.  Local Government Antitrust Act

The Local Government Antitrust Act ("LGAA") provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4 . . . of the Clayton Act . . . from any local government[.]"  15 U.S.C. § 35(a).  "Local government" is defined in relevant part as "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States[.]"  *Id.* § 34(1). The LGAA "provides absolute immunity when the terms of the statute are met" and "courts should strive to resolve the immunity issue as early as possible, with minimum of expense and time to the parties."  *Sandcrest Outpatient Servs., P.A. v. Cumberland*, 853 F.2d 1139, 1148 n.9 (9th Cir. 1988); *see also Palm Springs Med. Clinic, Inc. v. Desert Hosp.*, 628 F. Supp. 454 (C.D. Cal. 1986).  "The question of whether a defendant is

---

was not a party to the decision, and the Court has declined to take judicial notice of the evidence on which the District relies that purportedly demonstrates otherwise.  The Court will not dismiss the claims on this basis.

1    entitled to absolute immunity is a question of law[.]"  *Tennison v. City & Cty. of S.F.*, 570

2    F.3d 1078, 1087 (9th Cir. 2008).

3          The District argues it falls under the protection of the LGAA because it is a special

4    function governmental unit established under A.R.S. § 48-2301.  As a matter of law, the

5    District is a political subdivision of the state created by state law and the state

6    constitution.  *See* A.R.S. § 48-2302; *see also* Ariz. Const. art. 13, § 7.  SolarCity's

7    allegations do not undermine the District's status.  Consequently, the LGAA shields the

8    District from SolarCity's antitrust damages claims.[6]

9                    **2.  Absolute Immunity under State Law**

10         The District argues it is absolutely immune from SolarCity's state law damages

11   claims under Arizona law.  A.R.S. § 12-820.01 provides "absolute immunity" for a public

12   entity's "exercise of a judicial or legislative function."  As a political subdivision of the

13   state, the District is a "public entity" under A.R.S. § 12-820(7) ("'Public entity' includes

14   this state and any political subdivision of this state.").

15         The District argues that ratemaking by a public utility is a legislative function.  *See*

16   *Arizona Corp. Comm'n v. State ex rel. Woods*, 830 P.2d 807, 812 (Ariz. 1992) (noting

17   ratemaking is a legislative power of the Arizona Corporation Commission); *Arizona*

18   *Corp. Comm'n v. Superior Court*, 480 P.2d 988, 991 (Ariz. 1971) (same).  But the cases

19   it cites apply to the Arizona Corporation Commission's ratemaking power, not that of the

20   District.  Whether the District's ratemaking power is a legislative function is a question

21   of fact not appropriately before the Court.

22         Alternatively, the District argues it is immune because it exercised "an

23   administrative function involving the determination of fundamental governmental

24   policy."  A.R.S. § 12-820.01(B).  It asserts the rate changes were necessary "to cover the

25   fixed costs of maintaining the electrical grid so that the District can provide electricity

26

27          [6] SolarCity argues the District must demonstrate that an award of antitrust
     damages would fall upon taxpayers in the absence of immunity.  It cites *United Nat'l
28   Maint., Inc. v. San Diego Conv'tn Ctr. Corp.*, 2010 WL 3034024, at *4 (S.D. Cal. Aug. 3,
     2010) in support of this requirement.  But that case cites no authority for such a
     requirement, and the Court finds none in the language of the statute.

and water to hundreds of thousands of customers." (Doc. 53 at 8.) But this is question of fact not appropriately addressed at this stage, and the Court will not dismiss the state claims on these grounds.

### 3. Arizona's Notice of Claim Statute

The District claims SolarCity's state law claims should be dismissed because it failed to comply with A.R.S. § 12-821.01, which requires claimants to submit a notice of claim specifying the amount of damages it seeks against the public entity prior to filing suit. SolarCity argues it submitted the required notice, but the District argues it failed to comply with the statute because it did not identify a specific sum that it would accept to settle its claims. "Rather, SolarCity's notice states that it 'is not willing to settle damages independent of [the District's] consent to cease and desist from the business practices at issue . . . in a manner enforceable by court injunction or contempt proceedings.'" (Doc. 53 at 9.)

