# EXHIBIT 2

BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (#012548)
300 South Fourth Street, Suite 800
Las Vegas, NV  89101
Telephone:  (702) 382-7300
Facsimile:  (702) 382-2755
rpocker@bsfllp.com

WILLIAM A. ISAACSON *(pro hac vice to be filed)*
KAREN L. DUNN *(pro hac vice to be filed)*
5301 Wisconsin Avenue, NW
Washington, DC  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

STEVEN C. HOLTZMAN *(admitted pro hac vice)*
JOHN F. COVE, JR. *(admitted pro hac vice)*
KIERAN P. RINGGENBERG *(admitted pro hac vice)*
1999 Harrison Street, Suite 900
Oakland, CA  94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
jcove@bsfllp.com
kringgenberg@bsfllp.com

*Additional counsel on next page*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SolarCity Corporation,<br><br>                                    Plaintiff,<br><br>                    vs.<br><br>Salt River Project Agricultural<br>Improvement and Power District,<br><br>                                    Defendant. | No.  2:15-CV-00374-DLR<br><br>**PLAINTIFF SOLARCITY CORPORATION'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT SALT RIVER PROJECT AGRICULTURAL AND POWER DISTRICT** |

1
2
3
4

SEAN P. RODRIGUEZ *(admitted pro hac vice)*
1999 Harrison Street, Suite 900
Oakland, CA  94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
srodriguez@bsfllp.com

5
6
7
8
9
10
11

COPPERSMITH BROCKELMAN PLC
KEITH BEAUCHAMP (#012434)
ROOPALI H. DESAI (#024295)
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone:  (602) 381-5490
Facsimile:  (602) 224-6020
kbeauchamp@cblawyers.com
rdesai@cblawyers.com

*Attorneys for Plaintiff SolarCity Corporation*

12
13
14
15
16

**PROPOUNDING PARTY:**       Plaintiff SolarCity Corporation

**RESPONDING PARTY:**        Defendant Salt River Project Agricultural

                             Improvement and Power District

**SET NO.:**                 Two

17
18

               *                  *                  *

19
20
21
22
23
24
25
26
27
28

1   Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff SolarCity

2   Corporation hereby requests that Defendant Salt River Project Agricultural Improvement

3   and Power District produce the documents and things specified below for inspection and

4   copying to the offices of Boies, Schiller & Flexner LLP, located at 1999 Harrison Street,

5   Suite 900, Oakland, California 94612.

### DEFINITIONS AND INSTRUCTIONS

6   The definitions, instructions, and requirements of Federal Rules of Civil Procedure

7   26, 34, and 37 are adopted and incorporated herein by this reference.  The following

8   words and phrases shall have the following meanings in these Requests:

9   1.      The term "ACTION" means *SolarCity Corporation v. Salt River Project*

10  *Agricultural Improvement and Power District*, Case No. 2:15-CV-00374-DLR (D. Ariz.).

11  2.      The term "BOARD OF DIRECTORS" means those PERSONS who govern

12  Salt River Project Agricultural Improvement and Power District pursuant to Ariz. Rev.

13  Stat. §§ 48-2331 *et seq.* or are elected to govern Salt River Project Agricultural

14  Improvement and Power District pursuant to Ariz. Rev. Stat. §§ 48-2381 *et seq.*; or the

15  body on which those PERSONS serve in their capacity under the foregoing statutes.

16  3.      The term "COMMUNITY SOLAR" means the program, launched in

17  September 2011 and as modified by the SEPPs, under which SRP purchases utility-scale

18  solar energy and sells such electricity to SRP CUSTOMERS.

19  4.      The term "CONCERNING" means relating to, regarding, with respect to,

20  referring to, in connection with, describing, evidencing, or constituting.

