WILMER  CUTLER  PICKERING
 HALE  AND  DORR  LLP
Molly  S.  Boast  (*pro hac vice*)
7 World  Trade  Center
250 Greenwich  Street
New York, NY 10007
Telephone:  (212) 230-8800
Facsimile:  (212) 230-8888
molly.boast@ wilmerhale.com

Christopher  E.  Babbitt  (*pro hac vice*)
David  Gringer  (*pro hac vice*)
David  L.  Sluis  (*pro hac vice*)
1875 Pennsylvania  Avenue,  NW
Washington,  DC  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
christopher.babbitt@ wilmerhale.com

Christopher  T.  Casamassima  (*pro hac vice*)
Rebecca  A.  Girolamo  (*pro hac vice*)
350 South  Grand  Avenue
Los Angeles,  CA 90071
Telephone:  (213) 443-5300
Facsimile:  (213) 443-5400
chris.casamassima@ wilmerhale.com

*Attorneys for Defendant*

STEPTOE & JOHNSON LLP
Paul K. Charlton  (012449)
Karl M. Tilleman  (013435)
Quintin  Howard Cushner  (027303)
201 East Washington Street, Suite 1600
Phoenix,  Arizona 85004-2382
Telephone:  (602) 257-5200
Facsimile:  (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

## UNITED  STATES  DISTRICT  COURT
### DISTRICT  OF  ARIZONA

| | |
|---|---|
| SolarCity  Corporation,<br><br>                           Plaintiff,<br><br>      vs.<br><br>Salt River  Project Agricultural Improvement and Power District,<br><br>                           Defendant. | Case No. 2:15-CV-00374-DLR<br><br>**THE DISTRICT'S MOTION AND MEMORANDUM TO PRECLUDE MARK FULMER FROM OFFERING AT TRIAL ANY EXPERT OPINION REGARDING THE "VALUE OF SOLAR DG" TO THE DISTRICT OR ANY EXPERT  OPINION REGARDING THE E-27 RATE'S DEMAND CHARGE**<br><br>**ORAL ARGUMENT REQUESTED** |

**MOTION**

Defendant Salt River Project Agricultural Improvement and Power District (the "District") moves the Court to preclude Plaintiff SolarCity Corporation's proposed expert, Mr. Mark Fulmer, from offering the opinions contained in his report.

**MEMORANDUM[1]**

**INTRODUCTION**

Plaintiff SolarCity Corporation intends to present opinion testimony under Federal Rule of Evidence 702 from Mark Fulmer regarding (1) Mr. Fulmer's "estimate" of the "potential" value of rooftop solar to the District; and (2) Mr. Fulmer's "suspicion"—based on his "experience as an electric consumer" and a "half-dozen" customer declarations—that the demand charge component of the E-27 rate is complex and that as a result, consumers will not modify their behavior in response to the rate. Neither opinion is reliable and Mr. Fulmer's value of solar estimate is also irrelevant. The Court should not permit him to testify at trial.

Mr. Fulmer's value of solar estimate cannot provide data sufficiently reliable to be admitted at trial because (1) "significant methodological gaps" remain in estimating the value of rooftop solar to utilities; (2) as SolarCity and Mr. Fulmer concede, value of solar estimates depend on, and are sensitive to, multiple external variables, but Mr. Fulmer failed to control for any of those variables and also did not perform a sensitivity analysis; (3) a substantial portion of Mr. Fulmer's estimated value of solar is, by his own admission, not based on any data specific to the District, but instead cherry-picked from other solar-industry funded studies for other utilities; and (4) Mr. Fulmer, a consultant with no relevant academic or professional background, who is not a grid engineer, and who has never subjected his value of solar estimates to peer review, lacks sufficient qualifications to opine on the value of rooftop solar to the District. These multiple failures of Mr. Fulmer's value

---

[1] Pursuant to Local Rule 7.2, prior to filing its motion, the District met and conferred with SolarCity on September 14, 2016 in an effort to resolve the issues raised herein. The meet-and-confer process did not resolve them.

of solar estimate, coupled with the dubious reliability of value of solar estimates generally, means that Mr. Fulmer's opinion lacks a "reliable basis in the knowledge and experience in the relevant discipline," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999), and therefore must be excluded.

Mr. Fulmer's value of solar estimate is also irrelevant. SolarCity challenges the District's retail electricity rates as applied to rooftop solar customers. Value of solar estimates, like those Mr. Fulmer attempted to perform, purport to measure *future* avoided costs. Utilities do not set their rates based on costs that they hope to avoid in the future. Thus, Mr. Fulmer's value of solar estimate lacks a "valid . . . connection to the pertinent inquiry," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993), and is inadmissible.

