WILMER CUTLER PICKERING
  HALE AND DORR LLP
Molly S. Boast (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
molly.boast@wilmerhale.com

Christopher E. Babbitt (*pro hac vice*)
David Gringer (*pro hac vice*)
David L. Sluis (*pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
christopher.babbitt@wilmerhale.com

Christopher T. Casamassima (*pro hac vice*)
Rebecca A. Girolamo (*pro hac vice*)
350 South Grand Ave.
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400
chris.casamassima@wilmerhale.com

STEPTOE & JOHNSON LLP
Paul K. Charlton (012449)
Karl M. Tilleman (013435)
Quintin Howard Cushner (027303)
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| SolarCity Corporation,<br><br>                  Plaintiff,<br><br>   vs.<br><br>Salt River Project Agricultural Improvement and Power District,<br><br>                  Defendant. | Case No. 2:15-CV-00374-DLR<br><br>**THE DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**REDACTED VERSION** |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

I.      The District's Electric Operations And Ratemaking Authority ................. 3

II.     The District's Subsidization Of Early Solar Customers And Adoption Of E-27 ........ 4

III.    The District's 2014-2015 Public Pricing Process ........................................ 8

IV.    SolarCity Abandoned The District's Service Territory ............................... 9

ARGUMENT .................................................................................................... 10

I.      The District Has Not Engaged In Anticompetitive Conduct ..................... 11

      A.      There Is No Refusal To Deal ................................................. 12

      B.      SolarCity Cannot Proceed Under Trinko's Limited Exception ...... 14

           1.     The District's Prior Course of Dealing Was Not Profitable ............... 15

           2.     The District Did Not Sacrifice Short-Term Profits ........................... 15

      C.      SolarCity's Discrimination Theory Must Satisfy Trinko ............... 17

II.     SolarCity Cannot Establish That It Has Suffered Antitrust Injury ............ 18

III.    SolarCity's State-Law Claims Are Barred.................................................. 19

      A.      SolarCity Failed To Exhaust Its Administrative Remedies ............ 19

      B.      The District's Ratemaking May Not Be Enjoined ........................ 21

IV.    SolarCity's Claims Are Barred By The Filed-Rate Doctrine ................... 22

V.      The District Is Immune Under The State-Action Doctrine ....................... 24

VI.    SolarCity's Intentional Interference Claims Fail .................................... 29

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abarca v. Franklin County Water District*,
No. 1:07-cv-0388, 2011 WL 43456 (E.D. Cal. Jan. 5, 2011) ....................................22

*Aerotec International, Inc. v. Honeywell Int'l, Inc.*,
4 F. Supp. 3d 1123, 1138, *aff'd*, No. 14-15562, 2016 WL 4709868
(9th Cir. Sept. 9, 2016) .................................................................................13, 14

*Aerotec International, Inc. v. Honeywell International Inc.*,
No. 14-15562, 2016 WL 4709868 (9th Cir. Sept. 9, 2016) ...............................*passim*

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ....................................................................................12, 13

*Atlantic Richfield Co. v. USA Petroleum*,
495 U.S. 328 (1990) ...........................................................................................18

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
118 F.3d 178 (3d Cir. 1997) (Alito, J.) ...............................................................19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ..............................................................................................1

*California CNG, Inc. v. Southern California Gas Co.*,
96 F.3d 1193 (9th Cir. 1996) ...............................................................................26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................................10

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
499 U.S. 365 (1991) ......................................................................................24, 28

*City of Phoenix v. Kasun*,
97 P.2d 210 (Ariz. 1939) ......................................................................................3

*City of Phoenix v. Wright*,
80 P.2d 390 (Ariz. 1938) ......................................................................................3

*Cooney v. California Public Utililities Commission*,
No. C 12-6466, 2014 WL 3531270 (N.D. Cal. 2014) ...........................................22

*Cost Management Services, Inc. v. Washington Natural Gas Co.*,
99 F.3d 937 (9th Cir. 1996) .................................................................................23

*Ethypharm S.A. France v. Abbott Laboratories*,
    707 F.3d 223 (3d Cir. 2013) ..................................................................19

*FERC v. Electric Power Supply Association*,
    136 S. Ct. 760 (2016)..........................................................................22

*FTC v. Phoebe Putney Health System, Inc.*,
    133 S. Ct. 1003 (2013)................................................24, 25, 26, 27

*Great-West Life & Annuity Insurance Co. v. Knudson*,
    534 U.S. 204 (2002) ..........................................................................26

*Image Technology Services, Inc. v. Eastman Kodak Co.*,
    903 F.2d 612 (9th Cir. 1990) ..........................................................17

*Imperial Irrigation District v. California Independent System Operator Corp.*,
    146 F. Supp. 3d 1217 (S.D. Cal. 2015)..........................................13

*International Railways of Central America v. United Brands Co.*,
    532 F.2d 231 (2d Cir. 1976) ............................................................16

*John Doe 1 v. Abbott Laboratories*,
    571 F.3d 930 (9th Cir. 2009) ..........................................................11

*Kairy v. SuperShuttle International*,
    660 F.3d 1146 (9th Cir. 2011) ........................................................21

*Kinast v. Target Corp.*,
    No. CV-15-01063, 2016 WL 1593812 (D. Ariz. Apr. 21, 2016) ..............10

*LiveUniverse Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ..................................................13

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)..........................................................................12

*McLeod USA Telecommunications, Services, Inc. v. Arizonia Corp. Commission*,
    655 F. Supp. 2d 1003 (D. Ariz. 2009) ..........................................23

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ..............................................*passim*

*MiniFrame Ltd. v. Microsoft Corp.*,
    551 F. App'x 1 (2d Cir. 2013) ........................................................13

*Morris Communications Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ..............................................11, 16

*Mothershed v. Justices of the Supreme Court*,
    410 F.3d 602 (9th Cir. 2005) ................................................................ 24

*Neonatalogy Associates, Ltd. v. Phoenix Perinatal Associates Inc.*,
    164 P.3d 691 (Ariz. Ct. App. 2007) ...................................................... 29

*North Carolina State Board of Dental Examiners v. FTC*,
    135 S. Ct. 1101 (2015) .............................................................. 24, 27, 28, 29

*Novell Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................ 15

*Oahu Gas Service, Inc. v. Pacific Resource Inc.*,
    838 F.2d 360 (9th Cir. 1988) ................................................................ 17

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973) ............................................................................... 12

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
    555 U.S. 438 (2009) ........................................................................ 11, 14

*PegaStaff v. California Public Utilities Commission*,
    236 Cal. App. 4th 374 (2015) ................................................................ 21

*Ragan v. Merchants Transfer & Warehouse Co.*,
    337 U.S. 530 (1949) ............................................................................... 21

*Shady Grove Orthopedic Associates v. Allstate Insurance Co.*,
    559 U.S. 393 (2010) ............................................................................... 21

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*,
    88 F.3d 780 (9th Cir. 1996) .................................................................. 11

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .......................................................... 18, 19

*Southern Motor Carriers Rate Conference, Inc. v. United States*,
    471 U.S. 48 (1985) ................................................................................. 25

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ............................................................................... 12

*Town of Hallie v. City of Eau Claire*,
    471 U.S. 34 (1985) ........................................................................ 25, 27, 29

*Town of Norwood v. New England Power Co.*,
    202 F.3d 408 (1st Cir. 2000) ................................................................ 23

*United National Maintenance, Inc. v. San Diego Convention Center,*
    766 F.3d 1002 (9th Cir. 2014) ............................................................... 26, 29

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,*
    540 U.S. 398 (2004) .................................................................................. *passim*

*Wah Chang v. Duke Energy Trading & Marketing, LLC,*
    507 F.3d 1222 (9th Cir. 2007) ....................................................................... 22

*Wallace v. Casa Grande Union High School District No. 82 Board of Governors,*
    909 P.2d 486 (Ariz. Ct. App. 1995) ............................................................... 29

*Woods v. Interstate Realty Co.,*
    337 U.S. 535 (1949) ........................................................................................ 21

## DOCKETED CASES

*Vote Solar v. The Public Utilities Commission of Nevada*, No. 16-OC-00052,
    (1st Dep't Nev.) ................................................................................................ 6

