WILMER CUTLER PICKERING
 HALE AND DORR LLP
Molly S. Boast (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
molly.boast@wilmerhale.com

Christopher E. Babbitt (*pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
christopher.babbitt@wilmerhale.com

Christopher T. Casamassima (*pro hac vice*)
350 South Grand Ave.
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400
chris.casamassima@wilmerhale.com

STEPTOE & JOHNSON LLP
Paul K. Charlton (012449)
Karl M. Tilleman (013435)
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| SolarCity Corporation,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Salt River Project Agricultural Improvement and Power District,<br><br>　　　　　　　Defendant. | Case No. 2:15-CV-00374-DLR<br><br>**DEFENDANT SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED VERSION** |

## BACKGROUND

1. The District is a political subdivision of the State, vested by the Arizona Constitution with all "'immunities and exemptions granted municipalities and political subdivisions under th[e Arizona] constitution or any law of the state or of the United States.'" Dkt. 77 at 9, 23 (citing A.R.S. §48-2302; Ariz. Const. art. 13, §7).

2. The District's statutory purpose is to provide low-cost water and power within its defined service area. A.R.S. § 48-2303.

3. The District is a governed by a fourteen-member Board of Directors ("the Board"), a President and Vice-President, and a 30-member Council, elected pursuant to Arizona law. A.R.S. § 48-2381 *et seq.* Four "at-large" Board members are elected by landowners in the District, with each landowner entitled to receive one vote; all other members are elected under an acreage-based voting system by landowners within each of the District's ten divisions. A.R.S. § 48-2363; District 2018 Election Fact Sheet, http://www.srpnet.com/elections/pdfx/2018_FactSheet_District.pdf. These officials are public officials under Arizona law. A.R.S. § 41-1231(19).

4. A majority of the District's Board lack any business interest in irrigation from the District. *See* Declaration of Christopher E. Babbitt Exs. 1, 2, 3, 4; 5 at 22:12-14; 6 at 8:23-9:7; 7; 8; 83.[1] One of the four board members with such an interest, Steve Williams, voted against E-27. *Id.*, Ex. 9 at -302.

5. The District is a "public power entity." A.R.S. § 30-801(16).

6. The District is a community-based nonprofit utility without about 1 million customers. Ex. 10 at -313, -333.

7. The District has an obligation to furnish electricity to all residential customers in its service area. Ex. 11 at -122 to -125; Ex. 12 at 61:15-20, 122:22-123:4. This

---

[1] Each exhibit attached to the Declaration of Christopher E. Babbitt hereinafter cited in this filing will be references as "Ex."

-1-

obligation requires the District to meet the total electricity demands of all its customers at any given moment in time.  Ex. 13 at 157:7-19.

8. To satisfy the District's obligations, the District must invest in the electric grid itself—the generation facilities, transmission and distribution lines, substations, transformers, and other infrastructure necessary to ensure the District can reliably meet the electricity needs of all customers within its territory.  Ex. 14 at -726.

9. Seventy-three percent of the District's costs are fixed costs associated with building and maintaining the grid.  *Id.*

10. The District seeks to recover both its fixed and variable costs through its retail electricity rates.  Ex. 14 at -701, -710, -726 to -727; Ex. 15 at slide 14.

## SOLAR ELECTRICITY WITHIN THE DISTRICT

11. Since 2004, roughly 15,000 District customers have installed rooftop solar systems on their homes.  Ex. 16 at -635; Ex. 17; Ex. 18.

12. Rooftop solar customers rely on the grid during periods of peak demand—including in the late afternoon and evening after solar production has declined substantially.  Ex. 19 at 14; First Am. Cmplt. (Dkt. 39) ¶ 63.  Thus, rooftop solar customers continue to impose significant costs on the District.  Ex. 20 at -951 to 952; Ex. 14 at -726; Ex. 15 at slides 12-17; Ex. 21 at -506 to -507.