SolarCity's notice of claim, which the Court has taken judicial notice of, specified the amount of damages as $45 million, but conditioned settlement on injunctive relief. (Doc. 54-10 at 2.) Conditional settlement offers do not violate the statute, *see Auble v. Maricopa Cty.*, No. CV 08-1822-PHX-MHM, 2009 WL 3188378, at *3 (D. Ariz. Sept. 30, 2009), and thus the Court will not dismiss SolarCity's state law claims on this ground.

### 4. State Action Doctrine

The District argues it is immune from antitrust liability under the state action doctrine, which "exempts qualifying state and local government regulation from federal antitrust, even if the regulation at issue compels an otherwise clear violation of the federal antitrust laws." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 943 (9th Cir. 1996) (internal quotation marks and citation omitted). "A state law or regulatory scheme cannot be the basis for antitrust immunity unless, first the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, the State provides active supervision of anticompetitive conduct undertaken by private actors." *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 631 (1992).

The question of whether Arizona has articulated a clear policy permitting anticompetitive conduct in the retail electricity market and "the question of whether a state has 'actively supervised' a state regulatory policy [are] a factual one[s] which [are] inappropriately resolved in the context of a motion to dismiss." *Cost Mgmt. Servs.*, 99 F.3d at 942-43. SolarCity alleges that Arizona has a policy permitting competition in the relevant market and that the District operates without supervision. (Doc. 39, ¶¶ 42, 65.) This is all that is necessary at this stage.

### 5. Filed-Rate Doctrine

The District argues all of SolarCity's claims are barred by the filed-rate doctrine, which "precludes interference with the rate setting authority of an administrative agency[.]" *Wah Chang v. Duke Energy Trading & Mktg.*, 507 F.3d 1222, 1225 (9th Cir. 2007). Rates that are deemed reasonable by a regulatory agency are insulated from challenge. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). Originally, the doctrine applied to rates reviewed and filed by federal agencies. *See id.* at 578 (applying doctrine to bar claim challenging rates set by the Federal Energy Regulatory Commission for sale of natural gas). Several states have adopted the doctrine, *see Qwest Corp. v. Kelly*, 59 P.3d 789, 800 (Ariz. Ct. App. 2002) (listing cases), but Arizona has not, *see id.*; *see also Johnson v. First Am. Title Ins. Co.*, No. CV-08-01184-PHX-DGC, 2008 WL 4850198, at 4 (D. Ariz. 2008) (Arizona "has never adopted the filed-rate doctrine").

The Court need not determine whether Arizona would adopt the filed-rate doctrine because it does not apply here. SolarCity does not challenge the District's electricity rates as unreasonable, but instead alleges the District imposed the rates to exclude it from the market. Whether the rates are reasonable has no bearing on whether the District engaged in anticompetitive conduct. The Court will not dismiss SolarCity's claims on this ground.

### 6. *Noerr-Pennington* Doctrine

Last, the District argues the *Noerr-Pennington* doctrine bars all of SolarCity's claims. But the *Noerr-Pennington* doctrine protects those who lobby in favor of

anticompetitive governmental action, not those who actually commit it.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988).  It has no application in this case, and the District appears to have abandoned the argument in its reply brief.  (*See* Doc. 65.)

## CONCLUSION

Accordingly, the Association is dismissed from this action.  Counts three and four, as well as SolarCity's claims for damages under federal and state antitrust laws, are dismissed.

**IT IS ORDERED** that

1.      The District's motion to dismiss, (Doc. 53), is **GRANTED IN PART**.

2.      The Association's motion to dismiss, (Doc. 52), is **GRANTED**.

3.      The District's request for judicial notice, (Doc. 54), is **GRANTED IN PART**.

Dated this 27th day of October, 2015.

Douglas L. Rayes
United States District Judge