21  5.      The term "CONSULTANT(S)" means any PERSON or entity with whom

22  SRP consulted CONCERNING topics relevant to competition for the sale of electric

23  power, INCLUDING John Chamberlin; Sussex Economic Advisors, LLC; all former

24  firms or organizations with whom John Chamberlin was affiliated; Timothy S. Lyons;

25  Public Financial Management Inc.; Michael Mace; NERA Economic Consulting; Amparo

26  Nieto; Brattle Group; Ahmad Faruqui; Ryan Hledik; Electric Power Research Institute;

27  Mark McGranaghan; FTI Consulting; Lawrence Pacheco; Clean Power Research; Electric

1    Power Research Institute; and Ashley Brown.

2         6.      The term "COST SHIFT" means any over-payment or under-payment for a

3    service or good resulting from a misalignment in costs and revenues, CROSS-SUBSIDY,

4    SUBSIDY, and any similar or related concept or meaning employed by SRP management

5    or SRP's CONSULTANTS in connection with the PUBLIC PRICING PROCESS,

6    INCLUDING as used by Mark Bonsall during a BOARD OF DIRECTORS meeting on

7    February 19, 2015,[1] and further INCLUDING as used by Aidan McSheffrey during a

8    meeting held in connection with the PUBLIC PRICING PROCESS on January 5, 2015.[2]

9         7.      The terms "CROSS-SUBSIDY" or "SUBSIDY" means any grant, shift,

10   contribution, transfer, or donation of money, and any similar or related concept or

11   meaning employed by SRP management or SRP's CONSULTANTS in connection with

12   the PUBLIC PRICING PROCESS, INCLUDING as used in a report written by SRP

13   CONSULTANT Ashley C. Brown in connection with the PUBLIC PRICING PROCESS,[3]

14

---

15   [1] Tr. 7:16-8:2 (Feb. 19, 2015) ("The implication of that is it caps the cost shift that's been
     going on for -- it caps it. It stops it from growing because any new customers would, in
16   fact, pay for what they use as opposed to somebody else paying for what they use. So it
     caps the ongoing cost shift at the annual level that exists today. That cost shift will stay in
17   place for as long as grandfathering is approved. That level of cost shift is, in fact,
     embedded in the rest of the price proposal and will exist again for as long as
18   grandfathering is in place. Were there any growth in that cost shift, that growth would
     have to be recovered in a large base price increase proposal.").

19   [2] Tr. 74:12-19 (Jan. 15, 2015) ("Q. But if somebody in this E-23 rate class, for example, is
     paying less than the average or less than their cost of service, they are shifting those costs
20   onto someone else in that rate class, right?; A. I'm sure there are some customers that pay
     less and some that pay more within the entire class.; Q. And that's a cost shift?; A. Yeah.
21   You could characterize it that way."); id. at 145:20-146:7 ("Q. Let's take solar completely
     out of this for a moment. What types of cost shifts exist in your rates today?; A. So, for
22   example, we have a low-income program where low-income customers receive a bill
     credit of – it depends, but let's say $21 a month.  Those customers are not recovering their
23   full cost of service.  We have a lighting class of customers from the cost allocation point
     of view who are under-recovering and, as a result, we've -- and it's primarily related to
24   lighting facilities that utilities often provide and as a choice, we've chosen to exit that
     business to provide that. So those are a couple of examples.").

25   [3] Ashley C. Brown, *Matching Prices and Value for Distributed Solar PV: SRP's
     Proposal* 14 (2015) ("There simply is no reason why solar PV DG customers should
26   receive free backup service compliments of their neighbors. It is an unacceptable cross-
     subsidy."); *see also id.* at 16 ("The impact of net metering is not simply the creation of a
27   cross-subsidy from non-solar PV DG customers to solar PV DG customers but, as has
     been pointed out in a recent study by E3, a prominent economic consulting firm, it is a
28   cross-subsidy from less affluent households to more affluent ones.").

and further INCLUDING as used by Aidan McSheffrey during meetings held in connection with the PUBLIC PRICING PROCESS on January 5, 2015[4] and January 8, 2015.[5]

8.      The term "CUSTOMER(S)" means any PERSON that purchases power from SRP, INCLUDING any individual(s), business, government, non-profit, or other entity, regardless whether that purchased power is used for residential, personal, public, private, commercial, industrial, or other use.