Mr. Fulmer's opinion regarding the E-27 rate's demand charge fares no better. Mr. Fulmer has no experience as a regulator of a public utility, or working in pricing at a utility. He is not an economist. He did no empirical work in forming his opinion, he spoke to no customers who are actually on the rate, he has never been on a residential demand charge himself, he failed to consider or even look for evidence that directly contradicted his opinions, and he admits he has no expertise in customer marketing or behavior. Yet, he still seeks to offer his "suspicion" that the E-27 demand charge is too complicated for customers in the District's service area to understand (even though he says that he understands it), and that therefore the price signal embedded in the rate is unlikely to generate the desired response. Mr. Fulmer is entitled to his personal views, but this opinion is little more than "an opinion broached by a purported expert" and *not* an "opinion informed by the witness's expertise," and is therefore inadmissible. *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

**BACKGROUND**

## I.    Value of Solar

As Dr. Susan Tierney[2] explains in her report, in recent years, many utilities and regulators have begun to re-evaluate the sustainability of retail net metering.  In response, rooftop solar industry advocates have attempted to quantify the so-called value of rooftop solar to a utility, typically in order to justify continuation of a subsidy from the utility to rooftop solar customers.  Ex. A at ¶ 130. "[V]alue-of-solar studies typically seek to estimate the net value (positive or negative) of solar installations by accounting for both the costs and benefits associated with distributed solar."  *Id.* ¶ 133.  To date, however, "[n]o study [has] comprehensively evaluated the benefits and costs" of rooftop solar.  *See* Ex. B at 4 (eLab, "A Review of Solar PV Benefit and Cost Studies").  Thus, as Mr. Fulmer concedes, value of solar estimates typically have not been used by the ratemaking bodies of utilities to inform rate design for rooftop solar customers.  Ex. C at 14:21-15:17 (Videotaped Deposition of Mark Fulmer, Aug. 19, 2016).

In part, this reluctance on the part of regulators to rely on value of solar estimates stems from the absence of consensus surrounding the proper methodology—and the lack of sufficiently granular data—to calculate the benefits and costs of rooftop solar.  Mr. Fulmer, in forming his opinion, relied heavily on a meta-study of value of solar estimates, *id.* at 29:16-24, but that meta-study itself observed that "significant methodological gaps" exist in performing value of solar estimates.  Ex. B at 5.  Mr. Fulmer readily acknowledges that these "gaps" exist.  Ex. C at 112:13-113:25.  As a result, and as Mr. Fulmer testified, "the values [among different studies] have ranged considerably due to various factors."  *Id.* at 116:19-20.  No value of solar estimate has been subject to peer review to resolve these and other methodological discrepancies discussed below.

---

[2] Unlike Mr. Fulmer, Dr. Tierney has published on the value of solar methodology, has worked as a regulator of a public utility, and has overseen ratemaking and resource planning for public utilities.  *See* Ex. A at ¶¶ 2-8 (Expert Report of Susan F. Tierney, Ph.D., July 1, 2016).

In the normal course of its business, SolarCity recognizes the inherent unreliability of value of solar estimates. SolarCity admits that such estimates are "necessarily simplified given uncertainty about future conditions that are exogenous variables in the models." Ex. D (SOLARCITY, *Distributed Energy Resources in Nevada*, *available at* www.solarcity.com/gridx (last visited Sept. 13, 2016). SolarCity's co-founder testified that the value of solar is a "complicated area of grid systems engineering" that is currently part of an "active discussion" in the industry. Ex. E at 73:19-74:3; 74:21-75:7 (Videotaped Deposition of Peter Rive, Apr. 8, 2016). And SolarCity's corporate designee, Ryan Hanley, testified that in setting the E-27 rate, he did not know how the District's Board was "supposed to consider the value of rooftop solar, when [that value] depends on so many factors." Ex. F at 91:12-18 (Videotaped 30(b)(6) Deposition of SolarCity Corporation by Ryan Hanley, May 18, 2016).

Mr. Fulmer agrees that the potential value of rooftop solar to the District is a "function of various variables." Ex. C at 49:23-50:4. Yet, Mr. Fulmer did not control for any of these variables, by, for example, performing a regression analysis. *Id.* at 60:3-61:11. Mr. Fulmer also admits that an estimate of the value of solar is "sensitive to the inputs [he] select[s]." *Id.* at 216:23-217:4. But he did not perform a basic sensitivity analysis, *id.* at 217:5-7; 281:4-20, even though multiple other studies that Mr. Fulmer looked at had done just that. *Id.* at 53:5-11. Mr. Fulmer did not do so because "[f]or the most part, I was asked to provide a value of solar study with a value," *id.* at 51:22-52:21, and not for any analytical purpose.