# STATUTES, RULES, AND REGULATIONS

A.R.S.
    § 30-801(16) ............................................................................... 3, 28
    § 30-802 ............................................................... 20, 23, 25, 26
    § 30-802(B) .............................................................................. 20
    § 30-803(A) ........................................................................ 18, 26
    § 30-810 .............................................................................. 4, 20
    § 30-811 ............................................................................. *passim*
    § 30-812 .................................................................................. 20
    § 30-812(A) ...................................................... 4, 20, 21, 29
    § 30-812(F) ..................................................................... 2, 4, 21
    § 40-202(B) ........................................................................ 26, 27
    § 40-207(A) ........................................................................ 18, 19
    § 48-247 ................................................................................... 24
    § 48-2302 .................................................................................. 3
    § 48-2303 .............................................................................. 3, 28
    § 48-2303(A) ........................................................................... 21
    § 48-2303(A)(7) ................................................................. 25, 27
    § 48-2309 ................................................................................. 28
    § 48-2333(C) ........................................................................... 29
    § 48-2333(D) ........................................................................... 29
    § 48-2334 ............................................................................ *passim*
    § 48-2334(B) ............................................................................. 4
    § 48-2334(E) ............................................................................. 4
    § 48-2334(F) ............................................................................. 4
    § 48-2361 ................................................................................. 27
    § 48-2383 ................................................................................. 28

Ariz. Const.
    art. 13, § 5 .............................................................................. 3
    art. 13, § 7 .......................................................................... 3, 27
    art. 15, § 2 .......................................................................... 3, 19

Fed. R. Civ. P. 56(a) ......................................................................... 10

# OTHER AUTHORITIES

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 227a (2013) ................................. 29

Defendant Salt River Project Agricultural Improvement and Power District (the "District") hereby moves pursuant to Fed. R. Civ. P. 56 and Ariz. R. Civ. P. 56 for a grant of summary judgment on the claims set forth in Plaintiff's Amended Complaint. Dkt. No. 39. The District presents the following memorandum of points and authorities in support.

## INTRODUCTION

SolarCity asks this Court to overturn the results of the 2014-15 ratemaking process of the publicly-elected Board of the District, in order to direct the restoration of support provided to District customers who choose to install rooftop solar panels. Under the District's prior treatment of this class of customers, the District did not recover its costs of meeting those customers' demands on the electrical grid. These costs were then shifted to the rest of the District's ratepayers. The District expected this "cost-shift" to increase significantly over time, with increased rooftop solar adoption, unless it reformed its rates for rooftop solar customers. Accordingly, as part of an overall adjustment of its rate plans, the District's Board engaged in a public, duly-noticed ratemaking proceeding, an outgrowth of which was the adoption of the E-27 rate plan to apply to future solar customers. E-27 better aligns the costs of serving rooftop solar customers with the revenues the District receives from those customers. SolarCity opposed the Board's rate reforms, and now challenges those reforms in this Court, because its business model depends significantly on the preservation of the cost-shift. However, no principle in antitrust or tort law compels the continued support of SolarCity's preferred business model. To the contrary, the antitrust laws "were enacted for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

The District is entitled to summary judgment on all of SolarCity's claims. *First*, SolarCity cannot show that the District engaged in anticompetitive conduct when it reformed the rates for future rooftop solar customers because the antitrust laws protect a firm's ability to set the prices for its products and the terms upon which it does business. For SolarCity's claim to proceed to trial, it must demonstrate that it could fit its theory of competitive harm into what the Supreme Court and Ninth Circuit have recognized is a

-1-

"limited exception," at the outer bounds of antitrust liability. At the close of extensive fact and expert discovery, it is clear that SolarCity cannot carry its burden. The District had no relevant prior course of dealing with SolarCity. Rooftop solar customers continue to interconnect with the grid and many other rooftop solar installers have serviced customers seeking to install rooftop solar systems post-E-27. Finally, SolarCity cannot demonstrate that the District suffered a short-term profit sacrifice or engaged in other conduct justified solely by a desire to harm competition. There is no genuine dispute that the District was not recovering its costs of serving rooftop solar customers and that E-27 addresses that problem.

**Second**, federal courts have long held that the antitrust laws do not apply to utility ratemaking undertaken pursuant to state regulation. This principle applies with particular force where the entity whose ratemaking is challenged is a state political subdivision like the District. The filed-rate doctrine, which provides that federal antitrust law and state law may not be used to invalidate an already established rate, reflects this principle and precludes SolarCity's claims. In addition, the District is immune from antitrust suits under the state-action doctrine because the Arizona legislature has granted ratemaking authority to the District's Board, which necessarily displaces competition with regulation.

**Third**, Arizona law sets out an elaborate structure for regulating the District's rates. That structure includes the exclusive means to challenge the District's rates in court. SolarCity—a party in the ratemaking process—never filed a motion for reconsideration, nor did it avail itself of its appeal rights in the Arizona courts. SolarCity's failure to exhaust these remedies dooms its state-law claims. Moreover, this Court lacks subject-matter jurisdiction to adjudicate SolarCity's state-law claims because A.R.S. § 30-812(F) precludes this Court from enjoining any order of the Board "relating to rate making or rate design," unless the process set out in Title 30 is followed.

And ***fourth***, despite multiple allegations about the District's supposed interference with contracts that SolarCity hoped to make, SolarCity has presented no evidence in support of its intentional interference claims. Summary judgment on those claims, along with the rest of SolarCity's suit, is therefore proper.

**BACKGROUND**

## I.      The District's Electric Operations And Ratemaking Authority

Under the Arizona Constitution, furnishing electricity to retail customers serves a public purpose.  Ariz. Const. art. 15, § 2.  In Arizona, electricity is furnished either through "public service corporations," regulated by the Arizona Corporation Commission, or by the State, municipal corporations, and political subdivisions of the State.  Ariz. Const. art. 13, § 5.  As recognized by this Court, the District is a political subdivision, vested with all "immunities and exemptions granted municipalities and political subdivisions under th[e Arizona] constitution or any law of the state or of the United States."  Dkt. 77 at 9, 23 (citing A.R.S. § 48-2302; Ariz. Const. art. 13, § 7).  The District's statutory purpose is to provide low-cost water and power within its defined service area.  A.R.S. § 48-2303.  The District also has an obligation to provide electricity on demand to the approximately one million mostly residential customers in its service territory.  *See, e.g.*, SOF[1] ¶ 7.  Fulfilling that purpose today, the District's rates are among the lowest in the Southwest.  Babbitt Decl. Ex. 14, at -731.[2]

The state legislature "has the right to regulate the rates" charged by the District "and it has plenary power in that respect except as limited by the Constitution."  *City of Phoenix v. Kasun*, 97 P.2d 210, 212 (Ariz. 1939); *accord City of Phoenix v. Wright*, 80 P.2d 390, 393 (Ariz. 1938) ("the regulation of municipal corporations . . . [is] where it has always been ever since such corporations have existed—in the hands of the legislative branch[.]").  Exercising this jurisdiction, the Arizona legislature has conferred certain powers on "public power entities," which is the legislature's term for electric utilities that are not public service corporations and therefore are not subject to the jurisdiction of the ACC.  *See* A.R.S. § 30-801(16).  The District is a public power entity and therefore entirely outside the ACC's jurisdiction with respect to its rates.  Dkt. 39 ¶ 42.

---

[1] All citations to "SOF" are to the District's Separate Statement of Facts filed concurrently with this motion.

[2] Each exhibit attached to the Declaration of Christopher E. Babbitt hereinafter cited in this filing will be referenced as "Ex."

The powers conferred on the District's publicly-elected Board by the legislature include the exclusive power to set the price of electricity that the District charges retail customers. A.R.S. § 48-2334. The District's Board must follow a public process when making any "changes in the proposed standard electric rate schedules," *id.* § 48-2334(B), (E), and it is authorized to "establish and enforce rules and regulations" concerning any such changes, *id.* § 48-2334(F). The legislature also created exclusive procedures for challenging the District's rates set pursuant to this process: Within 20 days of a final order or decision by the Board, the attorney general or any party to a ratemaking may petition the District's Board for rehearing. *Id.* § 30-810. If the petition is denied, an administrative challenge may then be brought in the Arizona Court of Appeals if the challenged decision relates to "ratemaking or rate design." *Id.* § 30-812(A). No court has jurisdiction to enjoin on the basis of a state-law claim the District's ratemaking or rate design except as set out under this statutory framework. *Id.* § 30-812(F).