13. Rooftop solar is an intermittent resource, meaning that it does not provide reliable electricity 24 hours a day.  Rooftop solar does not generate significant electricity when clouds are overhead, and it does not generate any electricity at night.  Ex. 22. at 160:19-161:3; Ex.13 at 179:17-24, 181:14-19; Ex. 23 at 267:13-21.

14. Rooftop solar customers also rely on the District's grid to export any excess electricity generated by the rooftop solar system.  Ex. 13 at 176:21-25.

15. In 2005, the District adopted a "retail net metering" program, set forth in its Residential Solar Buyback Service Rider, "to subsidize the economics of [rooftop solar] technology."  Ex. 24 at -607, -611.

16. Under retail net metering, the District credited rooftop solar customers the full retail price of excess electricity they generated rather than the wholesale price the District paid for electricity from other sources. Ex. 25 at-574.

17. Under retail net metering, the District effectively paid twice as much for rooftop solar electricity as it would for electricity on the market. Ex. 14 at -741 to -760; Ex. 25, Ex. 27.

18. The District also provided a direct financial incentive for new rooftop solar customers. That incentive was discontinued in 2014. Ex. 26 at -243.

19. Although the District initially offered these incentives, it made clear its policies toward rooftop solar would eventually need to change. In a public, comprehensive evaluation of its solar incentives conducted in 2006, the District observed that: "[C]rediting the full kWh price of electricity to all on-site, customer-owned generation facilities ... would create an unfair subsidy at the expense of other ratepayers by shifting the cost burden of all or part of the fixed transmission, distribution, and customer service costs—services which the utility must continue to make available to serve customers with on-site generation." Ex. 24 at -607.

20. The District publicly explained nearly a decade ago that "[c]hanges to SRP's Net Metering offerings may occur … in future price processes at the Board's discretion." Ex. 24 at -623. Moreover, the District's Rules and Regulations state that "SRP may change these Rules and Regulations, any Standard Electric Price Plan, any of its Terms and Conditions of Competition, or any other price, fee, charge, minimum, demand charge, rate, credit, or other pricing term at any time." SRP Rules and Regulations § 2.2.1, http://www.srpnet.com/about/pdfx/rulesandregs10042010.pdf.

21. Under traditional residential rate plans, the size of a customer's bill is primarily determined by the volume of electricity the customer consumes in a given month. Under these plans, the District recovers its costs through a small fixed monthly service charge and a per kilowatt-hour (kWh) charge that can vary by the time of day and season of the year. Ex. 14 at –745, -750, -755. Although most of the District's costs are not driven by

1 the volume of electricity consumed, Ex. 14 at -726; Ex. 27 at – 485; Ex. 15 at slide 13, the
2 District's traditional rates adequately recover the District's costs from non-solar customers
3 because on average non-solar customers' usage corresponds with their on-peak demands.
4 Ex. 28 at 111:11-22, 112:6-8, 195:2-5, 216:12-13; Ex. 20 at -949, -951-952; Ex. 15 at slide
5 14.

22. As rooftop solar customers increased in number, the District's concern over the subsidy of rooftop solar customers increased. Ex. 29 at 9; Ex. 30; Ex. 31 at 205:10-25. This concern stemmed from the District's determination—one with which SolarCity's economic expert, Dr. Kalt, agrees—that rooftop solar customers were not covering their cost of service. Ex. 13 at 154:3-12; Ex. 32 at Figures 10A-C, 33A-C (compare revenues to costs); Ex. 27; Ex. 14 at -710, -766; Ex. 33; Ex. 26 at -238; Ex. 15 at slide 17; Ex. 34 at 11:9-12:13, 204:11-20; Ex. 35 at 17:8-15; Ex. 31 at 134:8-14, 205:10-25.