9.      The term "DISTRIBUTED GENERATION" means the generation of electric power on property owned, controlled, or occupied by any CUSTOMER, INCLUDING generation of electric power by any solar system installed on property owned, controlled, or occupied by any CUSTOMER, and further INCLUDING generation of electric power by any system or technology the new users of which are subject to the SEPPs' E-27 Price Plan, Buyback Service Rider or Renewable Net Metering Rider.

10.     The term "DOCUMENT(S)" shall be synonymous in meaning and equal in scope to the broadest meaning provided by Rule 34 of the Federal Rules of Civil Procedure, INCLUDING hard copies, electronic documents, electronic or computerized data compilations, software, software images, or downloads.  This term shall apply to documents, whether in hard copy or electronic form, on any computer or other system.

11.     The term "GRID" means the interconnected network used for transmission and distribution of electricity from suppliers to consumers, consisting of power generating stations, transmission lines, substations, transformers, and other infrastructure or equipment involved with transmitting and delivering electricity.

12.     The term "INCLUDING" means "including, but not limited to," and the term "include" means "include, but is or are not limited to."

---

[4] Tr. 42:19-21 (Jan. 5, 2015) ("So far we've subsidized $150 million.  Under the proposal, it would be approximately about a quarter of billion dollars.").
[5] Tr. 34:17-21 (Jan. 8, 2015) ("Q. The question is why does SRP subsidize water.; A. Again, it's part of our history here to support water and make water and power both affordable in the Valley and that's the reason we do it.").

13.     The term "PERSON(S)" means any natural person or any business, legal or governmental entity or association.  Any reference to a PERSON that is a business entity and is not otherwise defined includes that PERSON's predecessors (INCLUDING any pre-existing PERSON that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other PERSON directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; and all present and former directors, officers, employees, agents, CONSULTANTS, controlling shareholders (and any entity owned by any such controlling shareholder) and attorneys of any of them; and any other PERSON acting for or on behalf of any of them.

14.     The term "PUBLIC PRICING PROCESS" means all procedures, INCLUDING reports, presentations, emails, public comment sessions, and BOARD OF DIRECTORS meetings, through which SRP proposed, introduced, discussed, and ultimately obtained approval for the SEPPs.

15.     The term "SEPPs" means the Standard Electric Price Plans approved by the BOARD OF DIRECTORS on February 26, 2015 and any drafts thereof, INCLUDING the Proposed Adjustments to SRP's Standard Electric Price Plans Effective with the April 2015 Billing Cycle dated December 12, 2014.

16.     The term "SOLARCITY" means the Plaintiff in this ACTION, SolarCity Corporation.

17.     The terms "SRP," "YOU," and "YOUR" means the Defendant Salt River Project Agricultural Improvement and Power District, its BOARD OF DIRECTORS, its Council, or any other governing body, and any of Defendant Salt River Project Agricultural Improvement and Power District's predecessors, successors, parents, subsidiaries, affiliates, or alter egos, INCLUDING the Salt River Valley Water Users' Association and any of its predecessors, successors, parents, subsidiaries, affiliates, alter egos, Board, Council, or other governing body.

18.     The following rules of construction shall apply to all Requests as necessary

1   to bring within the scope of the discovery request all responses that might otherwise be
2   construed to be outside of its scope:

3           (a)    the use of a verb in any tense shall be construed to include the use of
4                   that verb in all other tenses,
5           (b)    the use of a word in its singular form shall be deemed to include
6                   within its use the plural form as well and vice versa,
7           (c)    the connectives "and" and "or" shall be construed either disjunctively
8                   or conjunctively, and
9           (d)    the terms "all," "any," and "each" shall be construed as "all, any,
10                  every and each."

11  19.   If any DOCUMENTS are withheld based on an objection to any Request, all
12  DOCUMENTS covered by that Request but not subject to the objection should be
13  produced.

14  20.   SOLARCITY reserves its rights to modify or supplement any Request in
15  this Second Set of Document Requests.

16  21.   The wording of any Request does not constitute an admission of what the
17  facts or evidence will ultimately show.

18  22.   DOCUMENTS not otherwise responsive to any of the Requests herein
19  should be produced if such DOCUMENTS are attached to a DOCUMENT or thing called
20  for by these Requests.