In addition, more than 25 percent of the "value" that Mr. Fulmer estimates is based solely on "non-SRP analyses or studies." Ex. G at 3 (Expert Report of Mark Fulmer [Corrected], Aug. 18, 2016). Most of these values were estimated as follows: Mr. Fulmer "glanced" at other value of solar estimates, "looked at their values and calculations," and assumed that the District would obtain a value somewhere along the range of values in those studies. Ex. C at 236:15-18; 261:13-263:24 ("Because I believed there was something

there, I didn't want to assume zero . . . So I just took a value that I thought—found to be within the middle, if not closer to zero than the highest value from the meta study.").

Mr. Fulmer also did not perform the location-specific, granular analysis in estimating the value of solar that he acknowledges is "ideal." *Id.* at 226:17-227:6. Location analysis is important because the benefits and costs of rooftop solar vary significantly depending on the location on the grid of rooftop solar installations. *See, e.g.*, Ex. H (ENERGY + ENVIRONMENTAL ECONOMICS, *The Benefits and Costs of Net Energy Metering in New York, Prepared for: New York State Energy Research and Development Authority and the New York State Department of Public Service*, December 11, 2015; Ex. A at ¶ 142-144; Ex. C at 16:13-23 (value of rooftop solar "is utility-specific. It's location-specific."). SolarCity itself believes that "it is worthwhile to perform" a value of solar estimate "with location-specific data and assumptions." Ex. F at 12:17-13:12. Yet Mr. Fulmer did not even ask for data on the location of rooftop solar installations in the District's service area, and never examined any such data in performing his estimate. Ex. C at 139:7-13.

Mr. Fulmer's estimate also did not consider most of the costs utilities incur from rooftop solar installations and administering net metering. *Id.* at 162:6-24; 269:24-270:17; 285:9-22. Mr. Fulmer admits that utilities incur incremental costs in serving rooftop solar customers. Ex. G at 38. For example, Mr. Fulmer agrees that the District incurs integration costs associated with rooftop solar. Ex. C at 266:6-8. Identifying these costs, however, requires "a specific engineering study." Ex. G at 38; Ex. C at 266:9-13. Mr. Fulmer never conducted such a study because doing so "requires a special skill" that Mr. Fulmer does "not have." Ex. C at 266:22-267:2. Instead, Mr. Fulmer estimated integration costs based exclusively on a three-year old study undertaken for a different utility because the firm that performed the study "is a big firm, and they have some reputation." *Id.* at 267:10-268:22.

Mr. Fulmer also failed to consider many of the other costs that the District incurs from serving rooftop solar customers. For example, other value of solar estimates examine administrative costs, interconnection costs, rebates/incentives, and decreased utility revenue associated with rooftop solar installations. Ex. B at 19. Mr. Fulmer's report did not even

consider these costs, let alone account for them.  Ex. C at 162:6-24; 269:24-270:17; 285:9-22. While Mr. Fulmer suggests that his value of solar estimate should have informed the District Board's decision in setting the E-27 rate, he acknowledges that his estimate only measures potential future avoided costs.  *Id.* at 58:5-59:20.  In contrast, he agreed that ratemaking attempts, in meaningful part, to recover historical costs already incurred.  *Id.* Neither Mr. Fulmer nor any representative of the solar industry produced a value of solar estimate for the District Board's consideration during the public ratemaking process, nor did they articulate the way in which such an estimate would have affected the E-27 rate design.

**II.    Demand Charge**

Mr. Fulmer offers an opinion "on demand charges in general."  Ex. C at 272:13-20. His opinion is that "he is not fond of demand charges" for residential customers because he sees them as unduly complex.  *Id.* at 273:4-18.

Mr. Fulmer has never worked at a utility.  *Id.* at 77:7-78:1.  He has never set retail electricity rates for a utility.  And he has never worked as a regulator of a public utility or otherwise served on a ratemaking body.  Mr. Fulmer has never been on a residential demand charge himself and has no experience as an economist.  *Id.* at 83:25-84:1.  Mr. Fulmer was unaware—because he contends that it "wasn't relevant to what [he] was doing"—that the District's Board, and not its management, is responsible for setting the District's retail electricity rates, *id.* at 37:11-22, and also has "no idea how the SRP Board sets [its] rates and what all they consider."  *Id.* at 63:8-13.