## II. The District's Subsidization Of Early Solar Customers And Adoption Of E-27

Most of the District's costs are associated with its investments to meet its obligation to serve retail electric customers. These investments in infrastructure are required to ensure the District can reliably meet the instantaneous electricity demands of all customers within its territory, including the overall system peak whenever it occurs. *See, e.g.*, SOF ¶¶ 8, 9. To continue making those investments, the District, like nearly all utilities, sets its rates in a manner to recover these costs (known in the industry as embedded average costs). Ex. 14 at -701, Ex. 71 ¶¶ 101, 105. In allocating its costs of service among its customers, the District follows the principle of equity in pricing, as mandated by its Board since 2000—that it must "treat customers of all types in an economically fair manner." Ex. 14 at -713.

The District's early financial support for rooftop solar customers threatened this principle of equity as the number of rooftop solar customers increased. The District initially provided support for rooftop solar customers in three ways. First, the District Board explicitly adopted a net metering rider in 2005 "to subsidize the economics of [rooftop solar] technology." SOF ¶ 15. Net metering is a billing mechanism whereby rooftop solar

customers receive credit for excess energy produced by their solar systems.[3]  Ex. 24 at -614.

Under its 2005 rider, the District credited solar customers the full retail price of excess

electricity they generated rather than the wholesale price the District paid for electricity

from traditional sources.  *See* SOF ¶ 16 at -606 to -607.  In effect, "retail net metering"

caused the District and its non-solar customers to pay more than twice as much for rooftop

solar electricity as they would for electricity on a wholesale basis.  *See id*.  The District

provided this subsidy for rooftop solar because, at the time, rooftop solar was a nascent

technology, the number of customers was small, and the District wished to better understand

the technology and its potential uses.  Ex. 24 at -591 to 592.

Second, the District also provided a direct financial incentive for rooftop solar

customers.  That incentive was discontinued in 2014.  SOF ¶ 18.

Third, traditional residential utility rate structures, designed for customers who take

all of their electricity from the grid, failed to sufficiently recover the District's costs of

serving rooftop solar customers.  SOF ¶ 21, 22.  Traditionally, residential utility rates had

two parts:  (1) a relatively small fixed monthly service charge, and (2) a variable charge

based on the volume of electricity consumed each month (measured in kWh).  This rate

structure works well for most customers who buy all of their electricity from the grid

because their monthly consumption of energy, when multiplied by a kWh rate, provides

sufficient revenue to cover the utility's costs to serve the entire customer class.  The volume

of electricity these customers purchase from the District generally correlates to the

maximum demand (measured in kW) they place on the grid's capacity at any one time,

allowing for recovery of demand-related costs.

Rooftop solar customers have a unique profile.  In contrast to traditional customers,

rooftop solar customers self-generate at least some of their energy needs when the sun is

shining, Ex. 56 at 86:4-18, and do not purchase the same total volume of electricity from the

grid.  *See, e.g.*, Ex. 20 at -951 to -952.  These customers do, however, need the grid to

provide power whenever their panels cannot meet their needs, and also rely on the grid in

---

[3] The credit can be set on a retail, wholesale, or avoided cost basis.

order to export excess energy from their solar panels. *See* Dkt. 39 ¶ 63; SOF ¶¶ 12, 14. Solar customers are particularly reliant on the grid for power in the late afternoon and evening after solar production has already declined substantially. SOF ¶ 12. Thus, rooftop solar customers continue to impose significant costs on the District, *see, e.g.*, SOF ¶ 12, but do not correspondingly, under traditional volumetric pricing, provide revenue sufficient to cover their costs. *Id*. *Cf. Vote Solar v. The Pub. Utils. Comm. of Nevada*, No. 16-OC-00052, (1st Dep't Nev. Sept. 13, 2016) (holding that "[b]ased on substantial evidence, the PUCN reached a finding that [rooftop solar customers] cause NV Energy to incur costs that were not being recovered . . . under the prior net metering rates.").

With the number of rooftop solar customers growing, the total support that the District offered grew as well—increasing the burden on non-solar customers. Ex. 30 at 2. The District estimated a revenue shortfall of $51/month for the typical solar customer under its prior rates in 2014. SOF ¶ 25. Non-solar customers had to make up the difference. Ex.72 at -385. This was not unknown or new. In a federally-mandated evaluation of net metering conducted in 2006, the District observed that:

> [C]rediting the full kWh price of electricity to all on-site, customer-owned generation facilities ... would create an unfair subsidy at the expense of other ratepayers by shifting the cost burden of all or part of the fixed transmission, distribution, and customer service costs—services which the utility must continue to make available to serve customers with on-site generation.

SOF ¶ 19 at -607. Accordingly, the District explained publicly, nearly a decade ago, that "[c]hanges to SRP's Net Metering offerings may occur … in future price processes at the Board's discretion." SOF ¶ 20. The District also recognized that its traditional, bundled volumetric rates reflected "imperfect pricing," as applied to rooftop solar customers, and observed that it would eventually "need to adjust its retail tariffs" to ensure adequate recovery of its fixed costs. SOF ¶ 24 at -617, -619. While the cost of the solar subsidy was small in 2006, it continued to grow with each new solar installation. By 2014 the District was facing a negative ▇▇▇▇▇▇▇▇▇▇ for a now-meaningful number of rooftop solar customers, resulting in ▇▇▇▇▇▇▇▇▇▇▇ during the 2015 fiscal year alone. Ex.

73, Figure 9; SOF ¶ 25 at 7. The District projected that as the rooftop solar industry expanded, this subsidy would become unsustainable over time. SOF ¶ 22. In part, this is because in light of the long-term capital investments required to maintain the grid, if the District does not earn a positive rate of return, it cannot survive. Ex. 13 at 157:14-23.

Meanwhile, the prices for solar energy produced by "utility-scale" solar facilities (installations with thousands of solar arrays built to track the sun over the course of a day) dropped significantly. In November 2014, the District entered into a 21-year agreement to buy the entire output of the Sandstone solar facility near Florence for 5.3 cents per kWh— approximately half the price at which the District was then crediting rooftop solar customers under the net metering rider. SOF ¶ 26. In addition, the District benefits from utility-scale solar in ways that it does not from rooftop solar. *See, e.g.*, Ex. 74 at 191:21-192:6. Specifically, for utility-scale solar the District (1) receives a renewable energy credit that it can trade or sell, Ex. 28 at 169:11-17, whereas either the customer or the installer keeps the credit for rooftop solar installations*, see* Ex. 75 at -726; and (2) the District has the ability to curtail production from utility-scale solar installations, thereby guarding against grid overload. *Id.*

These developments—an increasing cost-shift to non-solar customers, growing losses from solar customers on traditional rate plans, and solar power available from utility-scale solar facilities at nearly half the price—prompted the District to act to address the under-recovery of its costs from rooftop solar customers. In December 2014, as prescribed in A.R.S. § 48-2334, and as part of an overall adjustment of its rate schedules, the District's management proposed a new rate plan specific to new customers with rooftop solar systems and other forms of self-generation. SOF ¶¶ 27-31. The E-27 rate unbundles the traditional volumetric charge into separate charges for energy usage and demand. Thus, it contains three parts (rather than the traditional two). SOF ¶ 34. The rate was designed to ensure that revenues from customers who choose to install solar cover the District's costs of serving them, including their fair share of grid costs. Ex. 72.

The District anticipated that under E-27 a typical solar customer would save about $50/month on his or her District bill compared to a non-solar customer, even without a change in behavior, with the potential to save more by managing demand in peak periods. SOF ¶ 35. Moreover, the District determined that almost every customer who went solar after E-27 would save money on their electric bill. Ex. 76 at 13. No "penalty" exists for installing a rooftop solar system today.

## III. The District's 2014-2015 Public Pricing Process

On November 29, 2014, the District advised its residential customers that the District was commencing a ratemaking process, covering all rate plans, to begin on December 12, 2014. SOF ¶ 28. On December 1, 2014, other stakeholders, including SolarCity, received notice of the ratemaking proceeding and were offered an opportunity to participate. *See* SOF ¶ 29. These stakeholders were also informed that the proposed E-27 rate would apply to new customers who submitted applications after December 8. *Id.* Also on December 1, 2014, the District posted information on its website about the new rates and the December 8 deadline. SOF ¶ 29. On December 12, the District issued a notice and schedule of the public comment sessions, board meetings and vote, including the "Notice of Meeting of Board of Directors on Changes to Standard Electric Rate Schedules and Terms and Conditions of Competition Pursuant to A.R.S. Sections 30-802 and 48-2334." SOF ¶ 31

The rooftop solar industry—and SolarCity in particular—actively participated in the District's ratemaking process. Counsel and executives from SolarCity and its lobbying group examined five members of the District's management team, Ex. 53, and presented SolarCity's opposition to E-27 at two public hearings. *See* SOF ¶ 37. Neither SolarCity nor its industry allies ever presented an alternative rate design to the Board. SOF ¶ 39. SolarCity did not petition for a rehearing of the Board's decision pursuant to A.R.S. § 30-810 *et seq. See* SOF ¶ 40.