23. This shortfall existed because rooftop solar customers' usage fell by a greater percentage than did their demand. Ex. 36 at -173; Ex. 15 at slide 16. "Usage" measures the total amount of electricity consumed by a customer and is measured in kWhs. "Demand" measures a customer's highest amount of electricity consumed during a given period of time and is measured in kWs. *See* Ex. 15 at 13 (explaining and providing example of demand). Prior to 2015, the District's residential price plans recovered demand-related costs primarily through usage charges. Ex. 20 at -949, -951-952; Ex. 14 at -710, -766; Ex. 15 at slide 14.

24. The District had long recognized that its traditional volumetric rates reflected "imperfect pricing," as applied to rooftop solar customers, and observed that it would eventually "need to adjust its retail tariffs" to ensure adequate recovery of its fixed costs. Ex. 24 at -617, -619.

25. In 2014, the District estimated that it was facing a negative ▉▉▉▉▉ for its solar customers, resulting in ▉▉▉▉▉▉▉▉▉▉▉ during the 2015 fiscal year alone. Ex. 33. The District estimated a shortfall of $51/month for the typical solar customer. Ex. 26 at -238.

26. Meanwhile, cheaper sources of solar generation became available. In November 2014, the District entered into a 21-year agreement to buy the entire output of the Sandstone utility scale solar facility outside of Florence for 5.3 cents per kWh—approximately half the price at which the District was then crediting rooftop solar customers under retail net metering. Ex. 14 at -710.

## THE DISTRICT'S 2014-2015 PRICING PROCESS

27. The District conducted its most recent pricing process in 2014-2015 in conformance with A.R.S. §§ 30-802 and 48-2334. Ex. 37; Ex. 15 at 2.

28. On November 29, 2014, the District advised its residential customers that the District was commencing a ratemaking process, covering all rate schedules, to begin on December 12, 2014. Ex. 38.

29. On December 1, 2014, SolarCity and other stakeholders were given notice by email of the District's upcoming ratemaking proceeding and were offered an opportunity to participate. *See* Ex. 39.

30. The District created a website for the public pricing process, and set up an email address for stakeholders and members of the public to submit questions, comments, or information requests. Ex. 37. The District also set up a public information room containing documents relating to the pricing process. *Id.*

31. On December 12, 2014, the District issued a notice of the public comment sessions, board meetings, and vote on the proposed rate schedules. The notice explained that there would be a Special Board Meeting on February 9, 2015, and identified three additional meetings where interested parties could make presentations and comments. *Id.*

32. On December 31, 2014, SolarCity provided written notice to the District, invoking its statutory rights under A.R.S. §§ 30-802 and 48-2334. Ex. 40.

## THE E-27 RATE SCHEDULE

33. Among the proposed rate schedules was a new plan for customers who chose to install solar panels after December 8, 2014. Ex. 14 at -766 to -767.

34. This new rate plan, called E-27, contains three parts (rather than the traditional two), unbundling the traditional volumetric charge into separate charges for energy usage and demand. Ex. 14 at -727 to -728.

35. The District anticipated that under E-27 a typical solar customer would save about $50/month on his or her bill from the District compared to a non-solar customer, even without a change in behavior, with the potential to save more by changing his or her on-peak demand. Ex. 19 at 15, 16. The District's analysis also showed that some customers would have lower bills under E-27 than they would under the E-26 rate plan, assuming no change in behavior. Ex. 41.

## THE BOARD'S DELIBERATIONS AND APPROVAL OF E-27

36. The Board was informed by members of the District's management, industry consultants, including Ashley Brown, Executive Director of the Harvard Electricity Policy Group; Amparo Nieto, Vice President at NERA Economic Consulting; and Ahmad Faruqui, a principal at the Brattle Group, and the Board's separately retained independent consultant, Dr. John Chamberlin of Sussex Economic Advisors, that the prior rate structures undercharged rooftop solar customers, creating a cross subsidy; that creating a separate customer class for rooftop solar customers is consistent with sound ratemaking practices, and that the new E-27 rate design appropriately addressed the under-recovery of costs from rooftop solar customers. Ex. 42; Ex. 43; Ex. 44; Ex. 21 at -768 to -815; Ex. 45 at -144 to -156; Ex. 46 at -799 to -813; Ex. 47 at -062 to -067; Ex. 21 at -519 to -527, -821 to -827; Ex. 45 at -119 to -135; Ex. 48 at -309 to -325; Ex. 46 at -681 to -684, -813 to -816; Ex. 26; Ex. 49; Ex. 36; Ex. 50; http://www.srpnet.com/prices/priceprocess/pricingfaq.aspx.