21  23.   To the extent YOU contend that responsive DOCUMENTS cannot be
22  produced pursuant to the notice and consent requirements contained in a protective order
23  or agreement, the written response to each Request shall identify the specific provisions of
24  the protective order or agreement on which SRP is relying and the efforts that SRP has
25  and will undertake to provide notice and obtain consents.

26  24.   Unless otherwise specified, the DOCUMENTS requested include the
27  responsive DOCUMENTS in YOUR actual or constructive possession, control or custody,
28  as well as the responsive DOCUMENTS in the actual or constructive possession, control

1  or custody of YOUR employees, agents, representatives, officers, directors,

2  CONSULTANTS, or any other PERSON acting or purporting to act on your behalf, and,

3  unless privileged and such privilege has not been waived, your attorneys.

4       25.     All responsive DOCUMENTS in YOUR possession, custody or control that

5  exist in electronic format (whether on hard drives; on desktop, laptop, notebook, tablet, or

6  personal digital assistant computers; servers; CDs; DVDs; USB drives; or any other

7  electronic medium) shall be produced in native electronic format with all "electronically

8  stored information" as that term is used in Federal Rule of Civil Procedure 34 unless

9  otherwise agreed by the parties.

10      26.     Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure,

11  DOCUMENTS shall be produced either (a) as they are kept in the usual course of

12  business (in which case they shall be produced in such fashion as to identify the

13  department, branch, or office in whose possession it was located and, where applicable,

14  the natural person in whose possession it was found or the server or central file in which it

15  was found, and the address of each DOCUMENT's custodian(s)), or organized and

16  labeled to correspond to the specific Request enumerated in these Requests, which such

17  specific Request identified.

18      27.     In producing DOCUMENTS, YOU are requested to produce a legible copy

19  of each DOCUMENT requested together with all non-identical copies and drafts of that

20  DOCUMENT.  YOU shall retain all of the original DOCUMENTS for inspection or

21  copying throughout the pendency of this case, any appeal(s), and any related proceedings.

22      28.     YOU shall produce DOCUMENTS (including associated metadata) in the

23  format specified in the attached **SCHEDULE A**.

24      29.     Any alteration of a responsive DOCUMENT, INCLUDING any marginal

25  notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed

26  stamps, drafts, revisions, modifications, and other versions of a DOCUMENT is a

27  responsive DOCUMENT in its own right and must be produced.

28      30.     DOCUMENTS should be produced in full, without abbreviation or

1  expurgation, regardless of whether YOU consider the entire DOCUMENT to be relevant

2  or responsive.

3      31.     In instances where two or more exact duplicates of any DOCUMENT exist,

4  the most legible copy shall be produced.

5      32.     In the event that any DOCUMENT called for herein has been destroyed,

6  lost, or otherwise becomes unavailable, that DOCUMENT is to be identified as follows:

7  type of document, author, addressor, addressee, recipients of indicated or "blind" copies,

8  date, subject matter, number of pages, attachments or appendices, all PERSONS believed

9  at any time to have had a copy of the DOCUMENT, the PERSON(S) identified as its last

10  known custodian(s), the date of destruction or loss, place and manner of destruction or

11  loss, PERSONS authorizing destruction, and PERSONS destroying or responsible for

12  losing.

13      33.     These Requests are to be considered continuing in nature, and YOU must

14  promptly furnish supplemental responses in accordance with the requirements of Federal

15  Rules of Civil Procedure 26(e) if any additional DOCUMENTS or information is

16  discovered or created after YOUR responses are tendered, or if any of YOUR responses

17  are subsequently determined to be incorrect, incomplete, or misleading in any respect.