To form his opinion on the E-27 rate, Mr. Fulmer did not speak to any customers actually on the rate, nor did he look at any customer data "before and after" going on the E-27 rate.  *Id.* at 84:2-85:13.  He did not consult any studies about how residential customers respond to demand charges—including a readily available study analyzing the approximately 110,000 residential customers of APS who are on demand charges.  *Id.* at 130:9-13; 132:2-24; *see also* Ex. I (Meghan Grabel, Residential Demand Rates: APS Case Study (June 25, 2015) (concluding "Residential demand charges can be understood by residential customers").

1    Mr. Fulmer did rely on approximately six declarations from customers that SolarCity

2    procured for him five days before his report was due, as well as on rooftop solar application

3    data before and after E-27.  Ex. C at 309:20-310:7; 314:13-315:8.  The declarations Mr.

4    Fulmer consulted were not from a statistically significant sample of customers.  *Id.* at 86:2-

5    20.  *See also id*. at 313:9-314:12 (admitting he did not know the declarations chosen were

6    from customers who were told that SolarCity would not install solar DG systems in the

7    District's territory).  And Mr. Fulmer is unaware of the "basis" of these declarants'

8    opinions.  *Id.* at 304:2-5.  Mr. Fulmer relied on these declarations even though he has no

9    idea whether these customers have personal biases—if they own stock in SolarCity, for

10   example—or otherwise have some "hidden agenda."  *Id.* at 312:2-15.

11   Mr. Fulmer conducted no analysis of the reasons for the decline in solar applications

12   immediately after E-27 was announced, instead attributing the entire reason for the decline

13   to the E-27 rate because he had a "hard time imagining other factors being as critical."  *Id.*

14   at 87:15-23.  Mr. Fulmer also did not perform any empirical analysis of the E-27 rate or the

15   response of District customers who are actually on the rate.  *Id.* at 82:16-24; 87:15-23.

16   Mr. Fulmer then took his understanding of application data and "from that infer[red]

17   that customers were having difficulty" with the E-27 rate.  *Id.* at 302:18-303:6.  Mr. Fulmer

18   made this inference even though by definition if customers have not adopted the E-27 rate,

19   they cannot reliably discuss its intricacies.  Mr. Fulmer has no firsthand knowledge of any

20   customer experience on the rate.  *Id.* at 303:14-304:1.  He also is unaware of whether

21   customers are able to save money by installing rooftop solar systems on the E-27 rate,

22   although he acknowledges that because customers continue to "adopt[] solar" in the

23   District's service area, "there may be some folks who may be achieving savings or may be

24   getting some value that way."  *Id.* at 304:6-13.

25                                    **ARGUMENT**

26   In order to be admissible, opinion testimony under Federal Rule of Evidence 702

27   must be relevant and reliable.  *Daubert*, 509 U.S. at 597.  SolarCity bears the burden of

28   establishing that these pertinent admissibility requirements are satisfied.  *General Elec. Co.*

*v. Joiner*, 522 U.S. 136, 144 (1997); *Domingo v. T.K. M.D.*, 289 F.3d 600, 606-07 (9th Cir. 2002); *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Because Mr. Fulmer's opinions do not meet these requirements, he should not be permitted to provide testimony at trial.[3]

## I.   MR. FULMER'S VALUE OF SOLAR OPINION IS INADMISSIBLE

### A.   Mr. Fulmer's Value of Solar Opinion Is Unreliable

#### 1.   The Value of Solar Methodology Is Unreliable

Expert testimony must "rest[] on a reliable foundation." *Daubert*, 509 U.S. at 597. This requires the expert's reasoning or methodology to be scientifically valid. *Id.* at 592-93. In determining whether an expert's opinion is scientifically sound, the district court can consider (1) whether a scientific theory or technique can be (or has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *See id.* at 594-95; Fed. R. Evid. 702; Fed. R. Evid. 702 Advisory Committee's Note (2000). Each of these factors establish that a value of solar estimate lacks sufficient reliability to be admissible in a federal court.

First, value of solar estimates produce widely erratic results. For example, one value of solar estimate for APS arrived at a figure of 3.56 cents/kWh, while a solar-industry funded estimate for APS estimated the value at 23.7 cents/kWh. Ex. J at 5-6 (IREC, "A Regulator's Guidebook: Calculating the Benefits and Costs of Distributed Solar Generation," October 2013). Similarly, the RMI meta-study upon which Mr. Fulmer relied heavily, Fulmer Tr. 29:16-24, analyzed 16 different value of solar estimates and found a wide range of estimated values. Ex. B at 22. These differing outcomes primarily resulted from the "significant methodological gaps across studies, including (1) varying assumed cost and benefit categories; (2) varying approaches to calculating individual values; and (3)