To assist in its ratemaking process, the District Board retained an independent consultant, Dr. John Chamberlin. At the Board's direction, Dr. Chamberlin reviewed the proposed E-27 rate and other changes. He met with the Board members in person and

reviewed with them the intricacies of the rate plan. Ex. 6 at 65:17-68:4. In a detailed report to the Board, Dr. Chamberlin recommended that the Board approve E-27 because, *inter alia*, it "fixe[d] the problem of cost shifting," and would "not have an untoward negative impact on [solar] installations." Ex. 77 at 71.

The ratemaking process resulted in Board modifications to District management's proposed version of E-27. These changes included modifications made at SolarCity's urging. SOF ¶ 41. Among other changes, the Board allowed existing rooftop solar customers to remain on their existing rate plans for 20 years instead of the 10 management had proposed. SOF ¶ 42. Those customers were not required to go on the E-27 rate.

## IV. SolarCity Abandoned The District's Service Territory

Even before the E-27 rate was announced, SolarCity ████████████████ ███████████████████████████████. *See, e.g.,* Ex. 60 at 113:5-114:1; Ex. 84.. ███
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████, █████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████        ███████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████████

■■■■■■■■■■■■■

Other solar companies continue to sell in the District's service area. Dozens of rooftop solar installers have submitted applications for installations in the District's service area since E-27 went into effect, SOF ¶ 56, and customers continue to install solar systems today. ■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■ SolarCity's CEO Lyndon Rive told the Arizona Republic after it pulled out of the District's service territory: "Strange enough, [withdrawing from the District's service area] actually ends up better for SolarCity . . . . Financially, it's not a bad thing for the company." SOF ¶ 47.

## ARGUMENT

Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party is also entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Kinast v. Target Corp.*, No. CV-15-01063, 2016 WL 1593812, at *1 (D. Ariz. Apr. 21, 2016). "[A]necdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment." *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, No. 14-15562, 2016 WL 4709868, at *1 (9th Cir. Sept. 9, 2016).

## I. The District Has Not Engaged In Anticompetitive Conduct

To prevail on its monopolization claims, SolarCity must prove that the District "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). "Simply possessing monopoly power and charging monopoly prices does not violate § 2." *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934 (9th Cir. 2009). Rather, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). Anticompetitive conduct is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004). Courts can determine as a matter of law that conduct is not anticompetitive and, in so doing, grant summary judgment in favor of a defendant. *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996); *Aerotec Int'l.*, 2016 WL 4709868, at *8.

As it did in the public process, SolarCity challenges the District's retail electricity prices. It says that the prices for rooftop solar customers are too high under the E-27 rate relative to the price that the District charges nonsolar customers. But under longstanding precedent, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). The Supreme Court has exercised considerable caution in recognizing exceptions to this broad principle for three reasons: "1) compelled sharing of the resources generating a competitive advantage undermines the purpose of antitrust law by reducing incentives to invest in those resources; 2) compelled sharing puts federal courts in the role of central planners despite their being ill-equipped to assume this role; and 3) the compelled sharing may actually provide opportunities for collusion, which is the 'supreme evil of antitrust.'" *Aerotec Int'l,* 2016 WL 4709868, at *8. Accordingly, for SolarCity's claim to prevail, it must "shoehorn" its theory of competitive

harm into the "narrow" exception to the "broad principle" that there is no duty to deal with rivals. *Id*. at 22.

SolarCity cannot do so. SolarCity seeks to proceed under the exception set forth in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), later clarified and circumscribed in *Trinko*. In *Aspen Skiing*, a smaller ski resort in the Aspen area proved a Section 2 violation when its much larger competitor directly refused to deal with it by refusing to sell lift tickets to the smaller resort (even at retail prices). 472 U.S. at 592-94. That case stands as a "limited exception" "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 408-09; *see also Aerotec Int'l*, 2016 WL 4709868, at *8. But before SolarCity can even invoke *Aspen Skiing*, it must show that the District refused to deal. *Id*.[4]

## A.    There Is No Refusal To Deal

SolarCity does not like the E-27 rate. Neither party disputes that SolarCity would prefer that the District continued subsidizing the installation of rooftop solar systems. Indeed, SolarCity's most recent 10-K says that, "[w]ithout retail net metering," its "ability to attract new customers and compete with the price of electricity generated by local utilities . . . may be severely limited." Ex. 58 at 12. But SolarCity's preference for retail net metering does not transform the terms of the E-27 rate into a refusal to deal.

As a threshold matter, the District's relevant course of dealing was never with SolarCity. Instead, the District's relationship was with its solar customers. *See* SOF ¶ 48. The absence of a prior course of dealing with a competitor distinguishes this case from *Aspen Skiing*. *Compare Aspen Skiing*, 472 U.S. at 589-91 (15-year prior course of dealing

---

[4] SolarCity has also suggested that the Supreme Court's 65-year old decision in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), and the Court's decision in *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), support its theory of harm. But in both cases, the defendant refused to deal with the plaintiff or the plaintiff's customers respectively. *See, e.g.*, *Trinko*, 540 U.S. at 410 (distinguishing *Otter Tail*); *Lorain Journal*, 342 U.S. at 148-49 (defendant newspaper refused to sell advertising space to customers who also advertised with the plaintiff). As discussed, there is no refusal to deal here. In addition, *Lorain Journal* deals with *attempted* monopolization, not monopoly maintenance. *See* 342 U.S. at 144. SolarCity cannot prevail on an attempted monopolization claim if, as it contends, the District already has monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 452 (1993).

between plaintiff and defendant to jointly market a multi-resort lift ticket and share revenues) *with LiveUniverse Inc. v. MySpace, Inc.,* 304 F. App'x 554, 557 (9th Cir. 2008) (affirming dismissal of case because prior course of dealing existed only with customers, not between competitors) *and MiniFrame Ltd. v. Microsoft Corp.,* 551 F. App'x 1, 2 (2d Cir. 2013) (affirming dismissal of case where plaintiff did "not allege that [defendant] had any prior dealing with a competitor [and instead alleged that defendant] changed the terms by which [it] licenses its product to its customers."). This deficiency alone is sufficient grounds to enter summary judgment in favor of the District. *See Trinko*, 540 U.S. at 409.

Moreover, even if, contrary to authority, the Court were to treat the District's course of dealing with its own customers as a constructive course of dealing with SolarCity itself, that same course of dealing continues today. The same relationship—on the same terms—continues to this day for any customer who installed rooftop solar panels before E-27 went into effect. *Id.* Customers who choose to go solar today may do so under the E-27 rate, and there are many solar companies still doing business in the District's territory. There simply is no refusal to deal.

SolarCity's attempt to combine a constructive course of dealing *and* a constructive refusal to deal into a valid claim is unsupportable. Indeed, "courts are loathe to interfere when the claim is that the defendant is actually dealing, but only on disadvantageous or onerous terms," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1138 (granting summary judgment where plaintiff predicated refusal to deal claim on onerous terms of dealing), *aff'd*, No. 14-15562, 2016 WL 4709868 (9th Cir. Sept. 9, 2016); *see also Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1234-35 (S.D. Cal. 2015) (dismissing refusal to deal claim where plaintiff alleged that defendant had modified terms of dealing in a disadvantageous manner).

This case squarely implicates the rationale for this judicial reluctance. SolarCity has asked the court for injunctive relief to upend the prices set by the District's Board to cover the costs of serving future District customers. PI Mot. (Dkt. 154) at 2. Thus, the court would be required to "identify proper prices" and "manage the parties' business relations."

*Aerotec Int'l*, 4 F. Supp. 3d at 1138.  But the Supreme Court has admonished that courts are "ill-suited" to perform these tasks.  *Trinko*, 540 U.S. at 408.