37. Counsel and executives for SolarCity and its lobbying group presented SolarCity's opposition to E-27 at two public hearings, Ex. 51, and attended others. *See* Ex. 52 at -441; Ex. 53 at -565; Ex. 21 at -484; Ex. 46 at -658.

38. SolarCity made oral presentations, questioned the District's employees and consultants during interviews conducted by its counsel during the pricing process, and met

1 | with Board members.  Ex. 54 at 64:3-68:1; *see also* Ex. 53; Ex. 21 at -619 to -635; Ex. 46 at
2 | -710 to -714.

3 |     39.    SolarCity did not propose an alternative rate design to E-27 to the Board
4 | during the pricing process.  Ex. 54 at 128:8-128:21.

5 |     40.    SolarCity did not petition for a rehearing of the Board's decision on E-27, *see*
6 | Ex. 54 at 73:9-21, Ex. 46, and 20 days have elapsed since the ratemaking process
7 | concluded, *see id*.

8 |     41.    Exercising its statutory authority, the District's Board modified management's
9 | proposed version of E-27, including modifications SolarCity requested.  Ex. 50 at -397, -
10 | 399; Ex. 46 at -870 to -871; Ex. 54 at 85:19-86:10.  *See* Ex. 9 at -297 to -302.

11 |     42.    Among other changes, the Board allowed existing rooftop solar customers to
12 | remain on their existing rate plans for a period of 20 years instead of the 10 years
13 | management had proposed.  Ex. 9 at -303 to -308.  SolarCity's CEO testified that this "was
14 | an important change."  Ex. 22 at 33:11-17.

**SOLARCITY'S WITHDRAWAL
FROM THE DISTRICT'S SERVICE TERRITORY**

[Paragraphs 43 onward redacted]

47. SolarCity's CEO told the Arizona Republic after it pulled out of the District's service territory: "Strange enough, it actually ends up better for SolarCity . . . . Financially, it's not a bad thing for the company." Exs. 61; 22 at 88:16-89:8, 92:15-17.

### THE DISTRICT HAD NO PRIOR COURSE OF DEALING WITH ROOFTOP SOLAR INSTALLERS

48. The District has never had any course of dealing, agreement, or understanding with any rooftop solar installer concerning rate structures, incentives, or any other terms or conditions of the District's sale of electricity to residential rooftop solar customers or any other customers. Dkt. 39 at ¶ 92 ("SolarCity does not contract directly with SRP to provide systems to consumers."); Dkt. 97 at 10 n.4 ("There is no prior course of dealing 'with SolarCity' as relevant here."). The District's relationship has always been directly with its residential customers. Ex. 14 at -766 to -767.

49. Moreover, because existing rooftop solar customers were grandfathered into the prior rate plans, Ex. 9 at -303 to -308, the District did not alter any prior course of dealing with those customers.

### THE DISTRICT'S RATE CHANGES DID NOT SACRIFICE SHORT-TERM PROFITS, THEY INCREASED THEM

50. The District anticipated that E-27 would increase the revenue received from a typical solar customer by about $50/month compared to the prior E-26 rate plan with "retail net metering," assuming no change in behavior. Ex. 19 at 15.

51. The District estimated that E-27 would collect sufficient revenue from the typical rooftop solar customer to cover their cost of service, including their fair share of grid costs. Ex. 19 at 13-15; Ex. 14 at -766; Ex. 46 at -683; Ex. 21 at -508 to -509.