18      34.     Other than redactions of privileged information, as addressed in Paragraph

19  35 below, DOCUMENTS are to be produced in full and may not be redacted in any

20  manner.  If any requested DOCUMENT cannot be produced in full, produce it to the

21  extent possible, and provide the following information CONCERNING each such

22  DOCUMENT and each portion of such DOCUMENT withheld:

23          (a)     the type of DOCUMENT;

24          (b)     the general subject matter of the DOCUMENT and each portion

25                  withheld;

26          (c)     the date of the DOCUMENT;

27          (d)     the author(s) of the DOCUMENT and their title(s);

28          (e)     the recipient(s) of the DOCUMENT and their title(s); and

     (f)    the basis for withholding each portion of the DOCUMENT that is withheld from production.

35.    To the extent YOU object to or claim a privilege CONCERNING any Request in whole or in part, provide the following information for each DOCUMENT and each portion of any DOCUMENT withheld;

     (a)    the type of DOCUMENT;

     (b)    the general subject matter of the DOCUMENT and each portion withheld;

     (c)    the date of the DOCUMENT;

     (d)    the author(s) of the DOCUMENT and their title(s);

     (e)    the recipient(s) of the DOCUMENT and their title(s);

     (f)    and all reasons and the underlying basis for YOUR objection or claim of privilege for withholding such DOCUMENT and each withheld portion of a DOCUMENT in sufficient detail to permit the court to determine the validity of YOUR objection or claim of privilege; and

     (g)    provide all DOCUMENTS or portion of a DOCUMENT responsive to the Request to the extent not privileged, and set forth all reasons and the underlying basis for YOUR objection or claim of privilege in sufficient detail to permit the court to determine the validity of YOUR objection or claim of privilege as to the remainder of the Request.

36.    Unless otherwise specified, the geographic scope of these Requests is the United States.

37.    Unless otherwise stated, the time period covered by these Requests is the time period beginning January 1, 2010 and continuing thereafter.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All DOCUMENTS CONCERNING

(a) demand charges, monthly service charges, or energy charges in, or considered for inclusion in, the SEPPs for DISTRIBUTED GENERATION CUSTOMERS;

(b) net metering or other terms in or considered for inclusion in the SEPPs for the purchase of electricity from DISTRIBUTED GENERATION CUSTOMERS;

(c) any advantages or disadvantages of, rationale for, or alternatives to any rate, charge, or other term or condition in the SEPPs for CUSTOMERS who use DISTRIBUTED GENERATION;

(d) the actual or potential impact of any rate, charge, or other term or condition in the SEPPs CONCERNING DISTRIBUTED GENERATION; or

(e) demand charges, monthly service charges, or energy charges in or considered for inclusion in the SEPPs for COMMUNITY SOLAR CUSTOMERS.

2. All DOCUMENTS, prepared at any time since January 1, 2000 CONCERNING competition in the sale or provision of electricity in SRP's service area, INCLUDING competition arising from DISTRIBUTED GENERATION or solar-generated electricity.

3. All studies, analyses, surveys, reports, proposals, presentations, memoranda, meeting minutes, or drafts of any of them, CONCERNING SRP's pricing and rate structures for electricity and the revenues for the same, INCLUDING the SEPPs, net metering, demand charges, time-of-use rates, flat fees, the PowerPartner program, or proposed changes to any of the foregoing.

4. All studies, analyses, surveys, reports, proposals, presentations, memoranda, meeting minutes, or drafts of any of them, CONCERNING SRP's costs of or investments in the provision, sale, generation, transmission or distribution of electricity; SRP's costs of or investments in maintaining and/or upgrading the GRID or any other electricity

infrastructure; and any SRP categorization or definition of fixed and/or variable costs for any purpose.

5.     All DOCUMENTS CONCERNING any SUBSIDY, CROSS-SUBSIDY (INCLUDING any SUBSIDY CONCERNING water through any revenue or profit associated with the provision or sale of electricity), COST SHIFT, SRP's recovery or non-recovery of any costs from any CUSTOMER or any segment(s), categorization, type, or any SRP sponsorship payment, contribution, or donation.

6.     All DOCUMENTS CONCERNING the capacity of SRP's GRID or any other electricity infrastructure and any planned or considered upgrades to that GRID or other electricity-related infrastructure, INCLUDING costs related to the capacity of or upgrades to SRP's GRID.