---

[3] In addition, Professors Kalt and Wolak should be precluded from relying on Mr. Fulmer's opinions in their testimony.

varying levels of analytical granularity." Ex. B at 4-5. Mr. Fulmer acknowledged the significant differences in different estimates, but merely shrugged them off. Ex. C at 116:13-20; 120:16-121:5. But there are no "standards controlling the technique's operation," so it is impossible to assess the reliability of any particular estimate—including Mr. Fulmer's. *Daubert*, 509 U.S. at 594; s*ee also United States v. Cordoba*, 194 F.3d 1053,1061-62 (9th Cir. 1999) (holding that polygraph tests were unreliable because there were no uniform standards regulating their application); *Almeciga v. Center for Investigative Reporting, Inc.*, No. 15-cv-4319 (JSR), 2016 WL 2621131, at *11-14 (S.D.N.Y. May 6, 2016) (excluding handwriting analysis as unreliable because it had an "unacceptable high" error rate and was "entirely lacking in controlling standards").

Second, value of solar estimates are not "capable of empirical test." *Daubert*, 509 U.S. at 593. Testing a methodology is critical to separate those theories that can be confirmed as reliable from those that cannot. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 94 (1st Cir. 2014) ("Testing a particular theory will either reproduce consistent results, thus confirming the theory, or inconsistent results, thus casting doubt on it."). Such testing is not an option here. This is because value of solar estimates are premised entirely on future, *unknown* inputs. Ex. K at 5 (NREL, "Value of Solar: Program Design and Implementation Considerations," March 2015). These future projections of value are speculative and inherently uncertain and are therefore unreliable. *See, e.g.*, *U.S. v. 10.092 Acres*, No. cv05-00363, 2007 WL 962846, at *4 (D. Ariz. Mar. 27, 2007) ("Elements affecting value that depend upon events [that are] not shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value.").

Further, because value of solar estimates have no tested or accepted methodology, the decision about which elements to include or exclude are subject to the whims of the estimator. For example, even though Mr. Fulmer acknowledged that the District did not account for rooftop solar in its transmission planning, and that any potential transmission

value was dependent on a highly granular analysis that Mr. Fulmer did not perform, he still assigned a substantial value for avoided transmission costs. Ex. G at 19. Similarly, Mr. Fulmer assumed that the District would avoid substantial capacity costs from rooftop solar, even though the *earliest* the District would need additional capacity is 2022. *Id.* at 18. Then Mr. Fulmer simply guessed at the cost of a new power plant far into the future, which he claims rooftop solar might possibly obviate the need for. *Id.*

Mr. Fulmer attempts to explain away these and other flaws by pointing out that they are the best he can do with the data that he has and the still nascent nature of value of solar estimates. Ex. C at 227:14-21. While this statement is not true—other estimates have been far more comprehensive than Mr. Fulmer was here—it only proves the point: Value of solar estimates are not yet sufficiently reliable to be admissible in federal court. *See, e.g., Apple, Inc. v. Samsung Elecs Co., Ltd.*, No. 11-cv-01846, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) (excluding testimony where calculations were not based "on a generally accepted, peer-reviewed method"). Because value of solar estimates are not based on "good grounds, based on what is known," they are unsupported speculation that cannot be treated as the basis of a reliable methodology. *Daubert*, 509 U.S. at 590; *see also Ollier Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (holding that "speculative testimony is inherently unreliable"); *see also Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 134 (M.D. Pa. 2015) (excluding opinions where they were based entirely on "unverified projections").

2.   Even Assuming Value of Solar Is A Reliable Methodology, Mr. Fulmer Did Not Reliably Apply That Methodology to the Facts of This Case

An expert must not only employ a reliable methodology, but that methodology must be employed reliably to the facts of the case. Fed. R. Evid. 702(d). Mr. Fulmer has not done so. His opinion must therefore be excluded. *Kumho Tire Co.*, 526 U.S. at 152.

*First*, Mr. Fulmer, by his own admission, simply guesses at more than a quarter of his estimated value. Mr. Fulmer had no District-specific data or evidence to support these

estimates, so he "glanced" at other studies and made up a number. Ex. C at 236:15-18. And even though the vast majority of the studies Mr. Fulmer reviewed found no value (or even costs) associated with the categories Mr. Fulmer made up values for, he assigned a positive value because he didn't "think" the value was zero. *Id.* at 261:20-262:14. But "[c]oming to a firm conclusion first and then doing research to support it is the antithesis of the [proper application of the scientific method under *Daubert*]." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988 (C.D. Cal. 2012) (internal citation omitted).