The Ninth Circuit's recent decision in *Aerotec International* is instructive.  There the plaintiff objected to changed terms at which the defendant—a downstream competitor of the plaintiff—supplied it with parts.  There was no question that the changed terms were less favorable, *Aerotec Int'l*, 2016 WL 4709868, at *9, but the Ninth Circuit upheld the District Court's grant of summary judgment on the plaintiff's refusal to deal claim because "there is no duty to deal under the terms and conditions preferred by [a competitor's] rivals."  *Id.* (citing *Pac. Bell*, 555 U.S. at 457).  The Ninth Circuit made clear that its decision would be unchanged even if the defendant had changed the terms of dealing with the intent to foreclose competition.  *Id.*  As the court stated, "[w]ere intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition."  *Id.*

By its terms, the E-27 rate also bears no resemblance to a refusal to deal.  District customers continue to install solar panels on their roofs and the District continues to buy excess power generated from those panels.  SOF ¶ 55 at -766 to -767.  Other rooftop solar companies continue to sell rooftop solar systems in the District's service area in a manner that can save customers money on their total electric bills.  *See* SOF ¶ 57.  Indeed, as SolarCity's Senior Director of Sales Operations admits, ██████████████████ ████████████████████████████████████████████████████████ Ex. 80 at 111:8-13; Ex. 23 at 221:16-23.  The undisputed existence of multiple firms in the market continuing to sell rooftop solar systems under E-27, and the fact that new solar customers can save money on their electricity bills on E-27, precludes any finding that the E-27 rate amounts to a refusal to deal.  *See Aerotec Int'l*, 4 F. Supp. 3d at 1139.

**B.     SolarCity Cannot Proceed Under *Trinko*'s Limited Exception**

Even if SolarCity could prove a refusal to deal—and it cannot—SolarCity must establish two critical elements for its claims to proceed under *Trinko*.  **First**, it must show that the District engaged in a "unilateral termination of a voluntary (and thus presumably

-14-

profitable) course of dealing." *Trinko*, 540 U.S. at 409. **Second**, SolarCity must also show the District's "willingness to forsake short-term profits to achieve an anticompetitive end." *Id.*; *MetroNet*, 383 F.3d at 1132. SolarCity cannot satisfy either element.

### 1. The District's Prior Course of Dealing Was Not Profitable

Retail net metering was not profitable. It is undisputed that the District was not recovering its costs of serving solar customers. *See* Ex. 13 at 154:3-12. An eventual end to the subsidy inherent in retail net metering had been forecast nearly a decade earlier. *See* SOF ¶ 19 at -607. Adoption of E-27 was based on a decision to end the inequity of non-solar customers bearing the growing burden of subsidizing rooftop solar customers, particularly when solar power was available less expensively from utility-scale facilities. SOF ¶ 26. As such, the District's elimination of a money-losing subsidy for rooftop solar customers—particularly when a less expensive alternative source of renewable energy was available—"sheds no light" on whether the District's conduct was anticompetitive. *MetroNet*, 383 F.3d at 1132.

### 2. The District Did Not Sacrifice Short-Term Profits

To satisfy the second element of the limited exception, SolarCity must not only show that the District sacrificed short-term profits, it must also prove that the District did not have a legitimate business justification for reforming its rates. *See Trinko*, 540 U.S. at 409. This latter requirement is significant because "a monopolist might wish to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product of its own." *Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013).

The District did not sacrifice short-term profits when it enacted E-27. To the contrary, SolarCity emphasizes that the District acted to "increase[] prices to everyone," and asserts that the E-27 plan in particular was projected to increase the "'typical' solar customer's bill by 65% compared to previously-available options." PI Mot. (Dkt. 154) at 2-3. And according to SolarCity's expert, Dr. Kalt, the District set E-27's price ***above*** its marginal costs. SOF ¶ 53.

1    The District's decision to change its rates for solar customers was also based on the

2    legitimate business consideration that it was not recovering the cost of serving rooftop solar

3    customers—another point that Dr. Kalt concedes.  *See* SOF ¶ 22 at 153:19-154:12

4    (testifying that the District "under-recover[ed]" costs from rooftop solar customers before

5    the 2014-15 rate increases).  Thus, there is no dispute that the District had to raise rates by

6    some amount to correct the under-recovery.  Even considering the District as a profit-

7    seeking enterprise (which it is not), this is, by definition, not the sacrifice of profits, but the

8    pursuit of them and "cannot possibly be characterized as an act of monopolization."  *Int'l*

9    *Rys. of Cent. Am. v. United Brands Co.*, 532 F.2d 231, 239 (2d Cir. 1976).

10    Despite conceding both that the District was not recovering the costs of serving

11    rooftop solar customers prior to enacting E-27, Ex. 13 at 154:3-12, and that the E-27 rate is

12    priced above the District's costs, Ex. 81 ¶ 186, Dr. Kalt suggests that there was some other

13    hypothetical rate plan that the District could have enacted instead of E-27—but he

14    performed no analysis of what such a rate would be.[5]  SOF ¶ 54.  Dr. Kalt contends that this

15    hypothetical rate would have encouraged solar adoption and been more profitable for the

16    District than having lower levels of solar adoption under E-27.  *See* Ex. 13 at 87:4-88:8.

17    Dr. Kalt's suggestion that the District had available to it a less restrictive alternative

18    rate is untenable.  Because the District was not recovering the costs of serving solar

19    customers and sought to increase the revenues that it received from those customers, it had a

20    legitimate business justification for reforming its rates.  *MetroNet*, 383 F.3d at 1132; *PGA*

21    *Tour, Inc.*, 364 F.3d at 1295-98 (an independent "economic motivation" provides a valid

22    business justification).  Even if Dr. Kalt were correct that there were some unspecified

23    alternative rate that would have done what Dr. Kalt suggests, the law is clear:  "there is no

24    less restrictive alternative requirement in the context of a section 2 claim."  *Image Tech.*

25    *Servs., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 621 (9th Cir. 1990).  So long as the

26    _____

27    [5] Even assuming that Dr. Kalt had done so, crediting this testimony would require this Court
to substitute its judgment for the District's Board with respect to the prices that the District

28    charges.  *Compare Trinko*, 540 U.S. at 408 ("[e]nforced sharing [] requires [] courts to act
as central planners, identifying the proper price [] and other terms of dealing").

-16-

District has **any** non-pretextual business justification for its conduct, SolarCity's claims fail. *Oahu Gas Serv., Inc. v. Pacific Res. Inc.*, 838 F.2d 360, 368-69 (9th Cir. 1988).

The District's pursuit of increased revenues from its rooftop solar customers is directly at odds with the defendants' conduct in *Aspen Skiing* and in *Lorain Journal*, where the defendants refused business, even on terms that would have been immediately profitable, and stood to profit only in the long-term through the exclusion of a rival. Thus, the decision to enact E-27 illustrates that the District "was not forsaking short term profits." *MetroNet*, 383 F.3d at 1132.

In sum, SolarCity has failed to establish the essential elements of anticompetitive conduct under *Aspen Skiing*. It cannot prove that the District (a) terminated a profitable prior course of dealing with SolarCity or other rivals; or (b) that the E-27 rate plan sacrifices short-term profits.

## C.    SolarCity's Discrimination Theory Must Satisfy *Trinko*

SolarCity's theory that under *Lorain Journal* the District "discriminates" against customers who wish to go solar is squarely foreclosed by Ninth Circuit precedent.[6] In *MetroNet*, 383 F.3d at 1124, a reseller of telecommunications services sued Qwest for illegally maintaining a monopoly for small business local telephone services in the Seattle area. MetroNet had been aggregating phone lines of multiple small businesses to take advantage of volume discounts offered by Qwest, passing along a portion of the savings to its customers. Qwest then changed its volume discount pricing program to eliminate reselling by firms like MetroNet. Qwest's intent was not disputed—its price change was designed specifically to eliminate MetroNet's reselling practice. Nonetheless, the Ninth Circuit held that a defendant's decision to switch its pricing strategy to "maintain a price discrimination structure" was not anticompetitive conduct because it did not entail the sacrifice of short-term profits. 383 F.3d at 1133. In so doing, the Ninth Circuit observed the legitimacy of charging "different prices" even for "favored and disfavored consumers in order to recover the common costs of serving both sets of customers." *Id.* at 1136. Here,

---

[6] As noted, it is foreclosed for the additional reason that there is no refusal to deal here.

the District merely corrected pricing for future rooftop solar customers so that it can recover its fixed costs of providing reliable electricity to District residents.

Thus, the District's pricing reforms, unlike the defendants' business strategies in *Aspen Skiing* and *Lorain Journal*, make economic sense apart from any effect (let alone an intentionally anticompetitive effect) on a supposed rival. The District's changes to its pricing—even if, hypothetically, they were designed to discourage rooftop solar adoption—cannot form the basis of a claim under *Aspen Skiing* and its progeny. *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum*, 495 U.S. 328, 339 (1990) ("in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect"); *Aerotec Int'l*, 2016 WL 4709868, at *9 (refusal to deal is actionable only if "the **only conceivable rationale**" was excluding competition).