52. The District projected that the rate plans adopted in the 2014-2015 pricing process would cumulatively generate $109,806,698 in additional revenue, and increase the District's combined net revenue. Ex. 14 at -721, -736.

53. SolarCity's retained expert economist, Dr. Kalt, testified that the District set E-27's price above its marginal costs. Ex. 62 ¶ 93; Ex. 13 at 299:10-14.

54. Dr. Kalt performed no analysis of any alternative rate plan that would increase the District's revenues or profits more than E-27. Ex. 13 at 277:3-278:4.

**CUSTOMERS CONTINUE TO INSTALL ROOFTOP SOLAR IN THE DISTRICT'S SERVICE TERRITORY**

55. Under E-27, the customers continue to install solar panels on their roofs and the District continues to buy excess power generated from those panels. Ex. 14 at -766 to -767.

56. In 2015, dozens of rooftop solar installers continued to operate in the District's service area. Ex. 63 at 224:19-22; Ex. 64.

57. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**SOLARCITY DOES NOT PROVIDE RETAIL ELECTRICITY**

58. The relevant market as SolarCity defines it is the provision of electricity to retail residential, governmental, and businesses consumers. Dkt. 39 at 10.

59. SolarCity does not provide or furnish retail electricity in Arizona. Ex. 67 at 15:9-17; *see also* Ex. 22 at 148:13-16; Ex. 82.

60. To provide retail electricity in Arizona a company must "obtain a certificate" from the Arizona Corporation Commission. A.R.S. §§ 30-803(A), 40-207(A). SolarCity has not applied for or obtained such a certificate: "specific rules adopted by the Arizona Corporation Commission—which regulates companies that produce and sell electricity directly to consumers—expressly prohibit [SolarCity] from doing so." *SolarCity v. Ariz. Dep't of Revenue*, Verified Complaint ¶ 5 ("*SolarCity* Compl."), No. TX 2014-00129 (Ariz. Super. Ct. June 30, 2014).

61. "Since 2006, various energy service, meter reading and meter service providers …have applied to the [ACC] for authorization to sell competitive services in Arizona, but the ACC has not ruled on any of the applications." Ex. 68.

62. The ACC acknowledges that "for all practical purposes, consumers do not yet have a choice of [retail electric] providers." ACC, Frequently Asked Questions, http://www.azcc.gov/ divisions/utilities/electric/faqs.asp (visited May 2, 2016).

## NO EVIDENCE SUPPORTS SOLARCITY'S TORT CLAIMS

63. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

64. SolarCity objected to the District's interrogatory seeking information regarding the alleged damage caused by the alleged intentional interference, stating that the subject was a topic for expert discovery, *see* Ex. 70, yet provided no such expert testimony.

65. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

1  RESPECTFULLY SUBMITTED this 15th day of September, 2016.

<table>
<tr><td>

STEPTOE & JOHNSON LLP
Paul K. Charlton
Karl M. Tilleman
201 East Washington Street, Suite 1600
Phoenix, AZ 85004
Telephone: (602) 257-5200
Facsimile: (602) 257-5299
pcharlton@steptoe.com
ktilleman@steptoe.com

</td><td>

/s/ *Christopher E. Babbitt*
WILMER CUTLER PICKERING HALE AND DORR LLP
Molly S. Boast
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
molly.boast@wilmerhale.com

Christopher E. Babbitt
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
christopher.babbitt@wilmerhale.com

Christopher T. Casamassima
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400
chris.casamassima@wilmerhale.com

*Attorneys for Defendant*

</td></tr>
</table>

# CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Richard J. Pocker

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
William A. Isaacson
Karen L. Dunn

BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Steven C. Holtzman
Sean P. Rodriguez

SHEARMAN & STERLING LLP
535 Mission Street
25th Floor
San Francisco, CA 94105
John F. Cove, Jr.

COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Keith Beauchamp
Roopali H. Desai

/s/*ChristopherE. Babbitt*