7.     Detailed financial and accounting records underlying SRP's financial statements for each year since 2012, INCLUDING all data and records provided or made available to SRP's auditors and CONCERNING SRP's costs, expenses, investments, revenues, and financial transactions.

8.     All DOCUMENTS CONCERNING any costs, revenues, benefits, advantages or disadvantages of, or associated with, DISTRIBUTED GENERATION, COMMUNITY SOLAR, or the solar generation of electricity, INCLUDING any actual or potential impact of DISTRIBUTED GENERATION or COMMUNITY SOLAR on SRP's revenues from the sale or provision of electricity or on SRP's costs of selling or providing electricity.

9.     All DOCUMENTS CONCERNING actual or proposed SRP actions to reduce or prevent the growth of electricity usage, demand, or peak demand by CUSTOMERS, INCLUDING actions to promote energy efficiency or the monitoring, alteration, control, or distribution of demand or peak demand.

10.     All DOCUMENTS CONCERNING use by CUSTOMERS of battery or other electricity storage, load controllers, or any other means of monitoring or altering electricity demand.

11.     All DOCUMENTS CONCERNING CUSTOMER-service communications CONCERNING DISTRIBUTED GENERATION, INCLUDING guidance provided to CUSTOMER-facing representatives; transcripts, audio recordings, notes, or other records reflecting CUSTOMER communications or DOCUMENTS CONCERNING requests for proposals or contract negotiations by or with CUSTOMERS, and also INCLUDING any communications with CUSTOMERS CONCERNING the PUBLIC PRICING PROCESS or participation therein.

12.     All DOCUMENTS CONCERNING communications with any other utility, any trade association or organization, or any utility regulator (INCLUDING Pinnacle West, any affiliate or subsidiary of Pinnacle West, Arizona Public Service, Trico Electric Cooperative Incorporated, Touchstone Energy, UNS Energy Corporation, Fortis Incorporated, UniSource Energy Services, Tucson Electric Power, the Arizona Corporation Commission, the Edison Electric Institute, or the Electric Power Research Institute), or any representative, agent, or employee thereof, CONCERNING DISTRIBUTED GENERATION or the PUBLIC PRICING PROCESS.

13.     All DOCUMENTS since January 1, 2005 CONCERNING SRP's sustainability or renewable energy goals or guidelines, any SRP policy or position CONCERNING net metering or DISTRIBUTED GENERATION buyback programs, SRP's provision or consideration of incentives for installation of DISTRIBUTED GENERATION, or any SRP proposal or pilot program whereby SRP would provide, offer, or otherwise become involved with operations concerning DISTRIBUTED GENERATION, INCLUDING any pilot program or study involving the Electric Power Research Institute.

14.     DOCUMENTS sufficient to show, in the aggregate and for each strata or other categorization used in YOUR ordinary course of business, the electricity usage and demand for each hour of each day for CUSTOMERS, both overall and separately (a) for DISTRIBUTED GENERATION CUSTOMERS and non-DISTRIBUTED GENERATION CUSTOMERS and (b) for residential and non-residential CUSTOMERS.

15.     All DOCUMENTS CONCERNING any analysis of the time-of-day of electricity production from solar production, either in SRP territory or transmitted into SRP territory, INCLUDING any comparisons between the time of solar production and the time of peak electricity demand by CUSTOMERS.

16.     All DOCUMENTS containing any of the following non-case-sensitive terms, where "!" represents a root expander, "-" specifies either a space or a hyphen, and "*"specifies that no character, any character, or any string of characters may follow the term: "cost-shift", "cross-subsid!", "demand-charge", "demand-response", "distributed-generation", "DG", "solar*", "Alternate-Energy-Technologies", "Green-Valley-Cooling", "One-Way-Electric", "SkyPower", "Sunrun", "SunPower", "Sungevity", "Verengo", "Vivint", "Wilson-Electric", "AriSEIA", "ASDA", "net-meter!", "net-energy-meter!", "net-effective-meter!", "self-generat!", "non-requirement*", "rooftop photovoltaic", "PV", "rooftop-PV", or "distributed-PV".