Mr. Fulmer also assigns nearly 10 percent of the value of rooftop solar to associated voltage support. Ex. G at 27-30. As Mr. Fulmer concedes, every other value of solar estimate that he is aware of found this value to be zero. Ex. C at 259:14-18. Mr. Fulmer's only basis for his estimate of this "potentially real value," *id.* at 258:19-25, was a pilot SolarCity recently conducted in Fresno, California, *id.* at 257:21-24, and a "quick review of the literature." *Id.* at 259:1-13. But Mr. Fulmer admits that for this value to exist, rooftop solar installations must include smart inverters. *Id.* at 256:7-14. Mr. Fulmer admits that current smart inverter deployment in the District is "minimal," *id.* at 256:15-22, and that he has no knowledge of whether any rooftop solar installer beyond SolarCity even has the capacity to install smart inverters. *Id.* at 256:23-257:4. Mr. Fulmer also testified that the existence of voltage support benefits depends on "some number of very specific electrical engineering factors," *id.* at 257:25-258:7, and because he is not an electrical engineer, he has no "firsthand knowledge" of whether those benefits exist in the District's service area. *Id.*

Under Ninth Circuit precedent, Mr. Fulmer's failure to perform an "independent assessment of the validity" of data is itself grounds for exclusion. The court should exclude his opinion on the value of solar on this basis alone. *See, e.g.*, *Magnetar Technologies Corp. v. Intamin Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (holding that failure to independently verify data was grounds for exclusion); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (excluding expert testimony because expert's method of transposing data from

other studies based on conjecture and rough approximation lacked the "intellectual rigor" required by *Daubert*).

**Second**, Mr. Fulmer failed to follow the few areas of industry-consensus best practices in conducting his analysis, which is itself grounds for exclusion.  *See Kumho Tire*, 526 U.S. at 157 (affirming exclusion of expert testimony as unreliable where there was no evidence that other experts within the industry utilized the expert's particular methodology); *Daubert*, 509 U.S. at 594 (acceptance of methodology within the profession is "an important factor in ruling particular evidence admissible").  Because value of solar estimates are necessarily simplified and depend on a number of exogenous variables, Ex. C at 49:15-22; 51:9-15, an appropriate analysis would control for all variables that may affect the outcome.  This requires performing a regression or sensitivity analysis.  *Id.* at 53:5-11. *See, e.g., Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (excluding an economist's report because the expert failed to control for factors that could have impacted his conclusions).  Mr. Fulmer readily admits, however, that he neither controlled for any variables—he disclaimed any understanding of how he would do so—nor performed a sensitivity analysis.

In addition, there is widespread agreement—even from Mr. Fulmer—that most categories that go into a value of solar estimate depend on a granular, localized assessment of rooftop solar installations within a utility's service area. Ex. C at 16:13-23; 115:25-116:5;139:23-140:16;  Ex. A at ¶ 138.  Mr. Fulmer admittedly never performed that analysis, Ex. C at 140:17-22, nor is he qualified to do so.  *Id.* at 25:7-26:11.  Without examining this data, Mr. Fulmer cannot even determine whether there is a *positive* value of solar for most of the categories he considered, let alone values as high as he estimates.  Indeed, independent studies of the value of solar have noted the possibility of *negative* values if the proper data is considered.  *See* Ex. B at 12.  Mr. Fulmer's failure to use the correct data to perform his analysis renders his testimony unreliable.  *See, e.g.*, *Smith v. Pacific Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009) ("Opinions derived from erroneous data are appropriately excluded.");  *Rogers v. Bonnett*, No. 5:04-cv-118, 2009 WL 2461820, at *5

(W.D. Tex. Aug. 11, 2009) (excluding conclusory expert opinion where opinion was "tainted by [the expert's] use of incorrect facts").

***Third***, and perhaps most importantly, Mr. Fulmer's opinion skews heavily in favor of the benefits of rooftop solar. A value of solar estimate should subtract from the potential future benefits of rooftop solar its substantial costs. Mr. Fulmer, however, did not even consider many categories of costs, let alone attempt to quantify them. Ex. C at 162:6-24; 269:24-270:17; 285:9-22. These include costs associated with protection, voltage control, and ensuring the reliability on the circuits of individual parts of the distribution system, administrative costs associated with the administration of net metering and special billing for rooftop solar customers, and the costs associated with net metering participant bill savings that even SolarCity acknowledges exist. *Id.* Mr. Fulmer necessarily overstates the value of solar by not considering these additional costs, rendering his opinion unreliable and therefore inadmissible. *See, e.g.*, *Saavedra v. Eli Lilly and Co.*, No. 2:12-civ-9366-SVW (MANx), 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) ("By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation on relative fair market values to a seemingly subjective inquiry of what an average consumer wants."); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (D. Wash. 2009) ("[A]ny step that renders the expert's analysis unreliable renders the expert's testimony inadmissible.").