## II.      SolarCity Cannot Establish That It Has Suffered Antitrust Injury

SolarCity also cannot show that it has suffered antitrust injury. To establish antitrust injury, the Ninth Circuit requires, *inter alia*, "that the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

SolarCity cannot compete in its alleged relevant product market. The relevant market as SolarCity defines it is the provision of electricity to retail residential, governmental, and business consumers. Dkt. 39 at ¶10. By law, to participate in that market in Arizona—that is, to furnish retail electricity—a company must "obtain a certificate" from the ACC. A.R.S. §§ 30-803(A); 40-207(A). SolarCity has not applied for, much less obtained such a certificate. As SolarCity itself admits: "specific rules adopted by the Arizona Corporation Commission—which regulates companies that produce and sell electricity directly to consumers—expressly prohibit [SolarCity] from doing so." SOF ¶ 59. Without the requisite approval to begin selling electricity, SolarCity is prohibited as a matter of law from competing with the District in its relevant market. *See Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 235-36 (3d Cir. 2013) (plaintiff not market

participant because "[i]t did not ... receive the required FDA approval"); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 180 (3d Cir. 1997) (Alito, J.) (plaintiff not market participant because it "lacked the required [regulatory] license"). In ruling on the District's motion to dismiss, this Court held that these statutory provisions apply only to public service corporations and not to "private companies." Dkt. 77 at 15. But under Arizona law any corporation that is not a municipal corporation and that furnishes electricity is a public service corporation. *See* Ariz. Const. art. 15, § 2. SolarCity is not a public service corporation because it does not "furnish electricity." SOF ¶ 59. Thus, SolarCity's status compels a finding that it does not participate in the relevant market.

SolarCity's own employees admit that it is not a participant in the relevant market. As SolarCity's then-Executive Vice President of Policy and Electricity Markets testified in this case:

> Q:   Does SolarCity furnish electricity in the State of Arizona?
> A:   No.
> Q:   Why not?
> A:   We provide leased solar electric property and the host of that property enjoys and uses the property, and so we don't provide for the provision of electricity at all, we provide for the provision of a leased asset.

SOF ¶ 59.

SolarCity cannot provide retail electricity in Arizona because if it did so, it would have to submit to ACC jurisdiction. *See* A.R.S. § 40-207(A); Ex. 67 at 13:1-14:23. SolarCity has actively sought to ***avoid*** such regulation. *See* Ex. 58 at 25. SolarCity cannot have it both ways. If SolarCity does not furnish electricity in Arizona, it does not participate in the relevant market, regardless of whether it "competes" with the District. And if SolarCity is not a participant in the market it has defined, it has not suffered antitrust injury under Ninth Circuit precedent. *See Somers*, 729 F.3d at 963.

## III.   SolarCity's State-Law Claims Are Barred

### A.   SolarCity Failed To Exhaust Its Administrative Remedies

Arizona law vests in the District's elected Board the exclusive right to determine retail electric rates for the District's customers. *See* A.R.S. §§ 30-802, 48-2303(A), 48-

2334. The District Board's determination of those retail rates is committed by statute to its discretion, subject only to direct judicial review pursuant to a process prescribed by statute. *See* A.R.S. §§ 30-810; -812. Absent such process, the District Board's final orders or decisions are not subject to attack. SolarCity chose not to pursue these remedies and its state-law claims therefore fail.

Arizona statutes set out a specific process for contesting retail rates set by the District's Board. In relevant part, court challenges are not permitted: "***unless the party*** or the state ***makes, before the effective date of the order or decision, application to the governing body of the public power entity for a rehearing.***" A.R.S. § 30-810. Section 30-812 further explains that "within thirty days" after such an application for rehearing is resolved, the party may "file a notice of appeal in the court of appeals." Taken together, these provisions set forth the exclusive route for bringing actions under state law that challenge the retail electricity rates set by the governing bodies of "public power entities": (1) file an application for rehearing with the Board; and (2) if after the rehearing request has been resolved, a party remains dissatisfied with the Board's order or decision related to rate making or rate design, the party may appeal directly to the Arizona Court of Appeals and request that it "vacate, set aside, affirm in part, reverse in part, or remand the Board's decision." A.R.S. § 30-812(A). SolarCity did neither. It is undisputed that the District is a "public power entity," A.R.S. § 30-801(16), SOF ¶ 5, and that SolarCity never petitioned for a rehearing. *See* SOF ¶ 40.

SolarCity seeks to explain its failure to exhaust by alleging that it was not a party to the ratemaking. Dkt. 39 ¶ 91. The undisputed facts are to the contrary. A.R.S. § 30-802(B) provides certain rights only to "parties" to the District's ratemaking proceedings. These include making oral presentations and questioning the District's employees and consultants during interviews conducted by counsel. SolarCity admits that it invoked each of these rights during the ratemaking process, which it could have done only if it were a "party." *See* SOF ¶¶ 32, 37, 38.

As a party, if SolarCity wanted to challenge the District's rates pursuant to Arizona law it needed to follow the statutory framework discussed above. Having failed to do so, its state-law claims fail as a matter of law.

And if the Court decides SolarCity was ***not*** a party, it fares no better. Non-parties have no state-law avenue for challenging the District's ratemaking. A.R.S. § 30-812(A)

## B.        The District's Ratemaking May Not Be Enjoined

Regardless, this Court lacks jurisdiction to issue injunctive relief on SolarCity's state-law claims. Arizona law deprives courts of "jurisdiction to enjoin, restrain, suspend, delay or review any order or decision of the governing body of [a] public power entity . . . relating to rate making or rate design[.]" A.R.S. § 30-812(F). That is precisely what SolarCity seeks here. The purpose of the statute, which exists in comparable form in other states, is to "limit[] judicial review" of the decisions of ratemaking bodies so as to "expedite their final operative effect." *PegaStaff v. Cal. Pub. Utils. Comm'n*, 236 Cal. App. 4th 374, 384 (2015).

Although the state statute by its terms applies to state courts, this is of no moment. Under the *Erie* doctrine, this Court must apply state substantive law to SolarCity's state-law claims. *See, e.g.*, *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 397 (2010). And it has long been the rule that when a federal court hears state-law claims based on diversity or supplemental jurisdiction, state-law limitations on state-created remedies are respected. *See, e.g.*, *Ragan v. Merchs. Transfer & Warehouse Co.*, 337 U.S. 530, 533 (1949) ("Where local law qualifies or abridges [a claim], the federal court must follow suit."); *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538 (1949) (a plaintiff "barred from recovery in the state court [on a state-law claim] ... should likewise be barred in the federal court."). Thus, the Ninth Circuit has recognized the enforceability in federal court of a nearly identical California statute—section 1759 of the Public Utilities Code—that was limited to "court[s] of the state" of California. *Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1148 (9th Cir. 2011) (recognizing statute could apply to federal court sitting in diversity but determining California would not apply statute in that case); *Cooney v. Cal. Pub. Utils. Comm'n*, No. C 12-6466, 2014 WL 3531270, at *3 (N.D. Cal. 2014) (no subject-matter

1    jurisdiction to adjudicate state-law claims for injunctive relief); *Abarca v. Franklin Cty.*

2    *Water Dist.*, No. 1:07-cv-0388, 2011 WL 43456, at *3 (E.D. Cal. Jan. 5, 2011) (applying

3    section 1759 to state-law claim).

4    **IV.    SolarCity's Claims Are Barred By The Filed-Rate Doctrine[7]**

5            The filed-rate doctrine "turns away [suits] …which necessarily hinge on a claim that

6    the … approved rate was too high." *Wah Chang v. Duke Energy Trading & Mktg., LLC*,

7    507 F.3d 1222, 1226 (9th Cir. 2007).  In the Ninth Circuit, the doctrine extends to claims for

8    injunctive relief where the relief sought would require the Court to readjust the rates in

9    question.  Because SolarCity's claims all depend on its assertion that the rates for rooftop

10   solar customers approved by the District's Board were too high, and would require the

11   Court to substitute its own judgment for that of the District's publicly-elected Board, they

12   are barred by the filed-rate doctrine.

13           Although this Court initially denied the District's motion to dismiss based on the

14   filed-rate doctrine, stating that the District's argument "conflates the ***rate*** for electricity,

15   which is determined by the ACC, and the ***prices*** set by the District for distributing that

16   electricity via the grid," Dkt. 102 at 9, the Supreme Court has since clarified that no

17   distinction between prices and rates exist:  "[t]o set a retail electricity rate is … to establish

18   the amount of money a consumer will hand over in exchange for power." *FERC v. Elec.*

19   *Power Supply Ass'n*, 136 S. Ct. 760, 777 (2016).