DATED:  March 26, 2015                    BOIES, SCHILLER & FLEXNER LLP


By:_____
                                          Steven C. Holtzman

                                          *Attorneys for Plaintiff SolarCity Corporation*

## SCHEDULE A:  PRODUCTION PROTOCOL

1.    **Document Production Format.**

    (a)    **TIFF Images.**  Unless otherwise stated in this Production Protocol, each document shall be produced in Group IV Tagged Image File Format ("TIFF") regardless of whether such documents are stored by the parties in the ordinary course of business in electronic or hard copy form.  Each TIFF image file should be one page and should reflect how the source document would appear if printed to hard copy.

    (b)    **Load File(s).**  Document productions shall include Concordance-compatible Load Files, including a Concordance DAT file and an Opticon delimited file, that indicate document breaks of the TIFF images and additional fields as identified in Section 4 below.

    (c)    **File Name.**  Each document image file shall be named with the unique Bates Number of the page of the document in question followed by the file extension "TIF".  File names should not be more than fifteen characters long or contain spaces or underscore symbols.

    (d)    **Document Unitization.**  If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as they existed in the original document.

    (e)    **Color.**  Documents shall be produced as black and white TIFF images.  Upon written request, a party shall produce color images for a reasonable number of selected documents.  Documents produced in color shall be produced as JPEG images with Exif compression and 24-bit color depth.  Each color document image file shall be named with the unique Bates Number of the first page of the document in question followed by the file extension "JPG".

1

2. **Searchable Text.** In addition to TIFF images, each production will include text files corresponding to the TIFF image files described above.

    (a) **Hard Copy Documents**. Hard copy documents shall be scanned using Optical Character Recognition ("OCR") technology and searchable ASCII text (or Unicode text if the text is in a language requiring characters outside of the ASCII character set) files shall be produced. Each file shall be named with the unique Bates Number of the first page of the corresponding TIFF document followed by the extension "TXT".

    (b) **Electronic Documents.** The full text of each native electronic document shall be extracted ("Extracted Text") and produced in a text file. The Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a language requiring characters outside of the ASCII character set) and shall be named with the unique Bates Number of the first page of the corresponding TIFF document followed by the extension "TXT". Searchable text files corresponding to the TIFF image files for redacted Electronic Documents must include Extracted Text or OCR text only to the extent that it will not disclose redacted information.

3. **Production Media.** Documents shall be produced on external hard drives or readily accessible computer or electronic media (the "Production Media"). Each piece of Production Media shall identify: (1) the producing party's name; (2) the production date; and (3) the Bates Number range of the materials contained on the Production Media.

4. **Metadata Production.**

    (a) **Fields.** For all electronic documents, an ASCII text (or Unicode text if the text is in a language requiring characters outside of the ASCII character set) Load File shall be produced setting forth the Data Fields listed in Table A. SolarCity reserves the right to request that additional Data Fields be set forth

1    or provided for certain categories of document upon review of the other

2    party's production.

3    (b)   **Redactions.**  For redacted electronic documents, metadata fields must be

4    produced only to the extent such fields will not disclose redacted

5    information.

6    (c)   **Time Zone.**  Metadata pertaining to time/date should be standardized on

7    Mountain Standard Time (as applicable in Arizona).

8    (d)   **Parent/Child.**  Parent-child relationships (the association between an

9    attachment and its parent document) should be preserved and appropriately

10   reflected in the metadata.  Bates numbering of a parent document and any

11   attachments shall be sequential such that a parent document has the lowest

12   value Bates number when compared to its attachment(s).

13   5.   **Databases.**  Databases are not included in this Production Protocol, but will be the

14   subject of meet-and-confers as needed.

15   6.   **Native Production.**  Spreadsheet files (*e.g.*, Excel), presentations (*e.g.*,

16   PowerPoint), audio, and video files shall be produced in native form.  SolarCity

17   reserves the ability to request other file types be produced in native form or in

18   another reasonably usable form upon review of the other party's production.

19   Native file productions shall include metadata as set forth in Section 4 and a single-

20   page TIFF image indicating that the associated file was produced in native form.