The only costs Mr. Fulmer does consider are integration costs. Even here, he understates the true costs of solar to the District. Mr. Fulmer admits that he did not commission a "specific engineering study" even though one is required in "[d]eriving [integration] costs." Ex. G at 38; Ex. C at 266:6-17. Second, as he did in calculating the benefits of solar, he calculates the integration costs of solar using speculative data not relevant to the District. Instead, he relied exclusively on a different study for a different utility. Without explanation, he concludes that the District's integration costs are the same. Such guesswork may satisfy Mr. Fulmer, but a court cannot "simply take[] the expert's word for it." Fed. R. Evid. 702 Advisory Committee's Note (2000); *see also Goebel v.*

*Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.").

3.   <u>Mr. Fulmer Is Not Qualified to Perform A Value of Solar Analysis</u>

An expert must be qualified to render the opinion offered.  *See In re Apollo Group Inc. Securities Litigation*, 527 F. Supp. 2d 957, 960 (D. Ariz. 2007).  Mr. Fulmer is not sufficiently qualified to perform the estimate he intends to offer.  The Court must exclude an expert's testimony unless the expert offers "some special knowledge, skill, experience, training, or education on the subject matter" of the case.  *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

Mr. Fulmer has only conducted one other value of solar estimate and one "high level" review in his career.  Ex. C at 27:12-19.  Mr. Fulmer has never published any independent research on the value of solar, nor has his present methodology been subjected to peer review.  *Id.* at 28:3-8.  He has never studied the value of solar outside an adversarial context, and has never performed a value of solar estimate not funded by the solar industry. *Id.* at 27:12-23.  If the expert's testimony is not borne out of independent research, then he must provide "proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th Cir. 2003).

Mr. Fulmer cannot do so.  Mr. Fulmer simply glanced at other estimates, most of which were funded by the rooftop solar industry, and offers no basis to believe that any "analysis" performed had been subject to the type of intellectual rigor required.  And in several instances, Mr. Fulmer admits that he would have had "to hire" someone else to derive reliable figures.  That never stopped him from plowing ahead with his own guesses anyway, Ex. C at 266:22-268:22, which always resulted in more favorable outcomes for his client.

**B.     Mr. Fulmer's Value of Solar Opinion Is Not Relevant**

Expert testimony must be relevant "to the task at hand." *Daubert*, 509 U.S. at 597. This means the expert's opinion must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591.

The potential estimated value of solar as a generating asset to the District is not an issue in this case. SolarCity challenges the District's retail electric rates set pursuant to a ratemaking process. FAC ¶¶ 4, 89-104 (Dkt. 39). Mr. Fulmer testified that utility ratemaking seeks to recover already incurred costs. Ex. C at 49:4-9; 163:3-6. Utilities do not set their prices based on future costs they hope to avoid. Yet, that is exactly what Mr. Fulmer's opinion requires. The District may or may not obtain future value from rooftop solar installations in its service area, but that future value was not and cannot be an element of how the District sets its prices today. Ex. A at ¶ 106.

Further, Mr. Fulmer does not opine that the District's E-27 rate would have been any different if a value of solar analysis had been considered. Ex. C at 163:7-24. He also cannot point to a single other utility that employs value of solar estimates in determining the structure of retail net metering. *Id.* at 14:1-8. Mr. Fulmer's opinion on the value of solar is therefore not useful to this Court and should be excluded.

## II.    MR. FULMER'S DEMAND CHARGE OPINION LACKS SUFFICIENT RIGOR

Mr. Fulmer simply did not do enough work to provide a reliable or relevant opinion regarding the demand charge component of the District's rate. Mr. Fulmer may sincerely believe that the demand charge is complex, but his personal opinion will not assist this Court at trial.

Mr. Fulmer did not perform any empirical analysis. He did not speak to any customers on the E-27 rate. He did not review any data regarding customer behavior. He reviewed no studies of customer behavior on residential demand charges. And he certainly did not conduct a study of his own.

Instead, Mr. Fulmer looked at only two categories of evidence that are plainly insufficient to support his opinion here. First, Mr. Fulmer considered a half-dozen customer

declarations.  Six people out of the nearly one million District customers is clearly not statistically significant.  Mr. Fulmer even concedes that each customer actually on E-27 might have a different opinion about the rate. Ex. C at 105:4-14.