20           The ACC does not determine the rate the District charges for electricity because

21   under Arizona law, it regulates only public service corporations.  The District Board sets the

22   District's retail rates under authority delegated by the state legislature.  *See* A.R.S. § 48-

23   _____

24   [7] The District has included arguments in this motion on the filed-rate doctrine and state-
     action immunity.  These precise issues are currently before the Ninth Circuit on

25   interlocutory appeal.  *See* Dkt. 148.  Accordingly, the District again submits that the Court
     should not rule on this motion (or proceed to trial) until the appeal is resolved.  In the event

26   SolarCity's claims survive the appeal, the District reserves the right to revise its arguments
     for summary judgment appropriately.  Also pending before the Ninth Circuit is the

27   District's argument that it is immune from state-law damage claims.  *Id.*  SolarCity now
     contends that it has abandoned its claim for tort damages but the District will reopen this

28   argument should SolarCity's posture change.

2334. It is therefore not correct that the ACC sets electric "rates" for all utilities while the District merely sets distribution "prices."

In its prior order, this Court also appeared to suggest that the District's Board was not a "regulatory authority" under state law. The District does not argue that it is identical to the ACC. Rather, its structure reflects the state legislature's decision about how to properly delegate ratemaking authority to municipal corporations and political subdivisions. Under Arizona law, the District's publicly-accountable Board is responsible for ratemaking and oversight of the professional management of the District. The District's ratemaking process is like that of scores of other utilities throughout the country: the District's management publicly proposes a retail electric rate change, commencing a public process, with an opportunity for notice and comment, and a right for third-parties to participate and take discovery, and finally the Board—not management—either approves the rates as proposed, approves the rates only after modification, or disapproves the rates in their entirety. *See* A.R.S. §§ 48-2334; 30-802. Thus, its ratemaking decisions are entitled to the same deference as any other state-authorized ratemaking body, to which there is no doubt that the filed-rate doctrine would apply. *See McLeod USA Telcommc'ns., Servs., Inc. v. Ariz. Corp. Comm'n*, 655 F. Supp. 2d 1003, 1019 (D. Ariz. 2009).

In addition, this Court referenced the "competitor exception" to the filed-rate doctrine. But no "competitor exception" applies when, as here, the contention is that the filed-rate is too high rather than too low. Dkt. 39 ¶¶ 5, 78, 83. *Compare Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 946 (9th Cir. 1996) (allowing a competitor challenge to rates that were allegedly too low but noting that a regulatory agency "'generally scrutinizes rates to see if they are too high'"), with *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (rejecting applicability of the competitor exception where a rate was challenged as too high). This distinction makes sense: a genuine "competitor" would not be concerned that its competitor's prices were too high.

SolarCity's claims are barred by the filed-rate doctrine.

**V.    The District Is Immune Under The State-Action Doctrine**

The Supreme Court has established a two-part test for determining whether an entity's conduct receives state-action immunity.[8] *North Carolina State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1111 (2015).  The two requirements are "first, the State has articulated a clear policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct."  *Id.* at 1112 (alteration in original).  "[T]here are instances in which an actor can be excused from *Midcal*'s active supervision requirement."  *Id.*  In particular, "electorally accountable" bodies "are subject exclusively to *Midcal*'s clear articulation requirement," because "there is little or no danger that [they are] involved in a private price-fixing arrangement."  *Id.*

The first requirement, clear articulation, is met "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature."  *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1006 (2013).  In *Phoebe Putney*, the Court explained that this requirement had been satisfied in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), because "suppression of competition in the billboard market was the foreseeable result of a state statute authorizing municipalities to adopt zoning ordinances regulating the construction of buildings and other structures," *Phoebe Putney*, 133 S. Ct. at 1011; *see Omni*, 499 U.S. at 372-74.  As the Court elaborated, the displacement of competition is the foreseeable result of zoning regulations because zoning regulations displace unfettered business freedom with a regulatory structure.  *See Phoebe Putney*, 133 S. Ct. at 1013

The same logic applies here.  Arizona law authorizes the District to set both the terms and conditions of competition and rates for the sale of electricity in its service territory.  *See*

_____

[8] State-action immunity bars SolarCity's federal and state-law antitrust claims.  *See Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 609 (9th Cir. 2005).  In addition, Arizona has a statutory immunity that follows the first prong of the state-action immunity test:  under A.R.S. § 48-247, the District is immune from the state's antitrust laws when its "conduct or activity is approved by a statute of this state."  As noted, the District's ratemaking is expressly allowed under state statutes.

A.R.S. § 30-802 (terms and conditions); § 48-2334 (procedures for changing rates). Under Supreme Court precedent, this legislative grant of ratemaking power inherently displaces a competitive marketplace and, as a result, satisfies the clear-articulation requirement. *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 64-65 (1985) (state law giving an agency the authority to set rates demonstrated that "the State as sovereign clearly intends to displace competition … with a regulatory structure," such that "the first prong of the *Midcal* test [wa]s satisfied."); *Phoebe Putney*, 133 S. Ct. at 1013 (citing *Southern Motor Carriers* as a case in which an agency had "authorization[] to act or regulate in ways that were inherently anticompetitive"). The agency powers that were held sufficient in *Southern Motor Carriers* to show clear articulation are the same powers the District exercised here.

As these cases indicate, the anticompetitive effects alleged by SolarCity, such as that the District exercised "monopoly power in the retail market" in order to charge "supra-competitive" prices, Dkt. 39 ¶¶ 53-54, are the foreseeable result of the exercise of the District's ratemaking power, because exerting governmental authority to establish the price for a product by definition displaces full free-market competition. In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), for example, the Supreme Court noted that it had deemed the clear-articulation requirement satisfied where a state "statute provided [a] regulatory structure that inherently 'displace[d] unfettered business freedom.'" 471 U.S. at 42, *cited in Phoebe Putney*, 133 S. Ct. at 1013.

SolarCity also contends that the District acted to squelch the purported competitive threat from rooftop solar to protect the transfer of the District's electricity revenue to support low-cost water to Valley residents. Dkt. 39 ¶¶ 33-35, 54. But as noted, the District is entitled under Arizona law to do just that. A.R.S. § 48-2303(A)(7). By authorizing the District to raise part of its electricity revenues to support its water operations, it was foreseeable that the District would price its electricity at higher levels than it would if it did not support its water operations. Thus, the legislature "affirmatively contemplated the displacement of competition." *Phoebe Putney*, 133 S. Ct. at 1006; *United Nat'l Maint., Inc. v. San Diego Convention Ctr.*, 766 F.3d 1002, 1011 (9th Cir. 2014) (legislature's

specification that profits from convention center would go to support municipality made it foreseeable that the center would seek to generate profits on behalf of that municipality).

After the completion of discovery, the undisputed facts show that each of this Court's two rationales for denying the District's motion to dismiss on state-action immunity grounds is inapplicable.

***First***, this court pointed to a provision of Arizona law stating that "[i]t is the public policy of this state that a competitive market shall exist in the sale of electric generation." A.R.S. § 40-202(B), *quoted in* Dkt. 102 at 4-5.  But the statute by its terms applies only to public service corporations, not public power entities like the District.  A.R.S. §40-202(B). In contrast, the legislature granted the District the authority to determine the terms and conditions of competition within its service area.  A.R.S. § 30-802.

In any event, this general policy statement does not trump the relevant provisions of Arizona law that have operative effect—provisions showing the regulated regime that the legislature intended to prevail throughout the state. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 220 (2002) ("[V]ague notions of a statute's 'basic purpose' are … inadequate to overcome the words of its text regarding the specific issue under consideration.").  Those provisions give ratemaking authority to the District, which constitutes a clearly-articulated policy to displace competition.

Other relevant statutory provisions confirm that Arizona's legislature did not envision a regime of unfettered competition, particularly for service to residential customers.  For example, Arizona law requires public power entities to allow competition only by "electricity suppliers certificated by the commission pursuant to section 40-207," A.R.S. § 30-803(A), a requirement inconsistent with the notion that the legislature contemplated unfettered competition.  These circumstances satisfy the clear-articulation prong. *See Cal. CNG, Inc. v. S. Cal. Gas Co.*, 96 F.3d 1193, 1200 (9th Cir. 1996) (if legislature endorses competition but leaves to a regulator the decision to certify competition, then "any activity" by a utility is immune until the regulator does so).