21   Each produced native file shall be named with a unique Bates Number (*e.g.*,

22   ABC00000001.xls).  The producing party may, as applicable, (1) add a header or

23   footer to the native file bearing a document number and a confidentiality

24   designation, provided that it does not delete or modify any existing header or footer

25   (or any other information) in the native file, and (2) make the native file read-only.

26   The producing party may produce the native file in this manner only if the

27   producing party does not delete or change any information, including any

28

metadata, in the native file produced.  If the file contains privileged or work product content, the producing party may redact that content from the native file before production provided that the redaction is clearly labeled in the native file. After receipt of a native file produced in this manner, if the use or readability of the file is impaired in any way because of the document number, confidentiality designation or read-only protection, the receiving party may request a copy of the original native file but without the document number, confidentiality designation and/or read-only protection that impaired the use or readability of that file.  Absent undue burden, such request shall not be denied.

### TABLE A:  METADATA FIELDS

| DATA FIELD | DESCRIPTION |
|---|---|
| BEGDOC | Beginning Bates number assigned to each document |
| ENDDOC | Ending Bates number assigned to each document |
| BEGATTACH | Beginning Bates number assigned to the group of documents to which the parent document and any attachment documents are associated |
| ENDATTACH | Ending Bates number assigned to the group of documents to which the parent document and any attachment documents are associated |
| TYPE | "P" for parent document; "C" for child document |
| CUSTODIANS | The custodian of a document (or multiple custodians for globally de-duped documents) |
| RECORDTYPE | The type of record (*e.g.*, email, attachment) |
| DOCTYPE | Document type as identified by metadata associated with the native document indicating the application that created the native document (*e.g.*, Google Docs, Microsoft Word 6.0, Gmail, Outlook Email, etc.) |

| DOCAUTHOR | The "From" line of a produced email or the Author of a document |
|---|---|
| EMAILSUBJECT | The subject line of a produced email |
| FROM | The "From" line of a produced email |
| TO | The "To" line of a produced  email |
| CC | The "CC" line of a produced email |
| BCC | The "BCC" line of a produced email |
| DOCDATE | Date sent or Date received or Date last modified or Date created (In this hierarchy) |
| PARENTDATE | Create date of parent document or date email sent of parent document for all attachment family members and date last modified for loose files; field allows for attachment families to sort together |
| DATESENT | The date (MMDDYYYY) an email was sent |
| TIMESENT | The time (HH:MM AM/PM) that an email was sent |
| DATERCVD | The date (MMDDYYYY) an email was received |
| TIMERCVD | The time (HH:MM AM/PM) that an email was received |
| DATECREATE | The date that a document was created |
| TIMECREATE | The time that a document was created |
| DATELASTMOD | The date that a document was last modified |
| TIMELASTMOD | The time that a document was last modified |
| DATELASTPRINT | The date that a document was last printed |
| TIMELASTPRINT | The time that a document was last printed |
| TIMEZONE | The time zone of the document. |
| FILENAME | The filename of a produced document |
| PATHFOLDER | The folder information for a document (email) or the full path of a document (e-docs) |

| ORIGINALSOURCE | The file name of an e-mail store (*e.g.*, Outlook.pst, MyMail.nsf, etc.) |
| --- | --- |
| TITLE | The title of a document |
| DOCEXT | The file extension (*e.g.*, .txt or .pdf) of a produced document |
| FILESIZE | The file size (in KB\MB\GB) of a produced document |
| MD5HASH | Programmatic unique hash value of a produced document |
| NUMATTACH | The number of attachments to a document |
| MESSAGEID | Content of the "MessageID" email header field |
| PGCOUNT | The page count of the native document |
| NATIVEFILE | The location of the produced native version of a document |
| TEXTFILE | The location of the extracted text/OCR text for a document |
| AUTHOR | The author of a document from metadata |
| LASTAUTHOR | The content of "LastAuthor" document metadata |
| ORGANIZATION | The organization identified for the author of a document |
| COMMENTS | Whether the document has comments |
| REVISION | The revision version number of a document |
| PARENTID | For attachment, BEGBATES for parent |
| ATTACHID | For parent, BEGBATES for each attachment |