In addition, Mr. Fulmer considered the decline in applications immediately after E-27 was announced (although he never even looked at data in 2016). But Mr. Fulmer never did any work to determine what the causes of that decline were. As Professor Katz explains in his report, several factors explain this decline, Ex. L at ¶¶ 248-249 (Expert Report of Michael L. Katz, July 1, 2016), and it would be improper to simply assume that the E-27 rate is the sole or even the primary cause of the decline. *Id.* Yet, Mr. Fulmer simply offers his own *ipse dixit* that the decline in applications confirms his opinion. This is impermissible opinion testimony and should be excluded. *Joiner*, 522 U.S. at 146; *Building Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012) (holding that the district court did not abuse its discretion in rejecting the declaration of an expert who "offered unsupported assertions" with "no data forming the basis for [the expert's] assumptions or conclusions").

Mr. Fulmer also failed to consider evidence that would contradict his hypothesis. As Mr. Fulmer testified, he did not look to see if there was any evidence in the record that might conflict with his opinion. Ex. C at 88:20-89:12.  Instead, he simply performed word searches in deposition transcripts for snippets that supported his views. *Id.* at 294:7-18. *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 339, 460-61 (E.D. Pa. 2014) ("The court finds that the expert report prepared by Dr. Berard does selectively discuss studies most supportive of her conclusions, as Dr. Berard admitted in her deposition, and fails to account for contrary evidence[.].").  "But experts cannot simply ignore contradictory evidence; they are not allowed to pick and choose facts they find helpful and to pretend that the others do not exist." *Zeolla v. Ford Motor Co.*, No. 09-40106-FDS, 2013 WL 308968, at *9 (D. Mass. 2013).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Ex. M at 172:1-25;

203:21-204:6 (30(b)(6) Videotaped Deposition of Sun Valley Solar Solutions, by and through Russell Patzer, May 2, 2016), ███████████████████████████████

███████████████████████████████████████████████ His opinion should be excluded on this basis alone.

Dated: September 15, 2016           Respectfully Submitted,

                                    WILMER CUTLER PICKERING HALE
                                    & DORR LLP

                                    By: s/ Chris T. Casmassima
                                    Christopher T. Casamassima
                                    David Gringer
                                    *Attorneys for Defendant* Salt River Project
                                    Agricultural Improvement and Power District

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Attorneys for Defendant* Salt River Project Agricultural Improvement and Power District**

Molly S. Boast (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-230-8800
Fax:    (212) 230-8888
molly.boast@wilmerhale.com

Christopher E. Babbitt *(admitted pro hac vice)*
David Gringer (*admitted pro hac vice*)
David L. Sluis (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
202-663-6000
Fax: 202-663-6363
christopher.babbitt@wilmerhale.com
david.gringer@wilmerhale.com
david.sluis@wilmerhale.com

Christopher T. Casamassima (*admitted pro hac vice*)
Rebecca A. Girolamo (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
350 South Grand Ave.
Los Angeles, CA 90071
213-443-5300
Fax: 213-443-5400
chris.casamassima@wilmerhale.com
becky.girolamo@wilmerhale.com

Karl Michael Tilleman (012449)
Paul Kipp Charlton (013435)
Quintin Howard Cushner (027303)
Steptoe & Johnson LLP
201 E Washington St., Ste. 1600
Phoenix, AZ 85004-2382
602-257-5200

Fax: 602-257-5299
ktilleman@steptoe.com
pcharlton@steptoe.com
qcushner@steptoe.com

**CERTIFICATE  OF  SERVICE**

I hereby certify that on September 15, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

BOIES, SCHILLER  & FLEXNER  LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Richard J. Pocker

BOIES, SCHILLER  & FLEXNER  LLP
5301 Wisconsin Avenue, NW
Washington,  DC 20015
William  A. Isaacson
Karen L. Dunn
James P. Denvir, III
Amy J. Mauser
Christopher  G. Renner
Ross McSweeney

BOIES, SCHILLER  & FLEXNER  LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Steven C. Holtzman
Sean P. Rodriguez

BOIES, SCHILLER  & FLEXNER  LLP
401 Wilshire  Blvd., Suite 850
Santa Monica, CA 90401
Shira Rebecca Anne Liu

SHEARMAN  & STERLING  LLP
535 Mission  Street
25th Floor
San Francisco,  CA 94105
John F. Cove, Jr.

COPPERSMITH  BROCKELMAN  PLC
2800 North Central Avenue,  Suite  1200
Phoenix,  AZ 85004
Keith  Beauchamp
Roopali  H. Desai

/s/ [DRAFT]