The factual record is also clear that no retail competition has materialized in Arizona. For example, the ACC acknowledges that "for all practical purposes, consumers do not yet have a choice of providers." SOF ¶ 62. That the legislature took no action during this period to amend the certification requirement or otherwise adjust its regulatory regime is further evidence that unrestricted competition was never its intent.

Thus, what the legislature meant by a "competitive market … in the sale of electric generation," A.R.S. § 40-202(B), was actually a highly regulated system, under which the ACC, in addition to regulating public service corporations, retained authority to approve or disapprove new electric-generation suppliers, while public power entities like the District retained authority to set rates and otherwise determine the terms and conditions of competition, if any, in their service areas.

**Second**, this Court stated that only the ACC, and not public power entities like the District, have the authority to set retail electricity rates. Dkt. 102 at 7. That is incorrect. The District's Board, and not the ACC, sets the prices the District charges for electricity. *See* A.R.S. § 48-2334.

In short, the anticompetitive conduct that SolarCity challenges was "the inherent, logical, or ordinary result" of a regulatory regime that displaces unfettered business freedom. *Phoebe Putney*, 133 S. Ct. at 1012-13. The state-action inquiry can end here. The District is "electorally accountable," A.R.S. § 48-2361; A.R.S. § 48-2303(A)(7), and thus entitled to state-action immunity so long as the clear-articulation requirement is satisfied. *See North Carolina State Bd.*, 135 S. Ct. at 1112. Further, the Arizona constitution also entitles the District to the same immunities as a city or county government, *see* Ariz. Const. art. 13, § 7, and those entities unquestionably are not subject to the active-supervision requirement. *See Town of Hallie*, 471 U.S. at 45-47.

Disputing this, SolarCity has argued that under *North Carolina State Board* the District *is* subject to the active supervision-requirement. *See* Dkt. 58 at 10-11. SolarCity is not correct. That case dealt with whether a state-level dental licensing board, which was largely composed of practicing dentists elected by other practicing dentists, had been

sufficiently "invested … with the power of the State" to receive state-action immunity. 135 S. Ct. at 1110. Accordingly, the question presented was whether a "nonsovereign actor controlled by active market participants" had to show active supervision. *Id.* The Court held that it did, explaining that "[l]imits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants, for established ethical standards may blend with private anticompetitive motives." *Id.* at 1111.

The District is a categorically different entity than the dental board at issue in *North Carolina State Board*. The District is controlled not by "active market participants"—no member of the District's Board is alleged to be involved in the provision of retail electricity—but by a governing board and council, which are popularly elected by eligible landowners. A.R.S. §§ 48-2309, -2383. SolarCity's characterization of the individual economic interests of the Board members is completely irrelevant to the legal standard. It is also wrong. Contrary to SolarCity's insinuations, a majority of the District's Board lacks any private business interest in irrigation from the District. *See* SOF ¶ 4. In any event, the private economic interests of individual Board members do not, without more, create an obligation for the District to satisfy the active-supervision requirement. *Cf. Omni*, 499 U.S. at 378 (noting that a government official's monetary self-interest "has no necessary relationship to whether [] governmental action is in the public interest"). Finally, unlike the North Carolina dental board, which served the interests of its members' particular business profession, the District Board's core function is to serve the public interest, by providing residents with low-cost power and water. *See* A.R.S. § 48-2303. Nothing in *North Carolina State Board* indicates that an entity with these attributes is subject to the active-supervision requirement.

Even if it applied here, the active-supervision requirement—which "need not entail day-to-day involvement in an [entity's] operations or micromanagement of its every decision"— would be satisfied by the combination of Arizona's two "review mechanisms" over the District. *North Carolina State Bd.*, 135 S. Ct. at 1116. The District Board must approve all retail electric rate changes proposed by the District's managers and employees,

-28-

and SolarCity acknowledges that authority was exercised here.  Dkt. 39 ¶ 97.  And, as discussed above, the state legislature created a highly regimented process under which the District's rates are subject to the supervision of Arizona's courts.  *See* A.R.S. §30-812(A).

Moreover, the Supreme Court recognizes that being "subject to . . . mandatory disclosure regulations" may provide "greater protection against antitrust abuses," *Town of Hallie*, 471 U.S. at 45 n.9, thereby limiting the need for a more extensive supervision scheme.  *See* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 227a, at 221 (2013) ("the kind of supervision appropriate for a public body . . . could well be far less than for an entirely private party.").  Such protection exists here.  The District Board adheres to obligations that apply to public officials.  For example, the Board's meetings "shall be public," and its minutes are subject to public inspection.  A.R.S. § 48-2333(C), (D).

## VI.    SolarCity's Intentional Interference Claims Fail

To establish a claim for intentional interference, a plaintiff must show, *inter alia*, resultant damage to the party whose relationship has been disrupted.  *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 494 (Ariz. Ct. App. 1995).  In addition, interference must be "improper as to motive or means" before liability will attach.  *Neonatalogy Assocs., Ltd. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007) (citing *Wallace*, 909 P.2d at 494).  SolarCity's claims fail for at least three reasons.  ***First***, because SolarCity's antitrust claims fail, and SolarCity's tort claims depend on the same conduct, the District's conduct was not improper as a matter of law.  *See United Nat'l Maint.*,766 F.3d at 1012.  ***Second***, even if SolarCity were able to demonstrate wrongfulness, the District would be immune from these state-law claims for all of the reasons explained above.  And ***third***, SolarCity cannot establish it was damaged.

In discovery, SolarCity refused to answer interrogatories designed to assess the damage caused by the alleged intentional interference, stating that the subject was a topic for expert discovery.  Pl.'s Resp. & Objs. to Def.'s Interrog. No. 4.  But SolarCity ***did not produce any*** expert testimony to support its intentional interference claim.  And SolarCity has explicitly abandoned its damages claims.  *See* Dkt. 173 at 11 & n.9.  To the extent that

SolarCity attempts to argue that it suffered some aspect of irreparable harm apart from potential damages, that too would fail. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. SOF ¶¶ 63, 64, 66, 67. Because SolarCity has not made a sufficient showing on essential elements of its intentional interference claims, and has abandoned its claim for legal relief (the inadequacy of which is a prerequisite to injunctive relief) summary judgment should be granted for the District.

## CONCLUSION

This Court should grant the District summary judgment on all of SolarCity's claims.

Dated: September 15, 2016

Respectfully Submitted,

WILMER CUTLER PICKERING HALE & DORR LLP

By: s/ Christopher E. Babbitt
Christopher E. Babbitt

*Attorney for Defendant* Salt River Project Agricultural Improvement and Power District

***Attorneys for Defendant* Salt River Project Agricultural Improvement and Power District**

Molly S. Boast (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-230-8800
Fax:    (212) 230-8888
molly.boast@wilmerhale.com

Christopher E. Babbitt (*admitted pro hac vice*)
David Gringer (*admitted pro hac vice*)
David L. Sluis (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
202-663-6000
Fax: 202-663-6363
christopher.babbitt@wilmerhale.com
david.gringer@wilmerhale.com
david.sluis@wilmerhale.com

Christopher T. Casamassima
(*admitted pro hac vice*)
Rebecca A. Girolamo (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
350 South Grand Ave.
Los Angeles, CA 90071
213-443-5300
Fax:  213-443-5400
chris.casamassima@wilmerhale.com
becky.girolamo@wilmerhale.com

Karl Michael Tilleman (012449)
Paul Kipp Charlton (013435)
Quintin Howard Cushner (027303)
Steptoe & Johnson LLP
201 E Washington St., Ste. 1600
Phoenix, AZ 85004-2382
602-257-5200
Fax: 602-257-5299
ktilleman@steptoe.com
pcharlton@steptoe.com
qcushner@steptoe.com

# CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Richard J. Pocker

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
William A. Isaacson
Karen L. Dunn
James P. Denvir, III
Amy J. Mauser
Christopher G. Renner
Ross McSweeney

BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Steven C. Holtzman
Sean P. Rodriguez

BOIES, SCHILLER & FLEXNER LLP
401 Wilshire Blvd., Suite 850
Santa Monica, CA 90401
Shira Rebecca Anne Liu

SHEARMAN & STERLING LLP
535 Mission Street
25th Floor
San Francisco, CA 94105
John F. Cove, Jr.

COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Keith Beauchamp
Roopali H. Desai

_/s/Christopher E. Babbitt_